Jeremy B. Sporn
Federal Defenders of Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920

Attorneys for the Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
The Honorable SALVADOR MENDOZA, JR.

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br>　v.<br><br>James D. Cloud,<br><br>　　　　Defendant. | Case No. 1:19-cr-2032-SMJ-1<br><br>**Motion to Suppress Defendant's Statements**<br><br>Yakima - With Oral Argument<br><br>March 17, 2020, at 9:30 a.m. |

The defendant, James Cloud, respectfully moves for an order suppressing his post-arrest statements obtained in violation of *Miranda v. Arizona* and his Fifth Amendment right against self-incrimination and due process, and his Sixth Amendment right to counsel. The Yakima County Sheriff Deputy and FBI Special Agent who conducted the interrogation following Mr. Cloud's arrest violated his Fifth and Sixth Amendment rights by both (1) initiating an interrogation, and asking Mr. Cloud questions likely to elicit an incriminating response *prior to* reading him his *Miranda* rights, and then by (2) continuing to attempt to interrogate him after he had clearly and unequivocally invoked his rights to

Motion to Suppress Defendant's Statements

1

silence and to an attorney prior to any questioning. For these reasons, and as discussed below, Mr. Cloud's post-arrest statements must be suppressed.

**Factual Background**

On June 8, 2019, local law enforcement learned of a shooting at a residence on Medicine Valley Road in the outskirts of White Swan, on the Yakama Indian reservation. Shortly thereafter, sheriff deputies encountered a vehicle pulled over on the road, and occupied by several people to the east of the residence. One had been shot and was already deceased, while two of the other occupants were shot, but did not sustain life threatening injuries. At the same time, Yakima County Sherriff Office ("YCSO") deputies and Yakama Nation Tribal Officers investigated the scene at the Medicine Valley residence, and discovered four bodies, all of whom had been shot. Shortly thereafter, deputies learned of another incident that had occurred at another residence on Evans Road, where two unidentified men had carjacked a pick-up truck at gunpoint and drove off.

Working together, Yakima County Sheriff Deputies, and FBI agents came to suspect Donovan Cloud and James Cloud, and came to believe they were responsible in some form for the shootings as well as the carjacking shortly afterwards. They also suspected Morris and Natasha Jackson, who were arrested close to the scene shortly after the initial calls, of some degree of complicity in at least the earlier shootings. They obtained a federal arrest warrant on June 9 for assault with a dangerous weapon, and

Motion to Suppress Defendant's Statements

arrested Donovan Cloud in Oregon that same day. They arrested James Cloud in the early morning hours of June 10 on the Yakama reservation, after a YCSO K-9 attacked him and bit his leg. An ambulance was called, and after receiving medical treatment and being "cleared," he was released back into local custody.

Before being booked into the Yakima County Jail on the warrant, Mr. Cloud (James) was transported to the Yakima County Sheriff Office. He was held in a small interview room there, and handcuffed and shackled at the ankles. YCSO Det. Dan Cypher and FBI Special Agent Ronald "Troy" Ribail entered the room and after introducing themselves, advised Mr. Cloud that his brother, Donovan, is "good to go. He's okay. Donovan? All right? I want you to know that. He's fine. Okay?" Exhibit A[1], at 10:50-10:58. The other agent asks if Mr. Cloud knows where Donovan was picked up, and advises that it was in Oregon. Exhibit A, at 11:03-11:08. Then, Det. Cypher again says that Donovan is "good to go" and indicates that he knows that they were together for a while, and that they are brothers. Exhibit A, at 11:08-11:22. Mr. Cloud acknowledged the remarks, but neither denied nor affirmed that he and Donovan had been together. Det. Cypher then asks Mr. Cloud how he's doing that morning "under

---

[1] Exhibit A is an audio and video recording of the interview, which Mr. Cloud will provide to the Clerk's office as a non-scannable exhibit. The times provided refer to the elapsed time of the recording itself, and not to the actual time of day (which also appears in the video recording as beginning at approximately 8:15 a.m.).

Motion to Suppress Defendant's Statements

3

the circumstances," and asks if James knows "why we're here, right? Why we're all here? Why you're here? Yeah?" Exhibit A, at 11:30-11:45. Mr. Cloud responds, "I heard about Facebook[2]." Exhibit A, at 11:48-11:52. Detective Cypher responds, "You heard about Facebook? That's it?" Exhibit A, at 11:52-11:55.

Detective Cypher then tells Mr. Cloud that they've "got some administrative stuff to do real quick, okay?" Exhibit A, at 12:08-12:12. Detective Cypher read Mr. Cloud the *Miranda* warnings and then asks, "So since you understand all these rights . . . having these rights in mind, do you wish to speak with me, and talk with me some more?" Exhibit A, at 12:25-13:05. Mr. Cloud responds, unequivocally, "I do not." Exhibit A, at 13:05-13:08. Det. Cypher follows up, "No?" And then, Mr. Cloud, again, says, "No." Exhibit A, at 13:08. Detective Cypher responds, "What are you saying? You need to be verbal with me, a little bit, James." Exhibit A, at 13:08-13:15. Mr. Cloud responds, "I would like my lawyer present . . . for any discussion." Exhibit A, at 13:16-13:24. Det. Cypher responds, "Okay" and informs Mr. Cloud that the room is being recorded both audio and video. He then asks, "So you want a lawyer present?" Exhibit A, at 13:33. Mr. Cloud again responds, "Yes, sir." Exhibit A, at 13:35.

---

[2] Before Mr. Cloud's arrest, the Yakama Nation had put out an advisory as to Mr. Cloud on Facebook, that "One Suspect Remains at Large in Reservation Murders." The flyer contained Mr. Cloud's name and booking picture, and states that he "remains at large in the five murders that were committed on the Yakama Reservation on Saturday, June 8, 2019." It indicated that Mr. Cloud "is still being sought by law enforcement agencies [and] is considered armed and extremely dangerous."

Motion to Suppress Defendant's Statements

Det. Cypher responds, "Eh, that's too bad. Because I wanted to hear your side of the story. Cause there's always two sides to every freaking story. You know what I'm saying, man?" Exhibit A, at 13:35-13:43. Mr. Cloud says, "There is." Exhibit A, at 13:45. Cypher says he hoped Mr. Cloud would have wanted to tell them his side of the story. Exhibit A, at 13:45-13:50. The interview should have been terminated at least at that point, if not earlier.

Instead, however, it continues for some time, as both agents press Mr. Cloud further about what he's charged with, the events that allegedly occurred, and what they were hoping for in speaking with him. Exhibit A, beginning at 13:50. They also discuss how Morris and Natasha Jackson were also arrested. For example, "When you and your brother went to that house and you guys took that truck, remember the 15-year-old that you -- that your brother held a gun to? Yeah, and you had the shotgun? You're going to be charged with that, okay? And you're also going to be charged with five counts of homicide, Murder One. That's why I was wanting to -- that's why I was hoping, James, that you were going to talk to me so I could hear your side of the story, man, all right? That's what I was hoping." Exhibit A, at 14:25-15:00.

Det. Cypher again (for the fourth time) tells Mr. Cloud he'd like to hear James' side of the story, and Special Agent Ribail states, "I mean, as you can guess, some people are talking, and some people aren't. But, we've heard one side of the story, but maybe yours is different, you know. They might be lying to us." Exhibit A, at 16:18-16:36.

Motion to Suppress Defendant's Statements

5

Detective Cypher then states, "Yeah. I actually heard, and also, throughout this whole investigation over the last few days, I actually heard you're the only one that, you seem to stand out as the one that actually had some compassion. You had a conscience, you have a soul, and you have a heart, okay? So –" Exhibit A, at 16:36-16:54. To reiterate, all of this colloquy occurs *after* Mr. Cloud has invoked his *Miranda* rights and asked for an attorney. Exhibit A, at 13:16-13:36.

      Mr. Cloud's responses are typically flat, monosyllabic and brief. His demeanor appears consistent with those responses, with little in the way of animation or affect. Often, he is silent, quiet, or merely nods his head or says, "Hm-mm," or simply mumbles an unintelligible response. The unwritten subtext of the interview is that having believed Mr. Cloud to be complicit or responsible in some way for the murders of five people, the shooting of several others, and carjacking at gunpoint, law enforcement attempted to exploit what they believed to be Mr. Cloud's need to unburden himself and the weight of his moral transgressions. In other words, at least according to the officers' thinking, having carried around the guilt of what had transpired on June 8, both at the Medicine Valley residence and during the later carjacking, Mr. Cloud would have wanted to speak with them and incriminate himself in an effort to salve his conscience. This explains the interview's detour into the metaphysical, and Detective Cypher's reference to Mr. Cloud's soul and heart. Exhibit A, at 16:47-16:52.

Motion to Suppress Defendant's Statements

It takes no great insight into law enforcement tactics to appreciate the strategy behind their efforts[3]. It is straight out of the *Reid* playbook. *See generally United States v. Preston*, 751 F.3d 1008, 1023-24 (9th Cir. 2014) (discussing and questioning agents' employment of the *Reid* method of interrogation); Douglas Starr, *The Interview: Do Police Interrogation Techniques Produce False Confessions?*, THE NEW YORKER, Dec. 2, 2013. ("Having headed off denials, you steer the subject toward a confession by offering a face-saving alternative. The process is called "minimization"—downplaying the moral consequences of the crime without mentioning the legal ones."). Assuring a suspect that they merely want to "get his side of the story" and that they've heard that he stands out for having compassion, and is less culpable than others effects an unsubtle psychological coercion to overcome Mr. Cloud's unwillingness to speak with them. That Mr. Cloud nevertheless declined to speak with them further, or that the responses he did provide were minimal, does not mean that his statements become any more admissible or that their tactics should be condoned or overlooked.

---

[3] Law enforcement's tactics to evade *Miranda* and induce a confession are seen even more clearly in their attempts to interview Mr. Cloud's co-defendant, Donovan Cloud, in which they confront him with apparent evidence of guilt, and inform him of his opportunity to "get ahead" of the charges by offering "his side of the story," despite a clear request for an attorney. As to whether their efforts with respect to Donovan Cloud amount to a *Miranda* violation as well, it will have to await a motion by Donovan's counsel.

Motion to Suppress Defendant's Statements

7

**Legal Principles**

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." For its part, the Sixth Amendment and the due process clause provide the "assistance of counsel for [a] defense." These guarantees animate the prophylactic holding in *Miranda v. Arizona*, which now occupies a fundamental, hallowed part of the constitutional firmament: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. . . ." *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

For *Miranda* rights to attach, the suspect must be in custody, and must be interrogated by law enforcement. *See United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Formal arrest plainly satisfies the custodial requirement. *See id.* As to the interrogation requirement, the Court looks to all circumstances to determine whether law enforcement's query was "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). For example, a defendant who spontaneously blurts out something incriminating *not* in response to interrogation, is not entitled to suppression of the statement. However, where these principles are violated, the remedy is suppression of any statements made. *See Miranda*, 384 U.S. at 444-45 (establishing that if officers fail to provide *Miranda* warnings, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of

Motion to Suppress Defendant's Statements

the defendant"); *Chavez v. Martinez*, 538 U.S. 760, 790 (2003); *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002). Further, the suspect should be *Mirandized* not in midstream, but at the inception of the interrogation. *See Alvarez v. Gomez*, 185 F.3d 995, 997 (9th Cir. 1999) ("Under *Miranda*, a person in custody must be informed before interrogation that he has a right to remain silent and to have a lawyer present.").

The law is clear that once a defendant invokes his right to remain silent or to an attorney, any questioning must cease. *See Miranda*, 384 U.S. at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease"); *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). Not peter out or trickle down, but stop altogether. This requirement is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights[.]" *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). It helps ensure that law enforcement does not "take advantage of the mounting coercive pressures of prolonged police custody." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010). *Edwards* reflects a "bright-line rule" which expresses the "relatively rigid requirement that interrogation must cease through clear and unequivocal guidelines to law enforcement." *Rodriguez v. McDonald*, 872 F.3d 908, 925 (9th Cir. 2017) (quoting *Arizona v. Roberson*, 486 U.S. 675, 683 (1988)).

To obtain the prophylactic and remedial protections that the rule affords, a suspect must invoke his *Miranda* rights in clear and unambiguous fashion. *See Berghuis v.*

Motion to Suppress Defendant's Statements

*Thompkins*, 560 U.S. 370, 381 (2010) (finding, curiously, that a suspect's silence does not sufficiently invoke his right to remain silent and terminate an interview); *Davis v. United States*, 512 U.S. 454, 459-62 (1994) (finding that suspect's remark, "Maybe I should talk to a lawyer," was not a request for counsel or a clear assertion of the right to counsel, and thus did not mandate that the interrogation cease). In other words, an interrogation does not have to end right away if law enforcement legitimately needs to follow up on whether a suspect actually does wish to invoke his rights to silence or to an attorney. *See, e.g.*, *Davis*, 512 U.S. at 461 ("[W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."). "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62. At the same time, however, follow-up clarification should not be used as a pretext to continue to prod a suspect that already has clearly indicated he wishes to speak no further. Sometimes, as here, there is no need for any clarification.

Motion to Suppress Defendant's Statements

10

## **The Court Should Suppress Mr. Cloud's Statements**

This case deals with a relatively straightforward application of the aforementioned rules and principles. Merely reciting the applicable principle is to suggest an obvious *Miranda* violation. First, there is no doubt that Mr. Cloud, who was formally under arrest at the time of the interview, was in custody for *Miranda* purposes and thus entitled to such protections.

Second, the officers' questions, prior to reading Mr. Cloud his *Miranda* rights, amounts to questioning likely to elicit an incriminating response – including updating Mr. Cloud on Donovan Cloud's whereabouts, asking for James' knowledge on where Donovan was apprehended, indications that they had been together and inviting a response, asking how Mr. Cloud was doing generally and "under the circumstances[4]," and asking about James' belief as to why he was arrested or in custody. None of these things should have been the subjects of colloquy before Mr. Cloud was *Mirandized*. This initial line of questioning before reading *Miranda* rights was not routine background or booking information, nor was it the kind of inquiry "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. In the context of *this* investigation – where they believed that Mr. Cloud was responsible in some manner for five murders, a carjacking

---

[4] Even if their motives were pure, and they asked the question solely out of solicitude for Mr. Cloud's well-being, any similarly vague inquiry could prompt an incriminating response.

Motion to Suppress Defendant's Statements

and putting a gun to the head of a child – any non-perfunctory question could prompt an inculpatory answer. *See, e.g.*, *United States v. Salgado*, 292 F.3d 1169, 1172-73 (9th Cir. 2002) (noting that reason for defendant's arrest and presence in custody, as well as nature of questions asked, collectively inform the determination of whether suspect undergoes interrogation for *Miranda* purposes).

When Detective Cypher and Special Agent Ribail got around to reading Mr. Cloud his *Miranda* rights, their prefatory remark was also problematic. The question of reading Mr. Cloud his rights is addressed as an "administrative" nuisance or nicety, or some trifling red tape to be dispensed with, before getting to the heart or substance of the interview. But as this Court has reminded, in the course of finding a *Miranda* violation and in response to law enforcement's description of the inculpatory portion of an interrogation as the "meat and potatoes" of the interview:

> Particularly concerning to the Court is [one agent's] statement that he and [another agent] only called [a third agent who spoke Spanish] once they got to the "meat and potatoes" of the interview to ensure they understood the information Defendant provided. This statement implies that the *Miranda* warning portion of an interview is somehow less important than obtaining information from Defendant. It implies that advising a defendant of his *Miranda* rights is a procedural hurdle for law enforcement to overcome before getting to the heart of an interview. This is not so. A defendant's *Miranda* rights are part and parcel of an investigatory interview's "meat and potatoes."

*United States v. Gonzalez-Pena*, Case No. 16-cr-2086-SMJ, Order Suppressing Defendant's Post-Arrest Statements, ECF Document No. 76, at *14 (E.D. Wash. July 19, 2017).

Motion to Suppress Defendant's Statements

In any event, once Detective Cypher read Mr. Cloud his *Miranda* rights and asked if he understood, Mr. Cloud plainly and unequivocally asserted his right to remain silent and to decline to answer law enforcement questions. Exhibit A, at 13:05-13:35. There was no ambiguity, and there was nothing the deputies needed to clarify or on which to follow up. He could not have been more clear, in saying "I do not" when asked whether he wished to speak with them, then saying "No" when asked again. The same goes as for Mr. Cloud's unambiguous statements that he would not speak to them without a lawyer. The interview should have been over at that point.

Instead, they continued to badger him, with repeated requests for his side of the story, references to the alleged events [i.e., "when you and your brother went to that house and you guys took the truck, remember the 15 year old that you, that your brother held a gun to? Yeah, and you had the shotgun?"], appeals to his compassion, conscience, soul and heart, and assurances that Detective Cypher would not "blow smoke up your ass." Exhibit A, at 13:36-17:45. We are not asking for sympathy, but only for the remedy owed to Mr. Cloud under the Constitution, *Miranda* and progeny: suppression of his post-arrest statements.

Although Mr. Cloud's statements may not appear (or even be) particularly inculpatory, the extent or degree of how incriminating the statements in fact are, does not determine whether they must be suppressed. His statements do not amount to a confession by any means, but it does not matter. A *Miranda* violation is a *Miranda*

Motion to Suppress Defendant's Statements

violation, no matter the actual substance or tenor of the defendant's statements. And his answers were in response to questions that should not have been asked, in light of James Cloud's clear invocation of his rights to silence and an attorney.

Further, at trial, the government must not be permitted to comment on Mr. Cloud's silence or his requests for an attorney. Such statements would plainly burden the exercise of such rights and would risk diluting their meaning and any benefit. This is so both as to post-*Miranda* silence, *see Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976) (finding that prosecution argument highlighting defendant's silence violates due process because right to remain silent carries "implicit assurance" that it will not create a penalty), as well as his pre-*Miranda* silence, *see United States v. Whitehead*, 200 F.3d 634, 638 (9th Cir. 2000) (finding unconstitutional government's commentary on defendant's silence, which would "act as an impermissible penalty on the exercise of the . . . right to remain silent"). Nor should the government be permitted to elicit evidence of Mr. Cloud's silence in the guise of showing his post-arrest "demeanor" to have been quiet and taciturn, or otherwise. The Ninth Circuit rejects that distinction in no uncertain terms:

> Whether the government argues that a defendant remained silent or describes the defendant's state of silence, the practical effect is the same – the defendant's right to remain silent is used against him at trial. To hold otherwise would circumvent the constitutional protection against self-incrimination: introducing evidence at trial that the defendant remained silent in the face of incriminating evidence would violate the *Fifth Amendment*, but describing what a defendant looked like in remaining silent would not. This distinction would undermine our well-established rule that the government may not use evidence of a defendant's post-arrest, post-

Motion to Suppress Defendant's Statements

14

*Miranda* silence at trial, for impeachment or during its case-in-chief, because such evidence penalizes the exercise of a constitutional right.

*United States v. Velarde-Gomez*, 269 F.3d 1023, 1032 (9th Cir. 2001) (citing authorities). In short, at trial, the jury should hear neither Mr. Cloud's statements (unless he elects to testify) nor of his silence during interrogation.

### Conclusion

We recognize that an extremely serious offense had occurred, and that law enforcement, rightly or wrongly, suspected Mr. Cloud's involvement in it. But the severity of the crime investigated does not determine whether or how vigorously *Miranda* applies, or provide a justification to circumvent it. There was no ongoing emergency or continuing criminal conduct, and Mr. Cloud was the last of the suspects to be apprehended. Thus, no viable exception to *Miranda*'s prophylaxis was in play. Because Mr. Cloud was in custody and interrogated before the *Miranda* warnings, and because the interrogation also continued after he had unequivocally invoked his rights to silence and to an attorney, all post-arrest statements and evidence of silence and demeanor should be suppressed.

Motion to Suppress Defendant's Statements

Dated:   February 18, 2020

                      Respectfully submitted,

                      <u>S/Jeremy B. Sporn</u>
                      Jeremy B. Sporn, NY 4779310
                      Attorneys for James D. Cloud
                      Federal Defenders of
                      Eastern Washington and Idaho
                      306 East Chestnut Avenue
                      Yakima, Washington 98901
                      (509) 248-8920
                      Email:  Jeremy_Sporn@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to THOMAS J. HANLON and RICHARD C. BURSON, Assistant United States Attorneys.

                      <u>S/Jeremy B. Sporn</u>
                      Jeremy B. Sporn, NY  4779310
                      Attorneys for James D. Cloud
                      Federal Defenders of
                      Eastern Washington and Idaho
                      306 East Chestnut Avenue
                      Yakima, Washington 98901
                      (509) 248-8920
                      Email:  Jeremy_Sporn@fd.org

Motion to Suppress Defendant's Statements