John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for James D. Cloud

1
2
3
4
5
6
7

## United States District Court
## Eastern District of Washington
### Honorable Salvador Mendoza, Jr.

| | |
|---|---|
| United States of America, | No. 1:19-CR-2032-SMJ-1 |
| Plaintiff, | Motion to Suppress J.V.'s Tainted Identification (Correction)[1] |
| v. | |
| James Dean Cloud, | Yakima—With Argument |
| Defendant. | March 17, 2020 – 9:30 a.m. |

---

[1] This filing fixes a typo on page 2, line 1.

# Table of Contents

I.      Introduction ................................................................................................... 1

II.     Background ..................................................................................................... 6

        A.      In 2017, DOJ updated its best-practices for administering line-ups. ...................... 6

        B.      Many of DOJ's best-practices for administering line-ups are contained in the Yakima County Sheriff's Office's policies. ............................................. 8

        C.      These policies applied when police responded to a carjacking-in-progress and took statements from four witnesses. ................................................. 9

                1.      M.V. saw little. ...................................................................... 9

                2.      S.V. saw more. ....................................................................... 9

                3.      N.V. saw even more. ............................................................. 10

                4.      J.V. saw the most, getting good looks at both carjackers as he negotiated with them over which vehicle to take. ....................... 11

        D.      The following day, police arranged for the four witnesses to view line-ups. No one identified James Cloud. .............................................. 12

                1.      Line-Up 5032 (Donovan Cloud) ............................................. 12

                2.      Line-Up 5033 (James Cloud) ................................................. 13

                3.      Line-Up 5034 (Morris Jackson) ............................................. 14

                4.      Line-Up 5035 (Natasha Jackson) ........................................... 16

        E.      After four witnesses non-ID'd James Cloud, YCSO issued an inflammatory "Wanted" poster. .................................................................. 16

        F.      J.V. viewed the "Wanted" poster, contacted police, and said "that's the guy," reversing his non-ID from the line-up. ........................................ 17

        G.      Authorities notified J.V. about James Cloud's initial appearance, enabling J.V. to watch the U.S. Marshals escort James Cloud in (and out) of the courtroom. In shackles. ..................................................................... 18

        H.      Police violated policy when administering line-ups to J.V. ................................ 19

                1.      Police failed to record the line-up. ......................................... 19

2.    Police failed to document the line-up in detail. ...................................20

3.    Police failed to administer a blind line-up.......................................22

4.    Police failed to caution J.V. against outside research. ..............................23

I. An eyewitness ID expert reviewed this case. She identified several problems. ............23

III.    Discussion........................................................................24

A.    The Court should apply the *Manson* test...............................................27

1.    The FBI's failure to follow policy constitutes police misconduct............27

2.    Police committed misconduct by issuing a "Wanted" poster that "calls out" J.V.'s failure to select James Cloud. ................................28

B.    Applying *Manson*, the Court should exclude J.V.'s "ID," which occurred after viewing a "Wanted" poster. ...................................................30

1.    J.V.'s online show-up was unnecessarily suggestive. ................................30

2.    J.V.'s follow-up ID using the Wanted poster is unreliable. ........................34

i.    Each *Biggers* factor shows J.V.'s follow-up ID is unreliable. .........34

ii.    J.V. explained-away his initial non-ID because James Cloud's Wanted poster was a "better representation" of him. Not so. ......36

iii.    The police's policy violations augment the unreliability of J.V.'s follow-up ID using the Wanted poster. ...........................38

iv.    Courts exclude unreliable IDs like these. ......................................38

C.    If the Court declines to apply *Manson*, then it should exclude J.V.'s unreliable ID under Rule 403. ..........................................................42

IV.    Conclusion........................................................................43

# I.    Introduction

Mistaken eyewitness identification "is the 'single greatest source' of wrongful convictions in the United States," and is "responsible for more wrongful convictions than all other causes combined."[2] Its pernicious effect on an accused's right to a fair trial is attributed to not only its unique unreliability, but also its impact on a jury—an impact so powerful that, even *after* jurors are "made aware of the potential weaknesses," a courtroom identification "remains quite compelling," as there "is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'"[3] These due process dangers are on display here.

On June 8, 2019, police responded to an armed carjacking by two individuals at J.V.'s residence. On arrival, police took statements from each family member (4 in total) and returned the next day to administer line-ups containing possible suspects. Police crafted these line-ups not based on what witnesses had described, but rather based on four individuals police already had in-mind: 1) Donovan Cloud; 2) James Cloud; 3) Morris Jackson; and 4) Natasha Jackson.

---

[2] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1, 10-11 (2019).

[3] *Id.* at 11 (emphasis in original) (citation omitted).

By crafting the line-ups this way, police violated long-established line-up policy. And this policy violation wasn't the only one. Police also failed to 1) record the line-up, 2) document the line-up's administration in detail, 3) administer a blind line-up, and 4) caution the witnesses against speaking to each other or performing online research. These policies help ensure witnesses aren't nudged—explicitly or implicitly—towards picking individuals police think is "their guy." When these policy protections aren't in place, a line-up's potential for suggestibility increases.

Even with all these policy violation creating a heightened risk for suggestibility, each family member reviewed the line-up containing James Cloud—and *no one* selected him. To the contrary, both parents (J.V. and N.V.) described physical features that excluded James Cloud. Worse, after identifying Donovan Cloud as perpetrator #1, the parents noted it was Morris Jackson who looked most similar to perpetrator #2—not James Cloud.

After police failed to obtain an ID from the family on "their guy," they constructed a "Wanted" poster that included a booking photo of James Cloud in an orange jail jumper. The poster stated "due to misidentification," [read: the family's inability to select him] James Cloud remains "at-large in reservation murders," referring to him as "armed and extremely dangerous." The Yakima County

Sheriff's Office published the poster online, and it was re-published by the Yakama Nation on its official government Facebook account.

Police never cautioned J.V. to avoid online research—again violating policy. So, lacking a warning against performing outside research, J.V. viewed the Wanted poster, read James Cloud was still at-large due to *his* misidentification, and promptly contacted police to say he was "100% sure" James Cloud was perpetrator #2. J.V. attributed his initial non-ID to a poor line-up picture, and said James Cloud's jail-jumpsuit photo was "a better representation" of perpetrator #2.

Hardly. The photos police used in the line-up and Wanted poster are strikingly similar portrayals of James Cloud in age, hairstyle, and facial hair—all the way down to his unique goatee and mustache. The true differences between the photographs were what surrounded them: in the line-up photo, nothing; in the Wanted poster photo, James Cloud wearing a jail jumper, identified as a suspect in five murders, and labeled as armed and extremely dangerous.

But the taint on J.V.'s "ID" didn't end there. The following month, J.V. appeared at James Cloud's arraignment and watched the U.S. Marshals escort him into the courtroom in shackles while a federal magistrate arraigned him on charges of carjacking J.V.'s vehicle. In J.V.'s eyes, as soon as he saw James Cloud enter a

federal courtroom in a prison jumper and chains, the link between James Cloud and perpetrator #2 had the imprimatur of the federal courts.

Now the United States wants J.V. to testify at James Cloud's trial, point the finger at him, and say "That's the one!"—even though J.V. couldn't do that immediately after the carjacking, and could do so only after seeing James Cloud's Wanted poster. James Cloud respectfully asks the Court to exclude J.V.'s expected in-court ID for the following reasons:

**First,** J.V.'s exposure to a police-issued Wanted poster published on a government website was a *de facto* show-up (i.e., showing a witness only one person—the suspect), and show-ups are a "widely condemned" practice that is "inherently suggestive." *See U.S. v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) ("As the Supreme Court has acknowledged, a show-up procedure is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime."); *see also Stovall v. Denno*, 388 U.S. 293, 302 (1967) (recognizing that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up, has been widely condemned."). That show-up meets part one of the two-part due process test to exclude purported eyewitness IDs. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

1    **Second,** this unnecessarily-suggestive show-up is unreliable: "reliability is the

2    linchpin in determining the admissibility of identification testimony . . . ." *See*

3    *Manson*, 432 U.S. at 114. J.V. had ample opportunity (roughly 10 minutes) and

4    excellent conditions (late-afternoon on a sunny, summer day) to view both

5    carjacking perpetrators. He readily selected Donovan Cloud as perpetrator #1 (he

6    teared up upon seeing Donovan Cloud's line-up photo, a testament to his viewing

7    opportunity), but failed to select James Cloud as perpetrator #2 (even though he

8    spent more time interacting with perpetrator #2 during the carjacking). This ample

9    viewing opportunity, coupled with police violating multiple best practices on line-up

10    administration (which only *increased* the chances J.V. would select James Cloud),

11    cement J.V.'s initial non-ID as anything but. That unreliability meets part two of the

12    due process test. *See Manson*, 432 U.S. at 114.

13    **Third,** courts regularly exclude in-court IDs that are based on initial non-IDs,

14    followed by a tainted circumstance that causes the witness to reverse course. *See,*

15    *e.g., U.S. v. Emanuele*, 51 F.3d 1123 (3d Cir. 1995) (holding an in-court ID by an

16    eyewitness who could not recognize defendant in a pretrial photo array, coupled

17    with a highly-suggestive viewing of the defendant in conditions "reeking of

18    criminality"—U.S. Marshals escorting him by the witness in shackles—was

19    unreliable and inadmissible). James Cloud asks this Court to do nothing unusual.

## II.    Background

For the Court to appreciate the significance of the facts surrounding J.V.'s non-ID and subsequent reversal, it is helpful to first understand the policies governing line-ups—that is, what police are supposed to do. This background begins with those policies, then pivots to what happened before, during, and after the line-up at issue.

### A.    In 2017, DOJ updated its best-practices for administering line-ups.

On January 6, 2017, then-Deputy Attorney General Sally Yates released a nationwide memo to all law enforcement officers and prosecutors on eyewitness identifications.[4] In that memo, Yates acknowledged DOJ had last addressed best-practices in 1999, and "[r]esearch and practice have both evolved significantly since then."[5] So, after a year of working with experts, "including prosecutors, law enforcement personnel, and social scientists," DOJ issued new "procedures for the administration of photo arrays."[6] And while Yates stated these new procedures are "not a step-by-step description of how to conduct photo arrays," she nevertheless directed all heads of law enforcement to "review these procedures and, to the extent necessary, update their own internal policies to ensure that they are

---

[4] http://bit.ly/EyewitnessIDMemo, last accessed on February 18, 2020.
[5] http://bit.ly/EyewitnessIDMemo at 1, last accessed on February 18, 2020.
[6] *Id.* at 2.

Motion to Suppress
– 6 –

consistent with the procedures described in this document."[7] In effect, the memo served as a soft-directive "designed to promote sound professional practices and consistency" for DOJ's law enforcement agencies.

DOJ's memo lists numerous best practices, but nine are relevant here:

| Department of Justice – Best Practices for Line-Up Administrations | | |
|---|---|---|
| # | Best Practice | Source |
| 1 | Line-up fillers (i.e., non-suspect photos) should generally fit the witness's description of the perpetrator. | Policy 3.2 |
| 2 | Line-ups should be administered "blind" (i.e., the individual administering the line-up shouldn't be involved in the investigation or know what the suspect looks like). | Policy 5.1 |
| 3 | In the rare circumstances where a blind administration isn't feasible, the administrator should document why. | Policy 5.4 |
| 4 | If a witness recognizes someone, then the administrator should inquire about the witness's level of confidence in the identification. | Policy 6.3.3 |
| 5 | If the witness doesn't recognize someone, then the administrator should advise the witness the investigation will continue. | Policy 6.3.4 |
| 6 | The administrator should tell the witness not to assume the administrator knows who committed the crime. | Policy 6.3.5 |
| 7 | The administrator should instruct the witness not to discuss the line-up procedure with any other witnesses. | Policy 6.3.7 |
| 8 | The identification—and any statement of confidence—should be well-documented (by video, audio, or detailed notes). | Policy 9.1.1 Policy 9.1.2 |
| 9 | The administrator should also document the elapsed time, presentation method, everyone present, and any other facts to put events in context. | Policy 9.3 |

---

[7] *Id.* at 2.

These policies build on DOJ's existing line-up procedures, *Eyewitness Evidence: A Guide for Law Enforcement*, which direct police to tell witnesses "to **avoid** contact with the media or **exposure to media accounts concerning the incident**."[8]

These policies apply to all DOJ law enforcement agencies, including FBI Special Agent Ronald Ribail, who helped administer the line-ups here.

**B.    Many of DOJ's best-practices for administering line-ups are contained in the Yakima County Sheriff's Office's policies.**

YCSO Policy 603 sets forth guidelines for administering line-ups[9] and mirrors many of the best-practices from DOJ, including the following:

| Yakima County Sheriff's Office – Policies for Line-Up Administration | | | |
|---|---|---|---|
| # | Policy | Source | Also DOJ Best Practice? |
| 1 | Any line-up should be thoroughly documented. | 603.8 | Yes (DOJ 9.3) |
| 2 | Witnesses should be told not to discuss the line-up administration with other witnesses. | 603.5 | Yes (DOJ 6.3.7) |
| 3 | Whenever feasible, the line-up administration should be audio or video recorded. | 603.5 | Yes (Policy 9.1.1) |
| 4 | When practicable, the line-up administrator should not be involved in the investigation [translation: perform blind line-ups], and "[i]n no case should the member presenting the line-up to a witness know which photograph or person in the line-up is being viewed by the witness." | 603.6 | Yes (Policy 5.1) |

---

[8] http://bit.ly/OriginalDOJEyewitnessPolicies, last accessed on February 18, 2020 (emphasis added).

[9] *See* Exhibit A, YCSO Policy 603.

These policies apply to all YCSO employees, including Detective Dan Cypher, who helped administer the line-ups here.

**C.    These policies applied when police responded to a carjacking-in-progress and took statements from four witnesses.**

At 4:49 p.m. on June 8, 2019, a woman called 911 to report a carjacking-in-progress at her house. Three police officers[10] responded, arriving nine minutes later, at approximately 4:58 p.m. They found four witnesses: 1) M.V. (son); 2) S.V. (son); 3) N.V. (mother); and 4) J.V. (father). Police secured the scene and collected written statements from each.

**1.    M.V. saw little.**

M.V. was looking out the kitchen door towards the backyard when he saw "a guy with longish black hair" holding a gun to his brother's temple. The gun was black, but not a revolver. M.V. ran to alert his father about the situation, arriving at the same time as his mother. His mother told him to hide under the bed until police arrived. He did so and observed nothing else.

**2.    S.V. saw more.**

S.V. was in the backyard when a "skinnier guy" entered the backyard, placed

---

[10] Those officers: YCSO Deputy Austin Taylor, YCSO Deputy J. Hinze, and Yakama Tribal Police Officer Anthony Oaks.

a pistol next to his head, and grabbed his t-shirt to prevent him from running. As the skinny guy escorted S.V. around the house, they encountered another man walking into the garage with a shotgun in one hand and a machete in the other. The skinny guy instructed the shotgun-and-machete-toting man to "Get the keys, Vance!!!"

S.V. saw "Vance" approach his father (J.V.) for the car keys. J.V. provided him with keys to a van, which the skinny guy refused. He didn't want van keys; he wanted keys to the Chevrolet pick-up parked in the driveway. While J.V. went inside to exchange keys, he asked the two men to release S.V. The skinny man refused, but agreed to let S.V. ride in the truck's bed when they left.

After the skinny guy obtained the truck keys, he entered the truck (driver's seat), "Vance" entered as well (back seat), and S.V. climbed into the truck-bed. As the truck pulled away, S.V. jumped free. Besides describing perpetrator #1 as skinny, S.V. offered few other details regarding the two men.

### 3.    N.V. saw even more.

N.V. was in the backyard when an armed man entered her backyard (with a gun pointed at her son's head) and demanded keys to a vehicle. She said "anything you need."

N.V. ran inside, grabbed her husband, and called 911 while her husband retrieved the car keys. She offered no description of "Vance," but described the

man with the pistol as "taller than [her] son," with darker skin, and a "skinny nose at the bridge that was wide at the bottom of the nose."

> **4.    J.V. saw the most, getting good looks at both carjackers as he negotiated with them over which vehicle to take.**

J.V. was installing bathroom tile when N.V. entered in a panic and said a man was outside and holding a gun to S.V.'s head. J.V. dropped everything, ran into the garage, and encountered the shotgun-and-machete-toting man, who appeared "apoligectic [sic] and in a state of shock." Nearby, a man "2-3 inches taller than [his] son" held a pistol, which was pointed at S.V.'s head. That man demanded keys to a vehicle.

J.V. ran inside, grabbed the first set of keys he could find (to their van), and returned to the garage. The shotgun-and-machete-toting man accepted the keys, but the man with the pistol refused them, saying he wanted the keys to the truck instead. J.V. went back inside to grab the truck keys, this time followed by the man with the shotgun.

J.V. retrieved the truck keys, handed them to the shotgun-and-machete toting man, who in turn handed them to the man with the pistol. The two men then approached the truck and, as the man with the shotgun was about to climb into the rear seat, he dropped the machete, accidentally setting off the van's car alarm. At

this point, the man with the pistol became more agitated. The man with the shotgun turned off the car alarm, retrieved his machete, and finished climbing inside the truck.

The man with the pistol directed S.V. to climb into the truck's bed. After S.V. did so, the man with the pistol climbed into the driver's seat and started to pull away. As he did so, J.V. yelled for his son to leap from the truck. He did so, and the truck drove away while J.V. and his family waited for police to arrive.

**D.    The following day, police arranged for the four witnesses to view line-ups. No one identified James Cloud.**

On June 9, 2019, two of the lead investigating officers—FBI Special Agent Ribail and YCSO Detective Cypher—arrived at the family's home to administer line-ups of potential suspects. Police did not prepare these line-ups using the family's description of the suspects (in part because the family provided few details, and police didn't follow up for more). Instead, police prepared the line-ups based around suspects they had in mind. Each witness viewed the same four line-ups.

**1.    Line-Up 5032 (Donovan Cloud).**

The first line-up contained six photographs, including Donovan Cloud:[11]

---

[11] Note: although these 6 photos appear together (i.e., as a 6-pack of photos on the same page), these photos were provided separately in discovery, implying the witnesses viewed one photo-per-page. Because police failed to document the line-ups in detail, it is unclear whether these photos

Motion to Suppress
– 12 –



M.V. viewed this line-up and didn't identify anyone. S.V. viewed this line-up and didn't identify anyone, but reviewed photograph #6 (Donovan Cloud) "for a long period of time." N.V. viewed this line-up and didn't identify anyone. J.V. viewed this line-up and, after reviewing photograph #6 (Donovan Cloud), became "visibly shaken," "his eyes teared up," and said this was the individual who held a gun to his son's head.

### 2. Line-Up 5033 (James Cloud).

The second line-up contained 6 photographs, including James Cloud: [12]

were viewed simultaneously (i.e., the line-up administrator laid out all 6 photos at once), or sequentially (i.e., the line-up administrator laid out each photo, one-at-a-time).

[12] *See* Footnote 10.

M.V. viewed this line-up and didn't identify anyone. S.V. viewed this line-up and didn't identify anyone. N.V. viewed this line-up and didn't identify anyone. J.V. viewed this line-up and, when he looked at photograph #5 (***not*** James Cloud), noted the shotgun-and-machete-toting man had "rounded cheeks" like this man.

### 3.    Line-Up 5034 (Morris Jackson).

The third line-up contained 6 photographs, including Morris Jackson: [13]

---

[13] *See* Footnote 10.



N.V. said one of perpetrators "looked similar" to Morris Jackson.

Morris Jackson

M.V. viewed this line-up and didn't identify anyone. S.V. viewed this line-up and didn't identify anyone. N.V. viewed this line-up and, while she didn't identify anyone, she noted #4 (Morris Jackson) "look[ed] similar" to one of the men. J.V. viewed this line-up and, like his wife, didn't identify anyone, but noted "the man holding the shotgun had similar eyes to, but more facial hair than," #4 (Morris Jackson).

### 4.    Line-Up 5035 (Natasha Jackson).

The fourth line-up contained 6 photographs, including Natasha Jackson: [14]



Natasha Jackson

Each witness viewed this line-up and didn't identify anyone.

### E.    After four witnesses non-ID'd James Cloud, YCSO issued an inflammatory "Wanted" poster.

At 5:00 p.m. on the same day, June 9, 2019, YCSO issued a bulletin advising

the public that, "***due to misidentification,***" one suspect (James Cloud) remained at-

large. The release included a booking photo:

---

[14] *See* Footnote 10.



Confederated Tribes and Bands
of the Yakama Nation

Established by the
Treaty of June 9, 1855

FOR IMMEDIATE RELEASE – JUNE 9, 2019 (5:00 pm)

*UPDATED INFORMATION*

### ONE SUSPECT REMAINS AT LARGE IN RESERVATION MURDERS

TOPPENISH, WA – Due to misidentification, one suspect remains at large in the five murders that were committed on the Yakama Reservation on Saturday, June 8, 2019. James Cloud (07/08/1983), who is pictured below, is still being sought by law enforcement agencies. James is considered armed and extremely dangerous, if you see this subject do not approach him, and call 911. If you know his whereabouts please call 911 immediately.



**F.     J.V. viewed the "Wanted" poster, contacted police, and said "that's the guy," reversing his non-ID from the line-up.**

Shortly after the bulletin went live (the same day), SA Ribail and Detective Cypher were near J.V.'s home searching for evidence when J.V. asked to speak with them. J.V. advised police he saw a Facebook post from the Yakama Nation containing Mr. Cloud's "Wanted" poster, and was "100% sure" this was

perpetrator #2, claiming this picture "better represented" the shotgun-and-machete-toting man.

### G. Authorities notified J.V. about James Cloud's initial appearance, enabling J.V. to watch the U.S. Marshals escort James Cloud in (and out) of the courtroom. In shackles.

Over a month later, on July 18, 2019, the Court set two hearings for James Cloud. The first was an arraignment on the Superseding Indictment;[15] the second was a pretrial conference.[16]

Before both hearings began, the United States contacted J.V. and notified him about the upcoming hearings. *See* 18 U.S.C. § 3771 (a crime victim has the "right to reasonable, accurate, and timely notice of any public court proceeding . . . .").

Before the back-to-back hearings began, Mr. Cloud strenuously objected to J.V.'s presence, arguing J.V.'s crime-victim rights were outweighed by the clear risk that J.V.'s future testimony would be materially altered by watching the arraignment, which was, in effect, a show-up.[17]

---

[15] ECF No. 74.
[16] ECF No. 70.
[17] ECF No. 74.

The magistrate took the matter under advisement, but ultimately overruled Mr. Cloud's objection, allowing J.V. to watch the U.S. Marshals escort Mr. Cloud in—and out—of the courtroom while in shackles and wearing a jail jumper.

## H.    Police violated policy when administering line-ups to J.V.

Two law enforcement officers administered line-ups to J.V.: SA Ribail from the FBI, and Detective Cypher from YCSO. In administering the line-ups, both officers violated procedures from their agencies. Repeatedly.

### 1.    Police failed to record the line-up.

Recording a line-up is important. Doing so not only "preserves the identification process for later review in court," but also "allows fact finders to directly evaluate a witness's verbal and nonverbal reactions and any aspects of the array procedure that would help to contextualize or explain the witness' selection."[18] These benefits are why the National Academy of Science and the International Association of Police Chiefs recommend recording line-ups as a best practice;[19] these benefits are also why both DOJ and YCSO include video/audio recording in their policies:

---

[18] http://bit.ly/EyewitnessIDMemo at 10, last accessed on February 18, 2020.
[19] *See id.*

Motion to Suppress
– 19 –

| Agency | Policy | Source |
|--------|--------|--------|
| YCSO | "Whenever feasible, the eyewitness identification procedure should be audio and/or video recorded and the recording should be retained according to current evidence procedures." | 603.5 |
| DOJ | "The witness's identification of a photo, if any, and the corresponding statement of confidence should be clearly documented by video- or audio-recording the photo array." | 9.1.1 |

Neither SA Ribail nor Det. Cypher recorded J.V.'s line-up administration (or any line-up for that matter). There is no evidence to suggest recording was impossible or even inconvenient; quite the opposite, law enforcement recorded several interviews during this time window, including the following:

| Individual | Role | Recorded? |
|------------|------|-----------|
| James Cloud | Suspect | Audio + video |
| Donovan Cloud | Suspect | Audio |
| Morris Jackson | Suspect | Audio + video |
| Natasha Jackson | Suspect | Audio |
| Esmerelda Zaragoza | Witness | Video[20] |

## 2. Police failed to document the line-up in detail.

If recording isn't feasible, then documenting a line-up in detail is important.

---

[20] Note: the day after administering line-ups on J.V. and his family, police administered a line-up on Esmerelda Zaragoza (a different eyewitness)—and *recorded* it.

1   Like video recording, detailed documentation preserves not only what happened for

2   subsequent court review on the line-up's suggestibility, but also "[b]asic research

3   suggests that the memories of law enforcement officers are not infallible and, for

4   example, officers may recall following 'scripts' when improvisation occurred."[21]

5   This is why both DOJ and YCSO include detailed documentation in their policies:

| Agency | Policy | Source |
|---|---|---|
| YCSO | "A thorough description of the eyewitness process and the results of any eyewitness identification should be documented in the case report." | 603.8 |
| DOJ | The line-up administrator should "immediately write[] down as close to verbatim as possible the witness's identification and statement of confidence, as well as any relevant gestures or non-verbal reactions." The administrator should also document 1) the approximate amount of time it took the witness to make an identification, 2) the presentation method and order of the photographs displayed, 3) the names of all person present during the administration; 4) any other facts or circumstances that would help contextualize or explain the witness's selection; and 5) a statement of confidence. | 9.1.2 9.3.1 9.3.2 9.3.3 9.3.4 |

13   Here, Det. Cypher failed to document the line-up administration. At all. SA Ribail

14   did, but missing from his report are the following: 1) the approximate amount of

15   time it took the witness to make an identification (or not) (per DOJ Policy 9.3.1);

16   2) the presentation method and order of the photographs displayed (per DOJ Policy

17   9.3.2); 3) the names of all persons present during administration (per DOJ Policy

---

[21] 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 72.

9.3.3); and 4) any other facts or circumstances that would help contextualize or explain the witness's selection (per DOJ Policy 9.3.4).

### 3.    Police failed to administer a blind line-up.

Administering a blind line-up (i.e., where the line-up administrator doesn't know who the suspect is) is important. Doing so protects against the "expectancy effect," a situation where "experimenters subconsciously and unintentionally shape the results of experiments to fit their expectations."[22] It also protects against more explicit influence, such as "when the investigator suggests in advance that the perpetrator is in the array ('We found the guy with your credit card' or 'We arrested someone we want you to identify') . . . ."[23] This is why DOJ bars the practice absent exceptional circumstances, and YCSO prohibits it outright:

| Agency | Policy | Source |
|--------|--------|--------|
| YCSO | "***In no case*** should the member presenting a line-up to a witness know which photograph or person in the line-up is being viewed by the witness." | 603.6[24] |
| DOJ | ***There may be exceptional circumstances in which it is not practicable to conduct either a blind or blinded photo array***. In those instances, the administrator should document the reasons for the non-blind(ed) procedure and be prepared to explain the reasons for conducting such an alternative procedure. | 5.4[25] |

---

[22] 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 13.
[23] http://bit.ly/EyewitnessIDMemo at 8.
[24] Emphasis added.
[25] Emphasis added.

1

2    Here, Det. Cypher and SA Ribail administered the line-up on J.V. despite being the

3    lead case agents, and failed to document what "exceptional reasons" existed for

4    performing a non-blind procedure.

5    **4.    Police failed to caution J.V. against outside research.**

6    Instructing a witness to avoid outside research is important. Doing so avoids

7    "unconscious transference," which "occurs when the witness recognizes that the

8    person identified is familiar but mistakenly attributes the person's familiarity to the

9    crime, rather than to the prior identification procedure."[26] To avoid unconscious

10   transference, best practices dictate police should caution witnesses "to avoid

11   undertaking their own investigations, such as through Internet searches or on social

12   media, or receiving information from friends about possible suspects."[27] This is why

13   DOJ includes a "no-outside-research warning" for witnesses (effective since 1999).

14   And that, of course, is precisely what J.V. did before reversing himself.

15   **I.    An eyewitness ID expert reviewed this case. She identified several
16        problems.**

17   Dr. Cara Laney is a psychologist who specializes in human memory generally,

18

19   ───────────────

[26] 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 60.
[27] *Id.*

and eyewitness identification specifically. She reviewed J.V.'s line-up and offered four opinions about its integrity:

1) police failed to follow best practices (and in several instances, its own procedures);

2) even though police failed to follow best practices, these shortcomings don't impact the reliability of J.V.'s initial non-ID of James Cloud;

3) J.V.'s "ID" of James Cloud (in response to the Wanted poster) was essentially a highly-suggestive show-up procedure; and

4) the taint from J.V.'s ID of James Cloud cannot be overcome, as "little can be done to correct memory once it has been corrupted."

These opinions, and the bases for them, will be fully developed at a pretrial suppression hearing.

## III.    Discussion

Four separate witnesses non-ID'd James Cloud. The *sole* identification comes only after police violated their own line-up policies, and J.V. (not being warned to avoid on-line research), saw a Wanted poster flatly stating he misidentified James Cloud, more or less accusing him of bungling the ID. At this point, J.V.'s memory has been tainted by the Wanted poster (which he should never have seen) and the arraignment (from which he should have been excluded), and his in-court ID should be excluded.

For over fifty years, the Supreme Court has recognized it is important to exclude eyewitness IDs based on unnecessarily suggestive line-ups. *See Simmons v. U.S.*, 390 U.S. 377 (1968) (a leading case acknowledging impermissibly suggestive line-ups may be excluded if there is "a very substantial likelihood of irreparable misidentification"); *see also Neil v. Biggers*, 409 U.S. 188 (1972) (setting forth the factors to consider when assessing an ID's reliability); *Manson*, 432 U.S. at 98 (refining the Supreme Court's admissibility standard). Excluding unnecessarily suggestive IDs isn't just good policy; it is rooted in the Due Process Clause as a critical component of procedural due process.

Today, a three-part test governs whether an eyewitness ID is admissible under the Due Process Clause:

*First*, a threshold question, a district court must decide whether the eyewitness ID flowed from improper police conduct. Because "[a] primary aim" behind exclusion "is to deter law enforcement use *of **improper procedures*** in the first place," the Supreme Court requires exclusion of unreliable line-ups under the Due Process Clause only where police engaged in misconduct. *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012).

*Second*, once police misconduct is shown, a district court must assess "whether the identification procedure was unnecessarily suggestive," a burden the

1    defendant carries.

2    *Third*, if the defendant carries his burden, then the United States must show

3    that, despite the ID's improper suggestiveness, it was nevertheless reliable under

4    the "totality of the circumstances." *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984)

5    (distilling the Supreme Court's precedent into a two-part test)[28]; *see also Bernal v.*

6    *Colorado*, 44 P.3d 184, 191 (Co. 2002) (synthesizing federal case law and capturing

7    the U.S. Supreme Court's burden-shifting analysis). Steps two and three are

8    referred to as the "*Manson* test."

9        Whether identification evidence should be suppressed is an issue that must be

10    resolved outside the jury's presence at an identification-suppression hearing. *See*

11    *U.S. v. Allison*, 414 F.2d 407, 410 (9th Cir. 1969) ("[W]here a timely and specific

12    motion is made to suppress identification testimony on the ground that it has been

13    tainted by pretrial photographic identification procedures, it must be heard and

14    determined by the court outside the jury's presence in the same manner as any other

15    motion to suppress evidence alleged to be inadmissible because unlawfully

16    obtained.").

17

18    [28] Note: Before *Perry*, the Supreme Court's standard for challenging eyewitness IDs contained two parts (Step 1: was line-up unduly suggestive?; Step 2: was line-up nevertheless reliable?). After

19    *Perry*, it is best to view the Supreme Court's analysis as a three-part inquiry, with the first part assessing whether police misconduct occurred.

Motion to Suppress

**A.     The Court should apply the *Manson* test.**

*Manson's* due process inquiry "comes into play only after the defendant establishes improper police conduct." *Perry*, 565 U.S. at 241. This case is awash in police misconduct.

**1.      The FBI's failure to follow policy constitutes police misconduct.**

Police misconduct occurred when the FBI violated a long-established, scientifically-based DOJ policy on cautioning witnesses against performing outside research, and this policy violation exposed a key witness (J.V.) to James Cloud's "Wanted" poster. Some context helps:

DOJ recognizes that eyewitness IDs are a potent and dangerous law enforcement tool, which is why, on January 6, 2017, then-Deputy AG Sally Yates reiterated how "crucial" it is for police to follow proper procedures. Given how powerful eyewitness identifications are ("That's the guy!"), and yet how unreliable they can be, DOJ recognizes police must follow policies that help "ensure the accuracy and reliability of evidence elicited from eyewitnesses."[29] One of those policies is to instruct "the witness to avoid contact with the media or exposure to media accounts concerning the incident."[30] This siloing policy is grounded in social

---

[29] http://bit.ly/EyewitnessIDMemo at 1.
[30] http://bit.ly/OriginalDOJEyewitnessPolicies at 16.

science research and has been part of DOJ's best practices for 20+ years.

Even though this siloing policy is long-established, Special Agent Ribail violated it by failing to caution J.V. against performing outside research after he participated in the June 9, 2019 line-ups. Lacking this admonition, J.V. turned to Facebook shortly after participating in the line-ups and came across James Cloud's "Wanted" poster, which was issued by YCSO (a law enforcement agency), and posted by the Yakama Nation (a government agency). Only *after* viewing this government-issued Wanted poster on a government-issued Facebook account did J.V. walk-back his prior non-ID and assert James Cloud was perpetrator #2. Because Special Agent Ribail failed to follow policy, the Supreme Court's "due process check" applies, as it is designed to "to deter law enforcement use ***of improper procedures*** in the first place." *Perry*, 565 U.S. at 241 (emphasis added).

> **2.    Police committed misconduct by issuing a "Wanted" poster that "calls out" J.V.'s failure to select James Cloud.**

There is nothing wrong when police issue a "Wanted" poster; doing so is consistent with promoting public safety. But there is something wrong when police issue a "Wanted" poster that "calls out" an eyewitness's failure to identify a suspect.

1    At 5:00 p.m. on June 9, 2019, mere hours after J.V. did not select James Cloud

2  from a line-up, YCSO issued a bulletin advising the public that, "***due to***

3  ***misidentification,***" one suspect (James Cloud) remained at-large:



FOR IMMEDIATE RELEASE – JUNE 9, 2019 (5:00 pm)

*UPDATED INFORMATION*

### ONE SUSPECT REMAINS AT LARGE IN RESERVATION MURDERS

TOPPENISH, WA – Due to misidentification, one suspect remains at large in the five murders that were committed on the Yakama Reservation on Saturday, June 8, 2019. James Cloud (07/08/1983), who is pictured below, is still being sought by law enforcement agencies. James is considered armed and extremely dangerous, if you see this subject do not approach him, and call 911. If you know his whereabouts please call 911 immediately.



The "misidentification" police referred to was J.V.'s (and his family's) non-ID of

James Cloud when police administered line-ups earlier that day.

    To be fair, there is no policy governing what police should—and should not—

insert in a "Wanted" poster. But policies can't anticipate every conceivable form of

police misconduct, and what happened here is alarming. The Wanted poster, in

effect, blamed J.V. for James Cloud's "at-large" status, and blaming J.V. served no legitimate law enforcement purpose. This "call out" strikes at the heart of the type of misconduct the Supreme Court discussed in *Perry*. *See Perry*, 565 U.S. at 241 ("A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place."). If this "call out" isn't labeled as misconduct, then police would be free to shame—and shape—eyewitness IDs. A call-out constitutes misconduct.

**B.    Applying *Manson*, the Court should exclude J.V.'s "ID," which occurred after viewing a "Wanted" poster.**

Once police misconduct is established, an ID must be suppressed if it is 1) unnecessarily suggestive and 2) unreliable. J.V.'s ID was both.

**1.    J.V.'s online show-up was unnecessarily suggestive.**

J.V. first identified James Cloud as perpetrator #2 when he viewed James Cloud's "Wanted" poster. That viewing constituted a show-up. "A show-up or field identification is a procedure wherein only one person—the suspect—is presented to a witness for the purpose of identification." 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 41. And while show-ups can be helpful when presented to a witness immediately after a crime (usually within

a few hours),[31] "[t]here is general agreement in the scientific community" that show-ups should be avoided, as they are, "by their very nature, suggestive and result in a higher rate of false identifications of innocent suspects than line-ups." *Id.*

Courts agree with the scientific community, finding—time-and-time-again, at the federal and state levels—show-ups are unnecessarily suggestive. And this is nothing new; as far back as 1967, the Supreme Court remarked that show-ups have been "widely condemned." *Stovall*, 388 U.S. at 302. Here's a partial list since then:

| Finding | Court |
|---|---|
| "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." | *Stovall v. Denno*, 388 U.S. 293, 302 (1967). |
| "The admissibility of an identification may be called into question when the police have used a ***highly suggestive procedure*** in asking an eyewitness to identify an individual, such as presenting photographs only of the suspect or having the suspect 'show up' alone." | *Cooper v. Bergeron*, 778 F.3d 294, 299 (1st Cir. 2015) (emphasis added). |
| "***As the Supreme Court has acknowledged, a show-up procedure is inherently suggestive*** because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." | *U.S. v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) (emphasis added). |
| "The problem with showups are apparent: in contrast to lineups and photo arrays, which allow a witness with fa faulty memory to pick someone other than the suspect, every positive identification in a showup implicates the suspect. | *Young v. State*, 374 P.3d 395, 421 (Alaska 2016). |

---

[31] "Show-ups should generally be conducted no later than two hours after the eyewitness observed the perpetrator." 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 43.

| Finding | Court |
|---|---|
| Showups seemingly provide little protection against witnesses who are inclined to guess, as witnesses participating in showups tend to base their identifications on clothing." | |
| "[C]ourts generally look upon show-up identifications with disfavor due to the inherent suggestiveness of the procedure." | *Merriweather v. Commonwealth*, 99 S.W.3d 448, 451 (Ky. 2003). |
| "By their nature, showups are suggestive and cannot be performed blind or double-blind." | *State v. Henderson*, 27 A.3d 872 903 (N.J. 2011). |
| "Police showups are generally regarded as inherently suggestive—and therefore less reliable than properly administered lineup identifications—because the witness is always aware of whom police officers have targeted as a suspect." | *State v. Lawson*, 291 P.3d 673, 686 (Or. 2012). |
| Holding that "evidence obtained from . . . a showup will not be admissible unless, based on the totality of the circumstances, the showup was necessary." | *States v. Dubose*, 699 N.W.2d 582, 591-92 (Wis. 2005). |

So the consensus (among courts and the scientific community) is that show-ups are unnecessarily suggestive—and that's when they're administered in the *best of circumstances*.

Here, the show-up circumstances weren't just unnecessarily suggestive, they were downright dangerous. J.V.'s show-up (i.e., his second attempt at an ID) did not consist of a single photo depicting James Cloud in a somewhat-neutral manner (as in his original line-up):



Instead, J.V.'s show-up depicted James Cloud in a jail jumpsuit, with the Wanted poster labeling him as "armed and extremely dangerous," and wanted for five murders:



 Mr. Cloud carries his burden under *Manson*'s first prong (whether line-up was unduly suggestive).

**2.      J.V.'s follow-up ID using the Wanted poster is unreliable.**

With police misconduct (Part 1) and an unnecessarily suggestive line-up

(Part 2) established, the district court's final inquiry (Part 3) is whether the show-up

is nevertheless reliable under the totality of the circumstances. In making this

assessment, courts consider five factors (known as the *Biggers* factors):

1)   the opportunity of the witness to view the defendant at the time of the
     crime;

2)   the witness's degree of attention;

3)   the accuracy of the witness's prior description of the defendant;

4)   the level of certainty demonstrated by the witness at the confrontation;
     and

5)   the length of time between the crime and the confrontation.

*See Biggers*, 409 U.S. at 198. When weighing these factors, "reliability is the linchpin

in determining the admissibility of identification testimony." *Manson*, 432 U.S. at

114.

**i.      Each *Biggers* factor shows J.V.'s follow-up ID is unreliable.**

***Opportunity to view.*** J.V. had ample opportunity. He viewed the two suspects

over a 10-minute period in the late-afternoon on a sunny, mid-summer day. These

conditions allowed J.V. to identify Donovan Cloud as perpetrator #1 without

hesitation during the line-up (and, according to all witnesses, Donovan Cloud remained outside J.V.'s house with a gun pointed at his son's head). Meanwhile, perpetrator #2 followed J.V. into his house while he retrieved keys to his truck, increasing J.V.'s opportunity to observe him.

**Degree of attention.** J.V. was undoubtedly on-edge (perpetrator #1 was pointing a pistol at his son's head; perpetrator #2 was pointing a shotgun at him). But that didn't stop J.V. from interacting with the perpetrators, including negotiating with them not only on what vehicle to take, but also for his son's release. His stress level was high, but so was his degree of attention.

**Accuracy of description.** J.V.'s description of perpetrator #2 did not match James Cloud. To the contrary, when viewing line-up #5033 (the one containing James Cloud), J.V. made clear that perpetrator #2 had "rounded cheeks like #5," not #2 (James Cloud):



Motion to Suppress
– 35 –

***Level of certainty.*** J.V. had none—he didn't select James Cloud from the original line-up, comment that James Cloud looks similar to perpetrator #2, or even meaningfully pause to review James Cloud's photo for a lengthy time-period (something his son, S.V., did when reviewing Donovan Cloud's photo).

***Length of time between crime and confrontation.*** It was quick: police administered a line-up on J.V. the day after the offense.

In short, J.V. had ample time to view both suspects, evidenced not only by the circumstances (sunny day, 10-minute encounter, and interactions with both suspects), but also by his certainty in identifying Donovan Cloud. But the certainty J.V. exhibited with Donovan Cloud didn't exist with James Cloud. He reviewed James Cloud's line-up, articulated physical characteristics of perpetrator #2 that didn't match James Cloud, and then moved on. Every *Biggers* factor bespeaks unreliability.

### ii.   J.V. explained-away his initial non-ID because James Cloud's Wanted poster was a "better representation" of him. Not so.

After J.V. viewed James Cloud's "Wanted" poster, he contacted police and stated "he was 100 percent sure" this was perpetrator #2, as the photo was a "better representation[]" of James Cloud. This post-hoc explanation is undercut by the photographs themselves. James Cloud's line-up photo and his "Wanted" poster

are strikingly similar. In both photos, James Cloud is similarly-aged with the same

hairstyle, the same mustache, and the same goatee:



In fact, the only appreciable difference (with respect to physical appearance)

between these photos is that, in James Cloud's line-up photo, he appears "thicker"

than his Wanted poster photo. This extra-thickness actually brings him more in-line

with what witnesses describe (S.V. described perpetrator #1 as "the skinny guy").

So while J.V. might be able to explain away his initial non-ID if the two photos

were dramatically different, *see, e.g.*, *U.S. v. Murphy*, 2018 WL 7017993 (E.D. Tenn.,

Oct. 15, 2018) (understanding why the victim didn't ID the defendant during the

initial line-up because that photo "depicted Defendant when he was younger,

thinner, and cleaner-shaven"), they weren't. What *was* different was James Cloud's clothing (in a prison jumpsuit) and his description (as a suspect in five murders who is armed and dangerous).

### iii.    The police's policy violations augment the unreliability of J.V.'s follow-up ID using the Wanted poster.

Eyewitness ID policies serve a clear purpose: to "reduce the likelihood of an erroneous identification." 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 24. For every ignored best-practice, the chance of suggestibility (and, in turn, an erroneous identification) increases. This is why, ironically, that the police's extensive policy violations augment the unreliability of J.V.'s follow-up ID using the Wanted poster.

Police failed to 1) record the line-up, 2) document the line-up in detail, 3) administer a blind line-up, or 4) caution J.V. against conducting outside research. Despite all these policy violations, which only serve to increase the initial line-up's suggestibility, J.V. did not identify James Cloud. A non-ID under these suggestive circumstances speaks volumes with respect to reliability, whereas a follow-up ID after viewing a Wanted poster does not.

### iv.    Courts exclude unreliable IDs like these.

The facts here (a non-ID, followed by a highly-suggestive follow-up ID) are

Motion to Suppress
– 38 –

1    not new for courts and, in these scenarios, courts regularly exclude. *See, e.g., U.S. v.*

2    *Emanuele*, 51 F.3d 1123 (3d Cir. 1995); *U.S. v. Beeler*, 62 F. Supp. 2d 136 (D. Me.

3    1999).

4       In *Emanuele*, a grand jury charged Joseph Emanuele with robbing two banks.

5    During one robbery, Lorraine Woessner (the teller) "observed the man for several

6    minutes at close range in the well-lit bank lobby." *Emanuele*, 51 F.3d at 1127. Despite

7    ample opportunity to view, she could not identify the robber in a line-up. Later, the

8    United States subpoenaed Ms. Woessner to testify and, while waiting outside the

9    courtroom with another witness, she observed Mr. Emanuele being escorted in

10   manacles by the U.S. Marshals. Both witnesses looked at each other, concluding "it

11   has to be him." *Id.*

12      Mr. Emanuele moved to suppress Ms. Woessner's in-court identification, and

13   the district court denied it. A jury convicted.

14      On appeal, the Third Circuit moved through *Manson's* two-part test and

15   concluded, under the first factor, the *de facto* show-up by the U.S. Marshals, while

16   inadvertent, was impermissibly suggestive. *See id.* at 1130.

17      Moving to the second factor (reliability), the Third Circuit noted

18   Ms. Woessner not only had ample opportunity to view the robber in good lighting

19   conditions, but also reviewed a line-up "close in time to the respective robberies."

*Id.* at 1131.

In these circumstances, the Third Circuit held Ms. Woessner's failure-to-identify Mr. Emanuele in the line-up, "coupled with the highly suggestive viewing of the defendant in conditions reeking of criminality, bolstered by the comments of another witness, render the in-court identification unreliable." *Id.* It reversed the district court, finding "there clearly was a substantial risk of misidentification." *Id.*

Here, like *Emanuele*, J.V. failed to identify James Cloud in the initial line-up despite ample time (several minutes) and proper conditions (sunny day) to view perpetrator #2. And like *Emanuele*, there was a second opportunity for the eyewitness to view the alleged perpetrator in highly-suggestive conditions (in *Emanuele*, it was an inadvertent show-up by the U.S. Marshals in court; here, it was a YCSO-issued Wanted poster on a government news feed describing James Cloud as an armed and dangerous killer). But in James Cloud's case, there is an *additional* compounding problem: J.V. attended James Cloud's initial appearance and had an opportunity to view him (in shackles and escorted by U.S. Marshals) while the magistrate arraigned him on charges of carjacking J.V.'s vehicle. This second, unduly-suggestive viewing was, in effect, another show-up, which researchers agree "can increase the chance of error." 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 60.

In *Beeler*, a grand jury charged Coleman Beeler with planting a pipe bomb on a vehicle. *See* 62 F. Supp.2d at 139. Shortly before the bombing, a gas station employee (Michael Swan) purportedly interacted with the bomber when he entered the store and asked for directions. Two days later, police administered a line-up on Mr. Swan.

During the line-up, Mr. Swan "examined the photographs for approximately five minutes and said that he could not make a positive identification because he was torn between pictures one and three." *Id.* at 141. Later, the United States wanted Mr. Swan to perform an in-court identification, and Mr. Beeler moved to exclude it.

The district court suppressed the attempted in-court ID, finding any subsequent in-court ID by Mr. Swan "would likely be based not on Swan's honest recollection, but on the fact that Defendant is the person charged with the crime." *Id.* at 143. The district court went on to note that "where the eyewitness fails to identify a defendant as the perpetrator of a crime in a fair, nonsuggestive, pretrial lineup, that eyewitness will not be given a second chance in court where the surroundings strongly suggest that the person accused of the crime is the actual perpetrator." *Id.* at 144.

Here, Mr. Cloud's facts are worse than *Beeker* because while the police in *Beeker* administered a "fair, nonsuggestive, pretrial lineup," the police here failed to follow best practices that minimize suggestibility.

In both *Emanuele* and *Beeker*, courts agreed that non-IDs, followed by IDs in unfairly-suggestive circumstances, are too dangerous for a jury.

**C.    If the Court declines to apply *Manson*, then it should exclude J.V.'s unreliable ID under Rule 403.**

The Court can comfortably find police misconduct based on two events:

1) the FBI's failure to follow eyewitness ID policies, which led to J.V. viewing James Cloud's police-issued "Wanted" poster on a government site (the Yakama Nation's Facebook account); and

2) police issuing a Wanted poster that "calls out" J.V.'s non-ID.

But if the Court finds these facts fall short of the misconduct necessary to trigger *Manson's* due process test, the Supreme Court set forth an alternative method for exclusion: the "protective rules of evidence . . . ." *Perry*, 565 U.S. at 233.

In assessing whether unfair prejudice exists under Rule 403, it makes sense for the Court to apply *Manson's* test because it, like Rule 403, focuses on whether eyewitness evidence is so unreliable [read: unfairly prejudicial] as to thwart an accused's right to a fair trial.

Here, J.V.'s testimony is of limited probative value because, as illustrated above in the *Biggers*-factor analysis, his initial non-ID was unreliable. Despite ample opportunity to view perpetrator #2, J.V. did not select James Cloud (he didn't even

*pause* on his line-up photo), had no certainty in what he saw, and offered a limited-at-best description of perpetrator #2. And where (as here) the probative value of a witness's testimony is marginal, even a "modest likelihood of unfair prejudice is high enough to outweigh the probative value of marginally relevant evidence." *U.S. v. Espinoza-Baza*, 647 F.3d 1182, 1190 (9th Cir. 2011) (internal quotations and citations omitted).

## IV.    Conclusion

The Supreme Court "has long recognized that eyewitness identifications' unique confluence of features—their unreliability, susceptibility to suggestion, powerful impact on the jury, and resistance to the ordinary tests of the adversarial process—can undermine the fairness of a trial." *Perry*, 565 U.S. at 249 (Sotomayor, J., dissenting). And that confluence of features is present here.

Over ten minutes on a sunny day last summer, J.V. observed a horrific crime—two men, both armed, held his son at gunpoint while they took his truck. The experience left an indelible print on J.V.'s memory—so much so he teared up the moment he viewed perpetrator #1's photograph (Donovan Cloud) in a line-up. But when J.V. viewed James Cloud's line-up photo? Nothing. He passed over it, commenting on how a different photo in the same line-up more closely resembled perpetrator #2.

Only after J.V. viewed a police-issued Wanted poster, which contained a photograph of James Cloud in a jail jumpsuit that labeled him as 1) wanted in the reservation murders, 2) armed and extremely dangerous, and 3) still at-large due to misidentification [read: a direct shot at J.V.'s inability to pick him out] did J.V. contact police and say that photo "better represented" perpetrator #2.

No, it didn't. The photos are strikingly similar and, if anything, James Cloud's line-up photo better represented the individual J.V. and his family described seeing that day (clearer image, thicker face). J.V's most accurate (and most reliable) memory of James Cloud is through a non-ID.

"[T]he brain does not work like a video camera."[32] Rather, it is generally accepted that "perception is imperfect, and memories are malleable" and may be "distorted or contaminated, without an individual intending or even knowing" that to be the case.[33] This is precisely what makes eyewitness IDs so dangerous—an in-court "That's the one!" is *so convincing* because the witness believes (to their core) that they're right. Yet in 76% of the first 250 convictions overturned due to DNA evidence, they're not.[34]

Trial judges are tasked with the solemn responsibility of screening evidence to

---

[32] 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 12.
[33] *Id.*
[34] *Perry*, 556 U.S. at 263.

ensure trials are fair. If the United States calls an emotionally-charged father and lets

him testify—with 100% certainty—that one of the armed men who carjacked him

was James Cloud (despite an initial non-ID), then the fallout from that unreliable

accusation can never be cleaned up on either cross or with an eyewitness expert. As

such, James Cloud respectfully asks the Court to exclude J.V.'s unreliable in-court

ID, which will let a jury decide James Cloud's guilt (and life) using reliable evidence.

Dated: February 19, 2020

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org

1

**Service Certificate**

2    I certify that on February 19, 2020, I electronically filed the foregoing with

3 the Clerk of the Court using the CM/ECF System, which will notify Assistant

4 United States Attorneys: Thomas J. Hanlon and Richard Burson.

5
s/ John B. McEntire IV
John B. McEntire, IV, WSBA #39469

6
10 North Post Street, Suite 700
Spokane, Washington 99201

7
509.624.7606
jay_mcentire@fd.org

8

9

10

11

12

13

14

15

16

17

18

19