William D. Hyslop
United States Attorney
Eastern District of Washington
Thomas J. Hanlon
Assistant United States Attorney
Richard Burson
Assistant United States Attorney
402 E. Yakima Avenue, Suite 210
Yakima, Washington 98901
(509) 454-4425

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 1:19-CR-02032-SMJ-1 |
| Plaintiff, | |
| vs. | United States Response to Defendant's Motion to Suppress Victim's Positive Identification |
| JAMES DEAN CLOUD, | |
| Defendant. | March 17, 2020[1], at 9:30 a.m. With Oral Argument |

Plaintiff, United States of America, by and through William D. Hyslop, United States Attorney for the Eastern District of Washington, Thomas J. Hanlon, Assistant United States Attorney for the Eastern District of Washington, and Richard Burson, Assistant United States Attorney for the Eastern District of Washington, hereby submits its response to the Defendant's Motion to Suppress the positive identification of the Defendant by one of the Defendant's victims (ECF 147).

---

[1] Actual date and time for evidentiary hearing and argument to be scheduled on this date.

Response to Motion to Suppress          1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................4

II.    FACTUAL BACKGROUND..............................................................6

    A.    Five dead bodies and an attempted kidnapping ignite a manhunt .......6

    B.    Yakama Nation issues a public safety warning....................................9

    C.    The FBI conducts a photo line-up; J.V. does not pick out the
        Defendant .........................................................10

    D.    J.V. positively identifies the Defendant ...............................................14

    E.    J.V. exercises his rights a victim and attends the Defendant's
        arraignment....................................................15

III.    ANALYSIS...............................................................16

    A.    The *Manson* test does not apply because there was no police misconduct
        that created unnecessarily suggestive circumstances.........................17

        a.    Agent Ribail followed FBI procedure when he
            administered the June 9, 2019 line-up .................................19

            i.    Choosing not to record the line-up was not a
                violation of FBI policy, and at any rate, did not create
                suggestive circumstances ..............................................22

            ii.    Agent Ribail administered the line-ups using the
                blinded administration technique required by FBI
                policy ...................................................................23

            iii.    FBI policy requires that Agents request that the
                witness have no contact with the media, not ignore
                public safety warnings regarding the whereabouts of
                suspects who pose a danger to the witness and his
                family...................................................................23

iv.    Agent Ribail generally followed FBI policy regarding the documentation of line-ups, and documentation deficiencies do not create unnecessarily suggestive circumstances ......................25

b.    The Yakama Nation did not commit misconduct by warning their community that a man who was suspected of murdering five people, attempting to murder two others, kidnapping a young child and carjacking a family was armed and at large........................................................26

B.    Even if the *Manson* test did apply, the identification procedure was not unnecessarily suggestive .................................................28

C.    J.V.'s identification of the Defendant is reliable viewed in the totality of the circumstances.................................................30

a.    J.V. had ample opportunity to view the Defendant at the time of the crime ...................................................................31

b.    J.V.'s degree of attention was high during his interaction with the Defendant.................................................................31

c.    J.V.'s prior description of the Defendant was not inaccurate ..............................................................................31

d.    J.V. was "100 percent sure" that the man pictured in the Yakama Nation public safety warning was the man who pointed a shotgun at him.......................................................34

e.    J.V.'s identification of the Defendant occurred 24 to 48 hours after the Defendant carjacked him and tried to abduct his son.........................................................................34

D.    Courts applying the *Manson / Perry* test permit eyewitness testimony under these circumstances ..................................................38

E.    This Court should not take the extraordinary step of casting aside *Manson* and *Perry* and exclude the evidence under Rule 403............40

IV.    CONCLUSION ..................................................................................41

# I.    Introduction

Our legal system is built on the premise that it is the province of the jury to weigh the credibility of witnesses. *Kansas v. Ventris*, 556 U.S. 586, 594 (2009). That province of the jury includes weighing the reliability of eyewitness identification against any admissible mitigating evidence the Defendant produces at trial, and against the backdrop of the other trial safeguards afforded the Defendant (e.g. jury instructions and the right to cross examine). The Defendant is asking this Court to take the extraordinary step of stripping the jury of that function. However, before even engaging in pretrial review of the reliability of eyewitness identification, the Court must determine whether the Defendant has met his burden under *Perry* to show that police engaged in misconduct that was both unnecessary and unduly suggestive. Only then does the Court engage in pretrial reliability analysis.

The Defendant has not cleared the first bar. There was no misconduct, and certainly no action on the part of law enforcement that was both unnecessary and suggestive. Agent Ribail conducted initial photo line-ups in accordance with FBI guidance issued on the very same day he conducted the line-ups. And the Defendant has not alleged any actions by Agent Ribail that were suggestive in any way. Similarly, the Yakama Nation did not engage in any misconduct or any action that was unnecessary. Yakama Nation's public safety announcement including a picture of the Defendant was not "calling out" any eyewitness. Yakama Nation was correcting

Response to Motion to Suppress              4

an earlier "all clear" message that they had posted when they thought both suspects in a quintuple homicide were in custody. Upon learning that the Defendant was still at large and likely armed and dangerous, they rightly alerted the community. Defendant would have this Court find that action unnecessary, based primarily on Defendant's factually incorrect mischaracterization of the Yakama Nation's actions.

Even if there had been misconduct, the question of whether J.V.'s identification of the Defendant would still be one for the jury to weigh. Under *Manson* and its predecessor cases, the Court must determine whether the totality of the circumstances indicate a "very substantial likelihood of irreparable misidentification." Here, where J.V. announced that he was "100 percent" certain regarding his identification of the Defendant, had ample time to view the Defendant over the course of ten minutes, and provided a reasonable explanation for his earlier inability to pick the Defendant out of a photo line-up, such circumstances are not present.

The Defendant has the right to cross examine J.V. The Defendant has the right to seek to call expert witnesses to rebut J.V.'s identification. The Defendant has the right to advocate for jury instructions governing eyewitness identification. The Defendant does not have the right to conceal his victim's identification of the Defendant from the jury when police engaged in no misconduct and circumstances do not indicate a likelihood of irreparable misidentification.

## II.    Background

A.    Five dead bodies and an attempted kidnapping ignite a manhunt.

On June 8, 2019, just after 4:00 p.m., E.Z. called 911 and reported that she was in a truck headed west on Evans Road in White Swan. She told dispatch she was fleeing from her friend's house, where unknown assailants had opened fire on the vehicle she and her friends were in. Her friend L.L. was driving the truck from the passenger side of the vehicle, because her other friend, Dennis Overacker, was dead in the driver's seat, having been shot in the head. E.Z. and L.L. had both been shot, but survived. E.Z.'s infant child was unharmed.

E.Z. directed law enforcement to the residence in White Swan where she and her friends had been shot – 5151 Medicine Valley Road, the home of John Cagle, a man affectionately known as "Dobbie Jack." Officers arriving at Dobie Jack's home encountered a grisly scene. Thomas Hernandez laid face down in the drive way, unconscious and suffering from a gunshot to the head that would later kill him. Just inside the front gate of the property, Catherine Eneas laid dead from a gunshot wound. Around back, near a game room, Michelle Starnes was found dead, also from an apparent gunshot wound. Finally, inside the game room, Cagle was found dead from a gunshot to the head. Discharged shell casings were littered about the bodies.

While tribal police secured the scene in White Swan, E.Z. was at a hospital in Yakima being interviewed by law enforcement. E.Z. told officers that she, Overacker,

Response to Motion to Suppress                6

L.L. and Hernandez had driven in Overacker's truck to Cagles's residence to check in on Cagle, who was "getting along in age." When they arrived at Cagles's, they did not see Cagle, but instead were confronted by two Indian males, one of whom told them that Cagle was not seeing anyone. Hernandez got out and spoke to the two Indian males, at least one of whom was holding a gun. Hernandez started walking back to the truck when one of the men suddenly shot Overacker in the head. Hernandez was shot next and fell in the driveway. One or more people opened fire on the truck. L.L. managed to reach over Overackers's body and hit the gas, speeding away from the residence while the truck was being peppered with shotgun blast. L.L. and E.Z. were hit, but not killed.

Around the time E.Z. was being interviewed, the Defendant and his brother were trying to make their escape out of the White Swan area. At approximately 4:45 p.m., N.V. called 911 and reported that two men had walked into her yard on Evans Road approximately seven miles from the Medicine Valley murder scene, put a gun to her young son's head, and stole her husband's truck. Responding officers spoke with N.V., her husband, J.V. and their two children, S.V. and M.V. The family relayed the following: S.V. was walking in the backyard when a "native male" walked up to him, grabbed him by his shirt and put a gun next to his head. The assailant walked S.V. to the house and told a second "native male" to "get the keys, Vance." N.V., seeing her son being held with a gun to his head, frantically ran to J.V., who was inside the

Response to Motion to Suppress                    7

house, and told J.V. that there were two men in the yard, one of whom had a gun to

S.V.'s head. J.V. went to the garage area and saw one "native" man with a shotgun.

Just outside of the garage, he saw a second native man holding a pistol to S.V.'s head.

Both men yelled at S.V. to give them the keys to the vehicles that were parked there.

J.V. quickly went to the house's mudroom and retrieved the first set of keys he saw –

the keys to his wife's van. The man with the pistol wanted the keys to the truck

instead. J.V. attempted to comply while the man holding the pistol at S.V.'s head

yelled at J.V., accusing him of stalling. J.V. went into the house to retrieve the keys

for J.V.'s truck. The man with the shotgun followed, and kept apologizing for what

the two men were doing, while continuing to point the shotgun at J.V. J.V. retrieved

and handed over the truck keys. The man with the pistol ordered S.V. to get in the

truck. J.V. pleaded with the two men not to take his son. The men refused. J.V. asked

the men to let S.V. ride in the back of the truck. The assailants acquiesced to that

request, and S.V. got into the bed of the truck. As the two armed men sped away in the

truck, J.V. yelled for S.V. to jump. S.V. jumped out of the bed of the truck as the

vehicle kept going, escaping the two kidnappers. The family ran into the house and

called 911.

 As police were talking to J.V., another responding officer saw two people in the

field directly behind J.V.'s house. Two officers went to the field and apprehended the

two people: M.S. and N.J. Both were taken into custody. A short time later, after

Response to Motion to Suppress   8

being provided *Miranda* rights, M.J. told officers the following about Medicine Valley: He and N.J. had been with Donovan and James Cloud at Cagle's. The Clouds were in Cagle's residence while M.J. and N.J. waited in the truck they had arrived in with the Clouds. That's when M.J. heard gunshots. M.J. explained that the four of them then fled Cagles's in a truck after ransacking Cagle's residence. The truck they fled in (later determined to be Eneas') broke down (and was later found) near J.V.'s house. M.J. and N.J. separated from the Clouds at that point and ran off through the field where they were apprehended. They did not know where the Clouds went.

Detectives began combing the area and questioning residents as to the whereabouts of the Clouds. As night fell and the next day dawned, the suspected perpetrators of five murders, two attempted murders, one carjacking and one kidnapping were still at large amongst the community and believed to be armed and dangerous.

B.    Yakama Nation issues a public safety warning.

Donovan Cloud was apprehended on June 9, 2019 at approximately 2:00 p.m. in Oregon, the day after the murders. When he was arrested, he was accompanied by two women. One of those women had an outstanding warrant out of Washington unrelated to the Medicine Valley investigation. She was arrested on the outstanding warrant. News of the arrest was communicated through various agencies. The arrest was communicated to the Yakama Nation, who, upon hearing that two individuals had

been arrested, mistakenly thought that both of the Clouds had been arrested. At 3:19

p.m., the Yakama Nation mistakenly posted on their Facebook account that *both*

Clouds had been apprehended and were in custody, leaving the public to believe that

the people responsible for the killings and mayhem the day before were no longer at

large in their community. Exhibit A (Yakama Nation Facebook Post 1). Just under

two hours later, the Yakama Nation realized they had mistakenly given the "all clear"

to their community. Upon realizing that one of the men suspected of murdering five

people the day before was still at large, the Yakama Nation issued "UPDATED

INFORMATION" at 5:12 p.m. warning the public that James Cloud was still at large,

thought to be armed and dangerous, and was being sought by law enforcement for the

murders. Exhibit B (Yakama Nation Update). The updated public safety warning

included a photo of the Defendant taken after a September 17, 2018 tribal arrest. In

order to make it clear that their first post was a mistake, the Yakama Nation noted that

"due to misidentification," one suspect remained at large. The "misidentification"

referred to Yakama Nation's earlier misunderstanding that both Clouds had been

apprehended in Oregon. "Misidentification" did not refer to a misidentification by any

eyewitness.

C.    The FBI conducts a photo line-up; J.V. does not pick out the Defendant.

The Federal Bureau of Investigation began assisting in the investigation the

same day of the murders, kidnapping and carjacking. Special Agent Ronald T. Ribail

took the lead ("Agent Ribail"). Agent Ribail is a 17 year veteran of the FBI. He has received FBI training on conducting photo lineups, personally conducted approximately 20 lineups in the course of his career, observed an additional 20, and has trained new agents on how to conduct line-ups. As such, while state resources processed the crime scene, Agent Ribail dispatched with Yakima County Sheriff's Office ("YCSO") Detective Cypher to interview J.V. and his family and conduct a photo lineup.

First, Agent Ribail and Detective Cypher went to the YSCO substation in Zillah to compile a photo line-up for each of the four suspects in the murders and the related carjacking and kidnappings. At the substation, Agent Ribail and Detective Cypher used a Spillman Technologies software program to generate the lineups. Generation of the lineups took approximately two hours. Separate line-ups were prepared for each suspect. The photograph of each suspect was the most recent state law enforcement photo on hand – the Defendant's Spillman photo had been taken two years prior on June 7, 2017 at the Yakima County Jail. None of the photos had been previously shown to any of the witnesses. None of the photos contained indications of criminal misconduct.

Agent Ribail and Detective Cypher next went to J.V.'s residence. Agent Ribail administered the photo line-ups with each of the family members: J.V., N.V., S.V. and M.V. The line-ups were conducted in the drive way of the residence. The family

Response to Motion to Suppress          11

members were interviewed and shown the photo line-ups separately and one at a time; while one member was being interviewed and shown the line-ups, the other members of the family were sequestered in the house. Agent Ribail started each lineup session by reading the line-up instructions to the witness and allowing them to read the instructions. Exhibit C (Instructions signed by J.V.). There was no information in the surrounding area that could have influenced the identification. Agent Ribail used the photos attached as Exhibit D for the line-up that included Donovan Cloud, the photos attached as Exhibit E for the line-up that included James Cloud and the photos attached as Exhibit F for the line-up that included M.J. The photos were shown to the interviewee one at a time. Agent Ribail conducted each line-up by placing the six photographs face down in a stack on the hood of a truck. Agent Ribail used a "blinded" administration technique: he flipped the photographs over one at a time and handed them to the interviewee, careful not to look at the photo himself. If the interviewee paused for a long period of time or made any comments about the photo, Agent Ribail would have to take the photo back from the eyewitness, or ask them at what number photo were they looking, to know which photo they were looking at.

When Agent Ribail conducted the line-up with J.V. containing Donovan Cloud's photo, J.V. identified a photo of Donovan Cloud as the individual who had held a pistol to his son's head the day before. Exhibit C; Exhibit D at 6. When J.V. was shown the line-up including a photo of James Cloud (Exhibit E), he did not

Response to Motion to Suppress            12

identify anyone as one of the kidnappers, but stated that the kidnapper who held the

shotgun had rounded cheeks like the individual in Exhibit E at 5:

Defendant's 6/10/19 photo[2]:          Page 5 lineup photo:

  

When J.V. was shown the line-up including M.J., he stated that the individual in

picture four "looked similar in the eyes," to the kidnapper who had held the shotgun,

but that the shotgun bearer had more facial hair:

---

[2] This is the Defendant's booking photo from when he was arrested on June 10, 2019, two days after the Defendant was seen by J.V., and the photo most recent to the carjacking/kidnapping.

1
2
3
4
5
6
7
8
9
10

Defendant's 6/10/19 photo:                    Exhibit E, page 4 line-up photo:

            

11
12      Despite being able to identify some individuals who shared characteristics with

13  the Defendant, and being able to note certain differences, J.V. did not affirmatively

14  identify the picture of the Defendant as one of the individuals who had terrorized his

15  family the day before.

16

17  D.     J.V. positively identifies the Defendant.

18      Agent Ribail and Detective Cypher returned to J.V.'s residence the next day, on

19  June 10, 2019, to collect evidence in furtherance of their investigation. After they had

20  concluded their search of the area, they were leaving the residence when J.V. flagged

21  them down. J.V. informed Agent Ribail that he had seen online photos of each of the

22  men who had kidnapped his son two days prior. J.V. stated that one of the photos

23  showed the same person that had previously held a gun to his son's head. The other

24  picture was a photo of the man who had held the shotgun. J.V. stated that he was "100

25

26

27

28

percent sure" that those were the two guys. J.V. asked Agent Ribail why Agent Ribail

had not used the pictures that were on Facebook when he conducted his line-up,

because the Facebook photos were better representations. Agent Ribail later asked

J.V. to send him the photos that he had seen on Facebook that he recognized to be

those of the kidnappers. In response, J.V. texted Agent Ribail a photo of Donovan

Cloud, and a link to the Yakama Nation public safety warning of James Cloud.

Exhibit G (J.V. text message).

J.V. had seen the photo of James Cloud posted by the Yakama Nation after the

Yakama Nation realized they had earlier spread an incorrect (and dangerously

misleading) "all clear" message to the community. When he saw that photo, he was

"100 percent sure" it was the man who had pointed a shotgun at him the day before:



E.    <u>J.V. exercises his rights a victim and attends the Defendant's arraignment.</u>

On July 18, 2019, the Defendant was arraigned on the Superseding Indictment.

J.V. exercised his right as a victim to attend the arraignment. 18 U.S.C. § 3771(a)(3).

Even though J.V. had already identified the Defendant five weeks prior, on June 10, 2019, the Defendant sought to exclude J.V. from the hearing.  The Magistrate rightly denied the Defendant's motion.[3] There was nothing in the record to suggest that J.V.'s testimony would be materially altered by attending the proceedings *after* he had already positively identified the Defendant a month prior. This was a not "show-up" - J.V. had already identified the Defendant the month before.

### III.    Analysis

In order to successfully move this Court to conduct a review of the reliability of an eyewitness identification before allowing a jury to decide reliability for themselves, the Defendant must first show the existence of police misconduct that was (1) unnecessary and (2) unduly suggestive. Without that showing, the inquiry ends before any trial court review of reliability, and the jury is allowed to hear both the eyewitness identification and any admissible evidence Defendant wishes to present to attack reliability.

The Defendant falls short. The Defendant alleged that Agent Ribail did not follow proper FBI procedure. In fact, Agent Ribail followed FBI guidance governing the assembly and administration of photo line-ups issued on the very same day he conducted the line-ups in this case. Any immaterial documentation errors of the line-ups did not create suggestive circumstances, and Defendant has failed to articulate

---

[3] *See* ECF 80.

1    how immaterial documentation errors would have had any influence on the

2    eyewitness' identification of the Defendant.

3        The Defendant also accuses the Yakama Nation of engaging in misconduct.

4

5    First, the Defendant's allegation that the Yakama Nation engaged in misconduct was

6    factually incorrect. The Yakama Nation was correcting a prior "all clear," not calling

7    out any eyewitness. Second, that action was certainly not unnecessary – the Yakama

8    Nation is obligated to alert its community when a suspect in a quintuple homicide is

9

10   believed to be armed and on the loose in the community.

11        Even if the Defendant had successfully shown police misconduct that was both

12

13   unnecessary and suggestive, J.V.'s identification is submitted to the jury, not barred

14   outright, because a totality of the circumstances, analyzed under *Biggers*, does not

15   indicate a "very substantial likelihood of irreparable misidentification" that cannot be

16

17   mitigated by the Defendant's right to cross examine J.V., call rebuttle witnesses and

18   advocate for appropriate jury instructions.

19   A.    The *Manson* test does not apply because there was no police misconduct that
20         created unnecessarily suggestive circumstances.

21       Because there is no evidence that any law enforcement official acted

22

23   improperly, J.V.'s identification cannot be hidden from the jury, and whether or not

24   his identification is reliable is a solely question for them to decide.

25       The Constitution protects a defendant against a conviction based on evidence of

26

27   questionable reliability, not by prohibiting introduction of the evidence, but by

28

affording the defendant means to persuade the jury that the evidence is unreliable

*Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Potential unreliability of

evidence does not render its introduction at trial fundamentally unfair. *See Ventris*,

556 U.S. 586 at 594 (rejecting a broad exclusionary test for uncorroborated jailhouse

snitch statements). Even assuming that eyewitness testimony is fallible, fallibility does

not, without the taint of police misconduct, justify a trial court screening the evidence

for reliability before allowing a jury to make that determination. *Perry*, 565 U.S. at

245. Before J.V.'s identification of the Defendant can be concealed from the jury, the

Defendant must show that police acted improperly in obtaining the identification by

creating circumstances that were both unnecessary and suggestive. *Id.* at 228 (citing

*Manson v. Brathwaite*, 432 U.S. 98, (1977)).

This prerequisite – an affirmative showing of police misconduct – makes sense,

and protects a cornerstone of our judicial system: the fundamental role of the jury to

weigh evidence. Without this prerequisite, the door would open to judicial review of

every eyewitness identification prior to its introduction to the jury. *Perry,* 565 U.S. at

243. That type of review would impermissibly trespass on the province of the jury to

weigh the reliability of evidence. It would also render null the protections already

afforded defendants in cautioning juries against placing undue weight on eyewitness

testimony the defendant believes unreliable. These protections include the Sixth

Amendment right to confront the eyewitness, *see Maryland v. Craig*, 497 U.S. 836,

Response to Motion to Suppress                    18

845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant."); the right to an attorney who can expertly test the eyewitness' testimony through cross examination, and argue unreliability to the jury, *Perry*, 565 U.S. at 246; and the protections already built into the courts' instructions to the jury to consider whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness. MODEL CRIM. JURY INSTR. 9th Cir. 4.11 (2020). A critical aim of the prerequisite of police misconduct is not to rob the jury of their right to weigh evidence, but instead to deter law enforcement from using improper line-ups, show-ups and photo arrays. *Perry*, 565 U.S. at 241 (citing *Manson*). Because here, no police conduct has been shown by the Defendant, the Court's inquiry is complete under *Manson* and *Perry*.

    a. Agent Ribail followed FBI procedure when he administered the June 9, 2019 line-up.

On June 9, 2019, the same day Agent Ribail administered the photo line-up to J.V., the FBI promulgated their Procedures for Eyewitness Identification of Suspects Policy Guide[4]. Exhibit H (FBI Policy). That document and the policies therein incorporate and rely upon the Department of Justice Memorandum, EYEWITNESS

---

[4] This document, minus the cover sheet and last page, was provided to Defendant's counsel on September 23, 2019 upon their request for FBI policy governing line-ups.

IDENTIFICATION: PROCEDURES FOR CONDUCTING PHOTO ARRAYS (Jan. 6, 2017)[5]. *Id.* at 19.

In incorporating the guidance of then Attorney General Sally Yates, and updating their own internal policies consistent with the memorandum, the FBI promulgated eight rules for agents to follow when assembling photo line-ups:

1. Prepare a separate photographic lineup for each suspect.
2. Select a photograph of the suspect that resembles the witness's description of the perpetrator or the perpetrator's appearance at the time of the incident.
3. Avoid using photographs that are outdated or are substantially dissimilar from the witness's description of the perpetrator.
4. Include at least five filler photographs that generally fit the witness's description of the perpetrator.
5. Consider creating a consistent appearance between the suspect and fillers by artificially adding or concealing any unique or unusual features (e.g., scars or tattoos).
6. Select photographs that are of similar size, background, format, and color.
7. Not reuse photographs previously shown to the same witness.
8. Attempt to use photographs that do not indicate criminal misconduct (e.g., booking photographs). If a booking photo is the only available photograph of the suspect, the number board or other indicia of prior arrest should be covered or masked and similar masking must be used for all filler photographs.

Exhibit H at 14.

Agent Ribail did not violate any of the guidelines when he assembled the photo line-ups in this case.

---

[5] The memorandum relied on by Defendant.

The FBI also promulgated 16 rules for administering sequential photo line-ups:

1. Conduct the procedure separately for each witness.

2. Provide instructions to the witness as described in subsection 4.7.2., "Instructing the Witness."

3. Conduct the photographic lineup in a location that does not expose the witness to information or evidence that could influence the witness's identification.

4. Ensure that neither the suspect nor any photographs of the suspect are visible where the witness will be present.

5. Consider using "blind" or "blinded" administration techniques. In a blind administration technique, the administrator is not involved in the investigation and does not know what the suspect looks like. In a blinded administration technique, the photographs are shielded from the administrator's view so he or she cannot see the placement of the suspect's photograph, even if he or she knows what the suspect looks like. The use of blind or blinded administration of photo arrays is strongly encouraged whenever practicable.

6. Not allow the witness to observe or overhear other witnesses during the procedure.

7. Allow the witness as much time as needed to view the photographs.

8. Avoid providing the witness any feedback regarding an identification.

9. Ask the witness how confident he or she is regarding any identification made.

10. Consider the value of audio or video recording the procedure. (*See* DIOG subsection 18.5.6.4.17.2, "Recorded Noncustodial Interviews," for approval and documentation requirements for recordings containing audio content.)

11. Have the witness initial and date the chosen photograph, if the witness makes an identification.

12. Request that the witness not discuss the identification procedure or its results with other witnesses involved in the case or have contact with the media.

13. Not advise the witness how many photographs he or she will be asked to view.

14. Present each photo to the witness separately, and remove each from view before presenting the next photograph.

15. Show all photographs at the same pace, even if the witness identifies a photograph.

16. Allow the witness to view any of the photographs again upon request.

Exhibit H at 15.

Agent Ribail followed each of the above rules regarding the administration of photo line-ups. But because the Defendant has inferred otherwise, a few of them are worth discussing here.

> i. Choosing not to record the line-up was not a violation of FBI policy, and at any rate, did not create suggestive circumstances.

The FBI instructs Special Agents to "*[c]onsider the value of* audio or video recording the procedure" (emphasis added). Agent Ribail would testify that on the morning of June 9, 2019, he dispatched to scene of the Medicine Valley murders to lead the processing of the crime scene. Once he felt that assisting agencies had the processing well at hand, he left with Detective Cypher to assemble the line-ups at the nearest available place to do so: the YCSO Zillah substation. He then went to J.V.'s residence in White Swan to interview the family and conduct the line-ups. Agent Ribail had no equipment with which to record the interview. At any rate, recording or not recording a line-up does not in any way suggest the identity of suspect. *Manson* and *Perry* require not just any police misconduct, but evidence that police acted improperly in obtaining the identification by creating unnecessarily suggestive

Response to Motion to Suppress          22

1  circumstances. *Perry* 565 U.S. at 238-239 (citing *Manson* 432 U.S. at 107). Agent

2  Ribail's decision to not record the line-ups did not in any way create an unnecessarily

3  suggestive circumstance.

4

5             ii.  Agent Ribail administered the line-ups using the blinded
                 administration technique required by FBI policy.

6

7       FBI policy instructs Agents to use one of two line-up administration techniques

8  when either is practical: blind or blinded. The blind method requires the use of an

9  Agent not involved in the investigation who does not know what the suspect looks

10  like. Agent Ribail will testify that he knew of no other Agent in the vicinity who did

11  not have knowledge of the investigation, and thus it was not practical to administer a

12  blind line-up. So, Agent Ribail used the blinded method: the photographs were

13  shielded from his view so he could not see the placement of the suspect's photograph.

14

15  In fact, Agent Ribail will testify that when J.V. indicated that he identified one of the

16  assailants, Agent Ribail did not realize that J.V. had identified Donovan Cloud until

17  he asked J.V. what number photo J.V. was looking at.

18

19

20             iii.  FBI policy requires that Agents request that the witness have
                 no contact with the media, not ignore public safety warnings
                 regarding the whereabouts of suspects who pose a danger to
                 the witness and his family.

21

22

23

24       The FBI policy requires that Agents request that line-up witnesses not have any

25  contact with the media. It does not request that Agents ask witnesses ignore or block

26  out public safety messages from law enforcement or their government. J.V. did not

27

28

Response to Motion to Suppress      23

contact the media. For that matter, the record contains no evidence that he viewed or had contact with any media output. J.V. viewed a public safety announcement issued by the Yakama Nation, warning their community that an armed and dangerous suspect in a quintuple homicide was loose in their community. Defendant's interpretation of FBI policy would have Agent Ribail tell J.V. to put blinders on and avoid such warnings, thereby endangering his own family.

J.V.'s family had been terrorized two days before. J.V. and his family had witnessed the kidnapping of their son and the carjacking of their truck. They were the only witnesses to the crime. Just before his family was terrorized, five people had been shot dead ten minutes down the road. The man who pointed a gun at his son's head and a shotgun at J.V. were still at large. They were obviously dangerous. They were obviously armed. For Agent Ribail to tell J.V. to ignore public safety warnings regarding the whereabouts of the Defendant and his brother would have been irresponsible and dangerous. He was right not to instruct J.V. to avoid such warnings, and failing to do so was not "misconduct."

Finally, even if FBI policy did (ridiculously) require that Agent Ribail warn J.V. to avoid public safety warnings, J.V.'s viewing of the public safety warning here would still not result in the showing of police misconduct required under *Perry. See Schroeder v. Premo*, 714 F. App'x 666, 669 (9th Cir. 2017) (finding no police misconduct, and thus allowing in-court identification *without* judicial reliability

Response to Motion to Suppress            24

assessment, where the eyewitness had read a newspaper article that included a

photograph of the suspect and saw a brief news clip about the suspect's case prior to

identifying him in the photo lineup.).

> iv. Agent Ribail generally followed FBI policy regarding the documentation of line-ups, and documentation deficiencies do not create unnecessarily suggestive circumstances.

In addition to guidance regarding the creation and administration of photo line-

ups, the FBI publishes to its Agent guidance regarding the documentation of line-ups.

Exhibit H at 17. Agent Ribail generally followed these procedures, with one

immaterial exception: he would testify that he did not record the amount of time it

took for J.V. to make the identification of Donovan Cloud.

But it begs the question: what unnecessarily suggestive circumstance was

created by Agent Ribail's failure to record the time it took for J.V. to identify

Donovan Cloud? None. What does the length of time it took J.V. to identify Donovan

Cloud have to do with the Defendant, James Cloud? Nothing. And how could failure

to record identification time of Donovan Cloud affect J.V.'s identification of the

Defendant the next day? It could not.

Agent Ribail followed FBI protocol when he administered the line-ups on June

9, 2019. There was no misconduct on his part. Defendant has not pointed to any action

on the part of Agent Ribail or any other law enforcement official that created

unnecessarily suggestive circumstances. Furthermore, the line-up generated a *non-*

identification of the Defendant. How that that impacted J.V.'s identification a day

later is a question left unanswered by the Defendant.

> b. The Yakama Nation did not commit misconduct by warning their community that a man who was suspected of murdering five people, attempting to murder two others, kidnapping a young child and carjacking a family was armed and at large.

"A primary aim of excluding identification evidence obtained under

unnecessarily suggestive circumstances is to deter *law enforcement* use of *improper*

*procedures* in the first place." *Perry* 565 U.S. 228 at 241 (emphasis added). The

rational for the *Manson* test is clear: we want to deter law enforcement from engaging

in conduct that creates unnecessarily suggestive circumstances influencing an

eyewitness. *Id*.

First, the Yakama Nation Facebook page is administered by the Yakama

Nation, not law enforcement. Second, the reason the Yakama Nation posted

Defendant's likeness on Facebook is obvious. White Cloud and the Yakama Nation

are not large communities. A quintuple homicide does not go unnoticed. A

community like the Yakama Nation is understandably put on high alert by a violent

crime spree such as the one that took place on June 8, 2019. It's no wonder that the

Yakama Nation informed their members that the suspects had been arrested and were

in custody. Exhibit A. It is equally obvious why the Yakama Nation would issue the

corrective public safety warning when they realized that their prior "all clear" was

incorrect. Even the Defendant acknowledges that there is nothing wrong with police

Response to Motion to Suppress                26

issuing a wanted poster. It goes without saying that Yakama Nation did nothing wrong when it issued its corrective announcement. In fact, in light of their prior "all clear" bulletin, the only responsible action was for the Yakama Nation to issue the corrective posting that was later seen by J.V. To *not* issue the warning, and leave community members under the impression that the Defendant had been arrested, would have placed members of the community in further danger. This is not the kind of action that the law seeks to deter.

The fact that Yakama Nation chose to describe its earlier "all clear" message as a "misidentification" does not change the analysis. "Misidentification" was an obvious reference to their earlier incorrect "all clear" posting. Without acknowledging that the earlier "all clear" posting was incorrect, the second corrective warning would have been confusing, leaving residents unsure of whether the Defendant had been arrested or was still loose in their community. Defendant's assertion that this was some sort of "call out" of J.V. is flat wrong. There is no record of law enforcement telling the Yakama Nation that J.V. had failed to identify the Defendant, nor any apparent reason why they would. The Yakama Nation was not shaming anyone, certainly not J.V. The Yakama Nation's corrective public safety warning, including an indication that the prior post was incorrect, was the only responsible action the Yakama Nation could have taken. Certainly this is not the type of action that the *Manson* and *Perry* tests seek to deter. The Yakama Nation should not have to choose between alerting the

Response to Motion to Suppress            27

community of dangerous criminals and being able to call eyewitnesses in a later

prosecution. Their action was far from unnecessary and does not constitute

misconduct.

In fact, the actions of the Yakama Nation are almost identical to situations

*Perry* described as suggestive, but <u>not</u> warranting exclusion:  "For example, suppose a

witness identifies the defendant to police officers after seeing a photograph of the

defendant in the press captioned "theft suspect," or hearing a radio report implicating

the defendant in the crime. Or suppose the witness knew that the defendant ran with

the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these

circumstances might have "suggested" to the witness that the defendant was the

person the witness observed committing the crime." *Id.* at 244. Under *Perry*, those

identifications are put before a jury, not excluded from their purview. Similarly, J.V.'s

identification should be put before a jury.

B.    <u>Even if the *Manson* test did apply, the identification procedure was not unnecessarily suggestive.</u>

Even if there had been misconduct, the Defendant must next show that the act

of misconduct was both unnecessary and suggestive. "[D]ue process concerns arise

only when law enforcement officers use[d] an identification procedure that is *both*

suggestive *and* unnecessary." *Id.* at 238–239. A rule requiring automatic exclusion

upon a showing of misconduct would "g[o] too far," for it would "kee[p] evidence

from the jury that is reliable and relevant," and "may result, on occasion, in the guilty

going free." *Manson*, 432 U.S. at 112. Only those acts of misconduct that create circumstances that are both unnecessary and suggestive satisfy the "police misconduct" element of *Perry* and *Manson*. Although Defendant (wrongly) claims that several acts constituted misconduct, the Defendant has only alleged that such one act was unnecessarily suggestive: the Yakama Nation's public safety warning that the Defendant was still at large and dangerous[6].

Whether an action was "unnecessary" and "suggestive" are separate inquiries. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds* by *United States v. Johnson*, 457 U.S. 537 (1982). In *Stovall* (a case upon which *Manson* is built), police had conducted a show-up by bringing the suspect handcuffed into the victim's hospital room and asking if he "was the man." The victim later made an in court identification. The Supreme Court recognized that the show up was of the type that had been widely condemned, but upheld the conviction nonetheless because the show up was necessary (it was thought the victim might die).

There is no contesting the Yakama Nation's corrective public service alert was equally necessary. It was the only reasonable action to take, given the dangerous nature of the crimes that had been committed for which the Defendant was the sole

---

[6] Defendant makes the conclusory statement that failure to record an interview and failure to document the interview in detail somehow influences the interviewee (i.e. is "suggestive"). Defendant stops short of providing any logical connection between recording and documenting the interview (the latter of which would occur *after* identification) and suggestiveness.

suspect at large. And because the alert was put out for the sole purposes of alerting the community of the Defendant's dangerous presence and soliciting information as to his whereabouts, it was necessary to include an accurate description of the Defendant (i.e. his photo) and a description of the danger he posed. Nothing about the post was unnecessary. Because it was not unnecessary, it cannot serve as the showing of police misconduct required under *Perry.*

C.    J.V.'s identification of the Defendant is reliable viewed in the totality of the circumstances.

Finally, even if the Defendant could successfully show that there was some sort of police misconduct that was both unnecessary and unduly suggestive, this Court should still not take the extraordinary step of concealing J.V.'s identification of the Defendant from the jury, because the circumstances do not indicate a "very substantial likelihood of irreparable misidentification," and thus the identification evidence should be admitted at trial and the reliability of the identification is "for the jury to weigh." *Manson*, 432 U.S. at 114, 116. A "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability," for reliability is the "linchpin in determining the admissibility of identification testimony." *Id.* at 106. The factors to be considered in evaluating the likelihood of misidentification are: (i) the opportunity of the witness to view the criminal at the time of the crime; (ii) the witness' degree of attention; (iii) the accuracy of the witness' prior description of the criminal; (iv) the level of certainty

Response to Motion to Suppress              30

demonstrated by the witness at the confrontation and (v) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The *Biggers* factors, applied to J.V.'s identification of the Defendant, weigh heavily in favor of allowing the jury to consider J.V.'s testimony for themselves.

      a.   J.V. had ample opportunity to view the Defendant at the time of the crime.

Both parties agree that J.V. had ample opportunity to view the Defendant. Even more so than Donovan Cloud. The Defendant was the perpetrator closest to J.V., and followed him into the house. The Defendant was not wearing a mask. It was a bright sunny day. The confrontation lasted for approximately ten minutes. J.V. had more than enough opportunity to view the Defendant's face to allow him to make a reliable identification.

      b.   J.V.'s degree of attention was high during his interaction with the Defendant.

J.V. was no mere bystander. He was the primary focus of the Defendant's ire. He talked with the Defendant and Donovan Cloud. He negotiated with them. He pleaded with them. There is no doubt that J.V. was paying attention to what the Defendant and his brother were doing.

      c.   J.V.'s prior description of the Defendant was not inaccurate.

J.V. did not initially pick the Defendant out of a photo line-up. Likely because, as J.V. later told Agent Ribail, the picture of the Defendant in Yakama Nation's public

safety alert was a better representation of the Defendant. Whatever the reason the Defendant did not initially pick out the Defendant, he did provide comparative descriptors during the line-up. He indicated that the Defendant had similar cheeks to this person:



That's a reasonable comparison to the Defendant's cheek structure and facial hair:



Response to Motion to Suppress                    32

1
2          J.V. indicated that the Defendant had similar eyes, but more facial hair, than
3
this man:
4
5
6
7
8
9
10
11
12
13
14



15        That is also not an inaccurate description:
16
17
18
19
20
21
22
23
24
25



26
27
28

Response to Motion to Suppress              33

J.V.'s comparative descriptions of the Defendant were not perfect, but not so wholly off the mark to justify depriving the jury of the opportunity to hear his testimony regarding identification, especially when all the other *Biggers* factors weigh heavily in favor of admissibility.

      d.  J.V. was "100 percent sure" that the man pictured in the Yakama Nation public safety warning was the man who pointed a shotgun at him.

When J.V. told Agent Ribail that he had seen the two carjacking and kidnapping suspects on Facebook, he said that he was "100 percent sure" that they were the perpetrators. By J.V.'s words, his level of certainty that that the Defendant is one of his assailants could not be higher.

      e.  J.V.'s identification of the Defendant occurred 24 to 48 hours after the Defendant carjacked him and tried to abduct his son.

The kidnapping and carjacking took place on June 8, 2019 between 4:00 and 5:00 p.m. In the afternoon of June 10, 2019, J.V. told Agent Ribail that he had spotted the Defendant in the public safety warning. Agent Ribail believes J.V. had viewed the public safety warning sometime the evening of June 9, 2019. These times are all recent enough for J.V. to have retained his memory of the Defendant's appearance.

Each of the *Biggers* factors weighs in favor of admissibility. Defendant's motion turns *Biggers* on its head by stating that because J.V. had ample time to view the Defendant, a high degree of attention during the incident, a high level of certainty in the subsequent identification and little time to forget what the Defendant looked

like, that somehow the identification is *less* reliable. That's an interesting sleight of hand, but not how the *Biggers* test works.

Finally, at play here is the open question: why was J.V. not able to identify the Defendant in the line-up, but able to identify him when he saw the public safety warning? Certainly, that's a question that a jury should be allowed to consider. But it's not hard to see why J.V. might not have picked the Defendant out of the initial line-up. As J.V. told Agent Ribail, the photo in the safety alert was a better representation of the Defendant. He was right:

Defendant's line-up photo:                    Defendant's photo posted by Yakima Nation:

        

Aside from a goatee, which J.V. indicated the Defendant had when he was comparing photos in the lineup the day before, the two photos are dissimilar: they differ in chubbiness, skin tone, even apparent facial structure. Note, the picture on the

right, from the Yakama Nation public safety warning, is in unaltered form. Curiously,

the Defendant altered the same photo when he included it in his motion[7] by stretching

it, which made it seem more comparable to the line-up photo, and giving the line-up

photo the "thicker" appearance the Defendant argues was closer to an initial

description given by S.V. As seen above, Yakama Nation photograph on the right is

actually the "thicker" of the two, and closer to S.V.'s description, not the other way

around.

The photo of the Defendant from the Yakama public safety warning is also a

better representation of the Defendant's appearance at the time of the offense than the

two year old line-up photo:

---

[7] Defendants Motion, page 37.

Response to Motion to Suppress                    36

Photos posted by Yakama Nation:



Photos taken two days after J.V. saw the Defendant:



Weighing the *Biggers* factors, the Court cannot come to the conclusion that circumstances indicate a "very substantial likelihood of irreparable misidentification," *Manson*, 432 U.S. at 116. Thus the identification evidence should be admitted at trial and the reliability of the identification is "for the jury to weigh." *Id*.

1

D.    Courts applying the *Manson / Perry* test permit eyewitness testimony under
these circumstances.

2

3       In *Perry,* the Supreme Court held that a defendant must show improper police

4    conduct. *Perry*, 565 U.S. at 241. Even before *Perry*, the court had linked the due

5    process check of exclusion "not to suspicion of eyewitness testimony generally, but

6
7    only to improper police arrangement of the circumstances surrounding an

8    identification." *Id*. at 242 (citing *Coleman v. Alabama*, 399 U.S. 1 (1970). *See also*

9
10   *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (Where the "crucial element of police

11   overreaching" is missing, the admissibility of an allegedly unreliable confession is "a

12   matter to be governed by the evidentiary laws of the forum . . . and not by the Due

13
14   Process Clause."); *Schroeder v. Premo*, 714 F. App'x 666, 669 (9th Cir. 2017)

15   ("Under *Perry*, however, only police-created impermissibly suggestive circumstances

16   implicate due process concerns and thus require a reliability assessment by the trial

17   court.").
18

19       In *Schroeder*, cited above, the Ninth Circuit found <u>no police misconduct</u> where

20   the eyewitness had read a newspaper article that included a photograph of the suspect

21   and saw a brief news clip about the suspect's case prior to identifying him in a photo

22
23   lineup. 714 F. App'x at 669. Thus, the Ninth Circuit held that the trial court did not err

24   by admitting the identification without judicial review of reliability.

25       In *Boyer v. Chappell*, the Ninth Circuit found that, because there was <u>no police</u>

26
27   <u>misconduct</u>, a trial court did not err by admitting in-court identification, despite the

28

Response to Motion to Suppress            38

witness having mis-identified the defendant in two live line-ups and one photo line-up. 793 F.3d 1092, 1100 (9th Cir. 2015). There, in two prior live line-ups, the witness picked out men other than the defendant. In a subsequent photo line-up, she also picked out someone different than the defendant. Although there were obvious deficiencies, the Ninth Circuit held that because the unreliability did not stem from "unnecessarily suggestive circumstances arranged by law enforcement . . . the state court did not unreasonably apply clearly established Supreme Court precedent [*Perry*] when it determined that federal law did not require a live evidentiary hearing to assess the reliability of [witness'] testimony." *Id*.

In *Benjamin v. Gibson*, an 11 year old girl failed to identify the defendant as the perpetrator and instead picked out another man in a photo line-up. She reiterated that mis-identification at a preliminary hearing (at which the defendant was presumably present), again failing to identify the defendant. Then, after a lunch break, she took the stand, recanted her testimony, and identified the defendant. She was allowed to identify the defendant at a later trial. Despite the obvious reliability issues, the Ninth Circuit held that counsel was not ineffective by not moving to suppress her testimony, because the motion would have likely been unsuccessful since there was no police misconduct. 640 F. App'x 656, 658 (9th Cir. 2016) (unpublished).

It's clear from the above line of cases, in order for this Court to even consider concealing J.V.'s identification of the Defendant from the jury by engaging in a review of his reliability, it must first identify circumstances that were:

1.  Caused by police misconduct;

2.  Unnecessary; and

3.  Unduly suggestive.

The Defendant has not identified any such circumstances. Therefore, the Court's inquiry ends here and the question of reliability is one for the jury.

E.    This Court should not take the extraordinary step of casting aside *Manson* and *Perry* and exclude the evidence under Rule 403.

*Perry* is clear: without police misconduct creating unnecessary and suggestive circumstances, eyewitness identification of a defendant cannot be excluded. To exclude an eyewitness identification without a showing of police misconduct is to ignore the Supreme Court's holding in *Perry*. This Court cannot simply toss aside on-point Supreme Court precedent governing the admissibility of evidence simply on the basis that Rule 403 is also applicable. Rule 403 is always applicable. But where the Supreme Court has established a detailed test for the admissibility of evidence, as it has with eyewitness identifications like the one here, Supreme Court precedent controls. Otherwise, every Supreme Court ruling governing the admissibility of evidence would be swallowed by Rule 403.

There is nothing to differentiate J.V.s identification of the Defendant from the eyewitness identification at issue in *Perry* or in the numerous Ninth Circuit decisions cited above. In each case, the testimony is or will be that the Defendant was the person who committed the crime. J.V.'s identification cannot be treated differently than the witness in *Perry*. In both, there was no police misconduct. Just as the Supreme Court held that the inquiry in *Perry* could go no further, so must this Court.

## IV.    Conclusion

The Defendant is asking this Court to take the extraordinary step of stripping the jury of their primary function: the weighing of evidence. The law is clear that the Court can do so only after identifying police misconduct that is both unnecessary and unduly suggestive. The Defendant has proffered no such actions on the part of law enforcement. Furthermore, the totality of the circumstance surrounding J.V.'s identification of the Defendant indicate that the identification was reliable, and certainly not do not indicate a risk of irreparable misidentification.

For those reasons, the Defendant's motion should be denied, and the jury allowed to fulfill its proper role.

//

//

//

//

Response to Motion to Suppress                41

DATED:  March 6, 2020, 2020      William D. Hyslop
United States Attorney

*s/ Thomas J. Hanlon*____
Thomas J. Hanlon
Assistant United States Attorney

*s/ Richard Burson*____
Richard Burson
Assistant United States Attorney

    I hereby certify that on March 6, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:   Lorinda Youngcourt, Esq.; John B. McEntire, IV, Esq.; Jeremy B. Sporn, Esq.

*s/ Richard Burson*____
Richard Burson
Assistant United States Attorney