

John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for James D. Cloud

# United States District Court
## Eastern District of Washington
### Honorable Salvador Mendoza, Jr.

| | |
|---|---|
| United States of America, | No. 1:19-CR-2032-SMJ-1 |
| Plaintiff, | |
| | Motion in Limine Re: |
| v. | Lindell LaFollette's |
| | False Memory[1] |
| James Dean Cloud, | |
| | Yakima — With Argument |
| Defendant. | |
| | September 29, 2020 – 9:00 a.m. |

---

[1] While a victim's initials are normally used, Mr. LaFollette interviewed with the Yakima Herald-Republic, where his full name was published. *See* https://bit.ly/LafolletteTellsWholeStory. Given Mr. LaFollette's voluntary decision to make his full name available to the community, the same privacy concerns aren't at issue.

Table of Contents

I.    Introduction ............................................................................................................. 1

II.    Background.............................................................................................................. 3

    A.    Mr. LaFollette travels to Medicine Valley, where he is shot and witnesses two murders. . 3

    B.    Mr. LaFollette escapes, then provides a statement to police. ............................. 5

    C.    First responders transport Mr. LaFollette to the hospital, where he provides a second statement. .................................................................................................. 6

    D.    The following day, police arranged for Mr. LaFollette to view line-ups. He did not identify James Cloud as a shooter. ..................................................................... 7

        1.    Line-Up 5032 (Donovan Cloud). ......................................................... 7

        2.    Line-Up 5033 (James Cloud) ............................................................... 8

        3.    Line-Up 5034 (Morris Jackson). .......................................................... 8

        4.    Line-Up 5035 (Natasha Jackson) ....................................................... 10

    E.    Police violated policy when administering line-ups to Mr. LaFollette. ........... 10

        1.    Police failed to record the line-up...................................................... 11

        2.    Police failed to document the line-up in detail. ................................. 13

        3.    Police failed to caution Mr. LaFollette against contact with "the media." ........ 15

    F.    A few days after the line-ups, Mr. LaFollette spoke with the press. .................. 20

    G.    Months later, Mr. LaFollette referred to James Cloud as one of the shooters after "seeing Cloud, and hearing the name, on the news." ................................................... 21

    H.    During a follow-up interview, Mr. LaFollette reverses everything he told police during the line-up. ............................................................................................................... 22

III.    Discussion ............................................................................................................. 23

    A.    Standard ........................................................................................................ 23

    B.    The probative value of Mr. LaFollette's statement is less-than-slight............. 26

    C.    The prejudicial effect of Mr. LaFollette's statement is substantial. .............. 31

IV.    Conclusion............................................................................................................. 32

# I.    Introduction

And then there were two.

On June 8, 2019, two armed males carjacked J.V.'s truck from his home. The next day, police administered a line-up on J.V., and he did not identify James Cloud as one of the carjackers. During the line-up, police failed to follow several long-established best practices, including cautioning J.V. against contact with any media about the event. Lacking that admonition, J.V. logged onto Facebook after the line-up, viewed a government-issued "Wanted" poster for James Cloud, and called police to reverse his non-ID, claiming a small, pixelated picture of James Cloud in a prison jumper "better represented" the carjacker he saw than the full-sized, non-pixelated photo police showed him during the line-up.

That makes one.

Also on June 8, two armed males—one wearing a blue shirt, the other wearing a red shirt—shot Lindell LaFollette and others at a home in Medicine Valley. The next day, police administered a line-up on Mr. Lafollette. He identified the blue-shirted male as Morris Jackson, but did not identify the red-shirted male as James Cloud. During this line-up, police failed to follow the same long-established best practices, including cautioning Mr. LaFollette against contact with any media or witnesses about the event. Lacking that admonition, Mr. LaFollette participated in a

1  recorded interview with the Yakima Herald-Republic a few days later, where the

2  reporter provided Mr. LaFollette with information connecting the Medicine Valley

3  murders to James and Donovan Cloud—a connection Mr. LaFollette ***did not make***

4  as an eyewitness. After that interview, Mr. LaFollette talked with "a few different

5  people" (he cannot remember who, or whether they were witnesses), all of whom

6  said James and Donovan Cloud were responsible for the Medicine Valley murders.

7      This post-event information left a lasting impression.

8      In late-January 2020, the FBI interviewed Mr. LaFollette. During that

9  interview, Mr. LaFollette repeatedly referred to the red-shirted male as James

10  Cloud. When agents asked why Mr. LaFollette was making that connection (he

11  never had before), Mr. LaFollette responded the connection came after "seeing

12  Cloud, and hearing the name, on the news."

13      In early-August 2020, Mr. Cloud's defense team interviewed Mr. LaFollette.

14  During that interview, Mr. LaFollette not only referred to the red-shirted male as

15  James Cloud, but now referred to the blue-shirted male (the one he previously

16  identified as Morris Jackson) as Donovan Cloud—a complete reversal from what he

17  told police right after the shootings, yet consistent with what the reporter and "a

18  few different people" told him.

19      That makes two.

Two witnesses, two reversed opinions, both after absorbing post-event information they never should have been exposed to in the first place. What a difference following policy makes.

But Mr. LaFollette's reversed opinion stands apart as more dangerous than J.V.'s reversed opinion. Whereas J.V. called police shortly after the line-up, walked back his non-ID, and stated he was "100% certain" the man from the Wanted poster carjacked him, Mr. LaFollette did not. Instead, Mr. LaFollette subconsciously merged what he saw in-person with what he was exposed to from his interview with the press and speaking with "a few different people," creating what is referred to as a "false memory." Because this false memory carries little probative value and is highly prejudicial, James Cloud asks the Court to exclude it under Rule 403.

## II.    Background

### A.    Mr. LaFollette travels to Medicine Valley, where he is shot and witnesses two murders.

In the early-afternoon on June 8, 2019, Dennis Overacker picked up E.Z. (a Hispanic female), A.Z. (her then-6-month-old son), and Mr. LaFollette (a then-61-year-old white male) in his truck, and then traveled John Cagle's home (referred to as "Dobie Jack") in Medicine Valley.

Why they went there depends on who you ask. E.Z. claimed Dobie Jack "was getting along in age" and they wanted to check on him; Mr. LaFollette claimed they were looking to purchase a motorcycle from Dobie Jack and wanted to view it; and another witness stated Dobie Jack sold methamphetamine, and the group was looking to buy.

The group arrived at Dobie Jack's home in Medicine Valley, where they were met at the front gate by a blue-shirted Native American male who stated "Dobie wasn't seeing anyone right now." Frustrated, the group turned around and traveled to Thomas Hernandez's house, seeking his help (he knew Dobie Jack well) to secure drugs. Mr. Hernandez agreed to help, climbed into the truck, and the group (now five) returned to Medicine Valley.

They arrived at the front gate (again), and Mr. Hernandez entered the property to speak with two Native American males—a blue-shirted male armed with a shotgun, as well as a red-shirted male armed with a rifle. After roughly five minutes spent talking, the red-shirted male followed Mr. Hernandez back to the truck, where the group waited inside the cab.

What happens next depends on who you ask. From Mr. LaFollette's viewpoint, the following occurred: the red-shirted male shot Mr. Overacker

(driver); the blue-shirted male shot him (front-passenger) and E.Z.

(rear-passenger); and someone shot Mr. Hernandez (standing outside the truck).

**B.    Mr. LaFollette escapes, then provides a statement to police.**

Mr. LaFollette slid into the driver's seat and drove the truck away from

Medicine Valley while E.Z. dialed 911. Mr. LaFollette stopped the truck near 3400

Evans Road (about 13 miles east of Medicine Valley) to wait for first responders:



YCSO Deputy Alan Klise arrived at the truck's location around 4:30 p.m.,

finding Mr. Overacker dead in the driver's seat, Mr. LaFollette shot in the

passenger seat, E.Z. shot in the rear-passenger seat, and A.Z. unharmed.

He asked what happened. Mr. LaFollette stated they arrived at Medicine

Valley to "purchase motorcycle parts" and were met by three individuals they did

not know. After watching the exchange between Mr. Hernandez and one of the

men, Mr. LaFollette thought something was wrong, and then "the shooting

started." He described one shooter as a dark-skinned male wearing a red shirt with

"puffy, dark, curly hair," and the other shooter as a dark-skinned male wearing a blue shirt.

## C.    First responders transport Mr. LaFollette to the hospital, where he provides a second statement.

EMTs stabilized Mr. LaFollette with 50 mcgs of fentanyl and transported him to Virginia Mason Memorial Hospital in Yakima. There, YCSO Deputy Jesus Arreguin interviewed Mr. LaFollette, and he described the shooters as follows:

| Description | Shooter #1 | Shooter #2 |
|---|---|---|
| Ethnicity | Native American | Native American |
| Age | Young (20s) | Young (20s) |
| Height | 5'8" | Unknown |
| Weight | 175 lbs. | 150 lbs. |
| Hair (Head) | Shorter | Black baseball cap |
| Hair (Face) | Light facial hair | Unknown |
| Top | Red shirt with large logo (maybe a bulldog) | Long-sleeve blue shirt |
| Bottom | Blue jeans | Blue and white shorts |
| Weapon | Rifle | Shotgun |

Deputy Arreguin completed his interview, leaving Mr. LaFollette to recover at the hospital.

**D.    The following day, police arranged for Mr. LaFollette to view line-ups. He did not identify James Cloud as a shooter.**

On June 9, 2019, two of the lead investigating officers—FBI Special Agent Ronald T. Ribail and YCSO Detective Dan Cypher—met with Mr. LaFollette and administered four line-ups:

**1.    Line-Up 5032 (Donovan Cloud).**

The first line-up contained six photographs, including Donovan Cloud:[2]



Mr. LaFollette viewed this line-up and didn't identify anyone.

---

[2] Note: although the four line-ups shown in this motion look like four separate pages with six photos each, that is not the case. Each line-up contained six separate, 8.5x11-inch photos, which police administered sequentially (i.e., one-at-a-time).

Motion in Limine
– 7 –

1

2

### 2.    Line-Up 5033 (James Cloud).

The second line-up contained six photographs, including James Cloud:



Mr. LaFollette viewed this line-up and didn't identify anyone.

### 3.  Line-Up 5034 (Morris Jackson).

The third line-up contained six photographs, including Morris Jackson:



Mr. LaFollette viewed this line-up and selected Morris Jackson (#4) as the blue-shirted male who "shot me and had the shotgun":

He also noted on the line-up form he suffers from "short term memory loss."

### 4.    Line-Up 5035 (Natasha Jackson).

The fourth line-up contained six photographs, including Natasha Jackson:



Mr. LaFollette viewed this line-up and did not identify anyone.

So four line-ups with one identification: Morris Jackson.

### E.    Police violated policy when administering line-ups to Mr. LaFollette.

The same two law enforcement officers that administered line-ups on J.V. administered the line-ups on Mr. LaFollette: SA Ribail and Detective Cypher. And like J.V.'s line-up, both officers violated procedures from their agencies. Repeatedly.

1  **1.      Police failed to record the line-up.**

2          As discussed in James Cloud's Motion to Suppress J.V.'s Tainted

3  Identification,[3] recording a line-up is important. Doing so not only "preserves the

4  identification process for later review in court," but also "allows fact finders to

5  directly evaluate a witness's verbal and nonverbal reactions and any aspects of the

6  array procedure that would help to contextualize or explain the witness' selection."[4]

7  And while the United States asserts "not recording a line-up does not in any way

8  suggest the identity of [a] suspect," recording does help ensure police do not

9  accidentally (or intentionally) influence the line-up through verbal or non-verbal

10  cues—cues that can only be assessed through reviewing a recording on what

11  happened. Recording promotes accountability.

12          The YCSO recognizes accountability is important, which is why recording is

13  included in their line-up policies:

14

| Agency | Policy | Source |
|--------|--------|--------|
| YCSO | "Whenever feasible, the eyewitness identification procedure should be audio and/or video recorded and the recording should be retained according to current evidence procedures." | 603.5 |

15

16

17          DOJ also recognizes accountability is important, which is why, in 2017,

18

19  _____

[3] ECF No. 147.

[4] http://bit.ly/EyewitnessIDMemo at fn 3, last accessed on August 20, 2020.

Motion in Limine

– 11 –

then-Deputy Attorney General Sally Yates directed all law enforcement heads to amend their policies to include a pro-recording approach:[5]

| Agency | Policy | Source |
|--------|--------|--------|
| DOJ | "The witness's identification of a photo, if any, and the corresponding statement of confidence should be clearly documented by video- or audio-recording the photo array." | 9.1.1 |

Despite DOJ's directive that all law enforcement heads "should review these procedures and, to the extent necessary, update their own internal policies to ensure they are consistent with the procedures described in this document," that didn't happen with the FBI.

On June 9, 2019, the FBI updated—finally, two years after DOJ instructed it to—its eyewitness ID policies, including a watered-down recording policy that advises agents to "consider the value" of recording:[6]

| Agency | Policy | Source |
|--------|--------|--------|
| 2019 Policy Manual | "Consider the value of audio or video recording the procedure." | 4.7.1.2 |

The FBI's failure to amend its policies consistent with DOJ's 2017 directive is especially odd since the FBI's 2019 Eyewitness ID Policy Manual cites, as authority

---

[5] http://bit.ly/EyewitnessIDMemo at 5 (Policy 9.1), last accessed on August 20, 2020.
[6] Exhibit A – *Procedures for Eyewitness Identification of Suspects – Policy Guide*, Federal Bureau of Investigation – June 9, 2019.

1   for the recent changes, DOJ's 2017 directive:[7]

<br>

**UNCLASSIFIED//LES**

(U) Procedures for Eyewitness Identification of Suspects Policy Guide

---

### 5. (U) Authorities

- (U) Constitution of the United States
- (U) *The Attorney General's Guidelines for Domestic FBI Operations* (AGG-Dom), as amended
- (U) Department of Justice (DOJ) memorandum, "Eyewitness Identification: Procedures for Conducting Photo Arrays" (01/06/2017)

<br>

8   YCSO Det. Cypher violated his agency's policies by not recording the line-up, and

9   while SA Ribail may not have violated the FBI's watered-down recording policy, he

10  violated DOJ's recording directive.[8]

### 2.    Police failed to document the line-up in detail.

12  As discussed in James Cloud's Motion to Suppress J.V.'s Tainted

13  Identification,[9] documenting a line-up in detail is important. Like video recording,

14  detailed documentation preserves not only what happened for subsequent court

15  review on the line-up's suggestibility, but also "[b]asic research suggests that the

---

[7] Exhibit A at 6.

[8] In its response to James Cloud's Motion to Suppress J.V.'s Tainted ID, the United States asserts SA Ribail "had no equipment with which to record the interview." (ECF No. 155 at 22.) As Dr. Cara Laney will testify, any recording device is better than no recording device, including a cell phone.

[9] ECF No. 147.

memories of law enforcement officers are not infallible and, for example, officers may recall following 'scripts' when improvisation occurred."[10] Again, it's about accountability.

Here, SA Ribail documented Mr. LaFollette's line-up with a one-page report:

198A-SE-3120298 Serial 48

-1 of 1-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION** 

Date of entry ___06/20/2019___

L███ L█████████, date of birth (DOB)████████, was interviewed at 4982 Progressive Rd, Wapato, WA.  After being advised of the identity of the interviewing Agent, also present was Det. Dan Cypher (YSO) and the nature of the interview, LAFOLLETTE provided the following information:

L████████ was read Photographic Lineup instructions and allowed to read them. L█████████ and writer subsequently signed the instructions. L███████ reviewed four sets of photographs containing six photographs each. The groups are numbered 5032, 5033, 5034, and 5035. During the review L███████ provided the following information:

5032 - L███████ did not identify anyone.

5033 - L███████ did not identify anyone.

5034 - L███████ stated that #4 (MORRIS JACKSON)possibly looks like the guy that had blue shorts, a hat over his head and had the shotgun.  Then L██████ said "that is the person that shot me and had the shotgun," identifying him as the shooter with the shotgun.  L█████████ stated that #2 (QUENTINE SAMPSON)looks sort of like the other shooter but did not identify him.

5035 - L███████ did not identify anyone. He did not see a female.

During the interview, L███████ notified that he has health issues and sometimes has short term memory loss.

The signed instructions and lineups will be made part of the investigative file.

---

[10] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 91 Temp. L. Rev. 1, 72 (2019).

1    Missing from SA Ribail's report are the following items from the FBI's 2019

2    policy manual: 1) "[t]he procedures used in the photographic line-up

3    (i.e., sequential or simultaneous)"; 2) "the presentation order of the photographs

4    and whether any photograph was shown to the witness more than once";

5    3) Mr. LaFollette's "stated degree of certainty for both identification and

6    nonidentification results"; and 4) [t]he approximate amount of time

7    [Mr. LaFollette] required to make an identification. . . ."[11]

8    Missing from Detective Cypher's report is, well, everything; he didn't draft a

9    report, violating YCSO policy:

| Agency | Policy | Source |
|--------|--------|--------|
| YCSO | "A thorough description of the eyewitness process and the results of any eyewitness identification should be documented in the case report." | 603.8 |

**3.    Police failed to caution Mr. LaFollette against contact with "the media."**

Instructing eyewitnesses to avoid contact with the media is a

long-documented DOJ best practice.

It started in 1999, when DOJ published its first best-practices guide,

encouraging eyewitnesses to avoid media exposure:[12]

---

[11] Exhibit A at 4.

[12] Exhibit B - *Eyewitness Evidence – A Guide for Law Enforcement* (1999) at 27.

Motion in Limine

– 15 –

## C. Obtaining Information From the Witness(es)

7. Encourage the witness to avoid contact with the media or exposure to media accounts concerning the incident.

The source for this advice was early research showing media exposure

(e.g., television, advertising, news headlines, etc.) could manipulate a witness's

memory through what scientists refer to as "post-event information."[13]

It continued in 2013, when the FBI published its eyewitness ID policy manual,

encouraging witnesses to avoid media contact:[14]

• (U) Ask that the witness not discuss the photographic line-up identification procedure, or its results, with any other witness involved in the case and request the witness not have contact with the media.

And when the FBI updated its eyewitness ID policy manual in 2019, the

policy remained unchanged:

• (U) Request that the witness not discuss the identification procedure or its results with other witnesses involved in the case or have contact with the media.[6] (U) In addition, for sequential photographic lineups, an employee should:

The source for the FBI's ongoing admonition was two more decades of research,

which served to cement science's conclusions from the 1980s and 1990s that media

---

[13] Exhibit C – Expert Report of Dr. Cara Laney Re: L.L. at 11-12

[14] Exhibit D – *Procedures for Eyewitness Identification of Suspects – Policy Implementation Guide*, Federal Bureau of Investigation – November 26, 2013 at 5.

exposure can manipulate a witness's memory.[15]

The FBI's instruction to avoid "contact with the media" means more than discouraging eyewitnesses from picking up the phone and calling the local newspaper. There are several reasons supporting this conclusion:

*First*, the research underpinning DOJ's policies uses "the media" broadly to include "radio, television, and the Internet."[16]

*Second*, the Cambridge Dictionary defines "the media" as "the internet, newspapers, magazines, television, etc., considered as a group."[17]

*Third*, adopting a narrow definition of "the media" would, in effect, walk-back DOJ's 1999 broad cautionary instruction that witnesses avoid "exposure to media accounts concerning the incident."[18] There's no scientific support for walking back this admonition, as the research hasn't changed since 1999; it has only become stronger.[19]

*Fourth*, defining "the media" narrowly would render the FBI's policy manual internally-inconsistent. The FBI's manual is replete with instructions meant to prevent eyewitnesses from being influenced by outside information.

---

[15] Exhibit C at 11-13.
[16] Exhibit C at 11-13.
[17] https://dictionary.cambridge.org/us/dictionary/english/media, last accessed on Aug 20, 2020.
[18] Exhibit B at 27.
[19] Exhibit C at 11-12.

1    It is why the manual instructs agents "not to say or do anything, even

2    unintentionally, to distinguish the suspect's photograph from the fillers'

3    photographs."[20] It's why the manual instructs agents to include "at least five filler

4    photographs that generally fit the witness's description of the perpetrator [not the

5    investigator's]."[21] It's why agents should "use photographs that do not indicate

6    criminal misconduct (e.g., booking photographs)."[22] It's why agents should

7    "[c]onduct the photographic lineup in a location that does not expose the witness to

8    information or evidence that could influence the witness's identification."[23] It's

9    why agents should "[e]nsure that neither the suspect nor any photographs of the

10   suspect are visible where the witness will be present."[24] It's why agents should

11   "[c]onsider using 'blind' or 'blinded' administration techniques" (i.e., techniques

12   where the agent doesn't know which photograph the eyewitness is examining).[25]

13   It's why agents should "[n]ot allow the witness to observe or overhear other

14   witnesses during the procedure."[26] It's why agents should not a rush an

15

16   _____

     [20] Exhibit A at 2 (Policy 4.7.1).

17   [21] Exhibit A at 2 (Policy 4.7.1.1).

     [22] *Id.*

18   [23] *Id.* at 3 (Policy 4.7.1.2).

     [24] *Id.*

19   [25] *Id.*

     [26] *Id.*

Motion in Limine
– 18 –

eyewitness.[27] It's why agents read a "cue card" to eyewitnesses—akin to *Miranda* warnings—containing additional safeguards.

Agents do these things because outside information—in any form—influences memories.

Given the litany of policies the FBI employs to protect witnesses against outside information, it would be inconsistent for the FBI to leave out from its warnings the biggest source of outside information of them all: the news, newspapers, social media, and the Internet (i.e., "the media").

***Fifth***, defining "the media" narrowly runs contrary to common sense. In federal courts across the country, district judges caution juries—at *every recess*—not to discuss the case in-person or via electronic means such as "e-mail, via text messaging, or any Internet chat room, blog, website or application, including but not limited to Facebook, YouTube, LinkedIn, Snapchat, or any other forms of social media." *See* Ninth Circuit Model Instruction 2.1 (2020). District judges go to great lengths to protect jurors against outside information for the same reason police go to great lengths to protect eyewitnesses from outside information: it corrupts memories and shapes opinions.

Neither SA Ribail nor Det. Cypher cautioned Mr. LaFollette against exposure

---

[27] *Id.*

to "the media." Police's failure-to-instruct carried consequences.

**F.        A few days after the line-ups, Mr. LaFollette spoke with the press.**

On June 14, the Yakima Herald-Republic interviewed Mr. LaFollette. The interview was recorded, appearing online in an article:



EXCLUSIVE

# SURVIVOR'S STORY

White Swan killings: Survivor Lindell LaFollette tells the story

PHIL FEROLITO Yakima Herald-Republic    Jun 16, 2019 Updated Jun 7, 2020    💬    📄 3 min to read

1 of 11

FILE — This photo taken Monday, June 10, 2019, shows the crime scene where five people were fatally shot off of the 5100 block of Medicine Valley Road near White Swan, Wash.
Amanda Ray / Yakima Herald-Republic, file

It is unclear whether Mr. LaFollette reached out to the press, or whether the press reached out to him (he cannot remember). Either way, the interview is troubling.

1  Before the recorded interview began, Yakima Herald-Republic reporter Phil

2  Ferolito provided Mr. LaFollette with background on the police's investigation,

3  connecting the Medicine Valley murders to the Clouds. Mr. Ferolito also informed

4  Mr. LaFollette these murders (as well as other murders) may stem from a

5  Capulet-Montague-esque blood feud between two reservation families: the Culps

6  and the Clouds. Then the recording started, and Mr. Ferolito can be heard finishing

7  his explanation regarding the Clouds' involvement. Before this background from

8  Mr. Ferolito, Mr. LaFollette had not connected the Clouds to the Medicine Valley

9  murders, confirmed by his response to Mr. Ferolito's statements: "oh, I didn't

10  know that."

11  Mr. LaFollette then goes on to speculate the Clouds must be responsible for

12  the recent string of murders on the Yakama Indian Reservation: "There's a lot of

13  killings going on out there, and they're involved with a lot of it...what I figure

14  anyway."

**G.    Months later, Mr. LaFollette referred to James Cloud as one of the shooters after "seeing Cloud, and hearing the name, on the news."**

On January 27, 2020, SA Ribail and FBI Special Agent Jennifer Terami

interviewed Mr. LaFollette. During that interview, Mr. LaFollette repeatedly

referred to the red-shirted male (i.e., the individual who shot Dennis Overacker) as

James Cloud, an unusual statement considering Mr. LaFollette did not identify James Cloud during a line-up administered the day after the shooting.

When the agents asked why Mr. LaFollette kept referring to the red-shirted male as James Cloud, he answered it was after seeing James Cloud's name in the news:

> and shot OVERACKER. Victim #2 referred to the man wearing the red shirt as JAMES CLOUD, after seeing CLOUD, and hearing the name, on the news.

The FBI did not follow up with Mr. LaFollette on when he saw this information, where he saw it, or what he saw.

## H.   During a follow-up interview, Mr. LaFollette reverses everything he told police during the line-up.

To pick up where the FBI left off, Mr. Cloud's defense team interviewed Mr. LaFollette in early-August 2020. Mr. LaFollette explained the connection he made between the Clouds and the Medicine Valley murders came from two places:

First, the information provided from reporter Phil Ferolito; and

Second, he spoke with "a few different people" (he couldn't remember who, or whether they were witnesses), all of whom told him the Clouds were responsible for the Medicine Valley murders.

Mr. LaFollette stated he had not watched—or read—any news coverage about the Medicine Valley murders except his interview with the Yakima

1  Herald-Republic. So when Mr. LaFollette told the FBI in January 2020 he heard

2  James Cloud's name in the news, he was referring to what Mr. Ferolito told him

3  before the recorded interview began.

4        Mr. LaFollette also stated he doesn't think police cautioned him against

5  either speaking with other individuals about the case or having contact with the

6  media.

7        The information Mr. LaFollette received from Mr. Ferolito, as well as "a few

8  other people," left a lasting impression. It didn't just cause him to now-ID James

9  Cloud as the red-shirted male; when asked about the blue-shirted male (the one he

10  previously identified during his police-administered line-up as Morris Jackson),

11  Mr. LaFollette now stated that was Donovan Cloud.

12        Mr. LaFollette's latest statements (now identifying the Clouds) are a

13  complete reversal from what he told police shortly after the murders, the reversals

14  coming exclusively from information learned after the shootings.

15                    **III.    Discussion**

16  **A.    Standard**

17        In eyewitness ID cases, courts typically employ a three-part due process

18  test—referred to as "the *Manson* test"—when assessing eyewitness ID challenges.

19  *See*, *e.g.*, *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012). The first part considers

whether police used improper procedures (a prerequisite to trigger a due process challenge); the second part considers whether the ID procedure was unnecessarily suggestive; and the third part considers whether the unnecessarily-suggestive ID procedure was nevertheless reliable under the "totality of the circumstances." *Id.*; *see also Ponce v. Cupp*, 734 F.2d 333, 336 (9th Cir. 1984).

But these aren't typical facts. While police used improper procedures during Mr. LaFollette's line-up (including failing to caution Mr. LaFollette against contact with the media), he never identified James Cloud. Nor did Mr. LaFollette formally walk-back his non-ID. This sets him apart from J.V. (the subject of a different motion), who called police shortly after the line-up, said he saw James Cloud's picture in a government-issued "Wanted" poster, and was "100% sure" the man from the poster carjacked his truck. That's a true reversal—tied directly to a show-up—subject to the *Manson* test.

Instead, months passed and, during an interview with the FBI in January 2020, Mr. LaFollette repeatedly referred to the red-shirted male (the man who shot Mr. Overacker) as James Cloud. When agents asked why he kept making this connection, Mr. LaFollette said it was because he saw (and heard) James Cloud's name in the media. So there never was a "that's the guy!" moment with Mr. LaFollette, where he claimed a level of certainty in his walked-back

Motion in Limine
– 24 –

1    identification; instead, he subconsciously merged what he saw in-person with what

2    he heard from the media (as well as what "a few different people" told him).

3    Scientifically speaking, this is referred to as a false memory—a memory that never

4    happened, but rather developed through post-event information.

5         These facts aren't suited for *Manson's* due process framework; they just don't

6    fit. They are, however, suited for Rule 403, which courts recognize is a different, yet

7    equally-effective vehicle for challenging eyewitness IDs. *See Perry*, 565 U.S. at 233,

8    247 (noting that, when *Manson's* traditional due process test doesn't apply, other

9    remedies do, including "the protective rules of evidence," which "permit trial

10    judges to exclude relevant evidence if its probative value is substantially outweighed

11    by its prejudicial impact or potential for misleading the jury."); *see also U.S. v.*

12    *Henderson*, 68 F.3d 323, (9th Cir. 1995) (finding the district court should have

13    excluded a police officer's lay witness ID of a suspect under Rule 403).

14         Rule 403 allows a district court to "exclude relevant evidence if its probative

15    value is *substantially outweighed* by a danger of one or more of the following: unfair

16    prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

17    needlessly presenting cumulative evidence." Fed. R. Evid. 403 (2020) (emphasis

18    added). Importantly, this "substantially outweighed" evidentiary bar isn't

19    set-in-stone; instead, Rule 403's evidentiary bar operates on a sliding scale—as the

probative value of evidence lessens, so too does the prejudicial showing required to exclude it. *See*, *e.g.*, *U.S. v. Espinoza-Baza*, 647 F.3d 1181, 1189 (9th Cir. 2011) ("Thus, where the evidence is of very slight (if any) probative value, even a modest likelihood of unfair prejudice or a small risk of misleading the jury will justify excluding that evidence.") (internal quotations and punctuation omitted). Visually, Rule 403's sliding evidentiary scale looks like this:



The question is where Mr. LaFollette's statement falls on this continuum.

**B.    The probative value of Mr. LaFollette's statement is less-than-slight.**

Mr. LaFollette's statement carries no probative value for three reasons:

***First***, Mr. LaFollette did not connect the Clouds to the Medicine Valley

1    murders; the media (and "a few different people") did that for him. This

2    contaminated connection stemmed from two events.

3         The first event was Mr. LaFollette's June 14 interview with the Yakima

4    Herald-Republic. By this point, Mr. Lafollette had told police what he saw. Twice.

5    Once when police arrived at the scene, and in greater detail that evening at the

6    hospital. He then followed up those statements with a line-up the following day,

7    where he *did not* identify either James Cloud or Donovan Cloud as a shooter.

8         Then, five days later, the Yakima Herald-Republic interviewed

9    Mr. LaFollette. During that interview, the reporter provided information to

10   Mr. LaFollette about the investigation, not only connecting the Clouds to the

11   Medicine Valley murders, but also laying out the Capulet-Montague-esque feud

12   between the Culps family and the Cloud family—none of which Mr. LaFollette

13   knew. We know this not only from what Mr. LaFollette stated during his August

14   2020 interview, but also from the recorded interview itself, which caught the

15   tail-end of Mr. Ferolito's "background," including Mr. LaFollette saying "oh, I

16   didn't know that."

17        The second event was Mr. LaFollette speaking with "a few different people,"

18   all of whom said the Clouds were responsible for the Medicine Valley murders.

19        These two events re-shaped Mr. LaFollette's memory, causing him to change

*everything* he told police during the line-up.

The first thing Mr. LaFollette changed was his non-selection of James Cloud. During the January 2020 interview with the FBI, Mr. LaFollette repeatedly referred to James Cloud as the red-shirted male (i.e., the man with a rifle who shot Dennis Overacker)— a connection Mr. LaFollette ***never made*** during his two prior police interviews, and ***never made*** during his line-up. When the agents asked why he made that connection, he responded it was "after seeing Cloud, and hearing the name, on the news." Mr. LaFollette advised Mr. Cloud's defense team he never saw any media about the Medicine Valley murders (other than his own interview), clarifying the media-related comments he made to the FBI were referring referred to what Mr. Ferolito told him before his recorded interview began.

The second thing Mr. LaFollette changed was his identification of Morris Jackson. During his original line-up the day after the shooting, Mr. LaFollette identified the blue-shirted male (the man who shot him and Esmerelda Zaragoza with a shotgun) as Morris Jackson. But during the follow-up interview with Mr. Cloud's defense team, Mr. LaFollette stated the blue-shirted male was Donovan Cloud—again, a connection Mr. LaFollette ***never made*** during his two prior police interviews, and ***never made*** during his line-up.

So after talking with one reporter and "a few different people," all of whom

blamed the Clouds for the Medicine Valley murders, Mr. LaFollette walked back everything he told police.

Science explains why this happened. Memory expert Dr. Cara Laney will testify Mr. LaFollette's exposure to both the media and other individuals is referred to as "post-event information," and decades of research shows post-event information influences memory, causing people to remember things they did not see or experience.[28]

This post-event information contamination isn't rare; it's common. In their 2019 report, the Third Circuit's Eyewitness Task Force confirmed this concept, noting memories can "be distorted or contaminated by a variety of influences that an eyewitness may never even be aware of."[29] The Task Force even provided a spot-on example: "an eyewitness who hears or reads a media report describing a suspect may absorb that information and integrate it with his or her memories, distorting what the eyewitness believes that he or she has seen."[30]

***Second***, Mr. LaFollette participated in a line-up the day after he was shot, when his memory was fresh. Research shows as time passes, so too does the

---

[28] Exhibit C at 9-10.
[29] Third Circuit Report on Eyewitness Identifications, 91 Temp. L. Rev. at 25.
[30] *Id.*

1    accuracy of an identification or memory.[31]

2        ***Third***, Mr. LaFollette never had a "that's the one!" moment. After the

3    reporter and "a few different people" connected the Clouds to the murders for

4    Mr. LaFollette, he never reached out to police to correct his line-up and say "I stand

5    corrected; it's the Clouds that I saw that day." Nor did he volunteer this

6    information when the FBI interviewed him months later. Agents had to ask

7    Mr. LaFollette why he referred to red-shirted male as James Cloud, and only then

8    did Mr. LaFollette explain how he made the connection—the media, as well as "a

9    few different people" he spoke with. This behavior, Dr. Laney will explain, shows

10   the post-event information Mr. LaFollette received influenced him on an

11   unconscious level.

12       In short: the probative value from Mr. LaFollette's non-ID of James Cloud at

13   the time of the shooting is substantial; the probative value from Mr. LaFollette's

14   statement linking James Cloud to red-shirted male after speaking with a reporter and

15   talking with other people is not.

16       Since Mr. LaFollette's statement possesses little-to-no probative value, the

17   prejudicial effect needed to exclude it under Rule 403 is slight:

18

19
_____
[31] Exhibit C – Expert Report of Dr. Cara Laney Re: L.L. at 13.



### C.  The prejudicial effect of Mr. LaFollette's statement is substantial.

Mr. LaFollette's statement is substantially prejudicial for two reasons:

***First***, Mr. LaFollette's statement appears genuine. Dr. Laney will testify that, in most cases, people can't tell the difference between false memories and true ones. This means that, correctively speaking, "little can be done to correct memory once it has been corrupted."[32]

Mr. LaFollette is a perfect example. During his January 2020 interview with the FBI, he nonchalantly referred to the red-shirted male as James Cloud, not remembering he said something different during the line-up; he also nonchalantly referred to the blue-shirted male as Donovan Cloud, not remembering he said

---

[32] Exhibit E – Expert Report of Dr. Cara Laney Re: J.V. at 10.

something differing during his line-up. He appeared genuine in his remarks, showing he absorbed that information and integrated it with his memories.

***Second***, Mr. LaFollette's genuineness makes him a dangerous witness. Dr. Laney will testify "[r]esearch in jury decision-making shows that eyewitness testimony in general is more influential than its value justifies."[33] This undue influence happens because jurors "overvalue witness confidence" and "undervalue key factors, including identification procedure errors," which are known to substantially impact ID accuracy.[34] This concept explains why procedural fixes for tainted testimony, such as curative jury instructions, are "largely inadequate."[35]

## IV.    Conclusion

"[T]he brain does not work like a video camera."[36] Rather, it is generally accepted that "perception is imperfect, and memories are malleable" and may be "distorted or contaminated, without an individual intending or even knowing" that to be the case.[37] This is especially true with post-even information.

Mr. LaFollette is a textbook example. Before talking with the press and a "few different people," Mr. LaFollette did not identify either James Cloud or Donovan

---

[33] *Id.* at 12.

[34] *Id.*

[35] *Id.*

[36] 2019 Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. at 12.

[37] *Id.*

Cloud as a shooter during the police-administered line-ups; now, after these

conversations, he did. The remedy for such dangerously-misleading testimony isn't

cross-examination; it's to exclude the connection altogether, especially given its

minimal probative value (the memories simply aren't his).

So while James Cloud does not object to Mr. LaFollette testifying about what

he saw and heard on the day of the shooting, he does object to Mr. LaFollette

testifying about a connection the media and other people made for him. Such

testimony should never influence a jury when a man's life is on the line.

Dated: August 21, 2020

<div style="margin-left:40%">

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org

</div>

1

## Service Certificate

2    I certify that on August 21, 2020, I electronically filed the foregoing with

3    the Clerk of the Court using the CM/ECF System, which will notify Assistant

4    United States Attorneys: Thomas J. Hanlon and Richard Burson.

5    <u>s/ John B. McEntire IV</u>
     John B. McEntire, IV, WSBA #39469
6    10 North Post Street, Suite 700
     Spokane, Washington 99201
7    509.624.7606
     jay_mcentire@fd.org

8

9

10

11

12

13

14

15

16

17

18

19