**Cara Laney, PhD**[1]

**Expert Witness**

| | |
|---|---|
| Department of Psychology | claney@collegeofidaho.edu |
| The College of Idaho | |
| 2112 Cleveland Blvd., Caldwell ID 83605 | |

**Client:** James Cloud

**Report:** L.L. Identification Procedures

## Information Relied Upon

To prepare this report, I reviewed the following:

- The entire discovery file, which includes police reports, interviews, the various line-ups administered to witnesses, as well as the Yakima County Sheriff's Office and FBI policies on administering line-ups.
- Interview conducted by investigators Chris Reyes and Cole Rojan on August 7, 2020
- Various treatises and literature on eyewitness identification procedures, as well as post-event information.

## Case Background[2]

On Saturday, June 8, 2019, police responded to reports of multiple shootings on Medicine Valley Road.

L.L., a then 61-year-old White male, was one of the shooting victims – sustaining buckshot injuries to the back left of his head and neck[3] as well as his upper chest.[4]

L.L.'s first contact with law enforcement was just after 4:00pm on June 8. While receiving first aid for his gunshot injuries, he told YCSO Deputy Klise that he, Dennis Overacker, and E. Z. were "contacted [at John "Doby Jack" Cagle's

---

[1] For notes regarding my qualifications and a brief overview of eyewitness testimony research, please see my report on J.V.'s identifications.

[2] This background is based on allegations contained in the discovery.

[3] Discovery, p. 1930

[4] Discovery, p. 1940

1

Exhibit C - 1

house] by three subjects they did not know"[5] and then fled the scene after "the shooting started." At this time L.L. "could not provide a good description of any of the subjects," though he did provide the following information:

- one was wearing a red shirt and had "puffy, dark, curly hair"
- another wore a blue shirt
- all three were male and had dark skin

    It is unclear from the incident reports whether E.Z. and L.L. may have heard each other's statements at this point. The only relevant detail in the discovery is that they were "about 10 feet"[6] apart when E.Z. was first approached.

    L.L. was given 50 mcg of fentanyl intravenously in the ambulance.[7] In addition, he had previously been prescribed a variety of medications for his lung cancer, and he was a methamphetamine user[8].

    Later that evening, Deputy J. Arreguin[9] interviewed L.L. in a hospital room at Yakima Valley Memorial Hospital, shortly after L.L. had received a CAT scan and while he received further medical attention. L.L. reported that the perpetrators were two unknown Native American males, one in a red shirt and one in a blue shirt. At one point they sat in a red Chevy Blazer with a third person. L.L. said that the man in the red shirt shot Dennis Overacker with a rifle, and that he did not know where the shotgun shots that caused his own injuries had come from.

    When asked for descriptions of the two males, he "described both subjects as young Native males in their 20's. The male in the red shirt was approximately 5'8" and about 175 pounds. [L.L.] advised this male had a large logo on the shirt, something like a bulldog. [L.L.] said that male had dark, shorter hair and light facial hair. He also said this male was wearing blue jeans. [L.L.] further described the second male as being about 150 pounds. [L.L.] was unable to get a good height estimate, nor was he able to see the male's hair color. [L.L.] advised that the male wore a black baseball cap. [L.L.] described the subject's shirt as a blue longsleeve, and also advised that the male wore some shorts that were both blue and white."

---

[5] Discovery, p. 26
[6] Discovery, p. 2655
[7] Discovery, p. 1930
[8] According to E.Z. in her video recorded interview.
[9] Discovery pp. 4053-4055

The following day (Sunday, June 9), FBI Special Agent Ribail administered four line-ups to L.L.:

- Line-Up 5032 (a 6-person line-up that included Donovan Cloud)
- Line-Up 5033 (a 6-person line-up that included James Cloud)
- Line-Up 5034 (a 6-person line-up that included Morris Jackson)
- Line-Up 5035 (a 6-person line-up that included Natasha Jackson).

A YCSO line-up form[10] is signed and dated 6/9/19 (though the witness signature is redacted and the officer signature is illegible). The notes on this form are the only real-time documentation of the L.L. line-up procedures. These notes are copied below, in their entirety (in fact, there are no other markings visible on this form – not even a case number):

[Handwritten line-up form dated 6/9/19, with notes:]

5035 Didn't see a female
5034 #4 looks like guy blue shorts had hat over head poss had shotgun #2 looks shirt of the other dude that is person shot me had shotgun
5033 None
5032 None

has short term memory loss

Esmerelda used to live in U6 by PL4 2nd house on right

---

[10] Discovery p. 992

3

Exhibit C - 3

Agent Ribail's FBI 302 form was "drafted" some 10 days later and submitted on June 20.[11] The form reports the outcomes of the lineup more formally:

| Line-up | Result |
| --- | --- |
| 5032 (with Donovan Cloud) | No identification |
| 5033 (with James Cloud) | No identification |
| 5034 (with Morris Jackson) | "#4 (MORRIS JACKSON) possibly looks like the guy that had blue shorts, a hat over his head and had the shotgun... 'that is the person that shot me and had the shotgun,' identifying him as the shooter with the shotgun. … #2 (QUENTINE SAMPSON) looks sort of like the other shooter but did not identify him." |
| 5035 (with Natasha Jackson) | No identification |

The form also states that L.L. has health problems and sometimes has short term memory loss. No further detail is given here.

On Thursday, June 14, L.L. gave an audio recorded and photographed interview to Phil Ferolito of the *Yakima Herald-Republic*. He did not provide a detailed description of the crime, but did comment more broadly: "There's been a lot of killings going on out there, and they're involved in a lot of it, the way I figure anyway." He also described his injuries and noted that "Dennis is my favorite cousin."

Approximately eight months after the crime, Agent Ribail submitted an additional FBI 302 form,[12] which refers to an additional (apparently also unrecorded) interview with L.L. on January 27. In this interview, L.L. identifies James Cloud as the man in the red shirt who shot Dennis Overacker. Specifically, L.L. "referred to the man wearing the red shirt as JAMES CLOUD, after seeing CLOUD, and hearing the name, on the news."

---

[11] Discovery, p. 963
[12] Dated February 14, 2020; drafted January 29, 2020; Discovery p. 10254

When subsequently interviewed by investigators Chris Reyes and Cole Rojan on August 8, 2020, L.L. made several claims. First, when asked, he claimed that he did not recall anyone from law enforcement telling him that he should limit contact with the media relevant to his case. Despite this lack of warning, he claimed that the only media relevant to his case that he had consumed was his own interview by Phil Ferolito of the *Yakima Herald-Republic*. According to L.L., Mr. Ferolito told him, during that interview, of the connection between the Clouds and the crimes at Medicine Valley, as well as about a long-running feud between the Clouds and another family. L.L. also claimed that a "few" people (he could not remember whom) had told him (he could not remember when) that the Clouds were responsible for the crimes. Finally, L.L. stated that he now believes that the perpetrator in the blue shirt was Donovan Cloud – consistent with what Mr. Ferolito told him on June 14, but *in*consistent with his own identification of Morris Jackson (but not Donovan Cloud) on June 9 (the day after the crime).

## Opinions

**Opinion #1.** In administering the line-ups to L.L., law enforcement failed to follow best practices (and, in several instances, its own procedures) on eyewitness identification in at least three ways:

1. Apparent failure to conduct a double-blind or even single-blind line-up
2. Failure to provide adequate documentation of identification procedures
3. Apparent failure to adequately instruct witness

**Basis for Opinion.** First, there is no evidence in the discovery that law enforcement conducted a "double-blind" or even single-blind line-up. Here, the law enforcement officer administering the line-up was Special Agent Ribail, the lead case agent in this investigation. Please see my report on J.V.'s identification for why this is problematic.

Recognizing that blind line-ups (whether double or single) are best practices, the FBI and YCSO incorporate these concepts into their policies:

| Policy | Section | Text |
|---|---|---|
| YCSO Policy Manual: Eyewitness Identification (2012) | 603.6 | When practicable, the member presenting the lineup should not be involved in the investigation of the case or know the identity of the suspect. |

5

Exhibit C - 5

| | | |
|---|---|---|
| FBI Yates memo to law enforcement (2017)[13,14] | 5.1-5.4 | … selecting an administrator who is not involved in the investigation and does not know what the suspect looks like. |
| | | There are times when such "blind" administration may be impracticable, for example, when all of the officers in an investigating office already know who the suspect is … In such cases, the administrator should adopt "blinded" procedures, so that he or she cannot see the order or arrangement of the photographs viewed by the witness or which photograph(s) the witness is viewing at any particular moment. |
| | | "Blinded" administration can be accomplished by … putting each photograph in its own physical folder, shuffling the order of the folders, and standing where the administrator cannot see which photographs the witness is viewing. |
| FBI Procedures for Eyewitness Identification of Suspects Policy Implementation Guide(2019) | 4.7.1.2 | Consider using "blind" or "blinded" administration techniques |

There is also no information in the discovery as to why either a double-blind or blind line-up was "not practicable."

Second, law enforcement did not record or adequately document the administration of the line-ups on L.L. Recording line-ups is important because while it cannot prevent the types of hints and suggestions that may occur with non-

---

[13] Yates, S. (January 6, 2017). *Memorandum for Heads of Department Law Enforcement Components All Department Prosecutors*. U.S. Department of Justice, Office of the Deputy Attorney General.

[14] Yates in particular provides good, research-based evidence for her recommendations (as well as potential consequences for not following them), as part of her memo (see pp. 8-9).

blind lineups, recordings can document the presence or absence of at least some types of suggestions. This is why best practices (dating back to at least 1999) dictate that the administration of line-ups should be recorded.[15,16] These best practices are incorporated FBI and YCSO policies:

| Policy | Section | Text |
| --- | --- | --- |
| YCSO (2012) | 603.5 | Whenever feasible, the eyewitness identification procedure should be audio and/or video recorded and the recording should be retained according to current evidence procedures. |
| FBI (2013) | 3.9 | The investigator must preserve the outcome of the photographic line-up by accurately and completely recording any identification or nonidentification results obtained from the witness. |
| FBI Yates memo (2017) | 9.1 | The witness's identification of a photo, if any, and the corresponding statement of confidence should be clearly documented by:<br><br>9.1.1 Video or audio-recording the photo array |
| FBI (2019) | 4.7.1.2 | Consider the value of audio or video recording the procedure. |

There is no documentation as to why recording these line-ups (either audio or video) was not feasible, especially considering law enforcement recorded interviews (both audio and video) of other witnesses in this case.

But lack of video recording is not the only deficiency in documentation of these line-ups. According to Sally Yates' 2017 Department of Justice memo to law enforcement[17]:

---

[15] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification*. Washington, DC: The National Academies Press.

[16] Technical Working Group for Eyewitness Evidence (1999). Eyewitness evidence: A guide for law enforcement. U.S. Department of Justice.

[17] Section 9.3; see also the Technical Working Group for Eyewitness Evidence (1999). Eyewitness evidence: A guide for law enforcement. U.S. Department of Justice; which notes that line-up administrators should "Document the lineup in writing, including: (a) identification

"The administrator should document the following elements of the identification procedure: The approximate amount of time it took the witness to make an identification; the presentation method and order of the photographs displayed; the names of all persons present during administration; and any other facts or circumstances that would help contextualize or explain the witness's selection."

Neither the YSCO nor the FBI 302 forms include the following critical information (beyond that already noted above):

- Location of line-up administration
- Time L.L. spent viewing line-up
- Mode of line-up administration (sequential v. simultaneous; double-blind, single-blind, or neither)
- Names of any other parties present during line-up administration
- Documentation of L.L.'s physical and mental status at the time of the line-up administration (the day after he received a gunshot wound to the head)
- Documentation of L.L.'s contemporaneous (prior to any feedback) confidence in his (non) identifications[18,19,20]
- Documentation of instruction not to contact other witnesses or to avoid media exposure related to the case (see below)

Third, there is no evidence in the discovery that law enforcement instructed L.L. to avoid 1) discussing the event with other witnesses, or 2) seeking out additional information in media reports, social media posts, or internet searches. Instead, L.L. subsequently (on August 7, 2020) claimed that he does not remember an instruction, and in fact received what amounted to a personalized news report from reporter Phil Ferolito, which contained incriminating information about the

---

information of lineup participants; (b) names of all persons present at the lineup; (c) date and time the identification procedure was conducted. Document the lineup by photo or video."

[18] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification*. Washington, DC: The National Academies Press.

[19] Technical Working Group for Eyewitness Evidence (1999). Eyewitness evidence: A guide for law enforcement. U.S. Department of Justice.

[20] This is also addressed specifically in YCSO (2012) policy (603.5), and FBI policy (2013: 3.9; 2017: 8.2; 2019: 4.7.1.2)

Clouds and the crimes in question. He also discussed the crimes with other (unnamed) individuals, who may have been witnesses to the crime, and who he believed when they implicated the Clouds.

Information from other witnesses and the media can produce a type of memory error called the "misinformation effect."[21] which will be discussed further below.

**Opinion #2.** Even though law enforcement failed to follow best practices and policies on eyewitness identification, these shortcomings do not substantially impact the reliability of L.L.'s initial *non*-identification of James Cloud.

**Basis for Opinion.** The same three issues addressed in Opinion #1 are also addressed here.

First, non-blind lineups can lead to false identifications because of hints and suggestions from the lineup administrator to the witness.[22] If the witness does not make a selection from a lineup, then the risk of a false identification has been avoided (at least for the current lineup – the damage could still reappear later).

Second, the lack of any audio or video record (or otherwise adequate documentation) of the lineup procedures means that there is no is no record of whether any hints or suggestions were present, but the same logic applies.

Third, the post-event information in this case (obtained during the interview by Phil Ferolito of the *Yakima Herald-Republic* and subsequently from other people) was received by L.L. *after* his non-identification of James Cloud, so it cannot have affected this non-identification.

**Opinion #3.** L.L.'s eventual "identification" of James Cloud presents three specific additional problems beyond those discussed above:

1. Exposure to post-event information (provided by Phil Ferolito and other people)
2. Long delay between crime and identification

---

[21] Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning and Memory, 12*, 361-366

[22] Clark, S. E., Marshall, T. E., & Rosenthal, R. (2009). Lineup administrator influences on eyewitness identification decisions. *Journal of Experimental Psychology: Applied*, *15*, 63–75.

3. Possible cross-race identification bias

**Basis for Opinion.** First, the information (provided by Phil Ferolito and unnamed other people) that L.L. used as the basis for his "identification" of James Cloud is a form of post-event information. Post-event information comes in many forms (including leading questions from investigators, intentional suggestions from researchers, facts and opinions from co-witnesses, media reports, and social media posts), and can have a strong negative effect on memory for witnessed events. This effect is called the "misinformation effect." [23,24] The misinformation effect is a concept based on decades of research that demonstrates post-event information can influence memory.

Post-event information is most likely to corrupt memories that were not very clear to begin with,[25] as apparently L.L.'s memory of the perpetrator was not, because he did not identify James Cloud initially and his initial identification of Morris Jackson was hesitant. The misinformation effect can also be seen specifically in memory for, and subsequent identification of, people's faces.[26,27] According to a recent set of research studies, eyewitnesses who watch television re-enactments may be particularly susceptible to misinformation about what happened during those crimes.[28] Additional research shows that even the suggestion that there was a video of a particular incident (a plane crash or the death of a public figure) is enough to convince some people in research studies that they

---

[23] Loftus, E. F. (1992). When a lie becomes memory's truth: Memory distortion after exposure to misinformation. *Current Directions in Psychological Science*, *1*(4), 121–123.

[24] Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning and Memory, 12*, 361-366

[25] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[26] Loftus, E.F., & Greene, E. (1980). Warning: Even memory for faces may be contagious. *Law and Human Behavior, 4,* 323-334.

[27] Brewer, N., Weber, N., & Semmler, C. (2005). Eyewitness Identification. In N. Brewer & K. D. Williams (Eds.), *Psychology and law: An empirical perspective.* (pp. 177–221). The Guilford Press.

[28] Cullen, H.J., Paterson, H.M., & van Golde, C. (2020). Stopping crime? The effect of crime re-enactments on eyewitness memory. *Psychiatry, Psychology, and Law.*

remember witnessing that event happen,[29] and media reports contribute to false memories of alien abduction.[30,31]

Avoiding relevant media contact is a long-documented best practice[32,33] incorporated into FBI policies. In particular, the 2013 FBI eyewitness policy calls for investigators to:

| Policy | Section | Text |
|---|---|---|
| FBI (2013)[34] | 3.8.4 | Ask that the witness not discuss the photographic line-up identification procedure, or its results, with any other witness involved in the case and request the witness not have contact with the media. |

This policy has its roots in earlier policies and advice from experts. For example, US DOJ advice from 1999[35] (created in a collaboration between law enforcement, eyewitness researchers,[36] and lawyers) states that investigators, when interviewing witnesses, should:

---

[29] Crombag, H.F.M., Wagenaar, W.A., & van Koppen, P.J.(1996). Crashing memories and the problem of "source monitoring". *Applied Cognitive Psychology, 10,* 95–104.

[30] Clark, S. E., & Loftus, E. F. (1996). The construction of space alien abduction memories. *Psychological Inquiry*, *7*(2), 140–143.

[31] Clancy, S. A. (2005). *Abducted: How people come to believe they were kidnapped by aliens*. Cambridge, MA: Harvard University Press.

[32] Technical Working Group for Eyewitness Evidence (1999). *Eyewitness evidence: A guide for law enforcement.* U.S. Department of Justice.

[33] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

[34] Subsequent policies also made the same point, including Yate's 2017 memo, which instructs investigators to tell witnesses "Please do not discuss this procedure or any photograph that you may pick with any other witness in this case," and the 2019 FBI eyewitness policy, which instructs investigators to "request that the witness not discuss the identification procedure or its results with other witnesses involved in the case or have contact with the media."

[35] Technical Working Group for Eyewitness Evidence (1999). *Eyewitness evidence: A guide for law enforcement.* U.S. Department of Justice.

[36] Also, note that according to the authors, "this *Guide* is supported by social science research" (p. 1).

| DOJ (1999) | C (p. 15) | Encourage the witness to avoid contact with the media or exposure to media accounts concerning the incident. |

The source of this advice was early research[37,38] that used media exposure (television, advertising, news headlines, etc.) as a form of misinformation. A further two decades of misinformation research has only strengthened these conclusions.[39,40,41,42,43,44,45,46] In this research, "media" has as broad a meaning as it does in everyday use. For example, Paterson and Kemp used a "media report" (specifically a mock newspaper article) as their source of misinformation, while Rich and Zaragoza note that "In our information-rich society, people have constant

---

[37] Braun, K. A., & Loftus, E. F. (1998). Advertising's misinformation effect. *Applied Cognitive Psychology*, *12*(6), 569–591.

[38] Roberts, K. P., & Blades, M. (1999). Children's memory and source monitoring of real-life and televised events. *Journal of Applied Developmental Psychology*, *20*(4), 575–596.

[39] Zaragoza, M. S., Hyman, I., & Chrobak, Q. M. (2019). False memory. In *Psychological science and the law* (pp. 182–207). The Guilford Press.

[40] Berkowitz, S. R., & Loftus, E. F. (2018). Misinformation in the courtroom. In H. Otgaar & M. L. Howe (Eds.), *Finding the truth in the courtroom: Dealing with deception, lies, and memories.* (pp. 11–20). Oxford University Press.

[41] Shaw, J. S., III, McClure, K. A., & Dykstra, J. A. (2007). Eyewitness confidence from the witnessed event through trial. In M. P. Toglia, J. D. Read, D. F. Ross, & R. C. L. Lindsay (Eds.), *The handbook of eyewitness psychology, Vol I: Memory for events.* (pp. 371–397). Erlbaum.

[42] Davis, D., & Loftus, E. F. (2007). Internal and external sources of misinformation in adult witness memory. In M. P. Toglia, J. D. Read, D. F. Ross, & R. C. L. Lindsay (Eds.), *The handbook of eyewitness psychology, Vol I: Memory for events.* (pp. 195–237). Erlbaum.

[43] Paterson, H. M., & Kemp, R. I. (2006). Comparing methods of encountering post-event Information: The power of co-witness suggestion. *Applied Cognitive Psychology*, *20*(8), 1083–1099.

[44] Ecker, U. K. H., Lewandowsky, S., Chang, E. P., & Pillai, R. (2014). The effects of subtle misinformation in news headlines. *Journal of Experimental Psychology: Applied*, *20*(4), 323–335.)

[45] Rich, P. R., & Zaragoza, M. S. (2016). The continued influence of implied and explicitly stated misinformation in news reports. *Journal of Experimental Psychology: Learning, Memory, and Cognition*, *42*(1), 62–74.

[46] Lewandowsky, S., Stritzke, W. G. K., Oberauer, K., & Morales, M. (2009). Misinformation and the "war on terror": When memory turns fiction into fact. In W. G. K. Stritzke, S. Lewandowsky, D. Denemark, J. Clare, & F. Morgan (Eds.), *Terrorism and torture: An interdisciplinary perspective.* (pp. 179–203). Cambridge University Press.

access to the media through radio, television, and the Internet. The media uses these formats to report up-to-the-minute news about political figures, current events, and the state of the world."[47] On a related note, there is a relatively new subfield of psychology called "media psychology" that addresses the intersection of media and human behavior.[48]

In addition, a closely related area of legal psychology is also relevant here. Research on pretrial publicity[49,50,51] assesses the harmful effects of news reports and similar media exposure on jurors' understanding of and memory for the facts of a trial. Media exposure can similarly affect the memories of witnesses.

Decades of misinformation research has led the relevant scientific community to conclude that giving the same eyewitness multiple chances to identify a perpetrator should be avoided because it is likely to increase the probability of false identification.[52,53]

Second, L.L.'s initial non-identifications of James Cloud and Donovan Cloud (instead identifying Morris Jackson) were made the day after the crime. His identification of James Cloud was made more than seven months after the crime. As a rule, identifications closer in crime to the crime are more reliable.[54] Research suggests that a delay of even a few hours can decrease accuracy in identifications,[55] let alone a delay of months.

---

[47] Page 62

[48] https://www.apadivisions.org/division-46/about/what-is

[49] Ruva, C. L., & Guenther, C. C. (2015). From the shadows into the light: How pretrial publicity and deliberation affect mock jurors' decisions, impressions, and memory. *Law and Human Behavior*, *39*(3), 294–310.

[50] Butler, B. (2012). Capital pretrial publicity as a symbolic public execution: A case report. *Journal of Forensic Psychology Practice*, *12*(3), 259–269.

[51] Hope, L., Memon, A., & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied*, *10*(2), 111–119.

[52] Lin, W., Strube, M.J., & Roediger, H.L., III. (2019). The effects of repeated lineups and delay on eyewitness identification. *Cognitive Research: Principles and Implications, 4*(1).

[53] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

[54] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press

[55] Pigott, M. A., Brigham, J. C., & Bothwell, R. K. (1990). A field study on the relationship between quality of eyewitnesses' descriptions and identification accuracy. *Journal of Police Science and Administration*, *17*, 84–88.

Third, L.L. is White, while James Cloud is of Native American origin. Because L.L. is of a different racial background than James Cloud, his identification may have been affected by cross-race bias. This issue is addressed in more detail in my report on E.Z.'s identification.

Finally, although it is unclear what effect the drugs in L.L.'s system (including the powerful opioid fentanyl) and/or his self-reported "memory problems" may have had on L.L.'s initial non-identification, there is nothing to suggest that the passage of time would improve matters. If memories are not accurately encoded (that is, laid down) at the time of an event (whether because of intoxication, injury, or poor memory), then they will not suddenly appear in an accurate form later.

**Opinion #4.** L.L.'s "identification" of James Cloud—after initially non-identifying him—is a problem that cannot be overcome and corrected.

**Basis for Opinion.** Please see the argument in my report on J.V.'s identification.

**Opinion #5.** L.L.'s "identification" of James Cloud after media and other third-party exposure should not be presented to a jury because it is likely to be unduly influential in their decision-making process.

**Basis for Opinion.** Please see the argument in my report on J.V.'s identification.

## Conclusions

L.L. did not identify James Cloud when he was clearly presented in a line-up conducted the day after the crime. Instead, he identified Cloud as the perpetrator in the red shirt only months later, after receiving incriminating information about Cloud during the course of a personalized news report delivered by a member of the local media, and in conversations with other parties. This "identification" is very likely to be a product of post-event information rather than original memory, and is thus highly unreliable. Further, the unreliability of the identification cannot be corrected, and evidence suggests that a jury is unlikely to adequately discount this "identification," so they should not be exposed to it.