**Cara Laney, PhD**                                                              **January 24, 2020**
**Expert Witness**

| Department of Psychology | claney@collegeofidaho.edu |
| The College of Idaho | |
| 2112 Cleveland Blvd., Caldwell ID 83605 | |

**Client:** James Cloud

## Qualifications

    I am an associate professor of psychology at the College of Idaho in Caldwell. I received a bachelor's degree in Psychology at Reed College in Portland, and then a master's degree in Social Ecology, as well as a PhD in Psychology and Social Behavior from the University of California, Irvine. I have taught courses in forensic and legal psychology for more than 12 years, at both undergraduate and graduate levels. I have more than 30 publications, and more than 25 of these are in the area of legal psychology. I am currently revising Elizabeth Loftus's classic text *Eyewitness Testimony*. Most of my research is in human memory as it behaves in a legal context, but I am also well-versed in scientific methodology, and I have read extensively and taught on the subjects of eyewitness identifications, police procedures, and jury decision-making. I have been qualified as an expert in the area of eyewitness identification in both state and federal courts.

## Information Relied Upon

To prepare this report, I reviewed the following:

- The entire discovery file, which includes police reports, interviews, the various line-ups administered to witnesses, as well as the Yakima County Sheriff's Office's policies on administering line-ups.
- Various treatises and literature on eyewitness identification procedures, as well as post-event information.

## Case Background[1]

On June 8, 2019, police responded to reports that two males (both armed) showed up at a residence and stole a pick-up truck. After arriving at the residence (9440 Evans Road), police interviewed—and took official statements from—four individuals (all family members): J.V. (father), N.V. (mother), S.V. (child), and M.V. (child).

The following day, FBI Special Agent Ronald T. Ribail and Yakima County Sheriff's Office Detective Dan Cypher returned to the residence and administered line-ups to members of the family. In total, four line-ups were administered:

- Line-Up 5032 (a 6-person line-up that included Donovan Cloud);
- Line-Up 5033 (a 6-person line-up that included James Cloud);
- Line-Up 5034 (a 6-person line-up that included Morris Jackson); and
- Line-Up 5035 (a 6-person line-up that included Natasha Jackson).

N.V. (mother), S.V. (child), and M.V. (child) did not identify James Cloud as being involved in the carjacking.

J.V. (father) viewed Line-Up 5032 (the line-up containing Donovan Cloud) and, after viewing it, "teared up" and said Donovan Cloud "looks like the man that held the pistol to his son's head." Here is that photo, as well as J.V.'s written certification that he ID'd Donovan Cloud:



J.V. also viewed Line-Up 5033 (the line-up containing James Cloud; photo below left.) He commented that the man holding the shotgun had "rounded cheeks" like the person in Photo #5 (Casey Tahmalwash, below right), which suggests that he

---

[1] This background is based on allegations contained in the discovery.

had adequate time to carefully view the photos and did so. However, he did not select James Cloud or anyone else from Line-Up 5033.

   James Cloud photo in Line-Up 5033        Casey Tahmalwash photo in Line-Up 5033

 

Later that day, J.V. contacted Special Agent Ribail and advised him that, after law enforcement left his house, he viewed a press release from the Yakima Nation, which stated "Due to misidentification, one suspect remains at large in the five murders that were committed on the Yakima Reservation on Saturday, June 8, 2019." The release included James Cloud's name and mug shot:



FOR IMMEDIATE RELEASE – JUNE 9, 2019 (5:00 pm)

*UPDATED INFORMATION*

**ONE SUSPECT REMAINS AT LARGE IN RESERVATION MURDERS**

TOPPENISH, WA – Due to misidentification, one suspect remains at large in the five murders that were committed on the Yakama Reservation on Saturday, June 8, 2019. James Cloud (07/08/1983), who is pictured below, is still being sought by law enforcement agencies. James is considered armed and extremely dangerous, if you see this subject do not approach him, and call 911. If you know his whereabouts please call 911 immediately.



3

Exhibit E - 3

After seeing this "Wanted" posting, J.V. advised law enforcement "that he was 100 percent sure" this was the other carjacking suspect.

## General Background on Eyewitness Identification

According to extensive research, true line-ups—whether live or photographic—are preferable to "show-ups" (aka "Field Identifications"; more below).[2,3,4] Line-ups should be conducted quickly after the witnessed event.[5] Witnesses should be warned that the perpetrator "may or may not be present" in the lineup.[6] The line-up should be created fairly (i.e., all of the people or pictures in the lineup are plausible choices for someone who didn't actually see the crime).[7,8] Line-ups should be conducted using appropriate sequential (rather than simultaneous) procedures.[9]

## Opinions

**Opinion #1.** In administering the line-ups (especially to J.V.), law enforcement failed to follow best practices (and, in several instances, its own procedures) on eyewitness identification in at least four ways:

---

[2] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

[3] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[4] Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. F. Ross, J. D. Read & M. P. Toglia (Eds.), *The handbook of eyewitness psychology: Volume 2. Memory for people* (pp. 137–153). Erlbaum.

[5] Yarmey, A. D., Yarmey, M. J., & Yarmey, A. L. (1996). Accuracy of eyewitness identifications in showups and lineups. *Law and Human Behavior*, *20*, 459–477.

[6] Steblay, N. M. (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior*, *21*, 283–297.

[7] Wells, G. L., Memon, A., & Penrod, S. D. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the Public Interest, 7,* 45-75.

[8] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[9] Steblay, N. M., Dysart, J., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

First, law enforcement did not perform a "double-blind line-up," which is best practice.[10, 11] A double-blind line-up occurs when the person conducting the line-up doesn't know who the suspect is and thus can't give the witness any hints, whether they mean to or not.[12]

Here, the two law enforcement officers administering the line-ups were Special Agent Ribail and Det. Cypher—two of the lead case agents in this investigation. Having the lead case agents administer the line-ups creates several problems. Even if these individuals have every intention and desire to act honorably and not influence the witness, it is possible that they may unconsciously provide hints to witnesses, perhaps via body language or eye gaze.[13] Of course if investigators do not feel the need to be completely honorable, these suggestions could be much more direct – including strongly urging the witness to reexamine a particular photo, or reconsider a choice.[14]

If a double-blind procedure cannot be employed, then the next best practice is to conduct a single-blind (or "blinded") line-up.[15] A single-blind line-up occurs when lineup administrators know which member of the lineup is the suspect, but either separate themselves from the witness who is viewing the lineup or randomize the order of the photographs in the lineup and then stand in such a way they cannot know which photograph the witness is viewing at any particular time. Recognizing that blind line-ups (whether double or single) are best practices, the YCSO incorporates these concepts into its policy manual:

> **603.6  PHOTOGRAPHIC AND LIVE LINEUP CONSIDERATIONS**
> When practicable, the member presenting the lineup should not be involved in the investigation of the case or know the identity of the suspect.

There is no information in the discovery as to why either a double-blind (or blind) line-up was "not practicable."

---

[10] Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603-647.

[11] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

[12] Clark, S. E., Marshall, T. E., & Rosenthal, R. (2009). Lineup administrator influences on eyewitness identification decisions. *Journal of Experimental Psychology: Applied*, *15*, 63–75.

[13] *Ibid*

[14] *Ibid*

[15] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

Second, law enforcement did not record the administration of the line-ups on any members of the Verwey family. Recording line-ups is important because while it cannot prevent the types of hints and suggestions that may occur with non-blind lineups, they can document the presence or absence of at least some types of suggestions. This is why best practices dictate that the administration of line-ups should be recorded.[16] These best practices are incorporated into the YCSO's policy manual (603.5):

> Whenever feasible, the eyewitness identification procedure should be audio and/or video recorded and the recording should be retained according to current evidence procedures.

There is no information as to why recording these line-ups (either audio or video) was not feasible, especially considering law enforcement recorded interviews (both audio and video) of several witnesses.

Third, there is no evidence (at least thus far) that law enforcement instructed the Verweys to avoid 1) discussing the event with other witnesses, or 2) seeking out additional information in media reports, social media posts, or internet searches, all of which are best practices. [17] Quite the contrary, there is evidence J.V. was online (including on Facebook) and saw pictures of both James and Donovan Cloud. Avoiding these types of information is important because of the "misinformation effect." [18]

The misinformation effect is a concept based on decades of research that demonstrates post-event information can influence memory.[19, 20, 21, 22] Post-event information comes in many forms (including leading questions from investigators, intentional suggestions from researchers, facts and opinions from co-witnesses, media reports, and social media posts), and can have a strong negative effect on memory for witnessed events. In psychological research, effects of even very

---

[16] *Ibid.*

[17] *Ibid*

[18] Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning and Memory, 12*, 361-366.

[19] Loftus, E.F., & Palmer, J.C. (1974). Reconstruction of automobile destruction: An example of interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior, 13,* 585-589.

[20] Wells, G.L. & Olson, E. (2003). Eyewitness testimony. *Annual Review of Psychology, 54,* 277-295.

[21] Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning and Memory, 12*, 361-366.

[22] Frenda, S. J., Nichols, R. M., & Loftus, E. F. (2011). Current issues and advances in misinformation research. *Current Directions in Psychological Science, 20*, 20–23.

minor post-event information (e.g., a change of a single word in a question) can have substantial effects on memory for legally-relevant facts.[23, 24] Post-event information can have an effect on memory even when that information is obviously false to those who receive it.[25, 26]

The misinformation effect can also be seen specifically in memory for, and subsequent identification of, people.[27, 28] Two specific types of psychological research are particularly relevant to memory for faces in legal contexts: research on mugshot exposure and media exposure. Eyewitnesses who are asked to review mugshot books (that is, large collections of faces) before they see a line-up can end up with erroneous memories for the perpetrator of the crime they witnessed. Specifically, those who choose an innocent person from a mugshot book are very likely to falsely identify the same person in a subsequent lineup.[29, 30, 31] Sometimes this seems to result from a commitment effect (meaning that where people have made a choice of an individual, they tend to stand by that choice),[32] while in other cases it is clear they (falsely) recall the person from the mugshot as the

---

[23] Loftus, E.F., & Palmer, J.C. (1974). Reconstruction of automobile destruction: An example of interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior, 13,* 585-589.

[24] Loftus, E. F., Miller, D. G., & Burns, H. J. (1978). Semantic integration of verbal information into a visual memory. *Journal of Experimental Psychology: Human Learning & Memory*, *4*, 19-31.

[25] Ecker, U. K., Lewandowsky, S., Cheung, C. S., & Maybery, M. T. (2015). He did it! She did it! No, she did not! Multiple causal explanations and the continued influence of misinformation. *Journal of Memory and Language*, *85*, 101–115. 10.1016/j.jml.2015.09.002

[26] Weil, R., Schul, Y., & Mayo, R. (2020). Correction of evident falsehood requires explicit negation. *Journal of Experimental Psychology: General*, *149*, 290–310.

[27] Loftus, E. F., & Greene, E. (1980). Warning: Even memory for faces can be contagious. *Law and Human Behavior*, *4*, 323–334.

[28] Brewer, N., & Wells, G. L. (2005). The confidence-accuracy relationship in eyewitness identification: Effects of lineup instructions, foil similarity, and target-absent base rates. *Journal of Experimental Psychology: Applied*, *12*, 11–30.

[29] Deffenbacher, K. A., Bornstein, B., & Penrod, S. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30*, 287–307.

[30] Kersten, A. W., & Earles, J. L. (2017). Feelings of familiarity and false memory for specific associations resulting from mugshot exposure. *Memory & Cognition*, *45*, 93–104.

[31] Dysart, J.E., Lindsay, R.C.L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects, *Journal of Applied Psychology, 86*, 1280-1284.

[32] *Ibid*.

7

perpetrator.[33] In both cases, witnesses are incorrectly identifying suspects because of exposure to faces between the witnessed event and the lineup.

Effects of media on memory for eyewitnessed events are normally studied in the context of pretrial publicity. In this research, news and other media reports about crime—from the 11:00 news to Facebook and Twitter feeds—have been shown to influence people involved in trials, usually making them have more negative feelings towards the defendant.[34, 35, 36] The legal system acknowledges this influence, which is why jurors are often asked whether they have seen media reports about the case before they are asked to be on the jury. If a defendant is identified in news reports or through social media, witnesses may see his face and later identify him, even if he wasn't the original perpetrator.

The Yakama Nation press release (shown above, which is effectively a "Wanted" poster) forms a very strong type of direct suggestion—much stronger than that normally used in misinformation effect research. It is more reminiscent of local news media reports about crime ("hey everybody, here's a scary person who has been out doing scary things"). The legal system worries about potential jurors in criminal cases having been exposed to reports of this nature, and routinely excludes them from serving on juries. The risk of an eyewitness being exposed to this type of suggestion is even greater. The fact that J.V. identified James Cloud as a perpetrator only after seeing this press release, and especially considering that he had rejected James Cloud in a previously conducted lineup, makes this "identification" highly unreliable.

Fourth, there is no evidence (at least thus far) that law enforcement asked each witness how confident they were in their choices before being given feedback as to whether they chose the suspect.[37, 38] This is necessary because after a witness makes an identification (and especially if they get the impression that they chose

---

[33] Kersten, A. W., & Earles, J. L. (2017). Feelings of familiarity and false memory for specific associations resulting from mugshot exposure. *Memory & Cognition*, *45*, 93–104.

[34] Kovera, M. B. (2002). The effects of general pretrial publicity on juror decisions: An examination of moderators and mediating mechanisms. *Law and Human Behavior*, *26*, 43–72.

[35] Clow, K. A., Lant, J. M., & Cutler, B. L. (2013). Perceptions of defendant culpability in pretrial publicity: The effects of defendant ethnicity and participant gender. *Race and Social Problems*, *5*, 250–261.

[36] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

[37] Wells, G. L., & Bradfield, A. L. (1998). "Good, you identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360-376.

[38] Wright, D. B., & Skagerberg, E. M. (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172-178.

correctly), they become more confident that their choice was correct, compared to the moment they were making the ID. That is, confidence changes, even though accuracy of the identification of course cannot change after it has been made.

This best practice is incorporated into the YCSO's policy manual (603.4):

> (j) A statement from the witness in the witness's own words describing how certain he/she is of the identification or non-identification. This statement should be taken at the time of the identification procedure.

**Opinion #2.** Even though law enforcement failed to follow best practices (and, in several instances, its own procedures) on eyewitness identification, these shortcomings don't impact the reliability of J.V.'s initial non-ID of James Cloud.

**Bases for Opinion.** The same four issues addressed in Opinion #1 are also addressed here.

 First, non-blind lineups can lead to false identifications because of hints and suggestions from the lineup administrator to the witness.[39] If the witness does not make a selection from a lineup, then the risk of a false identification has been avoided (at least for the current lineup – the damage could still reappear later).

 Second, the lack of any audio or video record of the lineup procedures means that there is no record of whether any hints or suggestions were present, but the same logic applies.

 Third, the misinformation in this case (the press release) was received by J.V. *after* his non-ID of James Cloud, so it cannot have affected this non-ID.

 Fourth, although there is no record of J.V.'s confidence at the time of his non-ID, we can assume that he did not have enough confidence in any potential choice to rise to the threshold necessary for him to make an ID.

**Opinion #3.** J.V.'s "identification" of James Cloud, which was in response to the press release, wherein James Cloud is pictured in a prison jumpsuit, described as "armed and extremely dangerous," and as a "suspect . . . in the five murders that were committed on the Yakama Indian Reservation," was essentially a highly-suggestive show-up procedure.

---

[39] Clark, S. E., Marshall, T. E., & Rosenthal, R. (2009). Lineup administrator influences on eyewitness identification decisions. *Journal of Experimental Psychology: Applied*, *15*, 63–75.

A show-up or field identification (discussed in YCSO Policy 603.7) is a common, but not scientifically supported, identification procedure whereby a witness is taken to a suspect and asked, essentially, "is this the guy?"[40] There is no opportunity for show-ups to be created fairly or conducted blind, as discussed above. Rather, a show-up tells the witness immediately who the suspect is and offers no protection for that suspect. A show-up is suggestive by definition. But they can be made even more suggestive by the context. If the suspect is seated in the back of a police car, or flanked by police officers, or handcuffed, that suggests to the witness that they are guilty.[41] The timing of show-ups also matters. According to a study of 500 show-ups, a delay of just two hours between the crime and the show-up led to more than half of witnesses to falsely identify **innocent** suspects.[42]

J.V.'s exposure to this "show-up" happened more than two hours after the crime, and indeed after he had failed to identify James Cloud in a better line-up procedure.

**Opinion #4.** J.V.'s "identification" of James Cloud—after initially non-ID'ing him—is a problem that cannot be overcome and corrected.

Research in legal psychology has tested whether errors introduced into eyewitness memory can be identified (using characteristics from detail and confidence to emotional content and consequentiality) and, perhaps, corrected – with appropriate questioning or even hypnotic intervention. In most cases, corrupted (or outright false) memories are indistinguishable from true memories,[43, 44, 45] and little can be done to correct memory once it has been corrupted.[46] This provides additional evidence that it is important to use the right, scientifically-supported procedures (as above) from the start.

---

[40] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[41] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[42] Yarmey, A. D., Yarmey, M. J., & Yarmey, A. L. (1996). Accuracy of eyewitness identifications in showups and lineups. *Law and Human Behavior*, *20*, 459–477.

[43] Laney, C., & Loftus, E.F. (2008). Emotional content of true and false memories. *Memory, 16,* 500-516.

[44] McNally, R. J., Lasko, N. B., Clancy, S. A., Maclin, M. L., Pitman, R. K., & Orr, S. P. (2004). Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. *Psychological Science*, *15*, 493-497.

[45] Nash, R. A., & Ost, J. (2017). *False and distorted memories*. Routledge/Taylor & Francis.

[46] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

Many people believe that confident witnesses are accurate witnesses. Decades of research on eyewitnesses shows that, in most situations, confidence is not a very good predictor of accuracy.[47, 48, 49, 50] One exception is confidence reported and recorded immediately after a pristine, blind line-up.[51] But confidence reported later (for example, on the witness stand), or after inappropriate identification procedures, is a very poor predictor of accuracy. Witnesses can be 100% confident that they have chosen the right person in a line-up, and yet be wrong. In many circumstances, there is essentially no relationship between confidence and accuracy.

Using hypnosis to "refresh" eyewitness memory has also been proposed.[52] Again, extensive psychological research has shown that hypnosis increases memory suggestibility and reduces thresholds for reporting rather than actually allowing for greater memory.[53, 54]

In short, there is no "undo key" for memory errors. Instead, they must be prevented from the start.

**Opinion #5.** J.V.'s "identification" of James Cloud after exposure to the press release should not be presented to a jury because it is likely to be unduly influential in their decision-making process.

---

[47] Wells, G. L., Memon, A., & Penrod, S. D. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the Public Interest, 7,* 45-75.

[48] Loftus, E. F. (1979). *Eyewitness testimony.* Cambridge, MA: Harvard University Press.

[49] Loftus, E. F., & Greenspan, R. L. (2017). If I'm certain, is it true? Accuracy and confidence in eyewitness memory. *Psychological Science in the Public Interest*, *18*, 1–2.

[50] 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (2019).

[51] Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior*, *36*(4), 312–319.

[52] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[53] Scoboria, A., Mazzoni, G. A. L., Kirsch, I., & Milling, L. S. (2002). Immediate and persisting effects of misleading questions and hypnosis on memory reports. *Journal of Experimental Psychology: Applied*, *8*, 26–32.

[54] Mazzoni, G. A. K., & Lynn, S. J. (2007). Using hypnosis in eyewitness memory: Past and current issues. In M. P. Toglia, J. D. Read, D. F. Ross, R. C. L. Lindsay (Eds.) *The handbook of eyewitness psychology: Volume 1: Memory for events* (pp. 321-338). London: Lawrence Erlbaum.

**Basis for Opinion.** Jurors being allowed to review improper eyewitness identifications has led to many wrongful convictions.[55] Research in jury decision-making shows that eyewitness testimony in general is more influential than its value justifies.[56, 57] Jurors put substantial faith in eyewitness identifications and often overvalue witness confidence,[58, 59] which is problematic for the reasons described above. Jurors also undervalue key factors, including identification procedure errors,[60, 61] that can actually have substantial negative effects on identification accuracy, as described above.

Additional research has tested modifications to jury instructs as a potential tool to correct jurors' misconceptions about the problems associated with faulty identifications. However, these modified instructions have been largely inadequate.[62, 63] Instead, the only adequate remedy for an identification as irredeemably corrupted as that of James Cloud by J.V. is to keep the improper identification away from jurors.

## Conclusions

The "identification" of James Cloud by J.V. was the result a highly suggestive show-up procedure – not even "is this the guy?" but more like "this scary dude who the police officially say killed five people is totally the guy, right?" in the form of a "Wanted poster" press release. The suggestive nature of the press

---

[55] Jones, A.M., & Penrod, S. (2018). Improving the effectiveness of the *Henderson* safeguard against unreliable eyewitness identification. *Psychology, Crime, & Law, 24,* 177-193.

[56] Boyce, M., Beaudry, J. L., & Lindsay, R. (2007). Belief of eyewitness identification evidence. In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology: Volume 2. Memory for people* (pp. 501–525). Mahwah, NJ: Lawrence Erlbaum.

[57] Reisberg, D. (2014). *The science of perception and memory: A pragmatic guide for the justice system.* Oxford University Press.

[58] Cutler, B. L., Penrod, S. D., & Dexter, H. R. (1990). Juror sensitivity to eyewitness identification evidence. *Law and Human Behavior, 14,* 185–191.

[59] Wells, G. L., Memon, A., & Penrod, S. D. (2006). Eyewitness evidence: Improving its probative value, *Psychological Science in the Public Interest*, 7, 45–75.

[60] Cutler, B. L., Penrod, S. D., & Dexter, H. R. (1990). Juror sensitivity to eyewitness identification evidence. *Law and Human Behavior, 14,* 185–191.

[61] Wells, G. L., Greathouse, S. M., & Smalarz, L. (2012). Why do motions to suppress suggestive eyewitness identifications fail? In B. L. Cutler (Ed.), *Conviction of the innocent: Lessons from psychological research* (pp. 167–184). Washington, DC: American Psychological Association.

[62] Dillon, M., Jones, A.M., Bergold, A.N., Hui, C., & Penrod, S. (2017). *Henderson* Instructions: Do They Enhance Evidence Evaluation? *Journal of Forensic Psychology Practice*, 17, 1-24.

[63] Cutler, B. L., Penrod, S. D., & Dexter, H. R. (1990). Juror sensitivity to eyewitness identification evidence. *Law and Human Behavior, 14,* 185–191.

release, the personally meaningful context in which it was received (by a victim of the set of crimes), and the timing of the "identification" (after the same witness had rejected James Cloud in a more appropriate lineup procedure) combine to make this "identification" not only unreliable, but also incurable. Evidence suggests that a jury is unlikely to adequately discount this "identification," so they should not be exposed to it.