

John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for James D. Cloud

United States District Court
Eastern District of Washington
Honorable Salvador Mendoza, Jr.

| United States of America, | No. 1:19-CR-2032-SMJ-1 |
|---|---|
| Plaintiff, | Motion to Exclude E.Z.'s Unreliable ID |
| v. | |
| James Dean Cloud, | Yakima—With Argument |
| Defendant. | September 29, 2020 – 9:00 a.m. |

# Table of Contents

I.      Introduction ...................................................................................................... 1

II.     Background ........................................................................................................ 6

        A.    E.Z. traveled to Medicine Valley, where she is shot and witnessed two murders... 6

        B.    E.Z. escaped, then provided a statement to first responders. ................................ 7

        C.    EMTs transported E.Z. to the hospital; she provided a statement en-route........... 8

        D.    Police visited E.Z. at the hospital, taking her statement in the early-evening. ........ 9

        E.    Later that night, police took another statement from E.Z. ...................................... 9

        F.    Two days later, YCSO detectives interviewed E.Z. and learned no one had shown her a line-up. ........................................................................................ 10

        G.    As one detective left the room to prepare a line-up, the other turned the interview into a lecture. ..................................................................................... 11

        H.    The detectives administered four line-ups. Since these line-ups were recorded, so too were the policy violations. .................................................................. 13

III.    Discussion........................................................................................................20

        A.    Standard.............................................................................................................20

        B.    The *Manson* test applies. .................................................................................. 26

        C.    Police's failure to follow policy produced an unnecessarily suggestive line-up. ... 29

        D.    E.Z.'s identification is unreliable.........................................................................39

              1.    E.Z. lacked a good opportunity to view the red-shirted male...................40

              2.    E.Z.'s degree of attention was low. ......................................................... 43

              3.    E.Z. showed little-to-no accuracy in her prior description. ...................... 46

              4.    E.Z. showed no certainty in her identification.......................................... 47

              5.    The multi-day delay between crime and line-up impacts reliability.......... 47

IV.     Conclusion........................................................................................................48

# I.    Introduction

On June 8, 2019, police responded to two crime scenes: a quintuple homicide in Medicine Valley, and a carjacking outside White Swan. Although many law enforcement agencies were involved, the FBI "took the lead."[1]

The following day, with both scenes secure, Special Agent Ronald T. Ribail set out with YCSO Detective Dan Cypher to prepare—and administer—line-ups for witnesses from both crime scenes. SA Ribail spent "approximately two hours"[2] preparing line-ups at the YCSO substation in Zillah, then traveled to the White Swan area to administer line-ups on the victims who witnessed the carjacking.

SA Ribail "considered the value" of recording the line-ups for the carjacking victims, but declined, saying he "had no equipment with which to record the interview."[3] This decision ran contrary to well-established DOJ guidance, which directed law enforcement agencies—FBI included—to ensure identifications are "clearly documented" by "video- or audio-recording the photo array."[4]

After completing four un-recorded line-ups, SA Ribail then traveled to administer line-ups on Lindell LaFollette, a victim who witnessed some of what

---

[1] ECF No. 155 at 10-11.
[2] ECF No. 155 at 11.
[3] ECF No. 155 at 22.
[4] *See* Exhibit A - January 6, 2017 DOJ Memorandum on Eyewitness Identification: Procedures for Conducting Photo Arrays at 7.

1  happened at Medicine Valley. SA Ribail "considered the value" of recording the

2  line-ups for Mr. LaFollette, but declined, again contradicting DOJ guidance.

3      On June 10, YCSO Detectives Mike Williams and Brian McIlrath interviewed

4  E.Z., another victim who witnessed some of what happened at Medicine Valley.

5  During that interview, the detectives administered a line-up, and E.Z. selected

6  James Cloud as the red-shirted male who shot Dennis Overacker. But unlike the

7  FBI, the detectives followed best practices (at least with regard to documenting what

8  happened), recording both the interview and the line-up.

9      What a difference recording makes.

10      The recording lets us hear Detective Williams lecture E.Z. about the "bad

11  decisions she made as a mom" by bringing her six-month-old child along for an

12  ill-fated trip to purchase methamphetamine in Medicine Valley. The recording lets

13  us see the lecture's effect on E.Z. as she slumped down in her interview chair,

14  looked at the ground, and started to cry. The recording lets us see the detectives

15  administer an un-blinded, non-sequential line-up, practices verboten by YCSO

16  policy. The recording lets us hear E.Z. describe Dennis Overacker's killer as a

17  red-shirted, Native American male who appeared seemingly-white from a

18  distance—a description she later attributed to Morris Jackson, not James Cloud.

19  The recording lets us see E.Z. review James Cloud's line-up photo, pause, then say

"this guy, I think I recognized him. ***I don't think he was wearing the red shirt***." The recording lets us see Detective Williams pick up his pen and, immediately after E.Z.'s exculpatory statement, set it down above James Cloud's photograph, like a bookmark.

The recording gives us a play-by-play on where this line-up went wrong. To right these wrongs, James Cloud respectfully asks the Court to exclude E.Z.'s unreliable identification for the following reasons:

***First***, the Supreme Court's "due process check" for reliability—referred to as "the *Manson* test"[5]—"comes into play only after the defendant establishes improper police conduct." *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012). Here, YCSO detectives violated their own policies (and recognized best practices) by administering an un-blinded line-up, a practice courts—and research—treat as "inherently untrustworthy." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 321 (3d Cir. 2016) (McKee, C.J., concurring) ("Common sense suggests that identification procedures administered without some degree of blinding are inherently untrustworthy, and research confirms this.").

---

[5] The name is derived from *Manson v. Brathwaite*, 432 U.S. 98 (1977), a seminal Supreme Court decision on eyewitness identification.

***Second***, YCSO detectives administered an unnecessarily suggestive line-up. They lectured E.Z. about her failings as a mother before the line-up began, which Dr. Cara Laney will testify increased E.Z.'s susceptibility to suggestion. They administered an un-blinded line-up, a dangerous practice considering there is a "near zero" chance a well-intentioned officer doesn't influence an un-blinded line-up, as "[e]ven seemingly innocuous words and subtle cues—pauses, gestures, hesitations, or smiles—can influence a witness' behavior." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 322 (3d Cir. 2016) (McKee, C.J., concurring). They used fillers (i.e., the five other photos in the six-person line-up) that appreciably differed from James Cloud in height, weight, hairstyle, and clothing, causing him to stand out. *See*, *e.g.*, *U.S. v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) (finding a line-up unduly suggestive when the suspect's photograph "stood out" in its background color and lighting).

***Third***, the line-up's suggestiveness impacted the reliability of E.Z.'s identification due to a myriad of other factors, including the following: 1) she lacked a good opportunity to see the red-shirted male, observing him up close for only seconds; 2) her degree of attention was low since she was high, stressed, and focused on both a gun and her baby; 3) she could not describe the red-shirted male in any detail; 4) she confused Morris Jackson for James Cloud in identifying the red-shirted

male; and 5) she made the identification days after the event, a window when memory fades precipitously.

**Fourth,** the remedy for these violations is not vigorous cross-examination, for "even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability." *U.S. v. Wade*, 388 U.S. 218, 235 (1967). Courts view this as especially true for witnesses like E.Z., who was subconsciously nudged towards selecting James Cloud's photograph. *See Dennis*, 834 F.3d at 323 ("Obviously, if an eyewitness is completely unaware that her identification has been shaped by subliminal cues communicated by investigators, it is incredibly difficult, if not impossible, to dissuade that witness of the accuracy of her identification.").

Nor are jury instructions a cure-all, as "jury instructions can ordinarily no more cure the erroneous admission of powerful identification evidence than they can cure the erroneous admission of a confession," *Id.* at 341.

The true cure-all is exclusion.

## II.    Background[6]

**A.    E.Z. traveled to Medicine Valley, where she is shot and witnessed two murders.**

In the early-afternoon on June 8, 2019, Dennis Overacker picked up E.Z. (a then 31-year-old Hispanic female), A.Z. (her then-6-month-old son), and Mr. LaFollette (a then-61-year-old white male) in his truck, and then traveled to home of John Cagle (known as "Dobie Jack") in Medicine Valley.

Why they went there depends on who you ask. E.Z. claimed Dobie Jack "was getting along in age" and wanted to check on him; Mr. LaFollette claimed they were looking to purchase a motorcycle from Dobie Jack and wanted to view it; and another witness stated Dobie Jack sold methamphetamine, and the group was looking to buy.

The group arrived at Dobie Jack's home in Medicine Valley, met at the front gate by a red-shirted Native American[7] male who stated "Dobie wasn't seeing anyone right now." Frustrated, the group turned around and traveled to Thomas

---

[6] Note: this background differs in a few respects from the background in James Cloud's Motion in Limine Re: Lindell LaFollette's False Memory. That is because this background section is told from E.Z.'s perspective, while the motion involving Mr. LaFollette is told from his perspective. Key differences will be noted.

[7] This statement contradicts Mr. LaFollette, who told police they were met at the closed gate by a blue-shirted Native American male.

Hernandez's house, seeking his help to gain entrance to Dobie Jack's home. Mr. Hernandez agreed to help, climbed into the truck, and the group (now five) returned to Medicine Valley.

They returned to the front gate, where Mr. Hernandez entered the property and met two Native American males—one wearing a blue shirt, the other wearing a red shirt. Both had guns. After roughly five minutes of conversation, the red-shirted male followed Mr. Hernandez back to the truck, where everyone else waited; the blue-shirted male remained nearby.

According to E.Z., the following occurred: the red-shirted male asked Mr. Overacker for a cigarette. As Mr. Overacker leaned towards the center-console to grab one, the red-shirted male fired first, shooting Mr. Overacker (driver). The next person shot was Mr. LaFollette (front-passenger); and the last person shot was Mr. Hernandez.

**B.    E.Z. escaped, then provided a statement to first responders.**

Mr. LaFollette slid into the driver's seat and drove the truck away from Medicine Valley while E.Z. dialed 911. Mr. LaFollette stopped the truck near 3400 Evans Road (about 13 miles East of Medicine Valley), waiting for first responders:

Yakama Nation Officer Anthony Oaks  arrived at the truck's location around 4:14 p.m., finding Mr. Overacker dead in the driver's seat, Mr. LaFollette shot in the passenger seat, E.Z. shot in the rear-passenger seat, and A.Z. unharmed. While other officers attended Mr. LaFollette, Officer Oaks assisted E.Z. and A.Z.

He asked what happened. E.Z. stated she was sitting in the truck's rear-seat when someone started shooting at them. "At the last second, she shielded her baby by moving to the right, which is also when she was grazed in the shoulder," likely by buck shot. EMTs then arrived to treat E.Z., interrupting the interview.

This is her first statement.

**C.    EMTs transported E.Z. to the hospital; she provided a statement en-route.**

EMTs stabilized E.Z. and transported her to Virginia Mason Memorial Hospital in Yakima. En route, she advised EMTs she was shot by an oncoming driver as she approached her friend's house:

31 YOF presents w/ a L shoulder GSW onset 6/8/19. ==Per EMS, she was going to a friend's house at White Swan and reports being fired on by an oncoming driver as she was driving up to her friend's house.== She reports the shot being close range, also reporting sitting in the middle seat holding her baby w/ the driver's side window being down. Per-EMS, she is c/o paresthesia and pain, denies other injuries or complaints, and has FROM to the L UE. Pt reports that the driver of the vehicle was killed.

This is her second statement.

**D.    Police visited E.Z. at the hospital, taking her statement in the early-evening.**

As medical staff treated E.Z., YCSO Deputy Chad Michael arrived shortly before 8 p.m. to interview E.Z.

E.Z. recounted to Deputy Michael about traveling to Dobie Jack's home, encountering the two armed Native American males, and watching Mr. Overacker, Mr. LaFollete, and Mr. Hernandez get shot—in that order. E.Z. didn't say when she was shot.

Besides describing the two shooters as an "I/M wearing a red shirt," as well as an "I/M wearing a blue shirt," E.Z. provided no other details.

This is her third statement.

**E.    Later that night, police took another statement from E.Z.**

Sometime around 9:30 p.m., YCSO Deputy Kyle Cameron interviewed E.Z. She described seeing two males with firearms who "opened fire on Dennis's [Mr. Overacker's] truck and on Thomas [Mr. Hernandez]." She also observed "a

skinny native female in dark clothing with the two male shooters," as well as "a third male whom she could not describe." No other details were provided.

This is her fourth statement.

**F.    Two days later, YCSO detectives interviewed E.Z. and learned no one had shown her a line-up.**

On June 10, 2019, YCSO detectives Brian McIlrath and Mike Williams interviewed E.Z. at the sheriff's office. Unlike prior interviews, this one was audio- and video-recorded.

At the beginning, Detective Williams asked why E.Z. went to Dobie Jack's home. E.Z. answered (as she had before) that it was "just to check on him." Detective Williams did not believe her, raised her methamphetamine addiction, and told her not to "hold back."

E.Z. continued, saying they arrived at Dobie Jack's house and were met at a closed gate by a "young Native"—maybe 19-to-23—wearing a red shirt.[8] At first, E.Z. thought he was white, "but the closer he got, you could tell he was a Native." He was unarmed. The red- (or blue-) shirted male told the group "Dobie wasn't having any visitors."

---

[8] This statement contradicts Mr. LaFollette, who told police they were met at the closed gate by a Native American male wearing a blue shirt.

1    After picking up Mr. Hernandez, the group returned to Medicine Valley.

2    Mr. Hernandez exited the truck, entered the property, and went to speak with the

3    red-shirted male, who was carrying a shotgun (at least that's what she thought).

4    After a several-minute exchange, Mr. Hernandez returned to the truck and asked

5    Mr. Overacker to grab a cigarette for the red-shirted male.

6    At that moment, E.Z. stated the red-shirted male shot Mr. Overacker, shot

7    Mr. Hernandez twice, and also shot Mr. LaFollette in the chest. She described the

8    red-shirted male as "not chubby, but maybe, just thicker."

9    After the detectives asked a few clarifying questions, E.Z. walked back her

10    statement, saying "I don't know which one shot Thomas [Mr. Hernandez]." She

11    went on to say "the one in the red shot again, and that's when he hit

12    [Mr. LaFollette]" in the chest."[9]

13    Later in the interview, Detective McIlrath asked E.Z. if anyone has shown her

14    a photo montage. When E.Z. said "no," he left the interview room to prepare one.

15   **G.    As one detective left the room to prepare a line-up, the other turned the
       interview into a lecture.**

16

17    After Detective McIlrath left the interview room to prepare a line-up, the

18

19    ───────────────
[9] This statement contradicts Mr. LaFollette, who told police he was shot by the blue-shirted male, who he ID'd in a line-up as Morris Jackson.

Motion to Exclude
– 11 –

interview took a turn. Detective Williams lectured E.Z. about her poor life choices. He remarked E.Z. knows "the kind of people" that come out to Dobie Jack's house (people looking to buy drugs). Then he talks about, with disapproval, that she would involve her child:

> 2    **DETECTIVE WILLIAMS:** -- people.  So it's
> 3    concerning that you would take your child out there.

He then asked whether she was thinking about her child when she traveled out to Dobie Jack's house that day and, when E.Z. said "I didn't," he pressed her on why her child never crossed her mind.

Detective Williams then pressed her on what drugs she took that day, finding out E.Z. was high on both methamphetamine and marijuana, and that Mr. Overacker (the driver) was as well. He then returned to commenting about E.Z.'s poor decision-making as a mother:

> 15    **DETECTIVE WILLIAMS:** And so you knew that he was
> 16    smoking marijuana, and you still let him drive you around
> 17    with your kid.  I mean, what's bringing this on?  What's
> 18    what's making -- these are bad decisions --
>
> 20    **DETECTIVE WILLIAMS:** -- for a mom to make.

Detective Williams also commented (repeatedly) that CPS took E.Z.'s son away,

and that she needs to reform her behavior.

Detective Williams's lecture hit a nerve. E.Z. slumped down in her chair, started looking at the floor, and began to cry:



Guilt-ridden and crying over her failures as a mother, Detective McIlrath re-entered the room with the line-ups.

**H.    The detectives administered four line-ups. Since these line-ups were recorded, so too were the policy violations.**

The detectives began with a policy violation. Detective McIlrath took James

1    Cloud's line-up (#5038) and checked the photograph order:



Doing so ran afoul of YCSO line-up policy 603.6, which states—unequivocally—

officers should *never* do that:

In no case should the member presenting a lineup to a witness know which photograph or person in the lineup is being viewed by the witness. Techniques to achieve this include randomly numbering photographs, shuffling folders or using a computer program to order the persons in the lineup.

Next they moved to cautionary instructions. Detective Williams read a

pre-amble to E.Z., telling her the suspect may or may not be in the photographs. He

then asked her to sign a form certifying she understood the procedure. She did.

1    The detectives then openly conferred about the next step, confused on how to

2    document the line-up. They reviewed the form for guidance as E.Z. watched:



Agreeing more forms were needed, Detective McIlrath left the room to get more.

While waiting for more forms, Detective Williams also checked the photograph

order, violating the same "never do this" policy Detective McIlrath just violated:





Detective Williams then handed E.Z. all six photographs for review.

E.Z. came to James Cloud's photo, paused, then said "this guy, I think I recognized him. ***I don't think he was wearing the red shirt***." So E.Z., unprompted, stated James Cloud ***wasn't*** the man who shot Mr. Overacker (the basis for James Cloud's first-degree murder charge). She then went quiet, looking at several photographs simultaneously, which violated a different paragraph in YCSO line-up policy 603.6:

<mark>The member presenting the lineup to a witness should do so sequentially (i.e., show the witness one person at a time) and not simultaneously.</mark> The witness should view all persons in the lineup.

Motion to Exclude
– 16 –

Then, after E.Z. passed over James Cloud's photo, Detective Williams picks up his pen and sets it down above James Cloud's photograph, like a bookmark:



E.Z. then shuffled through the photos before returning to James Cloud's photo, saying "this is the guy that was wearing the red shirt, the one that shot Dennis."

At that moment, Detective McIlrath handed her a pen and said "Do you want to write that one there or sign your name? Just write the guy who shot Dennis, or whatever, if that's what you think." As he did, he looked over at Detective Williams and made eye contact:



No words were exchanged, but the meaning was clear: she picked the one they wanted.

The detectives then pulled out a line-up containing Morris Jackson (#5040). Again, the detectives let E.Z. lay out the pictures on the table, violating the same "in-no-case-should-you-do-this" policy.

E.Z. then shuffled through the photographs, returning to Morris Jackson's photo. She then told detectives "I think this is the guy that was in the blue shirt. I'm not sure. I think this is the guy in the blue shirt."

The detectives then give her a pen to sign her name and instruct her to write "blue shirt" on the photograph. She then reinforced her selection, saying she thinks Morris Jackson is the one "because he looked white far away and then got close." Moments later, E.Z. stated "this is the same guy that came up to the car and told us he [Dobie Jack] wasn't having any visitors."

These statements about Morris Jackson (i.e., he was the one who looked white from far away and turned them away at the gate when they first arrived) are the statements E.Z. used to describe ***red-shirted male*** earlier in the interview.

They moved through two additional line-ups (one for Donovan Cloud, the other for Natasha Jackson), and then Detective McIlrath, after writing several notes, asked, "is that what you wrote? The guy in the red shot Dennis?"

E.Z.'s answer: correct.

Detective McIlrath then asked E.Z. what the red-shirted male's gun looked like. She said both their guns (i.e., the red-shirted male and blue-shirted male) were rifles, then clarified the red-shirted male had the "longer shotgun."

After some additional questioning, the detectives left. Then, a few minutes later, Detective Williams returned. He resumed commenting about E.Z.'s mistakes, told her he "doesn't know what the State wants to do" regarding her CPS case, and notes she "fucked up." He then wrapped up the interview by noting Dobie Jack may

have been a good guy "at one point in his life," but he was "caught up in a lot of crap, and it finally got to him."

At no point did either detective instruct E.Z. to avoid discussing the case (or the line-up) with other witnesses, violating YCSO line-up policy 603.5:

> In order to avoid undue influence, witnesses should view suspects or a lineup individually and outside the presence of other witnesses. Witnesses should be instructed to avoid discussing details of the incident or of the identification process with other witnesses.

That concluded the interview.

### III.    Discussion

### A.    Standard

To meaningfully assess whether E.Z.'s identification is reliable, a brief backdrop on the law and science behind eyewitness identifications helps.

In 1968, the Supreme Court set the basic framework for challenging an eyewitness identification under the due process clause. *See Simmons v. U.S.*, 390 U.S. 377, 384 (1968). This framework contained two parts: first, courts examined whether the identification procedure (be it line-up, show-up, or otherwise) was "impermissibly suggestive";[10] second, if the procedure was impermissibly

---

[10] Courts use the phrase "impermissibly suggestive" and "unnecessarily suggestive" interchangeably. *See Simmons*, 390 U.S. at 384 (using "impermissibly suggestive" when discussing the due process framework); *Manson v. Brathwaite*, 432 U.S. 98 (1977) (using "unnecessarily suggestive" when discussing the due process framework).

suggestive, then courts considered whether it was nevertheless reliable under the "totality of the circumstances." *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984).[11] When assessing reliability, courts looked at five factors (referred to as the *Biggers* factors):

    1) the witness's opportunity to view the accused;

    2) the witness's degree of attention;

    3) the accuracy of the witness's prior description of the accused;

    4) the level of certainty claimed by the witness at the confrontation; and

    5) the time lapse between the crime and the confrontation.

*See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

In 1977, the Supreme Court affirmed this burden-shifting framework as the go-to standard, adding that "reliability is the linchpin in determining the admissibility of identification testimony. . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). For reasons unclear, courts, parties, and academics refer to this framework as "the *Manson* test," even though *Manson* didn't establish the framework, but rather refined it. *See*, *e.g.*, *U.S. v. Greene*, 704 F.3d 298, 305 n.3 (4th Cir. 2013) (referring to "the *Manson* test").

---

[11] A defendant carries the burden on the first step; the United States carries the burden on the second step. *See*, *e.g.*, *Bernal v. Colorado*, 44 P.3d 184, 191 (2002).

Then things changed (science-wise). When the Supreme Court decided *Manson*, "social scientists had just embarked on a course of experimental research that would revolutionize our understanding of human memory," uncovering "memory is not like a videotape, but rather is constructed in a dynamic fashion." Brandon L. Garrett, *Eyewitnesses and Exclusion*, 65 Vand. L. Rev. 451, 453 (2012). The sheer volume of research was incredible. Scientists published more than 2,000 studies, many focused on whether the *Manson* test was the best framework for weighing eyewitness challenges. *See Greene*, 703 F.3d at 305 n.3.

The scientific results were enlightening. Time-and-time again, studies showed certain variables impacted an identification's reliability, with these variables falling into two categories: system variables and estimator variables.

"System variables are the procedures and practices law enforcement use to elicit eyewitness identifications." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 321 (3d Cir. 2016) (McKee, C.J., concurring). These factors not only "heavily influence the reliability of identifications," but also "largely lie within the exclusive control of the criminal justice system," and include what instructions police provide to eyewitnesses. *Id.*

"Estimator variables are the conditions present during memory formation or storage." *Id.* at 329. These factors also "have a substantial impact on the reliability

of eyewitness identifications," and include the presence of weapons, stress, and visibility conditions. *Id.*

The scientific results were also damning. Hundreds of peer-reviewed articles concluded the *Manson* framework "fails to account for most of the factors that contribute to the integrity of eyewitness identifications." Amy D. Trenary, *State v. Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U. Colo. L. Rev. 1257, 1261 (2012). For example, the Supreme Court directs courts to consider a witness's certainty at the time of identification, yet "a witness' subjective confidence in the accuracy of her identification has limited correlation to the reliability of her identification." *Dennis*, 834 F.3d at 335.

This tension between law and science made things awkward, as "the law ha[d] not caught up to the science." *Id.* at 314. As a result, courts reluctantly applied the *Biggers* factors because they were instructed to, while simultaneously recognizing these factors weren't the best way to assess an identification's reliability. *See, e.g., Haliym v. Mitchell*, 492 F.3d 680, 705 n.15 (6th Cir. 2007) ("As a matter of law, we acknowledge that the witness' degree of certainty is a relevant factor to consider in determining reliability. We note, however, that empirical evidence on eyewitness identification undercuts the hypothesis that there is a strong correlation between certainty and accuracy.").

1    In effect, the *Manson* test was a two-mule wagon in a jet plane world.

2    In 2012, the Supreme Court took up its first eyewitness case since the

3    research into human memory solidified. *See Perry v. New Hampshire*, 565 U.S. 228

4    (2012). At issue: whether *Manson*'s due process framework applied to "suggestive

5    circumstances" that "were not arranged by law enforcement officers." *Id.* at 232.

6    The Supreme Court charted an interesting course. It recognized the latest

7    science, noting other variables besides the *Biggers* factors impact reliability, including

8    "whether the witness was under stress when he first encountered the suspect, how

9    much time the witness had to observe the suspect, how far the witness was from the

10   suspect, whether the suspect carried a weapon, and the race of the suspect and the

11   witness." *Id.* at 243-44. But it remained reticent to expand a due process check to

12   eyewitness identifications where something went wrong, but police weren't to

13   blame.

14   So instead of baking the latest science [read: system and estimator variables]

15   into a re-worked *Manson* test, "the Supreme Court advocated that courts

16   incorporate the relevant scientific findings through other avenues, such as jury

17   instructions and evidentiary rules." *Dennis*, 834 F.3d at 336. Of these other avenues,

18   the Supreme Court highlighted Rule 403 as one such "safeguard" to toss unreliable

19   eyewitness testimony: "State and Federal Rules of Evidence, moreover, permit trial

judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading a jury." *Perry*, 565 U.S. at 247.

Since *Perry*, "[s]ome states have heeded *Perry*'s call and created new procedures and evidentiary frameworks that minimize the risks associated with erroneous identifications." *Dennis*, 834 F.3d at 336.

Federal courts have also acted. In 2016, the Third Circuit created a task force to examine eyewitness identifications, recognizing the need to formally incorporate "scientific developments in the field of eyewitness identification," as "courts had begun to apply these developments in criminal cases." *See* 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1 (Fall 2019). In releasing its report, which acknowledged the importance of system and estimator variables in assessing an identification's reliability, the Third Circuit delicately sidestepped commenting on the much-criticized *Manson* test. *See* Third Circuit Report, 91 Temp. L. Rev. at 7 n.3 ("The Task Force was not concerned with and did not attempt to address identification procedures that are so unduly suggestive as to raise a Due Process objection pursuant to *Manson v. Brathwaite*. 432 U.S. 98 (1977), and its progeny.").

Today, courts still use *Manson*'s due process framework when police use improper procedures that produce suggestive identifications. *See*, *e.g.*, *Greene*, 704

F.3d at 305 ("The Supreme Court has established a two-step process to determine whether identification testimony is admissible."). But when assessing reliability, courts delve deeper than the *Biggers* factors alone, also weighing system and estimator variables. *See id.* at 308 (applying the latest scientific research to the due process test and noting "[w]eapon focus can 'impair a witness' ability to make a reliable identification and describe what the culprit looks like if the crime is of short duration.'"). And when suggestive identifications aren't the product of improper police procedures, then courts employ Rule 403. *See*, *e.g.*, *Perry*, 565 U.S. at 233 ("When no improper law enforcement activity is involved, we hold, it suffices to test reliability through" the "protective rules of evidence. . . ."); *see also U.S. v. Murphy*, 2018 WL 7017993 at * 16 (E.D. Ten. Oct. 15, 2018) ("Defendant is correct that the pretrial identifications may be barred or limited under Rule 403, even if they are not excludable under the Due Process Clause.").

Against this backdrop on the law and science of eyewitness identifications, Mr. Cloud turns to E.Z.'s identification.

## B.    The *Manson* test applies.

The Supreme Court's "due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct." *Perry*, 565 U.S. at 241. This is an easy showing with E.Z.'s identification,

1  as police recorded themselves violating policy in several ways.

2      First, police failed to administer a blind line-up. Blinding comes in two flavors:

3  double and single. A double-blind line-up occurs when neither the officer

4  administering the line-up nor the eyewitness know which person is the suspect. *See*

5  Third Circuit Report, 91 Temp. L. Rev. at 28. Although double-blinding is the

6  "preferred method," it can be difficult to do in small departments where "all of the

7  officers know the suspect . . . ." *Id.* The next-best approach is a single-blind line-up,

8  where the officer administering the line-up knows the suspect, but does not know

9  which photo the eyewitness is viewing. *See id.*

10     Courts recognize blinding is "the single most important characteristic that

11  should apply to eyewitness identification." *Dennis*, 834 F.3d at 321. Blinding is

12  critical because there is a "near zero" chance a well-intentioned officer doesn't

13  influence an un-blinded line-up, as "[even seemingly innocuous words and subtle

14  cues—pauses, gestures, hesitations, or smiles—can influence a witness' behavior."

15  *Id.* at 322.

16     Here, *both* officers reviewed the line-up order before handing it to E.Z. First it

17  was Detective McIlrath who checked the line-up order:

18

19



Then it was Detective Williams who checked the line-up order:



They then watched E.Z. review the photos, knowing exactly which photos she was reviewing as she set them out on the table. This violated their own policies, which state—unequivocally— officers should **never** do that:

> In no case should the member presenting a lineup to a witness know which photograph or person in the lineup is being viewed by the witness. Techniques to achieve this include randomly numbering photographs, shuffling folders or using a computer program to order the persons in the lineup.

This policy failure, by itself, triggers the Supreme Court's due process check.

Second, police failed to administer a sequential line-up. A sequential line-up occurs when an eyewitness views photos one-at-a-time (as opposed to simultaneously). YCSO policy requires police to administer sequential line-ups:

> The member presenting the lineup to a witness should do so sequentially (i.e., show the witness one person at a time) and not simultaneously. The witness should view all persons in the lineup.

That didn't happen. Instead, E.Z. was allowed to set the photos out on the table to review.

These policy violations, taken together, trigger *Manson's* "due process check." *Perry*, 565 U.S. at 241.

**C.    Police's failure to follow policy produced an unnecessarily suggestive line-up.**

Several components from E.Z.'s line-up stand out as unnecessarily suggestive.

1    ***First***, Detective Williams's moralistic lecture increased E.Z.'s suggestibility.

2    Dr. Laney will testify a link exists between self-esteem and interrogative

3    suggestibility. That is, interviewees "who are feeling badly about themselves and

4    their abilities are more likely to go along with interviewers' suggestions and thus to

5    experience the misinformation effect."[12] The misinformation effect, in turn, is a

6    well-documented phenomenon in human memory where "even very minor

7    post-event information (e.g., a change of a single word in a question) can have

8    substantial effects on memory for legally-relevant facts."[13]

9    And there was no shortage of E.Z. feeling bad about herself during this

10   line-up, thanks primarily to Detective Williams. The moment Detective McIlrath

11   left the interview room to prepare a line-up, Detective Williams didn't hold back.

12   His questions shifted from uncovering what happened that day to uncovering why

13   E.Z. would take her six-month-old baby to a known drug house:

14   2    **DETECTIVE WILLIAMS:** -- people. So it's

15   3    concerning that you would take your child out there.

16   He then expressed disbelief that mother would let a man high on marijuana drive her

17   (and her six-month-old son) to a drug house:

18

19   [12] Dr. Laney's Expert Report on E.Z. at 10.
     [13] Dr. Laney's Expert Report on J.V. at 6.

Motion to Exclude

15         **DETECTIVE WILLIAMS:** And so you knew that he was

16 smoking marijuana, and you still let him drive you around

17 with your kid.  I mean, what's bringing this on?  What's

18 what's making -- these are bad decisions --

20         **DETECTIVE WILLIAMS:** -- for a mom to make.

These moralistic questions, coupled with repeated references to CPS taking E.Z.'s

child away, caused E.Z. to slump down in her chair and start to cry. It was at this

vulnerable moment that Detective McIlrath returned to the interview room with the

photo montages, ready to begin the line-up procedure.

Although there is no YCSO policy against belittling a witness, science shows

it increases suggestibility.

***Second***, police employed a non-blinded technique. Courts recognize any

"identification procedures administered without some degree of blinding are

inherently untrustworthy, and research confirms this." *Dennis*, 834 F.3d at 321.

This is because even the best-intentioned line-up administrators "emit behaviors

that increase the likelihood that witnesses will choose the suspect, primarily by

affecting decisions of witnesses who would not have otherwise chosen the suspect."

Third Circuit Report, 91 Temp. L. Rev. at 30 (internal quotations omitted). These

influencing behaviors—whether obvious, subtle, conscious, or not—matter when an

1  eyewitness not only isn't sure what she saw, but also explicitly rejected the suspect.

2      E.Z. wasn't sure what she saw. During the interview, E.Z. described the

3  red-shirted male (the one who shot Mr. Overacker) as seemingly-white from a

4  distance, but Native as he got closer:

```
13           DETECTIVE WILLIAMS:  And what did he look like?
14  E███████ Z███████:  He was wearing a red shirt.
15  At first from far away, I thought he was maybe white. But
16  the closer he got, you could tell he was a Native.
```

Later in the interview, E.Z. referred to Morris Jackson as seemingly-white from a

distance, but Native as he got closer:

```
20           E███████ Z███████:  I think this is the guy
21  was in the blue shirt. I'm not sure. I think this is the
22  guy in the blue shirt. I think because he looked white
23  far away and then got close. You could tell he was
24  I think -- this guy.
```

15  So E.Z. described the red-shirted male as seemingly-white from a distance, then,

16  minutes later, described Morris Jackson as seemingly-white from a distance. Who

17  was wearing red and who was wearing blue matters, as the red-shirted male shot

18  Mr. Overacker (and possibly Mr. Hernandez), yet E.Z. kept confusing the two.

19      E.Z. initially rejected James Cloud as the red-shirted male. As E.Z. reviewed

Motion to Exclude
– 32 –

the line-up containing James Cloud, a critical moment happened: she looked at his photo, paused, then said "this guy, I think I recognized him. ***I don't think he was wearing the red shirt***." And here's where the un-blinded procedure makes a difference. At this exact moment, after E.Z. stated she didn't think James Cloud was the red-shirted male who shot Mr. Overacker, Detective Williams picked up his pen and set it down above James Cloud's photo, like a bookmark:



Moments later, E.Z. returns to James Cloud's photo and changes her mind, selecting him as the red-shirted male. The detectives then made meaningful eye contact with each other as they instructed her to confirm the identification in

1  writing: "Just write the guy who shot Dennis, or whatever, if that's what you

2  think."

3      It's impossible to know what impact placing the pen above James Cloud's

4  photo had on E.Z.; it's impossible to know what impact telling E.Z. what to write

5  had on her; it's impossible to know what impact the meaningful eye exchange

6  between the detectives had on E.Z.; it's impossible to know what impact the

7  detectives' other pauses, gestures, hesitations, or expressions had on E.Z.—the

8  camera is low-resolution and positioned behind Detective Williams, so we can't see

9  his face during the entire interview.

10     What we do know is E.Z. at first didn't think James Cloud was the red-shirted

11  male, then changed her mind after the pen placement (and who knows what other

12  cues). Had the detectives followed policy, none of these irregularities would have

13  happened. This made for a suggestive interview.

14     ***Third***, police use ill-fitting fillers, causing James Cloud to stand out. "Fillers"

15  are the non-suspects included in a line-up along with the suspect. Normally, fillers

16  should be selected based on "the witness's description of the perpetrator

17  (e.g., gender, age, height, weight, hair color, eye color) and a resemblance to the

18  suspect, rather than selecting fillers based only on their resemblance to the

19  suspect." Third Circuit Report, 91 Temp. L. Rev. at 35. But here, E.Z. provided few

Motion to Exclude
– 34 –

details. In her first few statements, she only described the suspects as "Native American males." It was only during the line-up interview where she provided greater detail, but not much, describing the red-shirted male as a "young Native," maybe 19-23, seemingly-white from a distance, and "not chubby, but maybe, just thicker." When an eyewitness provides few details about the suspect, then "all members of the lineup or photo array should be similar to the suspect as to the relevant characteristic, so as not to make the suspect stand out from the fillers." *Id.*

And if suspect's photo stands out from the fillers in one way, shape, or form, courts find that line-up unduly suggestive. *See, e.g., U.S. v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) (finding a line-up unduly suggestive when the suspect's photograph "stood out" in its background color and lighting); *U.S. v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999) (finding a line-up unduly suggestive where the suspect's photo stood out due to unnatural skin tone and because the fillers each had a think chain around their neck)[14]; *U.S. v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996) (finding a line-up unduly suggestive because the suspect stood out due to cropping, which emphasized his bushy hair and complexion).

Here, James Cloud's photo stood out in a few different ways, mostly regarding his physical appearance. James Cloud has short hair, stands 6'1", and

---

[14] Abrogated on other grounds by *Rosemond v. U.S.*, 572 U.S. 65 (2014).

weighed 195 pounds at the time of his arrest. Detective McIlrath selected one filler

of comparable height and weight (5'10", 200 lbs.), but the remaining fillers were

40-60 pounds heavier (and shorter), making the weight difference more

pronounced:

```
********************************************************************
                        PERSON INFORMATION
********************************************************************
  SEX    RACE   HEIGHT   WEIGHT    EYES    HAIR   PLACE OF BIRTH   CITIZENSHIP
  M       I      509      260      BRO     BLK         WA              US
                                                       US

********************************************************************
                        PERSON INFORMATION
********************************************************************
  SEX    RACE   HEIGHT   WEIGHT    EYES    HAIR   PLACE OF BIRTH   CITIZENSHIP
  M       I      600      250      BRO     BLK         WA              US
          W

********************************************************************
                        PERSON INFORMATION
********************************************************************
  SEX    RACE   HEIGHT   WEIGHT    EYES    HAIR   PLACE OF BIRTH   CITIZENSHIP
  M       I      509      250      BRO     BLK         US              US
                                                       WA

********************************************************************
                        PERSON INFORMATION
********************************************************************
  SEX    RACE   HEIGHT   WEIGHT    EYES    HAIR   PLACE OF BIRTH   CITIZENSHIP
  M       I      600      235      BRO     BLK         US              US
          W                                            WA
```

Visually, it made a difference, especially when E.Z. viewed the photos side-by-side,

like this one:



Or this one:



Motion to Exclude

It also made a difference considering witnesses described the suspects as having short hair, but police insert an overweight filler with a ponytail:



Also, James Cloud was the only individual wearing a white shirt, providing another basis for his photo to stand out:







Taken together (i.e., the moralistic lecturing, the explicit and implicit cues during the non-blinded line-up, and the poor choice for fillers), police administered an unduly suggestive line-up.

**D.    E.Z.'s identification is unreliable.**

The circumstances surrounding E.Z.'s viewing make her identification unreliable. As set forth above, courts consider five factors when assessing reliability (the *Biggers* factors), but also fold in other considerations into the mix, such as

weapons focus, stress, and cross-racial identification. *See Perry*, 565 U.S. at 243-44 (identifying several factors besides those laid out in *Biggers* that speak to reliability). Here, every factor courts consider—including estimator variables—demonstrate this identification was unreliable:

### 1.   E.Z. lacked a good opportunity to view the red-shirted male.

There are a few reasons E.Z. lacked a good opportunity to view the red-shirted male.

The first is distance, which, unsurprisingly, impacts an identification's reliability. *See*, *e.g.*, *Perry*, 565 U.S. at 243-44 (noting distance impacts risk of misidentification).

Here, when Mr. Overacker pulled his truck up to Dobie Jack's house, Mr. Hernandez exited and approached the red-shirted male, who was standing by a red vehicle on the property:

```
6          DETECTIVE MCILRATH:   Where were they at?
7          E███████ Z████    :   By the red vehicle, by the
8    Jeep, or whatever it was.
```

The red vehicle wasn't close, as E.Z. commented a female was also nearby the vehicle, but it was too far to get a clear visual:

> 2        ████ █ ████ : I don't know if it was this
> 3   girl. She was far away. She was by the vehicle, by the
> 4   door. I don't know if it was her or not.

So while Mr. Hernandez spoke with the red-shirted male for "a good, like, four minutes," it was from far away, so she lacked a good opportunity to view him.

The second is positioning. When Mr. Overacker pulled his truck up to Dobie Jack's house, he turned the vehicle around to face *away* from the property:

> 19   **DETECTIVE MCILRATH:** So you guys pulled down the
> 20   driveway, turned around to face out.
> 21         ████ █ ████ : Mm-hmm.

This means E.Z. (seated in the back) was facing away from events, so she'd have to crane her head nearly 180 degrees to see what was happening. And anything she could see was further impaired not only by dark window tint, but also by a roll bar with slanted metal slats:

1
2
3
4
5
6
7
8
9
10
11
12



Roll bar with slanted
metal, angled slats.

Dark window tint.

13    The third is duration, which, also unsurprisingly, impacts an identification's

14    reliability. *See Dennis*, 834 F.3d at 332 ("As one would expect, exposure duration,

15    distance, and lighting affect the accuracy of eyewitness identifications."). According

16    to E.Z., the red-shirted male approached the truck, asked for a cigarette, and then

17    shot Mr. Overacker as he was leaning over to grab one. Although E.Z. never

18    quantified the time frame when the red-shirted male was close to the vehicle, it

19    appeared brief. And while it's unclear where the red-shirted male was standing

during this brief encounter, E.Z.'s view was obstructed by one (or more) of the following: 1) Mr. Overacker, 2) his seat-back, 3) the window tint (depending on where the red-shirted male was standing), and 4) possibly Mr. Hernandez (depending on where he was standing). Taken together, this factor cuts against a reliable identification.

### 2.    E.Z.'s degree of attention was low.

Several things distracted E.Z., contributing to an unreliable identification.

The first was the presence of a weapon. "[S]cientific literature indicates that the presence of a weapon during a crime 'will draw central attention, thus decreasing the ability of the eyewitness to adequately encode and later recall peripheral details.'" *Young v. Conway*, 698 F.3d 69, 80-81 (2d Cir. 2012).

Here, E.Z. stated both individuals (i.e., the red-shirted male and the blue-shirted male) were armed:

```
14    █████ ███████:  They were rifles.  They
15 old, like old guns, like, maybe antique guns.  The one
16 the guy in the blue shirt had looked old.  And then the
17 in the red had -- like, it was long.  It was the longer
18 shotgun.
```

The second was stress. "[H]igh levels of stress have been shown to induce a defensive mental state that can result in a diminished ability accurately to [sic]

process and recall events, leading to inaccurate identifications." *Id.* at 81. One study on stress stands out:[15]

Researchers took 500 active-duty soldiers and divided them into two groups. Both groups were subjected to food- and sleep-deprivation for 12 hours, followed by interrogations. The first group experienced high-stress interrogations; the second group experienced a low-stress interrogations. Both interrogations lasted roughly 40 minutes, with interrogators within an arm's length of the soldiers the entire time. The next day, the soldiers were asked to identify their interrogators.

The results were stunning. In the low-stress interrogation, 62% of soldiers correctly identified their interrogators; in the high-stress interrogation, only 30% of soldiers correctly identified their interrogators, despite seeing their interrogators for forty minutes from less than three feet away. Stress impacts reliability. Tremendously.

E.Z.'s stress was far greater than what the soldiers experienced. Three of her friends were shot (two killed), she was shot, and she had a baby next to her the entire time. In this vein, Dr. Laney will testify she isn't aware of any research involving how a child's presence impacts memory formation during a crime. That said, the presence of E.Z.'s child certainly distracted her, as she described immediately

---

[15] Dr. Laney's Expert Report on E.Z. at 10.

turning towards her baby when the shooting started:

```
24              I just remember turning to cover the baby, and I
25  - Dennis must have pushed the gas when he went because the
```

The third was drugs. E.Z. admitted to using both methamphetamine and

marijuana:

```
19          DETECTIVE WILLIAMS:  And when you were -- when
20  were at the hospital, you had drugs in your system.
21      E        Z        :  Yes.
22          DETECTIVE WILLIAMS:  Meth, right?
23      E        Z        :  Correct.
24          DETECTIVE WILLIAMS:  What else?
25      E        Z        :  I think marijuana.  I
```

She also admitted to using both right before she left for Medicine Valley:

```
2           DETECTIVE WILLIAMS:  So you're caring for your
3   child.  When did you use it -- use it last?
4       E        Z        :  With      .
5           DETECTIVE WILLIAMS:  When?
6       E        Z        :  Before we left his house --
7   mom's house.
```

Dr. Laney will testify methamphetamine can have "dire consequences for memory

and other cognitive function," including "deficits in both short-term and long-term

recognition, as well as spatial memory."[16]

In short, E.Z. was high, stressed, and distracted by both weapons and protecting her child. This factor cuts against a reliable identification.

### 3.    E.Z. showed little-to-no accuracy in her prior description.

E.Z. provided little-to-no description of the red-shirted male, other than being a "young Native," maybe 19-23, seemingly-white from a distance, and "not chubby, but maybe, just thicker." Beyond this vague description, E.Z. confused James Cloud for Morris Jackson during the interview, describing the red-shirted male as seemingly-white from a distance, a description she then associated with Morris Jackson. There is a scientific explanation for E.Z.'s confusion. She is Hispanic, and Morris Jackson and James Cloud are Native American, creating a cross-race identification issue.

Courts recognize cross-racial identifications impact accuracy in a significant way. *See*, *e.g.*, *Conway*, 698 F.3d at 81 ("[S]ocial science research indicates that people are significantly more prone to identification errors when trying to identify someone of a different race, a phenomenon known as 'own-race bias.'"); *U.S. v. Stevens*, 935 F.2d 1380, 1392 (3d Cir. 1991) ("Scholarly literature attacking the trustworthiness of cross-racial identification is now legion.").

[16] Dr. Laney's Expert Report on E.Z. at 13.

Motion to Exclude
– 46 –

Because E.Z. provided a vague description of the red-shirted male that plainly confused one Native American for another, this factor cuts against a reliable identification.

### 4.    E.Z. showed no certainty in her identification.

E.Z. never stated a level of certainty during her identification, as neither detective asked her to do so. But perhaps the best barometer for certainty is the statement she made when first looking at James Cloud's photo (*before* police placed the pen above his photo): "I *think* I recognized him. I *don't think* he was wearing the red shirt." Because her certainty is low, this factor cuts against a reliable identification.

### 5.    The multi-day delay between crime and line-up impacts reliability.

Police administered E.Z.'s line-up on June 10, two days after the shooting. Courts (and research) recognize the biggest memory decay happens in the hours after an event. *See, e.g., State v. Guilbert*, 49 A.3d 705, 721-22 (Conn. 2012) ("Courts across the country now accept that . . . a person's memory diminishes rapidly over a period of hours rather than days or weeks."); *see also State v. Lawson*, 291 P.3d 6763, 688 (Or. 2012) ("Memory generally decays over time. Decay rates are exponential rather than linear, with the greatest proportion of memory loss occurring shortly after an initial observation, then leveling off over time."). Given the delay between

the event and the line-up, this factor cuts against a reliable identification.

## IV.    Conclusion

*"It is difficult to un-ring the bell that an unreliable eyewitness identification tolls."*

-    *Dennis*, 834 F.3d at 344

E.Z.'s opportunity to view the red-shirted male was brief, occurring over a matter of seconds as he approached the truck and asked for a cigarette. This viewing occurred from the back-seat of a tinted truck while she was high, stressed, and focused on both a gun and her baby. She exhibited little-to-no accuracy in her description of the red-shirted male, and confused one Native American for another during her line-up. All of this, coupled with a multi-day delay between the crime and a line-up, creates the foundation for an unreliable identification. Add in the detectives' un-blinded line-up, coupled with their suggestive cues, and the result is a line-up that violates both due process and Rule 403.

Given these circumstances, Mr. Cloud respectfully asks the Court to allow E.Z. to testify as to what she saw on June 8, but forbid her from identifying James Cloud as the red-shirted male.

Dated: August 27, 2020

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org

**Service Certificate**

I certify that on August 27, 2020, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF System, which will notify Assistant

United States Attorneys: Thomas J. Hanlon and Richard Burson.

s/ John B. McEntire IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org