

**U. S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                                    *Washington, D.C. 20530*

January 6, 2017

MEMORANDUM FOR HEADS OF DEPARTMENT LAW ENFORCEMENT COMPONENTS
ALL DEPARTMENT PROSECUTORS

FROM:              Sally Q. Yates
                   Deputy Attorney General

SUBJECT:           Eyewitness Identification: Procedures for Conducting Photo Arrays

Eyewitness identifications play an important role in our criminal justice system, both by helping officers and agents identify suspects during an investigation and by helping juries determine guilt at trial. It is therefore crucial that the procedures law enforcement officers follow in conducting those identifications ensure the accuracy and reliability of evidence elicited from eyewitnesses.

There are several ways for law enforcement officers to test whether an eyewitness can identify a perpetrator, and the appropriate method for administering such a test varies depending on the circumstances. When the perpetrator is a stranger to the witness, the most common method involves the use of a "photo array," whereby a law enforcement officer displays a photograph of the suspect along with images of similar looking individuals for comparison.[1] This type of identification procedure has become particularly popular in recent years, in part because it can be assembled quickly and does not require the physical presence of the suspect or other individuals for a live line-up.

The Department of Justice last addressed procedures for photo arrays in its 1999 publication, *Eyewitness Evidence: A Guide for Law Enforcement*. Research and practice have both evolved significantly since then. For example, a growing body of research has highlighted the importance of documenting a witness's self-reported confidence at the moment of the initial identification, in part because such confidence is often a more reliable predictor of eyewitness accuracy than a witness's confidence at the time of trial. Similarly, there has been an evolution in views on whether the "sequential" administration of a photo array (presenting the witness one photo at a time) results in more accurate identifications than a "simultaneous" administration (presenting all of the photos at once). At the end of this memorandum is a summary of these and other recent developments in the field of eyewitness identification.

---

[1] A "photo array" is distinct from other law enforcement techniques involving photographs used to obtain investigative leads, such as "mug books" and single confirmatory photographs, which are outside the scope of this memorandum.

Over the past year, a team of Department experts—including prosecutors, law enforcement personnel, and social scientists—have worked together to study the research and identify best practices. Their work culminated in the attached document, which outlines procedures for the administration of photo arrays. These procedures are not a step-by-step description of how to conduct photo arrays, but rather set out principles and describe examples of how to perform them.

The heads of the Department's law enforcement components should review these procedures and, to the extent necessary, update their own internal policies to ensure that they are consistent with the procedures described in this document. In addition, all Department prosecutors should review these procedures and take them into consideration when deciding whether to charge a case involving an eyewitness identification. Although nothing in this memorandum implies that an identification not done in accordance with these procedures is unreliable or inadmissible in court, it is important that prosecutors identify potential issues in the administration of a photo array early in an investigation and take any such issues into account when evaluating the overall strength of the evidence in their case.

These procedures are designed to promote sound professional practices and consistency across the Department's law enforcement efforts. As stated in several sections, the principles may be adjusted in light of specific circumstances—including, but not limited to, exigent circumstances, limitations on personnel or other resources, concerns for a witness's fears and safety, and sensitivity to victims—and each identification must be evaluated on its own merits.

Thank you for your attention to this issue and for everything you do at this Department to ensure the administration of justice.

## U.S. DEPARTMENT OF JUSTICE

### EYEWITNESS IDENTIFICATION
### PROCEDURES FOR CONDUCTING PHOTO ARRAYS[1]

### Location of the Photo Array

1.1    Unless impracticable, the witness should view the photo array out of earshot and view of others and in a location that avoids exposing the witness to information or evidence that could influence the witness's identification, including information about the case, the progress of the investigation, or the suspect.

1.2    Neither the suspect nor any photographs of the suspect (including wanted posters) should be visible in any area where the witness will be present.

### Photograph of the Suspect

2.1    When selecting a photograph of the suspect for the photo array, the administrator should include only one suspect in each photo array regardless of the total number of photographs and regardless of whether multiple suspects fit the same description.

2.2    Unless impracticable, the administrator should select a photograph of the suspect that resembles the witness's description of the perpetrator or the perpetrator's appearance at the time of the incident.

2.3    The administrator should avoid using a photo that is several years old or has different characteristics (for example, hair style, or facial hair) than those described, unless a current photograph cannot be taken or procured.

### Selection of Filler Photographs

3.1    A photo array should include at least five filler, or non-suspect, photographs.

3.2    Fillers should generally fit the witness's description of the perpetrator, including such characteristics as gender, race, skin color, facial hair, age, and distinctive physical features. They should be sufficiently similar so that a suspect's photograph does not stand

---

[1] This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nothing in these procedures implies that an identification not done in accordance with them is unreliable or inadmissible in court.

out, but not so similar that a person who knew the suspect would find it difficult to distinguish him or her. When viewed as a whole, the array should not point to or suggest the suspect to the witness.

3.3    Where the suspect has a unique feature, such as a scar, tattoo, or mole, or distinctive clothing that would make him or her stand out in a photo array, filler photographs should include that unique feature either by selecting fillers who have such a feature themselves or by altering the photographs of fillers to the extent necessary to achieve a consistent appearance.  If the suspect's distinctive feature cannot be readily duplicated on the filler photographers, then the suspect's feature can be blacked out and a similar black mark can be placed on the filler photographs.  The administrator should document any alterations to either the fillers or the suspect's photograph as well as the reason(s) for doing so.

3.4    Photographs should be of similar size, background, format, and color.  Photographs should be numbered or labeled in a manner that does not disclose any person's identity or the source of the photograph.  No other writing or information should be visible.

3.5    Nothing should appear on the photos that suggests a person's name, his or her inclusion in a previous array, or any information about previous arrests or identifications.

3.6    If there are multiple perpetrators or multiple suspects, the administrator should inform the witness in advance that more than one array will be shown.

3.7    Fillers should not be reused in arrays for different suspects shown to the same witness.

## Method of Presenting Photographs

4.1    Administrators may employ either sequential or simultaneous procedures. Under a sequential procedure, the witness looks at one photograph at a time in a finite number of photographs until he or she has seen all in the array (with each photo being taken back before the next one is shown). In a simultaneous procedure, the witness observes all of the photos in the array at once.

## Administrator's Knowledge of the Suspect

5.1    The administrator must ensure that he or she does not suggest to the witness – even unintentionally – which photograph contains the image of the suspect. Oftentimes, the best and simplest way to achieve this is by selecting an administrator who is not involved in the investigation and does not know what the suspect looks like.

5.2    There are times when such "blind" administration may be impracticable, for example, when all of the officers in an investigating office already know who the suspect is, or when a victim-witness refuses to participate in a photo array unless it is administered by the investigating officer.  In such cases, the administrator should adopt "blinded" procedures, so that he or she cannot see the order or arrangement of the photographs viewed by the witness or which photograph(s) the witness is viewing at any particular moment.

5.3    "Blinded" administration can be accomplished by:

5.3.1    *If simultaneous administration:*  Randomizing the order of photographs and shielding the administrator from the photographs (for example, by displaying the images on a computer screen between the witness and the administrator, so that the witness can see it but the administrator cannot).

5.3.2    *If sequential administration:*  Putting each photograph in its own physical folder, shuffling the order of the folders, and standing where the administrator cannot see which photographs the witness is viewing.

5.4    There may be exceptional circumstances in which it is not practicable to conduct either a blind or blinded photo array.  In those instances, the administrator should document the reasons for the non-blind(ed) procedure and be prepared to explain the reasons for conducting such an alternative procedure.

**Instructions to Witness**

6.1    The administrator should read instructions to the witness and then permit the witness to read them and ask any questions.  The witness and administrator should sign and date the instructions.

6.2    The administrator should not interrupt the witness so long as she or he is looking at the array. However, when it becomes apparent that the witness is finished and no longer looking at the array, the administrator should end the procedure.

6.3    Instructions should use language similar to that below:

6.3.1    "In a moment, you will be shown a group of photographs. The group of photographs may or may not contain a photograph of the person who committed the crime of which you are the victim [*or witness*]."

6.3.2   "Sometimes a person may look different in a photograph than in real life because of different hair styles, facial hair, glasses, a hat, or other changes in appearance. Keep in mind that how a photograph was taken or developed may make a person's complexion look lighter or darker than in real life."

6.3.3   "Please let me know if you recognize the person who committed the crime [*or the actions you witnessed*]. If you do recognize someone, please tell me how confident you are of your identification."

6.3.4   "You may not recognize anyone. That is okay. Just say so. Whether or not you select someone, we will continue to investigate the case."

6.3.5   "Do not assume that I know who committed this crime."

6.3.6   "Pay no attention to any marking or numbers on the photographs or any differences in the type or style of the photographs. They are not relevant to identifying anyone in the photographs."

6.3.7   "Please do not discuss this procedure or any photograph that you may pick with any other witness in this case."

6.3.8   "Please let me know if you do not understand these instructions or if you have any questions."

6.3.9   *If sequential administration*: "You are going to look at the photographs one at a time. You may make a decision at any time. If you select a photograph before you get to the end, our protocol requires that you look at the rest of the photographs anyway. If, after seeing all the photographs, you want to see one or more photographs again, you should look at the entire array again."

**Multiple Witnesses**

7.1   If multiple witnesses are to be presented with photo arrays, each witness should be instructed and view the photo array separately.

7.2   A witness should not be able to hear or observe other witnesses during an identification procedure.

7.3   A witness who has seen the array should not return to the same area when other witnesses are waiting to see the array.

7.4    For each suspect, the administrator should use the same photo array for multiple witnesses. However, the order of appearance in the photo array should be changed if possible.

## Administrator Feedback

8.1    The administrator must avoid any words, sounds, expressions, actions or behaviors that suggest who the suspect is. Before, during, or after conducting the photo array, the administrator should not:

    8.1.1    Volunteer information about the suspect or the case;

    8.1.2    Indicate that the administrator knows who the suspect is;

    8.1.3    Indicate to the witness that he or she has picked the "right" or "wrong" photograph; or

    8.1.4    Tell the witness that any other witness has made an identification.

8.2    If the witness makes an identification, the administrator should ask the witness to state in his or her own words how confident he or she is in the identification (known as a "statement of confidence").

8.3    If the witness is vague in his or her answer, such as, "I think it's #4," the administrator should say: "You said [I think it's #4]. What do you mean by that?"

## Documentation[2]

9.1    The witness's identification of a photo, if any, and the corresponding statement of confidence should be clearly documented by:

    9.1.1    Video- or audio-recording the photo array;[3] or

    9.1.2    The administrator immediately writing down as close to verbatim as possible the witness's identification and statement of confidence, as well as any relevant

---

[2] This section assumes the use of printed photographs. If the photo array is presented on a computer screen, the administrator should ensure that the same information described in this section is captured and saved electronically.

[3] Electronic recording serves several important purposes: it preserves the identification process for later review in court, it protects officers against unfounded claims of misconduct, and it allows fact finders to directly evaluate a witness's verbal and nonverbal reactions and any aspects of the array procedure that would help to contextualize or explain the witness' selection.

gestures or non-verbal reactions. The witness should confirm the accuracy of the statement.

9.2    The witness should indicate his or her identification in writing.

    9.2.1    *If simultaneous administration*: The witness should circle the photograph chosen and then sign and date the photograph.

    9.2.2    *If sequential administration*: The witness should sign and date the front or back of the photograph chosen.

    9.2.3    If a witness fails to make an identification, the administrator should record so in writing.

9.3    The administrator should document the following elements of the identification procedure:

    9.3.1    The approximate amount of time it took the witness to make an identification;

    9.3.2    The presentation method and order of the photographs displayed;

    9.3.3    The names of all persons present during administration; and

    9.3.4    Any other facts or circumstances that would help contextualize or explain the witness's selection.

9.4    In addition to documenting information about an identification, the administrator should preserve as evidence:

    9.4.1    The written copy of the instructions signed and dated by the witness and the administrator; and

    9.4.2    All photographs shown to the witness, including any identified, signed, and dated by the witness.

## PROCEDURES FOR CONDUCTING PHOTO ARRAYS

### APPENDIX

For decades, law enforcement agencies at the federal, state, and local levels have used varying practices for the identification of suspects by eyewitnesses to crimes, while researchers have studied the science of human perception underlying eyewitness identification. In recognition of advancements in scientific knowledge and changes in practice, the National Academies of Science (NAS) convened a committee of experts to evaluate eyewitness identification procedures and, in 2014, published a report summarizing its findings entitled, *Identifying the Culprit: Assessing Eyewitness Identification.*[1] Although acknowledging that more research is still needed, the committee concluded that "a range of [identification] practices has been validated by scientific methods and research and represents a starting place for efforts to improve eyewitness identification procedures."[2]

This appendix provides a brief explanation of both the research and practical experience behind several of the procedures outlined earlier in this memorandum. This summary is not meant to be exhaustive, in part because research continues to advance on eyewitness identification procedures, including photo arrays. Furthermore, the described procedures are only exemplary and do not create an enforceable right in any civil or criminal matter. The intent of this summary is to provide law enforcement agents and prosecutors an understanding of the reasons behind several of the procedures that either are not widely known or were not addressed in a prior publication on eyewitness identification from the National Institute of Justice.[3]

### Sequential vs. Simultaneous Identification Methods

Historically, many law enforcement agencies employed simultaneous identification procedures, in which an eyewitness views all of the photos in an array at once. In the late 1980s, psychological research began to suggest that sequential methods, in which witnesses are shown one photo at a time, would be better at preventing erroneous identifications without reducing the rate of correct identifications.[4] As a result, several police agencies, including those in North Carolina[5] and Massachusetts,[6] turned to the sequential method for photo arrays. More recently,

---

[1] National Academies of Science, *Identifying the Culprit: Assessing Eyewitness Identification* (2014), available at: https://www.nap.edu/catalog/18891/identifying-the-culprit-assessing-eyewitness-identification.

[2] *Id.* at xiv.

[3] National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* (1999).

[4] Roderick Lindsay & Gary Wells, "Improving Eyewitness Identifications from Lineups: Simultaneous Versus Sequential Lineup Presentation," 70 *Journal of Applied Psychology* 556 (1985); Nancy Steblay, Jennifer Dysart, Solomon Fulero & R.C.L. Lindsay, "Eyewitness Accuracy rates in Sequential and Simultaneous Lineup Presentations: A Meta-Analytical Comparison," 25 *Law and Human Behavior* 459 (2001).

[5] N.C. Gen. Stat. § 15A-284.52 (2007).

[6] *See* Massachusetts Supreme Judicial Court Study Group on Eyewitness Identification, *Report and Recommendations to the Justices* (2013).

however, some research has raised questions about the superiority of sequential methods. Those studies tested techniques in the field[7] as well as in the laboratory[8] and employed different statistical tests to evaluate the accuracy of an eyewitness' identification. This research reached different conclusions, suggesting that simultaneous procedures may result in more true identifications and fewer false ones.[9] Until additional research is conducted, however, it is not possible to say conclusively whether one identification method is better than the other. Indeed, the NAS recommended "that caution and care be used when considering changes to" sequential or simultaneous procedures "until such time as there is clear evidence for the advantages of doing so."[10] For this reason, this document does not take a position on which procedure should be used.

### Investigator Influence and Blind vs. Blinded Procedures

An investigator's statements when administering an identification procedure can influence a witness' selection of a suspect in a photo array as well as his or her confidence in the choice.[11] Influence can occur, for example, when the investigator suggests in advance that the perpetrator is in the array ("We found the guy with your credit cards" or "We arrested someone we want you to identify"), when the investigator confirms or disconfirms the witness's pick ("Good work! You picked the right guy"), or when the administrator communicates such messages through nonverbal gestures.[12] In either case, witnesses may be more inclined to select a photograph from the array or to be more confident in their selection than they otherwise would be. "Suggestiveness during an identification procedure can result in suppression of both out-of-court and in-court identifications and thereby seriously impair the prosecution's ability to prove

---

[7] Karen Amendola & John Wixted, "The Role of Site Variance in the American Judicature Society Field Study Comparing Simultaneous and Sequential Lineups." *Journal of Quantitative Criminology* (2015), doi:10.1007/s10940-015-9273-6.

[8] David Dobolyi & Chad Dodson, "Eyewitness Confidence in Simultaneous and Sequential Lineups: A Criterion Shift Account for Sequential Mistaken Identification Overconfidence,"19 *Journal of Experimental Psychology: Applied* 345 (2013).

[9] John Wixted, Laura Mickes, John Dunn, Steven Clark & William Wells, "Estimating the Reliability of Eyewitness Identifications from Police Lineups," 113 *Proceedings of the National Academy of Sciences*, 304 (January 12, 2016); John Wixted, Laura Mickes, Steven Clark, Scott Gronlund & Henry Roediger, "Initial Eyewitness Confidence Reliably Predicts Eyewitness Identification Accuracy," 70 *American Psychologist* 515 (September 2015).

[10] National Academies of Science, *supra* note 1, at 118. *See also* International Association of Chiefs of Police, *Model Policy* (2016).

[11] Amy Bradfield Douglass & Nancy Steblay, "Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect," 20 *Applied Cognitive Psychology* 859 (2006); Carla Maclean, C.A. Elizabeth Brimacombe, Meredith Allison & Helena Kadlec, "Post-Identification Feedback Effects: Investigators and Evaluators," 25 *Applied Cognitive Psychology* 739 (2011); Gary Wells & Amy Bradfield, "Good, You identified the Suspect: Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience," 83 *Journal of Applied Psychology* 360 (1993); Nancy Steblay, Gary Wells, & Amy Bradfield Douglass, "The Eyewitness Post Identification Feedback Effect 15 Years Later: Theoretical and Policy Implications," 20 *Psychology, Public Policy & Law* 1 (2014).

[12] National Academies of Science, *supra* note 1.

its case beyond a reasonable doubt."[13]

There are several recommended approaches to avoid inappropriate investigator influence or an allegation of inappropriate investigator influence. First, as the procedures in this document outline, administrators of photo arrays must consciously "avoid any words, sounds, expressions, actions or behaviors that suggest who the suspect is." Second, feedback is virtually impossible when the administrator does not know who the suspect is or which photograph is that of the suspect. As the NAS explains, "if administrators are not involved with the construction of the lineup and are unaware of the placement of the potential suspect in the sequence, then they cannot influence the witness."[14]

Although the NAS recommends blind procedures, it acknowledges that such procedures may not be feasible in some circumstances because of "financial costs and human resource demands."[15] In these situations, investigators should at least use "blinded" procedures in which the administrator cannot see the order or arrangement of the photographs viewed by the witness or which photograph(s) the witness is viewing at any particular moment. However, even in these circumstances the NAS believes that law enforcement should consider "new technologies" such as "computer-based presentation technology" to prevent inadvertent suggestiveness.[16] If neither blind nor blinded procedures are practicable under certain circumstances, administrators should document the steps they took to avoid any influence before or after the array was shown and a confidence statement was taken.

## Confidence Statements

When the Supreme Court decided *Manson v. Brathwaite*,[17] establishing criteria to evaluate the reliability of eyewitness identification, it premised admissibility in part on the witness's self-reported confidence at the time of the initial identification procedure. After decades of research investigating and even questioning the science behind the Court's holding,[18] new research finds that a witness's confidence at the time of an initial identification is a reliable indicator of accuracy.[19] For this reason, the NAS has recommended "that law enforcement document the witness' level of confidence verbatim at the time when she or he first identifies a

---

[13] *Id.* at 107.

[14] *Id.* at 106.

[15] *Id.*

[16] *Id.*

[17] *Manson v. Brathwaite*, 432 U.S. 98 (1977).

[18] *See., e.g.*, Gary Wells, Elizabeth Olson & Steve Charman, "The Confidence of Eyewitnesses in their Identifications from Lineups," 5 *Current Directions in Psychological Sciences*, 151 (2002); Steven Penrod & Brian Cutler, "Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation," 1 *Psychology, Public Policy & Law* 817 (1995); National Academies of Science, *supra* note 1.

[19] John Wixted & Gary Wells, "The Relationship between Eyewitness Confidence and Identification Accuracy: A New Synthesis," *Psychological Science in the Public Interest* (in press); Wixted, et al., *supra* note 9.

suspect . . . ."[20] Further, to prevent any undue suggestion and to ensure that investigators and fact-finders fully understand the level of the witness' confidence, the NAS recommends that the "witness' self-report . . . should be given in the witness' own words."[21]

### Recording the Photo Array

A witness's identification and assessment of certainty cannot be easily challenged if law enforcement agencies electronically record the identification procedure and the witness's response. Electronic recording preserves the identification process for later review in court and also protects officers against unfounded claims of misconduct. Video-recording is helpful because it allows fact finders to directly evaluate a witness's verbal and nonverbal reactions and any aspects of the array procedure that would help to contextualize or explain the witness' selection. As of 2013, approximately one-fifth of state and local law enforcement agencies had instituted video-recording of photo arrays.[22] The NAS recommended "that the video recording of eyewitness identification procedures become standard practice,"[23] and the practice continues to expand as legislation[24] and model policies[25] urge its implementation. If video is impracticable, however, an audiotape may be useful because it allows judges and jurors to hear exactly what was said by both the administrator and the witness rather than relying exclusively on an oral or written report about the procedure.

---

[20] National Academies of Science, *supra* note 1, at 108.

[21] *Id.*

[22] Police Executive Research Foundation, *A National Survey of Eyewitness Identification Procedures in Law Enforcement Agencies* (2013).

[23] National Academies of Science, *supra* note 1, at 108.

[24] Ill. Comp. Stat. 725 § 5/107A-2 (2015); N.C. Gen. Stat. §15-284.52 (2007).

[25] *See* International Association of Chiefs of Police, *Model Policy: Eyewitness Identification* (2010); Municipal Police Training Council of New York, *Identification Procedures: Photo Arrays and Line-ups Model Policy* (2015); Attorney General of Wisconsin, *Model Policy and Procedure for Eyewitness Identification* (2010).