William D. Hyslop
United States Attorney
Eastern District of Washington
Thomas J. Hanlon
Assistant United States Attorney
Richard Burson
Assistant United States Attorney
402 E. Yakima Avenue, Suite 210
Yakima, Washington 98901
(509) 454-4425

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 1:19-CR-02032-SMJ-1 |
| Plaintiff, | |
| vs. | United States Response to Defendant's Motion to Suppress Victim E.Z.'s Identification |
| JAMES DEAN CLOUD, | |
| Defendant. | September 29, 2020, at 9:00 a.m. With Oral Argument |

Plaintiff, United States of America, by and through William D. Hyslop, United States Attorney for the Eastern District of Washington, Thomas J. Hanlon, Assistant United States Attorney for the Eastern District of Washington, and Richard Burson, Assistant United States Attorney for the Eastern District of Washington, hereby submits its response to the Defendant's Motion to Suppress the positive identification of the Defendant by one of the Defendant's victims, E.Z.

Response to Motion to Suppress                    1

# I.    INTRODUCTION

The Defendant is seeking to strike the identification of him by yet another witness. This time, he seeks to strike identifying testimony of a witness who had ample opportunity to view the Defendant and gave an accurate description of the Defendant prior to confidently and quickly picking him out of a lineup. His motion rests, as it must to survive, on the premise that there was police misconduct that created an unduly suggestive lineup. That is a rightfully high bar that the Defendant does not reach.

The Defendant's assertions that police engaged in misconduct are in some instances inconsistent with the recording of the lineup and the interview that proceeded it, filed with the Court as Exhibit A to this response. Other assertions are correct, in that the detectives conducting the lineup did not follow agency policy. But he fails to connect the dots between an imperfect procedure and actual suggestion by the Detectives. The law is clear: The Defendant does not have the right to a perfect lineup procedure. Rather, he has the right to a lineup that is not so impermissibly suggestive so as to make the identification of him by the witness a certainty. The lineup he now challenges far exceeded that requirement.

Even if the Defendant had established that detectives engaged in misconduct that led to an unduly suggestive lineup, the Court still must find that E.Z.'s identification was unreliable. However, the record here shows the opposite. There is

Response to Motion to Suppress            2

no doubt that E.Z. is a reliable witness, as detailed below. Her right to identify her attacker in court and the jury's right to weigh her identification should not be impeded by the Defendant.

## II.    BACKGROUND

A.    <u>E.Z. witnesses several murders and is shot attempting to escape</u>.

On June 8, 2019, just after 4:00 p.m., E.Z. called 911 and reported that she was in a truck headed west on Evans Road in White Swan. She told dispatch she was fleeing from her friend's house, where unknown assailants had opened fire on the vehicle she and her friends were in. Her friend L.L. was driving the truck from the passenger side of the vehicle, because her other friend, Dennis Overacker, was dead in the driver's seat, having been shot in the head. E.Z. and L.L. had both been shot, but survived. E.Z.'s infant child was unharmed.

Officers intercepted the truck on Evans Road, about 12 miles from John Cagle's house, and performed CPR on Overacker, which was unavailing. L.L. and E.Z. exited the vehicle and L.L. was screaming that he had been shot in the head. Officers administered aid while L.L. told them that he was at Cagle's to purchase motorcycle parts, but encountered three males, one of whom told him that Cagle was not seeing anyone. L.L. said that after being told that, one of the males pointed a rifle at Overacker just before the shooting started. L.L. described one of the males as having puffy dark curly hair and wearing a red shirt, and a second male with a blue shirt. He

could not provide details for the third male he had seen at Cagle's. E.Z. told an officer that she had been sitting in the rear seat of the truck when someone started shooting at them. She had shielded her child and was hit by several shotgun pellets in the process. Emergency services began administering aid to E.Z. on the scene.  E.Z. was taken to the hospital. According to the author of a medical notation, who heard it from paramedics, while en route, E.Z. said that she was going to friend's house and was shot by an oncoming driver (this is likely the result of a game of telephone).

E.Z. and L.L. directed law enforcement to the residence in White Swan where they had been shot – 5151 Medicine Valley Road, the home of John Cagle, a man affectionately known as "Dobbie Jack." Officers arriving at Dobie Jack's home encountered a grisly scene. Thomas Hernandez laid face down in the drive way, unconscious and suffering from a gunshot to the head that would later kill him. Just inside the front gate of the property, Catherine Eneas laid dead from a gunshot wound. Around back, near a game room, Michelle Starnes was found dead, also from an apparent gunshot wound. Finally, inside the game room, Cagle was found dead from a gunshot to the head. Discharged shell casings were littered about the bodies.

B.    <u>E.Z. is interviewed at the hospital.</u>

While tribal police secured the scene in White Swan, E.Z. was at a hospital in Yakima being interviewed by law enforcement. Among other things, E.Z. told the interviewing officer the following:

Response to Motion to Suppress                4

E.Z. arrived to Cagle's house earlier that day along with Overacker, Hernandez, L.L. and E.Z.'s child. They arrived in Overacker's truck. Overacker was driving, L.L. was in the front passenger seat, Hernandez was seated in the back seat behind L.L. and E.Z. was seated in the driver's side backseat behind Overacker. When they arrived, E.Z. saw an Indian male wearing a red shirt and holding a gun meet them at the gate. When Hernandez told the Indian male in the red shirt that the group was there to see Cagle, the Indian male responded that Cagle "wasn't seeing anyone right now." E.Z. saw Hernandez exit the truck and approach another Indian male wearing a blue shirt and carrying a gun. E.Z. stated that Hernandez talked to the Indian males for a short time. Then she saw the three of them, Hernandez, red-shirt and blue-shirt, walk back to the truck. She overserved that everything seemed fine at first. Red-shirt asked Overacker for a cigarette. When Overacker leaned to the console to get a cigarette, he was suddenly shot in the head. She reported that she thought blue-shirt shot first. As she recalled at the time, L.L. was shot after Overacker, followed by Hernandez. L.L. was able to take control of the truck and drive it away. E.Z. heard more shots as they were driving away.

C.   <u>E.Z. goes to the Sherriff's Office to give a statement and picks the Defendant out of a photo lineup.</u>

On June 10, 2019, Yakima County Sherriff's Office Detectives Mike Williams and Brian McIlrath were on duty at the Sherriff's Office on 1st Street in Yakima. E.Z. arrived on her own accord to speak to officers about what had happened on June 8th.

Response to Motion to Suppress                5

By this time, practically the entire Sheriff's Office was or had been involved in the investigation of the Medicine Valley murders, including 100% of YSCO detectives. There was no one available to conduct an interview or photo lineup who was not already familiar with the investigation.

Detectives Williams and McIlrath took E.Z. to an interview room equipped with audio and video recording equipment, which set this interview apart from other interviews and lineups that had been conducted in the field and thus were without the benefit of audio and video recording equipment[1].

E.Z. provided the following details in the recorded interview prior to the lineup: Overacker picked up E.Z. at her residence and took her to L.L.'s. From there, L.L., Overacker, and E.Z. drove to Cagle's house in Overacker's truck. E.Z. stated that they were going over there to check on Cagle, who had been being "taxed" by people in the area. They pulled up to the front gate, and a young man whom E.Z. described as a native around 19-23 years old and wearing a red shit, walked outside the gate and up to the driver's side window where Overacker was sitting. The man in the red shirt told Overacker that Cagle "wasn't having any visitors right now." He was not holding anything in his hands at this time. The man in the red shirt looked to E.Z. like a white man from a distance, but E.Z. could tell he was native when he approached the

---

[1] The recording of the interview, in its entirety, is being submitted as a physical exhibit with the court.

Response to Motion to Suppress            6

vehicle. E.Z., L.L. and Overacker left Cagle's and drove to Hernandez's residence. They told Hernandez what had happened at Cagle's, and that it appeared that something was amiss. Hernandez agreed to go back to Cagle's with them and got in the truck. They drove back to Cagle's. Hernandez got out of the truck and spoke to the guy in the red shirt. E.Z. observed, in addition to the man in the red shirt, a girl, a skinny guy in a blue shirt, and someone in the driver's seat of a red SUV. E.Z. did not know any of them. The man in the blue shirt had a shotgun. Overacker turned the truck around so that the truck was pointing away from the residence. The man in the blue shirt walked into Cagle's house. The man in the blue shirt came out and Hernandez walked toward the house, came back, and started talking to the guy in the red shirt again. The man in the red shirt was now holding a gun. The man in the red shirt and Hernandez walked back toward the truck. Hernandez asked Overacker, who was still sitting in the driver's seat of the truck, if he had a cigarette for the guy in the red.

Overacker turned to grab a cigarette and the man in the red shirt shot Overacker, then Hernandez twice, and then L.L. E.Z. remembers turning to cover the baby. E.Z. thinks that Overacker must have pushed the gas when he was shot because the truck started moving down the driveway. L.L. reached over and took control of the vehicle. E.Z. thought at the time that Overacker had been shot in the face. E.Z. called 911 while L.L. drove. They managed to escape.

Response to Motion to Suppress                    7

E.Z. clarified that the guy in the red shirt was the one who Hernandez had asked Overacker for a cigarette for, and described the man in the red shirt as "maybe chubby" and "thicker." She clarified that the man in the red shirt was the one who shot Overacker. She was in the backseat at the time. E.Z. did not know who shot Hernandez, but identified the man in the red shirt as the one who shot L.L. When asked what the other individuals were doing (referring to the two other people at Cagle's), E.Z. replied, "**I don't even know, I think I was just watching the guy in the red.**"

Detective McIlrath asked E.Z. if anyone had shown her a photo montage, to which she shook her head no. Detective McIlrath asked E.Z. if "she got a pretty good look at these guys," and E.Z. shook her head to indicate "yes." Detective McIlrath left the interview room to compile lineups.

At 13:26 (or 29:19 into the recording), Detective Williams and E.Z. began talking about where L.L. had driven the truck after Overacker was shot and the interaction with first responders. They talked about E.Z.'s prior visits to Cagle's house and her relationship with Cagle and Starnes. The conversation turned to E.Z.'s drug use, with Detective Williams telling E.Z. that he doesn't judge her for the drug use, and that he understands that "once you get on that stuff it's harder than anything to get off of." Detective Williams told E.Z. that the thing he was concerned with, other than the murders, is that E.Z. would take her child to Cagle's, given Cagle's reputation.

Response to Motion to Suppress                    8

E.Z. explained what she was thinking at the time. E.Z. did not appear shaken or upset. E.Z. told Detective Williams that Cagle and Starnes used to give her water and food. Detective Williams suggests that they also gave her drugs, and E.Z. confirmed that Cagle did through her ex-boyfriend. Detective Williams told E.Z. that getting drugs from Cagle and her ex-boyfriend was not helping her, but keeping her under the control of narcotics. E.Z. confirmed that she smoked meth prior to arriving at Cagle's. Detective Williams advised E.Z. that the people she hangs out with are a bad influence.

The conversation briefly turned to a discussion about E.Z.'s youngest child, and then to the murder again. E.Z. stated that she doesn't think that she was still under the effect of methamphetamine when she arrived at Cagle's. Detective Williams asked E.Z. what she thinks is causing her to make her decisions. The conversation then turned back to E.Z.'s familiarity with the individuals she saw at Cagle's.

E.Z. asked Detective Williams if he thought that "they" (referring to the murderers) will come looking for her to stop her from testifying. Detective Williams and E.Z. talked about that concern for some time. E.Z. expressed that she thought that they were trying to stop the truck from going and were going to kill her and the other occupants, including her baby. She stated that she didn't think of her son when she went to Cagle's. E.Z. says she "curses" herself because her son was there, because "they" didn't care who they killed. E.Z. said that she should have known better and

that she just didn't think of her son at the time. E.Z. said she felt bad for putting her baby in that spot. E.Z. said that she was in the wrong place at the wrong time and just didn't think of her son. At that point, her own words and reflection, *not* the words of Detective Williams, caused E.Z. to begin crying.

Detective Williams said that being a parent means you have to think about things really hard. Detective Williams started talking about raising teenagers and infants at the same time and told E.Z. about the importance of being a good role model. E.Z. stopped crying during this portion of the conversation.

She was no longer crying (and certainly not "cowering" in the corner) when Detective McIlrath entered the interview room with the photo lineups at 13:40, approximately 15 minutes after he left.

Conversation turned back towards E.Z.'s observations. E.Z. stated she only recalled seeing the man in the red shirt and the man in the blue shirt the first time the group arrived at Cagle's (prior to picking up Hernandez). The man in the blue shirt, she recalled, had been walking out of Cagle's house as the group was leaving. E.Z. and the Detectives talked a little more about Cagle and the property. This portion of the conversation lasted approximately three minutes. E.Z. was not crying during this portion and is composed well before the lineup is initiated.

Detective McIlrath asked Detective Williams if there were any lineup instructions on the desk. There were none, so he left to go get some. While he was

Response to Motion to Suppress          10

gone for approximately one minute, no relevant substantive conversation passes between Detective Williams and E.Z.

Detective McIlrath returned with lineup instructions and handed them to Detective Williams. Detective McIlrath gave a cursory glance at the batch of lineup photos in his hand (the lineup for James Cloud) to confirm that he had the right lineup and that the cover page was not inadvertently left in. Detective Williams then told E.Z. that the important thing was that the person may or may not be in the lineup, and that E.Z. should not feel obligated to pick anyone. He then read the instructions off the sheet verbatim:

> "You are about to be shown a group of photographs. Before you view these photographs, please read the following carefully: Because an officer is showing you a group of photographs, this should not influence your judgment in any way. The person who committed the crime may or may not be in this group of photographs. It is just as important to eliminate innocent persons as it is to identify those persons responsible. You are in no way obligated to identify anyone. Study each photograph carefully before making any comments. Consider that the photographs could be old or new, and that they hair styles change and that persons can alter their appearance by growing or shaving facial hair."

E.Z. confirmed she understood the instructions. Detective Williams gave the written instructions to E.Z. and asked her to sign. Detective McIlrath handed the lineup to Detective Williams. Detective Williams asked Detective McIlrath if they should complete one instruction sheet for all lineups or four separate instruction sheets. They pondered this for less than ten seconds before Detective McIlrath left the interview room to get more instructions sheets. This 10 second exchange is what the

Defendant characterizes as "confusion." Detective Williams also briefly flipped through the lineup to make sure it was the correct lineup and had no incorrect filler pictures or the cover sheet containing the names of those pictured. He then handed the six photographs to E.Z.

E.Z. flipped to the second sheet rather quickly after apparently not recognizing the first individual pictured. The second picture was of Defendant James Cloud. E.Z. almost immediately stated: **"This guy I think I recognized him. I don't know if he was the one wearing the redshirt[2],"** thus indicating that she recognized the Defendant as one present at the crime scene, but wasn't yet sure if he was the one in the red shirt. Note, this is not a statement that James Cloud was not the man who shot Overacker, as Defendant claims. E.Z. then continued flipping through the photographs.

Meanwhile, having heard E.Z.'s declaration that she recognized the Defendant, Detective Williams provided E.Z. a pen, because she would need to write down on the picture that she recognized the Defendant. E.Z. took no notice of the pen.

E.Z. flipped back to the Defendant's photograph and stated: **"This is the guy who was wearing the red shirt, the one who shot Dennis."** Detective McIlrath

---

[2] There is disagreement between the United States and the Defendant as to what was actually said here.

handed the pen to the E.Z. and said "okay do you want to write that on there and sign your name? Just write 'guy who shot Dennis' or whatever, if that's what you think."

This is point that the Defendant claims the Detectives make eye contact, although in the Defendant's photo there is no way of telling that, and indeed, Detective Williams appears to be looking at E.Z., not Detective McIlrath. E.Z., while the Detectives were supposedly making eye contact while not facing each other, remained looking at the picture of the Defendant. One wonders how this supposed eye contact could have any impact on E.Z. when she didn't even see it.

E.Z. wrote "guy who shot Dennis" (exactly what she had just said out loud, unprompted) on the Defendant's photo and signed it.

Detective Williams next handed E.Z. the photo lineup including a picture of another suspect, M.J. E.Z. flipped through and stated "I think this is the guy in the blue shirt" referring to the picture of M.J. E.Z. stated that the individual "looked white far away and then got close, and you could tell he was native, I think." She also stated that he was the individual who had come up to the car and told the group that Cagle was not having any visitors.

The next lineup shown to E.Z. included N.J. E.Z. identified a photo that she thought was a photo of an individual who was present, but E.Z. did not want to make a selection because she was only about 30% sure. Donovan's lineup had similar results.

Response to Motion to Suppress            13

At the conclusion of the lineups, E.Z. again confirmed that the guy in the red shirt, now identified as the Defendant, shot Overacker. E.Z. described the guns possessed by the Defendant and the man in the blue shirt whom she had picked out of the lineups. E.Z. stated that Hernandez and the Defendant spoke for a good four or five minutes, and that they were "kind of laughing" by the red SUV (thus indicating that she was watching and could see them both through the rear window of Overacker's truck). She then stated that the Defendant was walking next to Hernandez as they approached Overacker's truck. When they got to the truck, Overacker rolled his window down, Hernandez asked for a cigarette, and the Defendant shot Overacker.

E.Z. also stated that while Hernandez and the Defendant were talking, the man in the blue shirt entered Cagle's trailer and then exited again. E.Z. stated that Hernandez walked toward the trailer, but didn't enter it. These statements also indicate that E.Z. was observing what was going on during this four or five minute period through the rear window of the truck. She provided a little more detail about the physical appearance of the Defendant, adding that he had dirt on the back of his shirt. E.Z. also added that Cagle's dogs were going underneath the trailer while all this was going on (yet another observation through the rear window of the truck).

E.Z. provided a few more details, adding that a white van was next to the red SUV at Cagle's. She stated that the van was a utility type van without a window, and was clean. She stated that when they had come back the second time, the four

Response to Motion to Suppress                14

individuals were getting ready to leave in the red SUV. She stated that the Defendant was in the passenger seat of the red SUV when they arrived the second time, and had gotten out to talk to Hernandez. She again said that she saw the Defendant shoot Overacker. The Detectives left the interview room.

Detective Williams entered the interview room and stated that he wanted E.Z. to call her CPS worker and let her know that Detective Williams would like to talk to her. He advised that CPS would like to see E.Z. get into treatment on her own accord. He advised that doing so would show that she wants to recover. He said that he understood that "it is not easy" to fight addiction. He stated that E.Z. is going to have some trauma from the murders she witnessed and that she is going to need help with that too. They discussed this for a few minutes and Detective Williams again encouraged her to seek treatment, and he also stated that no one believed that she would willingly put her child in danger. This conversation took approximately five minutes.

The interview concluded with E.Z. signing a Sworn Statement form provided and read to E.Z. by Detective Williams. While she was signing, Detective Williams offered more words of encouragement to E.Z. Detective Williams and E.Z. talked a little more about her pending CPS case, with E.Z. talking freely about the matter, before leaving the interview room.

# III.   ANALYSIS

In order to successfully move this Court to conduct a review of the reliability of an eyewitness identification before allowing a jury to decide reliability for themselves, the Defendant must first show the existence of police misconduct that was (1) unnecessary and (2) unduly suggestive. Without that showing, the inquiry ends before any trial court review of reliability, and the jury is allowed to hear both the eyewitness identification and any admissible evidence Defendant wishes to present to attack reliability. Even if the Court finds such conduct however, it must next determine whether E.Z.'s identification is nonetheless reliable before deciding whether to strike it.

### A. Police administering the lineup did not engage in misconduct that was unduly suggestive and therefore this Court should not engage in its own review of E.Z.'s reliability as a witness.

A defendant does not have a constitutional right to a perfect lineup. *See Manson v. Brathwaite,* 432 U.S. 98, 104 (1976). Instead, a suspect has a due process right to be free from a lineup that "[i]s so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.,* 390 U.S. 377, 384 (1968). Furthermore, the suggestiveness must be the product of police misconduct. *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012). Because there is no evidence that any law enforcement official acted improperly in a way that suggested which picture E.Z. should pick out of the lineup in question, E.Z.'s identification

Response to Motion to Suppress          16

cannot be hidden from the jury, and whether or not her identification is reliable is a solely question for them to decide.

The Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence is unreliable *Perry*, 565 U.S. at 237. Potential unreliability of evidence does not render its introduction at trial fundamentally unfair. *See Kansas v. Ventris*, 556 U.S. 586, 594 (2009) (rejecting a broad exclusionary test for uncorroborated jailhouse snitch statements). Even assuming that eyewitness testimony is fallible, fallibility does not, without the taint of police misconduct, justify a trial court screening the evidence for reliability before allowing a jury to make that determination. *Perry*, 565 U.S. at 245. Before E.Z.'s identification of the Defendant can be concealed from the jury, the Defendant must show that police acted improperly in obtaining the identification by creating circumstances that were both unnecessary and suggestive. *Id.* at 228 (citing *Manson*, 432 U.S. at 98).

This prerequisite – an affirmative showing of police misconduct – makes sense, and protects a cornerstone of our judicial system: the fundamental role of the jury to weigh evidence. Without this prerequisite, the door would open to judicial review of every eyewitness identification prior to its introduction to the jury. *Perry,* 565 U.S. at 243. That type of review would impermissibly trespass on the province of the jury to

Response to Motion to Suppress            17

weigh the reliability of evidence. It would also render null the protections already afforded defendants in cautioning juries against placing undue weight on eyewitness testimony the defendant believes unreliable. These protections include the Sixth Amendment right to confront the eyewitness, *see Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant."); the right to an attorney who can expertly test the eyewitness' testimony through cross examination, and argue unreliability to the jury, *Perry*, 565 U.S. at 246; and the protections already built into the courts' instructions to the jury to consider whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness. MODEL CRIM. JURY INSTR. 9th Cir. 4.11 (2020). A critical aim of the prerequisite of police misconduct is not to rob the jury of their right to weigh evidence, but instead to deter law enforcement from using improper line-ups, show-ups and photo arrays. *Perry*, 565 U.S. at 241 (citing *Manson*). Because here, the Defendant has alleged no police misconduct, but instead, violations of best practices that did not influence E.Z.'s identification, the Court's inquiry is complete under *Manson* and *Perry*. Even if the Court were to find misconduct here based on the Detective's failure to administer the lineups in a blinded manner, the Court must also find that such conduct "created a 'substantial likelihood of misidentification.'" *Id.* at 239 (citing *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

Response to Motion to Suppress                18

With respect to lineups in particular, courts have been reluctant to suppress in-court identification unless "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). That is because, despite the hazards of initial identification by photograph, the procedure has been useful in apprehending offenders and sparing innocent suspects, and any danger of misidentification is "substantially lessened" by cross examination. *Id*.

In this case, the Defendant alleged several incidents of misconduct that the Defendant submits are so unduly suggestive as to justify this Court in assessing the reliability of E.Z.'s identification prior to submitting it to a jury. For the reasons that follow, none of the alleged incidents of misconduct, alone or together, justify such a drastic step.

The alleged incidents of misconduct here can be broken down into two categories: acts that may create circumstances where suggestion is more likely and acts that are actually suggestive. With respect to the first type, the Defendant alleges three acts that are not suggestive in and of themselves, but create an environment where suggestion becomes more likely: (i) a lecture by Detective Williams, (ii) the failure to use a blinded procedure and (iii) the failure to use a sequential line up technique. With respect to actual suggestion, the Defendant alleges three acts: (i) the bookmarking of a photograph with a pen, (ii) the instruction of Detective McIlrath to

Response to Motion to Suppress          19

E.Z. to write down what she had just stated about the picture of the Defendant, and (iii) the use of a "suggestive" photo array.

The first act alleged by the Defendant that created a suggestive environment is non-existent. There was no lecturing by Detective Williams, and an objective review of the recording evidences no such thing. The other two acts are policy violations, admittedly, but in and of themselves are not suggestive. Although a blinded lineup is ideal, a non-blinded lineup is not per se suggestive, absent an actually suggestive act. It is merely prophylactic.

As to the three suggestive acts alleged by the Defendant, they are not suggestive at all and it is apparent from the video that they had no influence on E.Z.

Taking each of the allegations made by the Defendant in turn:

i.  Detective Williams did not lecture E.Z., despite how Defendant's cherry-picked excerpts from the conversation might make it appear, and nothing about the conversation was suggestive.

While Detective McIlrath was out of the interview room generating the Spillman lineups, Detective Williams and E.Z. continued to talk about various topics for 15 minutes. From this 15 minute conversation, the Defendant cherry picked three sentences and on that basis alone, classified the entire conversation as a moral lecture. That characterization is inaccurate. The United States is submitting the video of the interview as a physical exhibit to this motion and implores the Court to view the

Response to Motion to Suppress          20

portion of the interview that the Defendant characterizes as a lecture[3]. An objective review of the conversation dispels the Defendant's version. The conversation that took place was a discussion about E.Z's children and ongoing drug habit. E.Z. was an active participant in the conversation, not the cowering child that Defendant attempts to paint. It's clear from the conversation that Detective Williams was sincerely concerned for E.Z. and the wellbeing of her child. This was far from misconduct. This was far from behavior that we should seek to deter. This was police officer doing his job.

Defendant's motion gives the impression that E.Z. was crying in a corner when Detective Williams reentered the room. Def. Mtn. at 13. That is also inaccurate. E.Z. had been crying earlier, but was recomposed by the time Detective McIlrath reentered. And E.Z.'s crying was not brought on by Detective Williams's questioning, but by E.Z.'s own recalling of the events in which her and her son could have been killed.

Furthermore, the Defendant's explanation for how this 15 minute conversation is created a suggestive environment is unconvincing. The Defendant's expert's opinion that the conversation between Detective Williams and E.Z. made E.Z. more susceptible to suggestion relies on the premise that Detective Williams spent 15 minutes lecturing E.Z. The expert's characterization is as off-the-mark as the

---

[3] This 15 minute conversation begins at 13:26 as indicated by the time stamp on the video.

Response to Motion to Suppress                21

Defendant's, as any objective review of the video demonstrates. Further, the Defendant's purported expert does not opine that making witnesses feel bad about themselves actually influences them, but rather, makes a witness more susceptible to influence. As detailed below, no such influence existed here.

ii.  <u>Each Detective checked the photo lineup to make sure the lineup was correctly compiled, and that act is not unduly suggestive</u>.

Each Detective gave a cursory flip-through of the photo lineup including James Cloud's photo prior to administering the lineup. Each detective is expected to testify that their reason for doing so was to make sure they had the right lineup and that it only included the relevant photos. Detective McIlrath had just compiled four lineups from Spillman and printed them all out prior to bringing them into the interview room. Each photo lineup included not only the photos, but also a sheet that included the names of each individual pictured. The Detectives' cursory review of the lineup was for the purpose of ensuring that the lineup was correctly compiled (i.e., including the correct photos) and that the sheet listing the names of those pictured was not included.

The flipping through of the photos made this lineup no longer "blind." That is a violation of best practices and department policy, true. But that does not equate to misconduct. Nor was it suggestive. There is no evidence that the Detectives gave any indication as to which photo was the "right" one, and indeed, just prior to administering the lineup, told E.Z. that the suspect might not even be included in the lineup.

iii.    <u>Showing the lineup to E.Z. all at once, rather than sequentially, was not unduly suggestive</u>.

Similarly, providing all of the photos in the lineup to E.Z. at the same time was inconsistent with best practices and YSCO policy. But the failure to administer a blind lineup is not unduly suggestive. Rather, the administration of a blind lineup is included as a best practice because it is a safeguard against suggestion – if the officer doesn't know which photo is being looked at by the witness, they cannot make any conscious or unconscious suggestions. <u>Report re Identification made by E.Z.</u>, Cara Laney, 7. Lack of a double blind or single blind procedure does not establish misconduct leading to suggestion without an actual, substantive suggestion by police. The Defendant here has alleged two such suggestions – the pointing of a pen and the suggestion of what to write on the Defendant's photo after E.Z. identified him as Overacker's murderer. As detailed below, neither act was suggestive.

iv.    <u>Detective Williams did not "bookmark" any photograph when he provided a pen for E.Z. to use</u>.

The alleged bookmarking by Detective Williams did not occur until after E.Z. looked at the picture of James Cloud and stated: "**This guy, I think I recognized him. I don't know if he was the one wearing the redshirt.**" At that point, Detective Williams did not bookmark the picture; he merely laid down a pen for E.Z. to use to indicate the identification she had just made. It's worth noting here that he would have done so

even if the lineup were administered in a double or single blind fashion. It also worth noting that E.Z. doesn't look up from the photographs towards the pen at any time.

Again, an actual review of the video evidences not a "bookmark," but merely the provision of a pen *after* E.Z. identified the Defendant; a pen which E.Z. took no notice of.

v.  Detective McIlrath told E.Z. to write "the guy who shot Dennis" under the Defendant's photograph because E.Z. had just pointed at the photograph and said "that's the guy who shot Dennis."

Detective McIlrath told E.Z. to write "the guy who shot Dennis" because E.Z. had just looked at the photo and stated **"that's the guy who shot Dennis."** There is nothing suggestive about asking someone to write down, verbatim, a claim they just made, especially when qualified with "if that's what you think."

vi.  The photographs in the lineup where generated by an automated system that searched for and included filler photos with characteristics and appearances similar to the Defendant, and did not produce an unduly suggestive array.

When Detective McIlrath stepped out of the interview room for 15 minutes, he was compiling the four lineups showed to E.Z. He did so using a Spillman lineup generator. The Defendant's picture was already in the system from a prior arrest. The Spillman system then generated filler pictures by searching for pictures of individuals with similar characteristics as the Defendant. That is why each of the pictures is of an individual of native appearance, with short dark hair, a goatee, and a round face. All of these match E.Z.'s description of the man in the red shirt as Native American, with

Response to Motion to Suppress            24

short hair, and maybe chubby or a little thicker. If we try hard enough, we can make any one of these individuals stand out, whether it's because they have a pony tail, bruising around the neck, are the only one wearing red, appear much older, or have a reddish complexion:









The mere use of filler pictures that include some individual characteristics not present in the Defendant's photo does not create a suggestive lineup, and none of the case cited by the Defendant is comparable. Indeed, those cases are examples of how suggestive an array should be prior to the court finding misconduct, and none of them come close to describing the lineup shown to E.Z. *See United States v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) (dark background and lack of lighting compared to filler photos gave the defendant "a menacing countenance that was lacking in the men in the other five photos"); *United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996) (filler photos were cropped so that they all looked like they had short hair, while the defendant's photo included his full afro, which the witness had included in his pre-lineup description); *United States v. Wiseman*, 172 F.3d 1196, 1208-1209 (10th Cir. 1999) (defendant's photo "st[ood] out prominently" and was the only one *without* a chain around the neck).

Similar suggestiveness is not present in the array used in this case and is more consistent with arrays previously held to be un-suggestive by the Ninth Circuit. *See, e.g.*, *United States v. Beck*, 418 F.3d 1008, 1012 (9th Cir. 2005) (approving a photospread where only one individual had facial hair, two individuals had shorter hair than the others, and all individuals were of similar age with similar skin, hair, and eye color); *United States v. Nash*, 946 F.2d 679, 681 (9th Cir. 1991) (finding a

Response to Motion to Suppress                26

photospread not unduly suggestive despite differences in individuals' complexion, nationality, and hair style).

### B. E.Z.'s identification is reliable.

Even if this Court were to find that the Detectives' failure to administer the lineup in a blind fashion, combined with an actually suggestive act, created a lineup so severely suggestive as to "give rise to a very substantial likelihood of irreparable misidentification," the Court cannot suppress E.Z.'s identification unless, under the totality of the circumstances, it determines that the E.Z.'s identification was actually unreliable. Here however, an analysis of E.Z.'s identification shows that E.Z.'s identification was reliable.

Courts look to the following factors in determining the reliability of a witness's identification:

(1) the opportunity of the witness to view the criminal at the time of the crime;
(2) the witness's degree of attention;
(3) the accuracy of the witness's prior description of the criminal;
(4) the level of certainty demonstrated by the witness at the confrontation; and
(5) the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

In E.Z.'s case, each factor cuts in favor of reliability.

i.  <u>E.Z. had ample opportunity to view the Defendant at the time of the crime and her degree of attention was high</u>.

E.Z. viewed the Defendant, wearing his red shirt, twice on the day of the murders. When E.Z., L.L. and Overacker first arrived at Cagle's, the Defendant

Response to Motion to Suppress                    27

approached the vehicle and spoke to Overacker, just feet from E.Z. E.Z. was close enough to hear the Defendant tell Overacker that Cagle wasn't seeing anyone that day. Then, the second time the group arrived at Cagle's, E.Z. observed Hernandez talking to the Defendant for four or five minutes. Her view of the Defendant was not obstructed, given that she was also able to observe the man in blue entering and exiting Cagle's residence, the other individuals in the red SUV, the white van that she described as a clean looking work van, the laughing that the Defendant and Hernandez were engaged in, the dogs running underneath Cagle's residence, and the dirt on the back of the Defendant's shirt. All those observations occurred just before the Defendant approached the vehicle, at which point he would have been just feet from E.Z. before he shot Overacker. Given the amount of detail that E.Z. was able to recall about what was going on in the moments leading up to Overacker's murder, it is clear that she was not distracted by the Defendant's gun, as Defendant posits. Just prior to the shooting, E.Z. wasn't sure what the others were doing and she replied **"I don't even know, I think I was just watching the guy in the red."** It's clear that her focus was on the Defendant and she had ample time to view him.

ii. <u>E.Z. gave an accurate description of the Defendant prior to picking him out of the lineup.</u>

In various statements, E.Z. described the Defendant as a Native American who might look white from a distance, around 19 to 23 years old, with a chubby or thicker appearance and puffy or curly dark hair. Or, put visually:



As Defendant points out, at one point, E.Z. also described the man in blue as the one who looked white from a distance and who had initially told the group that Cagle wasn't seeing anyone. But E.Z. only identified one individual as the one who shot Overacker: the Defendant.

iii. <u>E.Z. almost immediately and confidently recognized the Defendant when she saw his picture.</u>

Despite the compilation of a lineup that included individuals with similar characteristics, E.Z., upon seeing the Defendant, immediately declared **"This guy, I think I recognized him."** Then, after flipping through the remaining photos and not picking out anyone else, she quickly returned to the Defendant's photo and identified

him as **"the guy who shot Dennis."** As evidenced by her reluctance to make an identification in later lineup when she was only about 30% sure, E.Z. would not have hesitated to disclaim an identification if she was not confident. Here, it's clear she was certain.

iv.   E.Z. picked the Defendant out of a lineup up only two days after she saw him shoot Overacker.

Two days is not such a long period of time as to make an identification unreliable. *United States v. Hammond*, 666 F.2d 435, 440 (9th Cir. 1982) (a lapse of a week not long enough to indicate clear unreliability). As evidenced by E.Z.'s description of the scene (e.g. the van, the SUV, the dogs, the guns, etc.), the events of June 8th were still fresh in her mind.

Even if this Court were to find that Detectives Williams and McIlrath, by failing to conduct a blinded lineup, engaged in misconduct that created unduly suggestive circumstances, this Court cannot find, under a *Biggers* analysis, that E.Z.'s identification is unreliable.

## IV.    Conclusion

The Defendant does not have a right to a double blind lineup. He does not have the right to a perfect lineup. He has the right to a lineup free from misconduct in which police use an unduly suggestive procedure. He received that here. Defendant has pointed out some procedural aspects that could have been improved. That is well

short of the standard he needs to meet prior to this Court engaging in a reliability review of E.Z.'s identification.

But even if the Court were to engage in such a review, it would find E.Z.'s identification of the Defendant reliable. She had amble time and opportunity to view the Defendant, her identification was confident and consistent with prior descriptions, and was given only two days after the events in Medicine Valley. The jury should be allowed to hear her full story. The Defendant's motion should be denied.

DATED: September 11th, 2020          William D. Hyslop
                                     United States Attorney

                                      *s/ Thomas J. Hanlon*
                                     Thomas J. Hanlon
                                     Assistant United States Attorney

                                     *s/ Richard Burson*
                                     Richard Burson
                                     Assistant United States Attorney

I hereby certify that on September 11th, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Lorinda Youngcourt, Esq.; John B. McEntire, IV, Esq.; Jeremy B. Sporn, Esq.

                                      *s/ Richard Burson*____
                                     Richard Burson
                                     Assistant United States Attorney