

John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for James D. Cloud

1

2

3

4

5

6

7

## United States District Court
## Eastern District of Washington
### Honorable Salvador Mendoza, Jr.

| | |
|---|---|
| United States of America, | No. 1:19-CR-2032-SMJ-1 |
| Plaintiff, | |
| v. | Reply Supporting Motion in Limine Re: Lindell LaFollette's False Memory |
| James Dean Cloud, | |
| Defendant. | |

# Table of Contents

I.    Introduction ...........................................................................................................1

II.   Supplemental Background ...................................................................................3

    A.    Mr. LaFollette did not connect the Clouds to the Medicine Valley murders; a reporter—and "a few other people"—did. ............................................3

    B.    Mr. LaFollette reversed everything he told police during the line-up....................7

    C.    Mr. LaFollette never told police the blue-shirted male was "James Donovan." ....9

    D.    Mr. LaFollette knows James Cloud by sight.........................................10

    E.    Mr. LaFollette did not accurately describe James Cloud. ....................................12

III.  Discussion...........................................................................................................13

    A.    Mr. LaFollette did not identify James Cloud.........................................13

    B.    The United States doubles-down on misstating the law. .......................................15

    C.    The United States' proffered interplay between Rule 403 and expert testimony is outdated. ...............................................23

    D.    The United States reads too much into the dearth of Rule 403 authority............25

    E.    The jurors' common sense isn't an adequate safeguard against Mr. LaFollette's corrupted eyewitness testimony. ........................................28

    F.    Robust cross-examination isn't an adequate safeguard against the corrupted eyewitness testimony here............................................................29

# I.    Introduction

The United States suggests any decision to limit what a witness may say at trial would put the Court in rarefied evidentiary air. That's just not so. There are 32 evidentiary rules limiting what jurors hear. And courts use them. Routinely. Courts exclude irrelevant evidence under Rule 401, unfairly prejudicial, cumulative, or misleading evidence under Rule 403, bad-acts evidence under Rule 404, certain methods for proving character under Rule 405, information on a witness's character for truthfulness under Rule 608, improper conviction evidence under Rule 609, unreliable lay-witnesses under Rule 701, unreliable or unhelpful experts under Rule 702, hearsay under Rule 802, and unreliable documents under Rule 901.

Trials are not evidentiary free-for-alls. And for a presumed-innocent man charged with first-degree murder, that's a mildly-comforting prospect, especially given the tendency for jurors—who are humans—to set down their common sense and pick up their emotions. This concern, among many, are why the Federal Rules of Evidence—or, as the Supreme Court refers to them, the *protective* rules of evidence[1]—exist. And this case presents a striking example of when the protective rules of evidence should be used.

Even before any of these events, Lindell LaFollette knew James Cloud by

---

[1] *Perry v. New Hampshire*, 565 U.S. 228, 233 (2012).

1    face, yet afterwards, Mr. LaFollette didn't select him from a line-up as the

2    red-shirted male who shot Dennis Overacker. He also didn't select Donovan Cloud

3    as the blue-shirted male who shot him.

4        He selected Morris Jackson, an individual curiously uncharged in this case,

5    despite all the victims agreeing he was the blue-shirted male who shot both

6    Mr. LaFollette and E.Z.

7        After identifying Morris Jackson, Mr. LaFollette talked to a reporter, as well

8    as a "few other people," who all told him the Clouds were the Medicine Valley

9    killers—information he didn't know himself (he admitted as much).

10       This post-event information altered Mr. LaFollette's memory on what he saw

11   that day—so much so that, when interviewed months later, he believed James Cloud

12   was the red-shirted male (despite his prior non-ID); he believed Donovan Cloud was

13   the blue-shirted male (despite identifying Morris Jackson); and he believed he

14   picked James Cloud from the line-up (he didn't), all because others told him the

15   Clouds were responsible. Mr. LaFollette's memory was, quite literally, re-written.

16       These are dangerous reversals, especially when it comes to eyewitness

17   testimony, which not only has a "powerful impact on the jury," but also is resistant

18   "to the ordinary tests of the adversarial process. . . ." *Perry*, 565 U.S. at 249

19   (Sotomayor, J., dissenting). Cross, jury instructions, and expert testimony don't

1   solve this problem; preventing that specific testimony does. Rule 403 exists for

2   situations just like this one.

3        James Cloud's plea to the Court about Mr. LaFollette is a reasonable one:

4   when other people tell Mr. LaFollette who they think is responsible for the Medicine

5   Valley murders (the Clouds), and Mr. LaFollette simply repeats it and convinces

6   himself that it is his own position, he shouldn't be allowed to say the same to a jury.

## II.   Supplemental Background

8        Before addressing the United States' arguments, James Cloud must correct

9   some factual misstatements by the United States.

### A.   Mr. LaFollette did not connect the Clouds to the Medicine Valley murders; a reporter—and "a few other people"—did.

11        The United States asserts any claim that Yakima Herald-Republic reporter

12   Phil Ferolito connected the Medicine Valley murders to the Clouds for

13   Mr. LaFollette during an interview is "pure speculation."[2] It's not. That's what

14   Mr. LaFollette said *himself*.

15        On June 14, 2019, Mr. Ferolito interviewed Mr. LaFollette. On this point, the

16   parties agree.[3] Mr. Ferolito recorded the interview, but did not start recording the

---

[2] ECF No. 188 at 7.

[3] ECF No. 188 at 6 ("On June 14, 2019, L.L. was interviewed by a reporter from the Yakima Herald Republic.").

interview until *after* it was underway. On this point, the parties agree.[4] As a result, the recording begins with Mr. Ferolito finishing up a story about the Clouds. On this point, the parties agree.[5]

The critical question this partially-recorded interview raises: what did Phil Ferolito tell Mr. LaFollette about the Clouds *before* the recording began?

To answer this question, the Court must start with Mr. LaFollette's January 2020 interview with the FBI. During that FBI interview, Mr. LaFollette repeatedly referred to the red-shirted male (i.e., the individual who shot Dennis Overacker) as James Cloud, a surprising statement considering Mr. LaFollette never identified James Cloud during a line-up administered just one day after the shooting.

The agents, rightly surprised, stopped Mr. LaFollette to ask why he kept referring to the red-shirted male as James Cloud. Mr. LaFollette never said "because that's what I remember seeing that day"; instead, Mr. LaFollette said he saw the news identify Mr. Cloud as the shooter:

and shot OVERACKER. Victim #2 referred to the man wearing the red shirt as JAMES CLOUD, after seeing CLOUD, and hearing the name, on the news.

That answer should have given the FBI pause. A key eyewitness had just

---

[4] ECF No. 188 at 6 ("The recorded portion of the interview starts out as such. . . .").
[5] ECF No. 188 at 6.

1   informed the FBI that he was now, for the first time, identifying James Cloud as the

2   red-shirted shooter after seeing his name in the news.

3           This stunning reversal from what Mr. LaFollette told police during his

4   line-up should have prompted an array of follow-up questions from the agents: *Why*

5   *didn't you ID Mr. Cloud during the line-up? Do you actually remember Mr. Cloud, or*

6   *are you relying on the news? You'd met Mr. Cloud before, why wouldn't you have*

7   *recognized him immediately?*  The answers to those follow-up questions should have

8   gone in the FBI's report, right after Mr. LaFollette's comment about the news, and

9   right before agents switched topics:



13          As the Court can see, none of that happened. The agents switched topics,

14   unconcerned about the provenance of his revised testimony.

15          Given the prevalence of false IDs in wrongful convictions, the defense (unlike

16   the FBI) was concerned a media report caused Mr. LaFollette to now name James

17   Cloud as a shooter. So his investigative team set up an early-August 2020 interview

18   with Mr. LaFollette to pick up where the FBI left off.

19          During that August 2020 interview, Mr. LaFollette's answers were shocking.

1    Contrary to what Agent Ribail wrote in his 302, Mr. LaFollette stated he had not

2    watched—or read—any news coverage about the Medicine Valley murders (with

3    one exception: he watched his own interview with the Yakima Herald-Republic).

4         So when asked how Mr. LaFollette connected James Cloud to the Medicine

5    Valley murders, he stated the connection came from two places:

6         First, Phil Ferolito connected the Clouds to Medicine Valley.

7         Second, he spoke with "a few different people," all of whom told him the

8    Clouds were responsible for the Medicine Valley murders.

9         Mr. LaFollette provided another shocking statement during the interview: he

10    remembers picking James Cloud out during the line-up (and he would know, as he

11    knows James Cloud's face). But the reality is, he never did. This memory of

12    something that never happened, as Dr. Cara Laney will testify, is Mr. LaFollette's

13    memory adapting—and integrating—the post-event information he learned from

14    others into his own memories. Put less-scientifically: Mr. LaFollette's memory is

15    scrubbing his non-ID of James Cloud and replacing it with "that's who I selected all

16    along."

17         So, no, James Cloud is not "purely speculating" by asserting Phil Ferolito

18    (and others) connected the Medicine Valley murders to the Clouds for

19    Mr. LaFollette. The United States' *own* witness says that's what happened.

**B.    Mr. LaFollette reversed everything he told police during the line-up.**

The United States asserts Mr. LaFollette "*absolutely* did not 'reverse' anything he had previously told police—he simply put a name to the faces."[6] Not so.

On June 9, 2019, police met with Mr. LaFollette and administered four line-ups: the first line-up (#5032) contained Donovan Cloud and five fillers; the second line-up (#5033) contained James Cloud and five fillers; the third line-up (#5034) contained Morris Jackson and five fillers; and the fourth line-up (#5035) contained Natasha Jackson and five fillers.

From these four line-ups, Mr. LaFollette made one ID: he selected Morris Jackson as the blue-shirted male who "shot me and had the shotgun." He did not identify James Cloud.

But during Mr. LaFollette's follow-up interview with James Cloud's investigative team in early-August 2020, he reversed course, stating the same blue-shirted male who "shot me and had the shotgun" was now Donovan Cloud.

So *before* Mr. LaFollette spoke with Phil Ferolito and "a few different people," the blue-shirted male was Morris Jackson; *after* speaking with Phil Ferolito and "a few different people," the blue-shirted male became Donovan Cloud:

---

[6] ECF No. 188 at 7 (emphasis added).

| Mr. LaFollette's statements on the blue-shirted male | |
|---|---|
| **Before** reporter and others | **After** reporter and others |
| Morris Jackson | Donovan Cloud |

This is not, as the United States claims, Mr. LaFollette "simply putting a name to the faces."[7] When an eyewitness changes who he says shot him, that's a reversal.

Similarly, ***before*** Mr. LaFollette spoke with Phil Ferolito and "a few different people," he did not ID James Cloud as the red-shirted male; ***after*** speaking with Phil Ferolito and "a few different people," the red-shirted male became James Cloud:

| Mr. LaFollette's statements on red-shirted male | |
|---|---|
| **Before** reporter and others | **After** reporter and others |
| No ID | James Cloud |

This is not, as the United States claims, Mr. LaFollette "simply putting a name to the faces." When an eyewitness looks at a clear line-up photo of James Cloud, doesn't identify him as the shooter, and then changes what he told police later based on what others told him, that's a reversal.

So, yes, Mr. LaFollette reversed everything he previously told police. Absolutely.

---

[7] ECF No. 188 at 7.

### C.    Mr. LaFollette never told police the blue-shirted male was "James Donovan."

The United States asserts that, when the FBI interviewed Mr. LaFollette in January 2020, he "stated the man in the blue shirt was Defendant James Donovan."[8] That is hard to believe. Nowhere in the FBI's interview report does it mention Mr. LaFollette identified the blue-shirted male as Donovan Cloud. If Mr. LaFollette said this, then two trained FBI agents somehow omitted an *eyewitness changing who shot him* from their report, and James Cloud is skeptical the FBI left out the answer to *You now say someone different shot you?* from their interview materials.

The United States' unwillingness to recognize Mr. LaFollette's reversal is especially troubling given what occurred during the FBI's interview with Morris Jackson. On June 20, 2019, FBI Special Agents Terami and Ribail interviewed Mr. Jackson. During the interview, the FBI repeatedly pressed Mr. Jackson to admit he was the blue-shirted male who shot Mr. LaFollette and E.Z with a shotgun. Time

---

[8] ECF No. 188 at 7. Note: the United States' brief contains a typo (James Donovan), creating confusion on whether the United States is referring to James Cloud or Donovan Cloud. Ultimately, who the United States is referring to is irrelevant, as Mr. LaFollette never stated in the January 2020 interview that the blue-shirted male was anyone other than Morris Jackson.

and time again, Mr. Jackson denied doing so. Not believing him, Agent Ribail

confronted Mr. Jackson with a hard truth: some of the suspects (including his own

niece)—and *all* the victims—identified Mr. Jackson as the blue-shirted male with

the shotgun:

> 2    **SPECIAL AGENT RIBAIL:**  But the problem I'm still
> 3  stuck with, as we talked about before, is four people are in
> 4  custody.   Some people are talking.   And we've talked to the
> 5  victims that are alive, and everyone says you're the one
> 6  that had the shotgun.

And therein lies the rub. Based on what the FBI represented during Mr. Jackson's

interview, it finds the victims' unanimous identification of Mr. Jackson as the

blue-shirted male credible, with one of those credible identifications coming from

Mr. LaFollette.

So, on one hand, the United States' agents credit Mr. LaFollette's

identification of Mr. Jackson as the blue-shirted male, yet the United States now

claims in its response Mr. LaFollette "stated that the man in the blue shirt was

Defendant James Donovan."[9] The United States can't have it both ways.

**D.    Mr. LaFollette knows James Cloud by sight.**

---

[9] ECF No. 188 at 7.

The United States asserts "L.L. has consistently stated that he did not know James Cloud by sight prior to James Cloud trying to murder him."[10] This sentence contains two misstatements.

*First*, Mr. LaFollette has never "consistently stated" he doesn't know James Cloud by sight. There are no such statements in discovery. Mr. LaFollette has consistently stated he didn't know the blue-shirted male and had "never seen this male before." He made that remark twice during his police interview:

L███ advised that they arrived at "Dobey Jack's" and saw a Native male in a blue shirt out by the gate. L███ said that he had never seen this male before.

\* \* \*

all friends. L███ said that they told "Tommy Guns" about how they were turned away from seeing "Dobey Jack" by a unfamiliar Native male. L███ said that

To the contrary, Mr. LaFollette told James Cloud's investigative team in August 2020 he *does* know James Cloud by sight, recalling a year-ish ago where James Cloud and Tara Cloud stopped by his house to visit and chat.

This makes Mr. LaFollette's decision not to select James Cloud—a person he knows and recognizes personally—from a six-person line-up all the more compelling. Had he seen James Cloud, he would have recognized him. But he didn't.

---

[10] ECF No. 188 at 11.

Reply
– 11 –

*Second*, James Cloud did not "try to murder" Mr. LaFollette. The United States knows, from its own police reports, Mr. LaFollette identified Morris Jackson as the blue-shirted male who tried to murder him:

```
5034 - I ███████ stated that #4 (MORRIS JACKSON) possibly looks like the guy
that had blue shorts, a hat over his head and had the shotgun. Then
I ███████ said "that is the person that shot me and had the shotgun,"
identifying him as the shooter with the shotgun. I ███████ stated that #2
```

That was, of course, until Mr. LaFollette changed his story after talking with a reporter and "a few different people," substituting Donovan Cloud for Morris Jackson—parroting what others told him. But contrary to the United States' brief, Mr. LaFollette never stated James Cloud tried to kill him.

## E.    Mr. LaFollette did not accurately describe James Cloud.

The United States asserts Mr. LaFollette's "initial description" of the red-shirted male—a Native American male in his 20s, 5'8", about 175 pounds, with dark, shorter hair and light facial hair—"describes James Cloud."[11] There are two misstatements here.

*First*, that was not Mr. LaFollette's initial description. Police first interviewed Mr. LaFollette not at the hospital (as the United States suggests), but rather at the scene where Mr. LaFollette brought the truck he was driving to a stop (roughly 12

---

[11] ECF No. 188 at 10.

miles east of Medicine Valley). During that initial interview, he described the

red-shirted male as having puffy, dark, curly hair, which is a far cry from the "dark,

shorter hair" he described later on:

following descriptions. L████████ said one subject had puffy dark curly hair with a red shirt and a second one was wearing a blue shirt. L████ said

**Second**, the specifics Mr. LaFollette provided do not "describe James

Cloud." James Cloud is a Native American male, but he's not in his 20s, he's not

175 pounds, and he's not 5' 8". James Cloud is 37-years-old, weighs 200 pounds,

and is 6' 1", fully five inches taller than the man Mr. LaFollette described.

### III.    Discussion

**A.    Mr. LaFollette did not identify James Cloud.**

The United States claims James Cloud wants the Court to "take the

extraordinary step of excluding a victim's identification under Rule 403."[12] There

are several issues with this claim.

**First**, this claim presupposes Mr. LaFollette identified James Cloud. He

didn't. Mr. LaFollette participated in a line-up on June 9, 2019. He looked at a

line-up containing James Cloud (a person he knows and has met), yet ***did not*** select

him as the red-shirted male who shot Dennis Overacker.

---

[12] ECF No. 188 at 2.

1        So we have one non-ID of James Cloud.

2        Seven months later (January 2020), the FBI interviews Mr. LaFollette again,

3   and agents took notice when Mr. LaFollette repeatedly and unprompted referred to

4   the red-shirted male as James Cloud—an odd statement contradicting

5   Mr. LaFollette's earlier non-ID at the line-up. When the FBI asked why,

6   Mr. LaFollette supposedly told them he heard James Cloud's name on the news.

7   And the FBI asked no further questions.

8        When James Cloud's investigative team followed up with Mr. LaFollette on

9   what "news" he was referring to, he stated reporter Phil Ferolito—and a few other

10  unnamed people—told him the Clouds were responsible for the Medicine Valley

11  murders.

12       When others tell an eyewitness who they think the suspects are, and that

13  eyewitness adopts that position as his own, that's not an identification. This is akin

14  to hearsay—Mr. LaFollette is merely repeating what others have said. It's therefore

15  incorrect to say Mr. LaFollette identified James Cloud as the red-shirted male; he

16  never did—others did it for him.[13]

---

17  [13] This brings up a small issue, but one worth mentioning. In its response, the United States
18  renames James Cloud's motion from "Motion in Limine Re: Lindell LaFollette's False Memory"
    to "Motion to Suppress the positive identification of the Defendant by one of the Defendant's
19  victims, L.L." (ECF No. 188 at 1). James Cloud does not want to leave the Court (or anyone) with
    the impression he thinks an identification occurred—even when it comes to the caption.

*Second*, the United States' claim presupposes excluding testimony from an eyewitness who adopts the opinion of others as his own is an "extraordinary step." It's not. As the Ninth Circuit set out in *Espinoza-Baza*, Rule 403 operates on a sliding scale—as the probative value of evidence declines, so too does the prejudicial showing required to exclude it. *See U.S. v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011). Mr. LaFollette *admits* his identification of the Clouds arose only after a reporter and "others" told him the Clouds were the Medicine Valley killers, causing him to reverse his non-ID of James Cloud and switch his positive ID from Morris Jackson to Donovan Cloud. That places the probative value of his testimony at next-to-nil, which, in turn, lowers the threshold needed to exclude it from "extraordinary" to "even a modest likelihood of unfair prejudice or a small risk of misleading the jury will justify excluding the evidence." *Id.* And the likelihood of unfair prejudice, given Mr. LaFollette's reversals, is more than modest.

**B.      The United States doubles-down on misstating the law.**

In the United States' response to James Cloud's Motion to Suppress J.V.'s Tainted ID, it asserted an eyewitness identification cannot be excluded under Rule 403, insisting the Supreme Court's due process framework supplants the Federal Rules of Evidence.[14] In his reply, James Cloud cited the Supreme Court's

---

[14] ECF No. 155 at 40.

1    decision in *Perry v. New Hampshire* and numerous other courts,[15] explaining at

2    length why this was an erroneous statement of law.

3        James Cloud thought the matter was settled—the case law is clear and any

4    confusion the United States had on how Rule 403 interacts with *Perry*'s "due

5    process check" was resolved.[16] But the United States' response to the current

6    motion[17] shows confusion remains as, once again, the United States asserts that,

7    without "the existence of police misconduct," Rule 403 is inapplicable, and the

8    testimony goes to the jury.[18] In effect, any eyewitness identification goes to the jury

9    unless there is police misconduct. To clear up the United States' ongoing confusion,

10   it may help to look at cases discussing *Perry*.

11       A good place to start is the Third Circuit's 2016 decision in *Dennis*, which is a

12   97-page tour de force overturning a conviction for first-degree murder (and death

13   sentence) based on *Brady* shortcomings and eyewitness-identification issues. *See*

14   *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016). The opinion is the

15   most robust, thorough, and current analysis on eyewitness identification by any

16   federal court in the country—by far.

17

18   ───────────

[15] ECF No. 161 at 22-23.
[16] *Perry*, 565 U.S. at 241.

19   [17] ECF No. 185.
[18] ECF No. 188 at 8.

In *Dennis*, the Third Circuit first recognized and defined the narrow issue in *Perry*: whether the Fourteenth Amendment's "due process check for reliability"[19] applies when there is a corrupted identification,[20] but it wasn't the police's fault. That is, there was no police misconduct. The court in *Dennis* correctly captured the Supreme Court's holding, which was to "link[] the due process check" not to "suspicion of eyewitness testimony generally," but only to improper police conduct. *Id.* at 336.

The second thing *Dennis* recognized is what the United States does not: the Supreme Court laid out ***alternative*** avenues for challenging corrupted eyewitness identifications when police misconduct isn't to blame. One of those avenues—an avenue *Dennis* noted the Supreme Court "stressed"—is "the importance of evidentiary rules 'to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury.'" *Id.* at 336. That's Rule 403. In short, the Third Circuit interprets *Perry* as not just recognizing Rule 403 as an important independent safeguard, but ***stressing*** that the

---

[19] *Perry*, 565 U.S. at 241.

[20] The facts behind the corrupted identification at issue in *Perry*: police interviewed an eyewitness to a car burglary. When they asked for a "more specific description of the man," the eyewitness pointed to an individual in police custody—akin to a show-up. Police didn't intentionally place the suspect in front of the eyewitness; it was an accident, and there were no clear policy violations. *Perry*, 565 U.S. at 234.

1    evidentiary rules catch unreliable identifications testimony that slip through the Due

2    Process Clause's cracks—the *Perry* decision actually "advocat[es]" for evidentiary

3    rules as an important safeguard apart from the Due Process Clause. *Id.* at 336.

4        Put simply, *Dennis* correctly outlines the law as follows: if police violate policy

5    and corrupt an identification, then the Supreme Court's due process check for

6    reliability applies [read: the *Manson* test]; if there's a corrupted identification but

7    police weren't to blame, then a defendant resorts to evidentiary rules, including

8    Rule 403.

9        The Third Circuit's analysis of *Perry* isn't an island; other courts agree

10   Rule 403 is an independent test that applies whether or not the due-process inquiry

11   is triggered. *See*, *e.g.*, *U.S. v. Murphy*, 2018 WL 7017993 (E.D. Ten. Oct. 15, 2018).

12   In *Murphy*, the defendant challenged a corrupted eyewitness identification under

13   both the due process clause and Rule 403. In assessing the arguments, the court

14   recognized Rule 403 serves as an alternative to the due process clause. *See id.* at *16

15   ("Defendant is correct that the pretrial identifications may be barred or limited

16   under Rule 403, ***even if*** they are not excludable under the Due Process Clause.")

17   (emphasis added). Although the court in *Murphy* reserved ruling on Rule 403,

18   finding "the parties' arguments are too underdeveloped . . . at this time," the

19   decision could hardly be more clear: Rule 403 is independent; it does not rise and fall

1    with police misconduct and due process. *Id.*

2    Another case backing the Third Circuit's interpretation of *Perry* is *U.S. v.*

3    *Jones*, 2017 WL 752830 (D. N.J. Feb. 27, 2017). In *Jones*, the defendant challenged a

4    corrupted eyewitness identification under both the due process clause and Rule 403.

5    Like the court in *Murphy*, the court in *Jones* recognized what the United States does

6    not: "Mr. Jones is correct to the extent he argues that it is not sufficient merely to

7    find that an out-of-court identification does not violate due process. *Perry* itself

8    contemplated that, even where the police did not arrange an identification, its

9    reliability would be tested by the ordinary processes of a criminal trial," which

10   include "of course, Rule 403. . . ." *Id.* at *7. Of course Rule 403 is included.

11   James Cloud cited *Murphy* months ago in the Rule 403 analysis from his

12   briefing on J.V.'s tainted identification.[21] And *Jones*.[22] In its response here, the

13   United States never attempts to explain why *Murphy*'s interpretation of *Perry* is

14   wrong. Or *Jones*'s interpretation of *Perry*, for that matter. It cites no cases saying

15   Rule 403 requires police misconduct. It cites no advisory committee notes stating

16   "Rule 403 applies in every situation but this one." It never explains why Rule 403

17   would rise and fall with the wholly separate due-process test. That's because there is

18

19   [21] ECF No. 161 at 23 (Reply Supporting Motion to Suppress J.V.'s Tainted ID).
     [22] ECF No. 161 at 23 (Reply Supporting Motion to Suppress J.V.'s Tainted ID).

no authority articulating such a position; just authority to the contrary.

Instead, the United States doubles-down on an unsupported reading of *Perry* that, without police misconduct, a defendant cannot challenge a corrupted identification under Rule 403. It is a reading that makes no sense: the United States asks the Court to read a "police misconduct" element into Rule 403, citing no law whatsoever.

Visually, the interplay between the Due Process Clause and Rule 403 looks as follows:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16   The United States' ongoing confusion about Rule 403 also explains why it

17   mis-lists James Cloud's trial rights. In its briefing, the United States notes he "has

18   the right to cross examine L.L.";[23] it notes he "has the right to seek to call expert

19   _____

[23] ECF No. 188 at 3.

witnesses to rebut L.L.'s identification;[24] and it notes he "has the right to advocate for jury instructions governing eyewitness identifications."[25] Missing from this list is a big right *Perry* explicitly lists: the "protective rules of evidence."[26] And when the Court looks at the paragraph in *Perry* where this reference to the protective evidentiary rules is pulled from, the United States' omission stands out:

> When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, ***protective rules of evidence***, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilty be proved beyond a reasonable doubt.

*Id.* at 233 (emphasis added). The United States instead reads this paragraph from *Perry* as follows:

> When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, ~~**protective rules of evidence**~~, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilty be proved beyond a reasonable doubt.

---

[24] ECF No. 188 at 3.

[25] ECF No. 188 at 3.

[26] *Perry*, 565 U.S. at 233.

*Id.* at 233 (strikethrough included).

So, no, James Cloud is not "asking this Court to cast aside the *Perry* analysis";[27] it's asking the Court to follow it.

**C.    The United States' proffered interplay between Rule 403 and expert testimony is outdated.**

The United States asserts, "[w]ithout irony," the only time Rule 403 comes into play regarding eyewitness identification is when "higher Courts" review decisions by trial courts to "exclud[e] testimony of defense eyewitness experts. . . ."[28] In effect, the United States takes a swing at James Cloud's eyewitness expert, claiming courts are skeptical of such experts and regularly exclude them. While this briefing isn't the venue for an expert challenge, James Cloud cannot let this claim leave a lasting impression with the Court, so he briefly notes this claim misleads the Court in a few ways:

***First***, the authority the United States points to—*U.S. v. Amaral*, 488 F.2d 1148 (9th Cir. 1973), as well as *U.S. v. Christophe*, 833 F.2d 1296 (9th Cir. 1987)—never mention Rule 403. Anywhere. A "Control-F" for "403" produces zero results. So to say these cases "dealt with Rule 403 in the context of eyewitness

---

[27] ECF No. 188 at 8.
[28] ECF No. 188 at 13.

identification"[29] is incorrect.

**Second**, the authority the United States points to—*Amaral* and *Christophe*—is old. Really old (*Amaral* is 47-years-old, and *Christophe* is 33-years-old). Since these decisions, the science on human memory has evolved significantly, with researchers publishing "more than 2,000 scientific studies" on "the reliability of eyewitness identifications." *U.S. v. Greene*, 704 F.3d 298, 305 n.3 (3d Cir. 2013). And as the science has evolved, so too have judicial opinions, with appellate courts now *reversing* trial courts that exclude eyewitness identification experts. *See*, *e.g.*, *U.S. v. Brownlee*, 454 F.3d 131 (3d Cir. 2006) (finding the trial court abused its discretion in limiting expert testimony on eyewitness identification because witnesses often "profess considerable confidence in erroneous identifications," and "expert testimony was the only method of imparting the knowledge concerning confidence-accuracy correlation to the jury.").

**Third**, the aging authority the United States relies on pre-dates the seminal decision in *Daubert v. Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579 (1993), where the Supreme Court overhauled Rule 702's standard for admitting experts and, by all accounts, relaxed it, creating a more "flexible" test that "should be applied with a 'liberal thrust' favoring admission. . . ." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d

---

[29] ECF No. 188 at 12.

1227, 1232 (9th Cir. 2017) (citations omitted). So relying on pre-*Daubert* authority to argue courts remain tough on qualifying eyewitness experts in a post-*Daubert* world is unpersuasive.

**D.    The United States reads too much into the dearth of Rule 403 authority.**

The United States asserts the "sparing use of Rule 403" is why James Cloud "did not cite a single case" where testimony was excluded.[30] This assertion is incorrect in a few ways.

***First***, it is incorrect to say there is no authority in this area. There is authority saying Rule 403 applies to identification testimony when due-process protections do not. *See Perry*, 565 U.S. at 233 (recognizing the protective rules of evidence apply when due process protections do not); *Murphy*, 2018 WL 7017993 at *16 (recognizing Rule 403 applies to eyewitness challenges when due process protections do not); *U.S. v. Jones*, 2017 WL 752830 at *8 (same).

There is authority excluding identification testimony under Rule 403. *See*, *e.g.*, *U.S. v. Henderson*, 68 F.3d 323 (9th Cir. 1995) (finding district court should have excluded a police officer's lay witness identification of a defendant under Rule 403).

There is authority holding a Rule-403-idenfication exclusion in abeyance pending additional briefing. *See Murphy*, No. 17-cr-131, ECF No. 41 (E.D. Tenn.,

---

[30] ECF No. 188 at 9.

Dec. 11, 2018) (holding "Defendant's 403 arguments are too undeveloped at this time to make an informed ruling."). Perhaps tellingly, after the district court in *Murphy* entered its ruling and opened the door for additional briefing on the Rule 403 issue, the United States moved to dismiss the case, which the Court granted. *Id.* at ECF No. 60.

*Murphy* isn't the only case where a favorable ruling on identification testimony died on the vine before it could develop into a published opinion. Another example comes from this district. *See, e.g.*, *U.S. v. Tuaimalo*, No. 11-cr-184-EFS. In *Tuaimalo,* the defendant challenged the identification testimony of two separate witnesses who selected him from line-ups. Judge Shea heard testimony, including from an expert on eyewitness identifications, and then suppressed both identifications in an oral ruling from the bench, as reflected in the minute entry:[31]

| Court: | Defendant's MOTION to Suppress (ECF No. 48) **granted as to witnesses Flansburg and Gonzales** |
|--------|---------------------------------------------------------------------------------------------|

The next day, the United States moved to dismiss the Indictment.[32]

So authority in this area exists.

The United States also overlooks a more glaring reason why James Cloud couldn't find authority squarely on-point: despite his best efforts, he couldn't find

---

[31] *U.S. v. Tuaimalo*, 2:11-CR-184-EFS, ECF No. 206 (Minute Entry).
[32] *Id.* at 210 (United States' Rule 48 Motion to Dismiss).

facts this offensive—that is, an eyewitness who knows James Cloud, but didn't select him from a line-up, yet now reverses that decision based on a conversation with a reporter, as well as "a few other people," all of whom said the Clouds were responsible. Worse, the eyewitness *admits* he didn't make the connection between the Clouds and the Medicine Valley murders; others did that for him. Even worse, the eyewitness now believes he selected James Cloud from a line-up to begin with (he didn't), a testament to how badly his memory has been corrupted.

***Second***, it is incorrect to say courts use Rule 403 "sparingly." To the contrary, courts use Rule 403 regularly as part of their commitment to preserve fair trials for the criminally accused, and one need look no further than this district to confirm as much. *See*, *e.g.*, *U.S. v. Flett*, 379 F. Supp. 3d 1152, 1158 (E.D. Wash. 2019) (in prosecution for assault, the court excluded a defendant's prior assault convictions under Rule 403 because "[t]heir probative value is substantially outweighed by several dangers. . . ."); *see also U.S. v. Matherly*, 2:11-CR-093-EFS (ECF No. 124 – in sex-offense prosecution of prison guard, excluding information about disciplinary history under Rule 403; also excluding late-received discovery under, among other grounds, Rule 403); *U.S. v. Williams*, 2:13-CR-183-FVS (ECF No. 100 – in arson case, excluding testimony of witness as cumulative and lacking foundation under Rule 403); *U.S. v. Binford*, 2:14-CR-166-RMP (ECF No. 116 – in

§922(g)(1) case, excluding burglary items found by police in a bag under Rule 403);

*U.S. v. Henderson*, 2:16-CR-143-RMP (ECF No. 139 – in fraud case, excluding

document under Rule 403 because "the risk of prejudice from the document

outweighs its probative value. . . .").

**E.    The jurors' common sense isn't an adequate safeguard against
Mr. LaFollette's corrupted eyewitness testimony.**

The United States asserts there's no need to screen corrupted eyewitness

testimony under Rule 403, as "appeal[ing] to the experience and common sense of

jurors" will suffice.[33] Perhaps that was a reasonable approach 33 years ago, when

lawyers and courts were ignorant of the proven dangers of tainted identifications,

but not anymore.

"Studies have documented that jurors tend to misunderstand how memory

works and often believe it to be much more reliable and less susceptible to outside

influence than it actually is." *Dennis*, 834 F.3d at 341 (McKee, C.J., concurring). For

example, in a survey of 1,000 potential jurors, nearly 66% thought the statement "I

never forget a face" applies to them. *See id.* Another 37% think a weapon's presence

*enhances* reliability (it doesn't), and 39% think a violent event *enhances* reliability (it

doesn't). *See id.* This is why courts note the science behind memory "often

---

[33] ECF No. 188 at 2.

contradicts jurors' '***commonsense***' understandings." *Brownlee*, 454 F.3d at 142 (emphasis added). It's also why, "to a jury, 'there is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says, *that's the one!*'" *Id.* (citing *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (emphasis in original)).

Common sense may help jurors digest many things at trial, but corrupted eyewitness testimony isn't one of them.

### F.    Robust cross-examination isn't an adequate safeguard against the corrupted eyewitness testimony here.

The United States asserts there's no need to screen corrupted eyewitness testimony under Rule 403, as "skillful cross examination of eyewitnesses" will suffice.[34] Again, perhaps that was a reasonable approach 33 years ago, but not anymore.

The Supreme Court recognized, long before the science on eyewitness identification developed, that cross-examination isn't a cure-all: "even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute accuracy and reliability." *U.S. v. Wade*, 388 U.S. 218, 235 (1967). This is especially true with a witness like Mr. LaFollette, who 1) now believes James Cloud

---

[34] ECF No. 188 at 2.

was the red-shirted male (despite his prior non-ID), 2) now believes Donovan Cloud was the blue-shirted male (despite identifying Morris Jackson), and 3) now believes he picked James Cloud from the line-up (even though he didn't). All of this after being fed information from a reporter and some others on what to believe.

And this belief is where the true danger lies, for "if an eyewitness is completely unaware that [his] identification has been shaped by [outside information], it is incredibly difficult, if not impossible, to dissuade that witness of the accuracy of [his] identification." *Dennis*, 834 F.3d at 323. In fact, "vigorous cross-examination may serve only to reinforce the witness' certainty of [his] identification." *Id.* In other words, while the United States promotes cross-examination as the cure-all, the Third Circuit rightly notes the practical truth: it will make the corrupted memory worse.

This is why courts screen eyewitness testimony under the protective rules of evidence. Cross-examination doesn't, as the United States would lead the Court to believe, fix everything.

## IV.   Conclusion

For the reasons set forth above, James Cloud respectfully asks the Court to grant his request.

Dated: September 11, 2020

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org

**Service Certificate**

I certify that on September 11, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Thomas J. Hanlon and Richard Burson.

s/ John B. McEntire IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org