

John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for James D. Cloud

## United States District Court
### Eastern District of Washington
Honorable Salvador Mendoza, Jr.

| | |
|---|---|
| United States of America, | No. 1:19-CR-2032-SMJ-1 |
| Plaintiff, | |
| v. | Reply Supporting Motion to Exclude E.Z.'s Unreliable ID |
| James Dean Cloud, | |
| Defendant. | |

# Table of Contents

I.  Introduction ...................................................................................................1

II.  Discussion .....................................................................................................1

    A.  Explicit Concessions .............................................................................1

    B.  Implicit Concessions ............................................................................2

        1.  The victims told inconsistent stories to police. ...........................2

        2.  E.Z. told an inconsistent story to first responders. ....................2

        3.  E.Z. confused James Cloud for Morris Jackson. ..........................3

        4.  E.Z. was high, which impacts her memory. ...............................6

        5.  There is a near-zero chance a well-intentioned officer doesn't influence an un-blinded line-up. ..............................................................6

        6.  Police concluded E.Z.'s line-up with a policy violation. .............................7

        7.  The Supreme Court's *Manson* framework is outdated. ............................7

        8.  Courts delve deeper than the *Biggers* factors. ..............................7

    C.  The United States minimizes (or incorrectly characterizes) much of what went wrong during E.Z.'s line-up. ..........................................................8

        1.  It minimizes Detective Williams's moralistic lecture. ............................8

        2.  It minimizes the detectives' failure to conduct a blind line-up. ...............14

        3.  It incorrectly characterizes E.Z.'s exculpatory statement. ........................15

    D.  The United States muddles *Manson's* due process framework. ...........................21

    E.  James Cloud carries his burden on step 1: police engaged in misconduct. ...........23

    F.  James Cloud carries his burden on step 2: the police's misconduct created an unduly suggestive identification. ..........................................................24

    G.  The United States fails to carry its burden on step 3: this was an unreliable identification. ..........................................................................28

        1.  E.Z. lacked a good opportunity to view. ...................................28

        2.  E.Z. did not accurately describe James Cloud. .........................28

      3.     E.Z.'s degree of attention was low. .............................................. 29

      4.     E.Z. showed no certainty in her identification ............................ 30

      5.     The multi-day delay between crime and line-up impacts reliability. ......... 31

III.    Conclusion ................................................................................ 32

# I.    Introduction

The United States' response 1) explicitly concedes police violated multiple policies, 2) implicitly concedes other, critical points, 3) minimizes (or incorrectly characterizes) much of what occurred during E.Z.'s line-up, 4) muddles the standard, and 5) fails to carry its burden to show this impermissibly suggestive identification was nonetheless reliable. These issues will be addressed in turn.

# II.    Discussion

## A.    Explicit Concessions

In its response, the United States explicitly concedes two points, both worth drawing to the Court's attention.

***First***, the United States concedes YCSO detectives failed to administer a blinded line-up, violating both department policy and best practices: "The flipping through of the photos made this lineup no longer 'blind.' That is a violation of best practices and department policy, true."[1]

***Second***, the United States concedes YCSO detectives failed to administer a sequential line-up, again violating both department policy and best practices: "Similarly, providing all of the photos in the lineup to E.Z. at the same time was

---

[1] ECF No. 192 at 22.

inconsistent with best practices and YSCO [sic] policy."[2]

## B.    Implicit Concessions

In its response, the United States implicitly concedes several points, all worth drawing to the Court's attention as it narrows what disputed issues remain.

### 1.    The victims told inconsistent stories to police.

James Cloud detailed how E.Z. and Lindell LaFollette told inconsistent stories to police regarding their reasons for traveling to Medicine Valley.[3] Mr. LaFollette claimed it was to purchase motorcycle parts; E.Z. claimed it was to "check on" Dobie Jack. But the true motive, based on other witness testimony, was Dobie Jack sold methamphetamine (a well-known fact to police), and they were looking to buy. The United States does not dispute these inconsistencies (detailing the same inconsistencies in its background),[4] implicitly conceding this point.

### 2.    E.Z. told an inconsistent story to first responders.

James Cloud noted E.Z. told first responders she was "fired on by an oncoming driver as she was driving up to her friend's house."[5] The United States acknowledges E.Z.'s inconsistent statement, but attributes it "to a game of

---

[2] ECF No. 192 at 23.

[3] ECF No. 186 at 6.

[4] ECF No. 192 at 3 ("L.L. told them that he was at Cagle's to purchase motorcycle parts. . . ."); ECF No. 192 at 6 (E.Z. stated that they were going over there to check on Cagle. . . .").

[5] ECF No. 196 at 8-9.

telephone"—a curious explanation. Either way, this point is implicitly conceded.

### 3. E.Z. confused James Cloud for Morris Jackson.

James Cloud detailed how E.Z. confused James Cloud for Morris Jackson during her line-up and interview, a common issue in memory science known as cross-race identification.[6]

This is a big deal, one central to the reliability analysis.

During her interview on June 10, 2019, E.Z. told police she (and the truck's other occupants) was met at the gated entrance to Dobie Jack's property by a "young Native" who turned the truck away, saying Dobie Jack wasn't accepting visitors:

```
 4           E        Z       : Oh, yeah.  So like I
 5   were going to go just, you know, check on them.  And we
 6   ended up pulling up to his, like, before you get into the
 7   gate.  This young Native came up to the truck.  And Dennis
 8   –
 9           DETECTIVE WILLIAMS:  Was the gate shut or ...
10           E        Z       : Yes, it was locked.  So he
11   walked outside the gate and went up to Dennis' window, and
12   he said that Doby isn't having any visitors right now.
```

---

[6] ECF No. 196 at 46.

Detective Williams asked E.Z. to describe the young Native. She did, noting he was "19 to 23," *wore a red shirt*, and *seemed white from a distance*, but "the closer he got, you could tell he was a Native":

```
13          DETECTIVE WILLIAMS:  And what did he look like?
14          E        Z       :  He was wearing a red shirt.
15  At first from far away, I thought he was maybe white.  But
16  the closer he got, you could tell he was a Native.
17          DETECTIVE WILLIAMS:  How old about?
18          E        Z       :  Probably like -- I don't
19  know.  I'd say 19 to 23.  Like, he wasn't very old or
20  young.  So like, we -- we backed up.  We left.
```

The Native male who met E.Z. (and others) at the gate *was not James Cloud*, as the United States would have the Court believe; it was Morris Jackson. We know this because Morris Jackson admitted it. *Twice*.

He first admitted it during a June 11, 2019 interview with YCSO Detective Dan Cypher and FBI special agent Troy Ribail, where Mr. Jackson described seeing the truck[7] approaching Dobie Jack's property and running up to the gate to turn them away:

---

[7] Throughout Mr. Jackson's interviews, he refers to a "green" truck. It's actually black, and is depicted—at least the back half—in James Cloud's motion. (ECF No. 186 at 42.)

```
 8              MORRIS JACKSON:  And then the people pulled in on
 9   a green truck --
10              DETECTIVE CYPHER:  Okay.
11              MORRIS JACKSON:  -- the big, green truck.
12              DETECTIVE CYPHER:  Okay.  What happened there?
13              MORRIS JACKSON:  Well, Donovan and James didn't
14   see them pulling at first.  So -- and I ran up, and I told
15   them, hey, probably not a good idea to be here -- good idea
16   to be here; you guys should just go, you know.  And then
17   they left.
```

He next admitted it during a June 20, 2019 interview with SA Ribail and FBI special agent Jennifer Terami, where he described Natasha Jackson (his niece) alerting him about the approaching truck and running up to the gate to turn them away before they could enter Dobie Jack's property:

```
20   in.  Uncle, there's somebody coming.
21              And I -- I got up, and I looked.  And it was that
22   green truck coming down the driveway.  And I ran out there,
23   and, like, I stopped them.  I was like hey, hey, hey, hey,
24   hey.  You know, I caught them before they could get, you
25   know, like, all the way into the -- you know, and I stopped
```

The United States doesn't dispute E.Z. stated the "young Native" who met them at the gate wore a red shirt, nor does it dispute Morris Jackson admitted to meeting E.Z. (and the others) at the gate, impliedly conceding both points.

This produces an evidentiary syllogism:

- Morris Jackson met E.Z. at the gate (per Mr. Jackson)

- the Native male who met E.Z. at the gate wore a red shirt (per E.Z.)

- Morris Jackson is the red-shirted Native male.

**4.    E.Z. was high, which impacts her memory.**

James Cloud noted E.Z. used both methamphetamine and marijuana shortly before traveling to Medicine Valley, detailing how both drugs impact her ability to recall what happened.[8] The United States confirms E.Z.'s meth use;[9] it also doesn't dispute drugs impact memory, impliedly conceding this point.

**5.    There is a near-zero chance a well-intentioned officer doesn't influence an un-blinded line-up.**

James Cloud detailed how courts view blinding as "the single most important characteristic that should apply to eyewitness identification," as there is a "near zero" chance a well-intentioned officer doesn't influence an un-blinded line-up. . . ."[10] The United States makes no effort to dispute this conclusion (nor could it; the science is well-established),[11] impliedly conceding this point.

---

[8] ECF No. 186 at 45-46.
[9] ECF No. 192 at 9 ("E.Z. confirmed that she smoked meth prior to arriving at Cagle's.").
[10] ECF No. 186 at 27.
[11] The United States softly comments on blinding's importance, referring to it as "merely prophylactic." (ECF No. 192 at 20.) But still, no attempts are made to address the science

### 6.    Police concluded E.Z.'s line-up with a policy violation.

James Cloud noted neither detective instructed E.Z. to avoid discussing the case (or the line-up) with other witnesses, violating yet another YCSO policy.[12] The United States does not dispute this policy violation (nor could it; it's recorded), impliedly conceding this point.

### 7.    The Supreme Court's *Manson* framework is outdated.

James Cloud explained how science has evolved since *Manson*, leaving the Supreme Court's due process framework in tension with the latest science.[13] The United States does not dispute this backdrop, impliedly conceding courts struggle to reconcile a dated framework with current science.

### 8.    Courts delve deeper than the *Biggers* factors.

James Cloud walked through that, when assessing reliability, courts delve deeper than the *Biggers* factors alone, also weighing system and estimator variables (e.g., weapons focus, cross-racial identifications, etc.).[14] The United States does not dispute courts do a deeper dive, impliedly conceding this point.

---

showing even the best-intentioned officers inadvertently influence un-blinded line-ups.

[12] ECF No. 186 at 20.

[13] ECF No. 186 at 20-26.

[14] ECF No. 186 at 25-26.

**C.    The United States minimizes (or incorrectly characterizes) much of what went wrong during E.Z.'s line-up.**

**1.    It minimizes Detective Williams's moralistic lecture.**

The United States claims "[t]here was no lecturing by Detective Williams," insisting James Cloud "cherry picked three sentences" to classify the conversation as a "moral lecture."[15] Instead, the United States attempts to characterize Detective Williams as a "police officer doing his job."[16] The recording shows otherwise.

Detective Williams's tone shifted 87 seconds after Detective McIlrath left room, beginning with asking E.Z. a rhetorical question about Dobie Jack's involvement in drug life:[17]

**Detective Williams:**    Well, you know what Dobie's into?[18]

**E.Z.:**    [Nods].

But Detective Williams wasn't satisfied with a nod; he wanted E.Z. to say it herself:

**Detective Williams:**    What's he into?[19]

**E.Z.:**    You know, selling drugs and all that stuff.

---

[15] ECF No. 192 at 20.
[16] ECF No. 192 at 21.
[17] Detective McIlrath left the room at time-stamp 13:26:09; the tone shifted at 13:27:36.
[18] ECF No. 195 (E.Z.'s recorded interview) at 13:27:36.
[19] ECF No. 195 (E.Z.'s recorded interview) at 13:27:42.

He drives the point home a bit more:

> **Detective Williams:** You know he's been selling drugs. You know the kind of people that come out there.[20]

To be fair, Detective Williams clarifies he's not judging E.Z. on her drug use, noting that "once you get on that stuff, it's harder than anything to get off of."[21]

But almost immediately after, Detective Williams pivots the interview from E.Z.'s drug use (which he doesn't judge) to her decision to bring her child to a drug dealer's house (which he does judge—harshly):[22]

> **Detective Williams:** The thing I'm concerned about too is that, I mean, like I said, there's two things here, you know. There's the murder that…the murders that we're investigating. But then, it's concerning that you would take your child out there."

And as E.Z. tries to explain herself, Detective Williams interrupts her:[23]

> **Detective Williams:** When you know, you've already said, you've said you know what he does, Dobie. So, like, he's a drug dealer. People that come to drug dealers' houses— and I'm not talking about you right now—but people that come to drug dealers' houses, they're looking for drugs, they're looking for money, they have guns, they have weapons, they're people who

---

[20] ECF No. 195 (E.Z.'s recorded interview) at 13:27:48.
[21] ECF No. 195 (E.Z.'s recorded interview) at 13:28:02.
[22] ECF No. 195 (E.Z.'s recorded interview) at 13:28:32.
[23] ECF No. 195 (E.Z.'s recorded interview) at 13:28:52.

are felons a lot of times. They're not just users that are looking for something for the day. Sometimes they are, but half the time they're not. They're really bad people. So it's concerning that you would take your child out there.

At this point, E.Z. agrees and looks down at the interview table, ashamed at her decision. Undeterred, Detective Williams presses on:[24]

> **Detective Williams:** Did you think about that when you were on your way out there?
>
> **E.Z.:** I didn't. [E.Z. attempts to speak further.]
>
> **Detective Williams:** Why is that? Why didn't you think of that?

It's worth pausing for a moment to consider the United States' claim "[t]his was [a] police officer doing his job."[25]

Really? How does pressing E.Z. about her thoughtlessness in bringing her infant to a drug dealer's house further the police's investigation? Did Detective Williams learn more about the suspects' descriptions? Did it help him pin down who was present? Did it help him identify motive?

It furthered none of these things; just E.Z.'s guilt—and this is only three minutes after the other detective left the room.

---

[24] ECF No. 196 (E.Z.'s recorded interview) at 13:29:24.
[25] ECF No. 192 at 21.

It continues.

After E.Z. admits to using meth and marijuana that day, he brings up her child (again):[26]

> **Detective Williams:** So you're caring for your child [read: while using drugs].

And after Detective Williams confirmed Dennis Overacker (the driver) drove while high (with everyone in the car), he confronted her on her poor decision-making involving her child (again):[27]

> **Detective Williams:** And so you know that he was smoking marijuana, and you still let him drive you around with your kid.

And at this moment, E.Z. hung her head in shame (again):[28]



---

[26] ECF No. 195 (E.Z.'s recorded interview) at 13:30:34.
[27] ECF No. 195 (E.Z.'s recorded interview) at 13:34:22.
[28] ECF No. 195 (E.Z.'s recorded interview) at 13:34:29.

Detective Williams pressed on—

> **Detective Williams:**    I mean, what's bringing this on? What's…what's making…these are bad decisions for a mom to make. Are you guys sure you weren't out there to buy?

And as for the United States' belief James Cloud left an inaccurate impression "E.Z. was crying in a corner when [Detective McIlrath] reentered the room,"[29] the response is simple: well, that's what happened.

Right before Detective McIlrath walked back in, Detective Williams told E.Z. it's not her fault these people got shot, "but you put yourself and your baby in harm's way by hanging out with these people"—another unnecessary statement that didn't advance the investigation.[30] And in response to that statement, she reached up to blot her eyes, commenting she thought nothing bad would happen:

---

[29] ECF No. 192 at 21.

[30] ECF No. 195 (E.Z.'s recorded interview) at 13:40:38.

There's also how the interview wrapped up. After the line-up, but before E.Z. left, Detective Williams brought up the pending CPS investigation and the possibility E.Z. will lose her child. In a moment needing to be handled with care, Detective Williams did no such thing:[31]

> **Detective Williams:** I don't know what the State wants to do [regarding the CPS investigation]. I mean, because, obviously, you admit. I mean, you fucked up taking him [her child] out there.

An officer isn't "doing his job" when he criticizes a victim—repeatedly—for her poor decision making as a mother; and an officer isn't "doing his job" when he tells a victim she "fucked up."

---

[31] ECF No. 195 (E.Z.'s recorded interview) at 14:05:22.

So, no, James Cloud didn't "cherry pick three sentences" to characterize the interview as a moral lecture; there was far more lecturing than that. Nor did James Cloud represent the entire one-on-one interview was a lecture. It wasn't. But Detective Williams went beyond what's appropriate for an officer speaking with a victim trying to get facts and, as Dr. Cara Laney will testify, research shows these crossed boundaries made E.Z. more susceptible to suggestion.

In the roughly 13 minutes Detective McIlrath was away generating a line-up, Detective Williams's comments and questions caused E.Z. to hang her head in shame 16 times; that tells the Court all it needs to know.

**2.      It minimizes the detectives' failure to conduct a blind line-up.**

The United States claims the detectives' "cursory review of the lineup was for the purpose of ensuring that the lineup was correctly compiled," avoiding any risk E.Z. would inadvertently view a sheet listing the fillers' names.[32] In effect, the United States attempts to explain away the detectives' policy violation as an effort to ensure everything was in order. This explanation is unpersuasive.

If the detectives wanted to ensure a contaminant-free line-up, they wouldn't have checked the line-up ***right in front of her***, allowing E.Z. to see everything:

---

[32] ECF No. 192 at 22.



Did Detective Williams make a face, change his expression, or otherwise react when he flipped past James Cloud's line-up photo as E.Z. watched? We don't know (his back is to the camera), but E.Z. would (she watched the "cursory check").

No, if the detectives wanted to ensure the line-up was contaminant-free, they would have checked the line-up before entering the room, randomized it, and then provided it to her—as YCSO policy requires.

### 3.    It incorrectly characterizes E.Z.'s exculpatory statement.

The United States asserts that, as E.Z. reviewed James Cloud's line-up photo, she commented "This guy, I think I recognized him. ***I don't know*** if he was the one

wearing the redshirt [sic]."[33] That ***is not*** what she said.

The critical moment happens at 13:47:41:

**E.Z.:**           This guy [referring to James Cloud's photo], I think I
recognized him. ***I don't think*** he was wearing the red shirt.

The parties' dispute turns on whether E.Z. said "***I don't know*** if he was wearing the

red shirt," or "***I don't think*** he was wearing the red shirt." The distinction is

important. The United States' version is ambivalent (i.e., she doesn't know if James

Cloud shot Dennis Overacker); James Cloud's version is exculpatory (i.e., she ***does***

***not*** think James Cloud shot Dennis Overacker).

A close listen reveals a distinct, harsh "k" sound after "I don't," indicating

E.Z. used the word "thin***k***," not "know."

It's at this critical moment when Detective Williams sets his pen above James

Cloud's photo, like a bookmark. Then, less than 10 seconds later, E.Z. reverses

course, saying James Cloud was the red-shirted male. The sequence makes

Detective Williams's pen placement stand out:

---

[33] ECF No. 192 at 12 (emphasis added).

| Sequence |
|---|
| E.Z. doesn't think James Cloud is red-shirted male. |
| Detective places pen above James Cloud's photo. |
| E.Z. reverses, saying she thinks James Cloud is red-shirted male. |

The only intervening circumstance between E.Z.'s exculpatory statement and her inculpatory statement is the pen placement.

The United States defends the bookmarking, claiming Detective Williams "merely laid down a pen for E.Z. to use to indicate the identification she just made," and "he would have done so even if the lineup were administered in a double or single blind fashion."[34] This defense contains several problems:

***First***, the obvious: E.Z. initially didn't make an identification. She said "I ***don't think*** he was wearing the red shirt." That's a ***non-identification***. A pen doesn't get placed above a suspect's photo for a non-ID, yet that's what happened.

***Second***, if detectives administered a blind line-up, they wouldn't know what photo she was looking at, and wouldn't have been able to place a pen above James Cloud's photo in the first place.

***Third***, if the detectives wanted to run an interference-free line-up, they would have given her a pen *before* the line-up began (to use when ready), or after the line-up

---

[34] ECF No. 192 at 23-24.

1 wrapped up, not right during the line-up.

2   ***Fourth***, if the detectives were truly handing her a pen to record her

3 identification, then they would have instructed her what to do with the pen

4 (e.g., "Please record any thoughts about this photo," or "Just write down your

5 reaction"). That didn't happen. Detective Williams placed the pen above James

6 Cloud's photo, but didn't follow his act up with any instructions whatsoever; he

7 followed it up with silence, letting the pen's placement do the talking. This never

8 would have happened had they conducted an un-blinded line-up.

9   ***Fifth***, if the United States' claim the detectives "merely laid down a pen for

10 E.Z. to use to indicate the identification she just made," then they would have

11 adopted the same procedure for Morris Jackson's line-up (the other line-up where

12 she made an identification). ***They didn't.*** E.Z. looked at Morris Jackson's photo,

13 pointed, and said "I think this is the guy that was in the blue shirt."[35] As the seconds

14 ticked by (24 seconds total), neither Detective Williams nor Detective McIlrath

15 ***moved or said a word***:

16

17

18

19

---

[35] ECF No. 195 (E.Z.'s recorded interview) at 13:49:29.

This is a telling contrast to when E.Z. reviewed James Cloud's line-up, with Detective Williams placing his pen above James Cloud's photo *before* she made a decision.

Police conduct blind line-ups to remove any chance they'll influence the eyewitness—consciously or subconsciously. That didn't happen here and, contrary to the United States' view that nothing bad happened, something did: an unduly suggestive act.

### 4.    It incorrectly explains the detectives' eye contact.

The United States claims E.Z. "didn't even see" the "supposed eye contact" between Detective McIlrath and Detective Williams.[36] Yes, she did. The exchange occurs at 13:48:14. Detective McIlrath (sunglasses) places a pen on James Cloud's photo, asked if E.Z. wanted to "write that on there," and, as she looked straight at Detective McIlrath, Detective McIlrath looked straight at Detective Williams:



The look said it all (they had their guy), and E.Z. saw it. Again, this never would have happened had they conducted an un-blinded line-up.

---

[36] ECF No. 192 at 13.

**D.    The United States muddles *Manson*'s due process framework.**

The United States asserts James Cloud "must first show the existence of police misconduct that was 1) unnecessary and 2) unduly suggestive" before there is "any trial court review of reliability. . . ."[37] This assertion muddles the *Manson* framework in two ways: 1) it conflates it from three steps to two; and 2) it omits reference to the United States' burden.

Before *Perry*,[38] challenging an identification under the due process clause was a two-step process: 1) assessing whether the ID procedure was unnecessarily suggestive; and 2) assessing whether the ID was nevertheless reliable. *See Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984). But *Perry* inserted a new, threshold step: whether the police engaged in misconduct. *See* 565 U.S. at 241. A defendant carries the burden for step 1 (showing police misconduct) and step 2 (showing an unnecessarily suggestive ID); if met, then the United States carries the burden for step 3 (showing ID is nevertheless reliable). *See Bernal v. Colorado*, 44 P.3d 181, 191 (2002) (federal citations omitted).[39]

This is where the United States muddles things: it merges step 1 and step 2,

---

[37] ECF No. 192 at 16.

[38] *Perry v. New Hampshire*, 565 U.S. 228 (2012).

[39] It may seem odd to cite a Colorado Supreme Court opinion, but this opinion explains *Manson's* burden-shifting framework quite well and, for authority, cites exclusively to U.S. Supreme Court and federal precedent.

which you cannot do. The reason: if a defendant fails step 1, then the identification does not—as the United States wrongly claims—go straight to the jury; instead, the Court screens the identification under Rule 403. James Cloud provided a flow chart laying out this process in a separate reply, but will include it again for ease:



The *Manson* framework is three steps, not two.

The United States also omits its own burden for step 3: it must show E.Z.'s ID was nevertheless reliable. *See Bernal*, 44 P.3d at 191. James Cloud wants to clear up this confusion so the Court isn't left with the impression the burden of challenging an identification rests exclusively with James Cloud. It doesn't; it's shared.

**E.    James Cloud carries his burden on step 1: police engaged in misconduct.**

The United States concedes the detectives violated both department policy and best practices (thrice over), but digs in, asserting an un-blinded line-up "does not equate to misconduct."[40] In effect, the United States wants the Court to accept that police can violate department policies and best practices, but so long as the violation isn't intentional, it's fine. The Supreme Court rejected this idea long ago.

"The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes ***improper police conduct***." *Perry*, 565 U.S. at 241 (emphasis added).

Improper. Police. Conduct.

Merriam-Webster defines "improper" as "not in accord with fact, truth, ***or right procedure***."[41]

---

[40] ECF No. 192 at 22.

[41] https://www.merriam-webster.com/dictionary/improper (emphasis added), last accessed on

And that's what happened here. Police (check) conducted (check) a line-up without using the right procedures (check). Improper. Police. Conduct. James Cloud need not ***also*** show the detectives *intentionally* created a suggestive line-up, as the Supreme Court's "precedents make no distinction between intentional and unintentional suggestion. To the contrary, they explicitly state that suggestion can be created intentionally or unintentionally in many subtle ways." *Perry* 565 U.S. at 251 (Sotomayor, J., dissenting) (internal quotations and brackets omitted).

So, to carry step one, James Cloud need only show police failed to act in accordance with procedure. And he did; the United States admitted as much.

Step one is met.

## F. James Cloud carries his burden on step 2: the police's misconduct created an unduly suggestive identification.

The United States asserts the admitted policy violations are a non-issue because the violations "themselves are not suggestive," and reviewing the video shows "they had no influence on E.Z."[42] The United States' arguments are misguided on several fronts.

***First***, the United States presupposes Detective Williams engaged in a

---

Sep. 18, 2020.

[42] ECF No. 192 at 20.

1    perfectly appropriate, fact-based interview with E.Z.—only he didn't.

2    **Second,** the United States presupposes Detective Williams "merely laid down

3    a pen for E.Z. to use to indicate the identification she just made"[43]—only he didn't.

4    Detective Williams placed the pen above James Cloud's photo after E.Z. made ***an***

5    ***exculpatory statement*** (i.e., I don't think he was wearing the red shirt"); he didn't

6    hand the pen to E.Z. with instructions (i.e., please write down what you said); of all

7    the places to put his pen, he sets it above James Cloud's photo (which he wouldn't

8    have been able to do had they conducted a blind line-up); and he engaged in

9    different behaviors when administering Morris Jackson's line-up.

10    **Third**, the United States misunderstands James Cloud's concern about police

11    using ill-fitting fillers. In defending the detectives' decision to include fillers that

12    varied (bigly) in weight, height, hair, and clothing from James Cloud, the United

13    States points to two Ninth Circuit decisions[44] holding line-ups containing ill-fitting

14    fillers still satisfied due process. What the United States fails to mention is that, in

15    *Beck* and *Nash*, the ill-fitting fillers were the *only evidence* the defendants advanced to

16    argue the identifications were impermissibly suggestive. That's not the case here. As

17    set forth above, James Cloud cites many reasons this identification was corrupted.

18

19    _____

[43] ECF No. 192 at 23.

[44] *See U.S. v. Beck*, 418 F.3d 1008 (9th Cir. 2005); *U.S. v. Nash*, 946 F.2d 679 (9th Cir. 1991).

Put differently, police corrupted this identification not through one cut, but many. Our factually-different posture makes the United States' cited authority unhelpful.

**Fourth**, the United States fails to appreciate the science behind blinding. From the United States' comments, it expects corruption to always be readily apparent from the recording (and here, it is).

But in most cases, it isn't; the influence is insidious. This is due to the "expectancy effect," a phenomenon where "experimenters subconsciously and unintentionally shape the results of experiments to fit their expectations." 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1, 13 (Fall 2019). It's small stuff— innocuous words, subtle cues, pauses, gesture, hesitations, and, yes, pen placements—that influence a witness's behavior. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 322 (3d Cir. 2016) (McKee, C.J, concurring). And it's not as though we can interview E.Z. to inquire if she felt pushed to make a particular identification, as "the witness usually remains completely unaware of the signals she has been given or their effect on her identification." *Id.*

So, to be clear, James Cloud feels confident he carried his burden under step 2, as the detectives' overt acts (moralistic lecturing, use of ill-fitting fillers, pen placement, and meaningful exchanges as E.Z. looked on) caused E.Z. to walk back

her exculpatory statement. There's also the unconscious acts by the detectives, as research shows there's a "near zero" chance they didn't somehow influence the line-up on a subconscious level. *Id.* at 322. Taken together, these are unnecessarily suggestive actions.

These subconscious actions raise a problem with the burden. It seems logically (and legally) untenable to require a defendant to point to specific, concrete, corrupted acts from an un-blinded line-up when, as research shows, the corruption is too subtle to notice.

Simply, *Manson's* burden-shifting framework needs an update: when police conduct an un-blinded line-up, courts should automatically find step 2 met. It's the only way to reconcile what science shows about un-blinded line-ups (suggestiveness goes undetected) with a defendant's burden. Such a change is consistent with the due process clause, which aims "to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry*, 565 U.S. at 241.

Without this change, police are rewarded for conducting an un-blinded line-up, as their suggestiveness will be too subtle to detect; they're also rewarded for not recording line-ups, as any chance a defendant may have to show something went wrong is erased—or, more accurately, never recorded to begin with. This is part of what makes the FBI's voluntary decision not to record so troubling.

**G.    The United States fails to carry its burden on step 3: this was an unreliable identification.**

**1.    E.Z. lacked a good opportunity to view.**

The United States claims "E.Z. viewed the Defendant, wearing his red shirt, twice on the day of the murders."[45] In making this claim, the United States forgets E.Z. stated the red-shirted male met them at the gate—and that's Morris Jackson. She also described the red-shirted male as "seemingly white from a distance," but he looked Native the closer he got—an expression she used to describe Morris Jackson.

And that's the problem with the United States' assertions; it looks at E.Z.'s statements in a silo, without reconciling them with what Morris Jackson admitted to during his interviews (i.e., he met the truck at the gate). When you do, it's clear E.Z. isn't describing James Cloud as the red-shirted male, age 19-23, who looked white from a distance; she's describing Morris Jackson.

**2.    E.Z. did not accurately describe James Cloud.**

The United States' failure to reconcile Morris Jackson's admissions with E.Z.'s statements undercuts its second point: E.Z. accurately described James Cloud. No, she didn't. When Detective Williams asked E.Z. to describe the man at

---

[45] ECF No. 192 at 27.

the gate [read: Morris Jackson], this is what E.Z. said:

```
13            DETECTIVE WILLIAMS:  And what did he look like?
14                E       Z      :  He was wearing a red shirt.
15   At first from far away, I thought he was maybe white.  But
16   the closer he got, you could tell he was a Native.
17            DETECTIVE WILLIAMS:  How old about?
18                E       Z      :  Probably like -- I don't
19   know.  I'd say 19 to 23.  Like, he wasn't very old or
20   young.  So like, we -- we backed up.  We left.
```

So the United States ascribes the wrong description to James Cloud; E.Z. was referring to Morris Jackson. Plus, stating the obvious, James Cloud is not "19 to 23," is not chubby, and lacks "puffy or curly dark hair."[46] Not even close.

### 3.    E.Z.'s degree of attention was low.

The United States asserts E.Z. was "just watching the guy in red."[47] If true, then her eyes were apparently trained on Morris Jackson, as that's who she described. And if E.Z. was focused on "the guy in red," she wasn't focused very well, as she stated the red-shirted male shot Mr. LaFollette in the chest with a rifle. But in reality (and there's no dispute on this point), Mr. LaFollette was shot in the shoulder with a shotgun.

---

[46] ECF No. 192 at 29.
[47] ECF No. 192 at 28.

1    The United States also fails to address E.Z.'s repeated uncertainty expressed

2    throughout the interview (e.g., "I don't think," and "I'm not sure"), products of

3    weapons focus, stress, a baby, and drugs.

4    **4.    E.Z. showed no certainty in her identification**

5    The United States claims E.Z. was "certain" about her identification of

6    James Cloud.[48] There are a few problems with this statement.

7    ***First***, the United States misunderstands how this *Biggers* factor (i.e., level of

8    certainty) works. If a witness identifies an individual, what police should do is ask

9    the witness how certain she is about the identification, writing down the answer. It's

10   sometimes referred to as a "confidence statement." This procedure is reflected in

11   the FBI's line-up policy (3.8.3):

12   - (U) The witness need not pick anyone or be certain if he or she does pick
        someone. If the witness make an identification, the investigator will ask how

13     certain the witness is of the identification.

14   It's also reflected in the YCSO's line-up policy (603.4 – (j):

15   (j)    A statement from the witness in the witness's own words describing how certain he/
            she is of the identification or non-identification. This statement should be taken at the

16          time of the identification procedure.

17   The detectives didn't follow this policy either. After E.Z. exculpated James Cloud

18   and then reversed course, they instructed her to write "guy that shot Dennis,"

19   ───────────────
     [48] ECF No. 192 at 30.

                              Reply
                              – 30 –

1  without asking for any confidence statement.

2  Simply, this *Biggers* factor looks to E.Z.'s level of certainty at the time of the

3  line-up, not the United States' subjective interpretation of her certainty afterwards.

4  **Second**, the United States ignores E.Z. was not, in fact, "certain" in her

5  identification, and her initial statement about James Cloud was exculpatory

6  (i.e., "I don't think he was wearing the red shirt).

7  **Third**, the United States ignores courts recognize this *Biggers* factor has been

8  undercut by science. *See*, *e.g., Haliym v. Mitchell*, 492 F.3d 680, 705 n.15 (6th Cir.

9  2007) ("As a matter of law, we acknowledge that the witness' degree of certainty is

10  a relevant factor to consider in determining reliability. We note, however, that

11  empirical evidence on eyewitness identification undercuts the hypothesis that there

12  is a strong correlation between certainty and accuracy.").

13  **5.    The multi-day delay between crime and line-up impacts reliability.**

14  James Cloud agrees a two-day delay, by itself, is not enough to create an

15  unreliable identification. But what the United States does not dispute is the biggest

16  decay in memory happens in the hours after the event. *See*, *e.g.*, *State v. Guilbert*, 49

17  A.3d 705, 721-22 (Conn. 2012) ("Courts across the country now accept that . . . a

18  person's memory diminished rapidly over a period of hours rather than days or

19  weeks."). So it's the two-day delay, when coupled with the myriad of other

reliability concerns (i.e., drugs, weapons focus, stress, cross-racial identification, an initially-exculpatory ID, and opportunity to view) that undercut this identification's reliability.

### III.   Conclusion

Over the course of briefing this identification issue, the Court has been flooded with facts, science, and legal standards. It helps to put these facts in their proper place:

| Facts triggering *Manson* framework (improper police conduct) | Facts showing unnecessarily suggestive ID | Facts showing unreliable ID |
|---|---|---|
| Un-blinded line-up<br><br>Non-sequential line-up | Moralistic lecture<br><br>Doesn't think James Cloud is red-shirted male --> pen bookmark --> reverses<br><br>Eye contact between officers<br><br>Line-up conducted differently than Morris Jackson's<br><br>Ill-fitting fillers<br><br>Un-blinded (so unclear what other cues we missed) | In tinted truck, positioned far away<br><br>Distracted by drugs, weapons, stress, and child<br><br>Description of red-shirted male doesn't fit James Cloud<br><br>Confused James Cloud for Morris Jackson (cross-racial ID)<br><br>Uncertain in ID<br><br>Delay between crime and line-up |

E.Z.'s identification was not, as the United States suggests, a procedurally-proper line-up that lacked any hint of suggestiveness. Because James Cloud carries his

burdens on step 1 and step 2, and the United States cannot show E.Z.'s identification is cured on step 3, he respectfully asks the Court to grant his motion, allowing E.Z. to testify about what she saw, but preventing her from a corrupted in-court identification.

Dated: September 18, 2020

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org

## Service Certificate

I certify that on September 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Thomas J. Hanlon and Richard Burson.

s/ John B. McEntire IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org