

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*

# Eyewitness Evidence

## A Guide for Law Enforcement

*research report*

DEFENDANT'S EXHIBIT

**1010**

**U.S. Department of Justice**
**Office of Justice Programs**
810 Seventh Street N.W.
Washington, DC 20531

**Janet Reno**
*Attorney General*

**Raymond C. Fisher**
*Associate Attorney General*

**Laurie Robinson**
*Assistant Attorney General*

**Noël Brennan**
*Deputy Assistant Attorney General*

**Jeremy Travis**
*Director, National Institute of Justice*

---

**Department of Justice Response Center**
800–421–6770

---

| **Office of Justice Programs** | **National Institute of Justice** |
| **World Wide Web Site** | **World Wide Web Site** |
| *http://www.ojp.usdoj.gov* | *http://www.ojp.usdoj.gov/nij* |

---

DEFENDANT'S EXHIBIT

**1010-2**

# Eyewitness Evidence:
## A Guide for Law Enforcement

Developed and Approved by the
Technical Working Group for Eyewitness Evidence

October 1999

DEFENDANT'S EXHIBIT

**1010-3**

**U.S. Department of Justice**

Office of Justice Programs

**National Institute of Justice**

Jeremy Travis, J.D.

Director

Richard M. Rau, Ph.D.

Project Monitor

This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.

Opinions or points of view expressed in this document represent a consensus of the authors and do not necessarily reflect the official position of the U.S. Department of Justice.

**NCJ 178240**

The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.

**DEFENDANT'S EXHIBIT**

**1010-4**

# Message From the Attorney General

E yewitnesses frequently play a vital role in uncovering the truth about a crime. The evidence they provide can be critical in identifying, charging, and ultimately convicting suspected criminals. That is why it is absolutely essential that eyewitness evidence be accurate and reliable. One way of ensuring we, as investigators, obtain the most accurate and reliable evidence from eyewitnesses is to follow sound protocols in our investigations.

Recent cases in which DNA evidence has been used to exonerate individuals convicted primarily on the basis of eyewitness testimony have shown us that eyewitness evidence is not infallible. Even the most honest and objective people can make mistakes in recalling and interpreting a witnessed event; it is the nature of human memory. This issue has been at the heart of a growing body of research in the field of eyewitness identification over the past decade. The National Institute of Justice convened a technical working group of law enforcement and legal practitioners, together with these researchers, to explore the development of improved procedures for the collection and preservation of eyewitness evidence within the criminal justice system.

This *Guide* was produced with the dedicated and enthusiastic participation of the seasoned professionals who served on the Technical Working Group for Eyewitness Evidence. These 34 individuals brought together knowledge and practical experience from jurisdictions large and small across the United States and Canada. I applaud their effort to work together over the course of a year in developing this consensus of recommended practices for law enforcement.

In developing its eyewitness evidence procedures, every jurisdiction should give careful consideration to the recommendations in this *Guide* and to its own unique local conditions and logistical circumstances. Although factors that vary among investigations, including the nature and quality of other evidence and whether a witness is also a victim of the

DEFENDANT'S EXHIBIT

**1010-5**

iii

crime, may call for different approaches or even preclude the use of certain procedures described in the *Guide*, consideration of the *Guide*'s recommendations may be invaluable to a jurisdiction shaping its own protocols. As such, *Eyewitness Evidence: A Guide for Law Enforcement* is an important tool for refining investigative practices dealing with this evidence as we continue our search for truth.

**Janet Reno**

DEFENDANT'S EXHIBIT

**1010-6**

# Technical Working Group for Eyewitness Evidence

The Technical Working Group for Eyewitness Evidence (TWGEYEE) is a multidisciplinary group of content-area experts from across the United States and Canada, from both urban and rural jurisdictions, each representing his or her respective agency or practice. Each of these individuals is experienced in the use of eyewitness evidence in the criminal justice system from the standpoints of law enforcement, prosecution, defense, or social science.

At the outset of the TWGEYEE effort, the National Institute of Justice (NIJ) created a Planning Panel—composed of distinguished law enforcement, legal, and research professionals—to define needs, develop initial strategies, and steer the larger group. Additional members of the Technical Working Group then were selected from recommendations solicited from the Planning Panel, NIJ's regional National Law Enforcement and Corrections Technology Centers, and national organizations, including the National Sheriffs' Association, the International Association of Chiefs of Police, the National District Attorneys Association, the National Association of Criminal Defense Lawyers, and the National Legal Aid & Defender Association.

Collectively, over a 1-year period, the 34 members of TWGEYEE listed below worked together to develop this handbook, *Eyewitness Evidence: A Guide for Law Enforcement*.

*Planning Panel*

Comdr. Ella M. Bully (Ret.)
Detroit Police Department
Detroit, Michigan

Sgt. Paul Carroll (Ret.)
Chicago Police Department
Chicago, Illinois

Carole E. Chaski, Ph.D.
Institute for Linguistic
   Evidence
Georgetown, Delaware

James Doyle
Attorney at Law
Boston, Massachusetts

Ronald P. Fisher, Ph.D.
Florida International
   University
North Miami, Florida

Mark R. Larson
King County Prosecutor's
   Office
Seattle, Washington

Capt. Donald Mauro
Los Angeles County Sheriff's
   Office
Los Angeles, California

Melissa Mourges
New York County District
   Attorney's Office
New York, New York

Gary L. Wells, Ph.D.
Iowa State University
Ames, Iowa

DEFENDANT'S EXHIBIT

**1010-7** v

### TWGEYEE Members

#### Northeast

Michael J. Barrasse
Lackawanna County District
    Attorney
Scranton, Pennsylvania

Det. Sgt. Chet Bush
Kent County Sheriff's Office
Grand Rapids, Michigan

Solomon M. Fulero, Ph.D., J.D.
Sinclair College
Dayton, Ohio

David C. Niblack
Attorney at Law
Washington, D.C.

Det. Lt. Kenneth A. Patenaude
Northampton Police
    Department
Northampton, Massachusetts

Patricia Ramirez
Dodge County District
    Attorney
Juneau, Wisconsin

Senior Investigator
    Eugene Rifenburg
New York State Police (Ret.)
Oneida Indian Nation Police
Munnsville, New York

Det. Edward Rusticus
Kent County Sheriff's Office
Grand Rapids, Michigan

Capt. Michael B. Wall
Northampton Police
    Department
Northampton, Massachusetts

#### Southeast

Deputy Daniel Alarcon II
Hillsborough County Sheriff's
    Office
Tampa, Florida

First Sgt. Roger Broadbent
Virginia State Police
Fairfax Station, Virginia

Cpl. J.R. Burton
Hillsborough County Sheriff's
    Office
Tampa, Florida

Caterina DiTraglia
State of Missouri
Public Defender System
St. Louis, Missouri

Officer Patricia Marshall
Chicago Police Department
Chicago, Illinois

Det. Ray Staley
Kansas City Police Department
Kansas City, Missouri

Lt. Tami Thomas
Atlantic Beach Police
    Department
Atlantic Beach, North Carolina

#### Rocky Mountain

Det. Sgt. J. Glenn Diviney (Ret.)
Tarrant County Sheriff's
    Office
Fort Worth, Texas

Investigations Chief Arlyn
    Greydanus
Montana Department of
    Justice
Division of Criminal
    Investigation
Helena, Montana

Investigator Kathy Griffin
Loveland Police Department
Loveland, Colorado

Roy S. Malpass, Ph.D.
University of Texas at El Paso
El Paso, Texas

Jeralyn Merritt
Attorney at Law
Denver, Colorado

#### West

James Fox
San Mateo County District
    Attorney
Redwood City, California

William Hodgman
Los Angeles County District
    Attorney's Office
Los Angeles, California

#### Canada

Rod C.L. Lindsay, Ph.D.
Queen's University
Kingston, Ontario

John Turtle, Ph.D.
Ryerson Polytechnic University
Toronto, Ontario

DEFENDANT'S EXHIBIT

**1010-8**

# Acknowledgments

The National Institute of Justice (NIJ) acknowledges with great thanks the members of the Technical Working Group for Eyewitness Evidence (TWGEYEE) for their extensive efforts on this project and their dedication to improving the use of eyewitness evidence in the criminal justice system. All of the 34 members of this network of experts gave their time and expertise to draft and review the *Guide*, providing feedback and perspectives from a variety of disciplines and from all areas of the United States as well as Canada. The true strength of this *Guide* is derived from their commitment to develop procedures that could be implemented across the Nation, from small, rural townships to large, metropolitan areas. In addition, thanks are extended to the agencies and organizations represented by the Technical Working Group members for their flexibility and support, which enabled the participants to see this project through to completion.

NIJ is grateful to all the individuals from various national organizations across the Nation who responded to the request for nominations of experts in the field of eyewitness evidence to serve on TWGEYEE. It was from their recommendations that the members were selected. In particular, thanks are extended to James D. Polley IV of the National District Attorneys Association, Daniel Rosenblatt of the International Association of Chiefs of Police, Stuart Statler of the National Association of Criminal Defense Lawyers, Clinton Lyons of the National Legal Aid & Defender Association, and Aldine N. "Bubby" Moser, Jr., of the National Sheriffs' Association.

NIJ would also like to thank the many individuals and organizations who reviewed the draft of the *Guide* and provided valuable comments. Although these comments were given careful consideration by the Technical Working Group in developing the final document, the review by these organizations and individuals is not intended to imply their endorsement of the *Guide*.

DEFENDANT'S EXHIBIT

**1010-9**

vii

Aspen Systems Corporation, particularly Gayle Garmise and Erica Pope, provided tireless work on editing and re-editing the various drafts of the *Guide*. CSR, Incorporated, provided support in arranging the group's many meetings.

Staff from NIJ and the Office of Justice Programs provided valuable input, particularly Janice Munsterman, Karl Bickel, Luke Galant, and Anjali Swienton. Special thanks are extended to Lisa Forman and Kathleen Higgins for their contributions to the TWG program and to Lisa Kaas for her patience, dedication, endurance, and editing skills that made the work of TWGEYEE easier.

Finally, NIJ would like to acknowledge Attorney General Janet Reno, whose support and commitment to the improvement of the criminal justice system made this work possible.

DEFENDANT'S EXHIBIT

**1010-10**

# Contents

**Message From the Attorney General** ................................................................ **iii**

**Technical Working Group for Eyewitness Evidence** ........................................ **v**

**Acknowledgments** ............................................................................................ **vii**

**Introduction** ...................................................................................................... **1**

**Eyewitness Evidence: A Guide for Law Enforcement** .................................. **11**

**Section I: Initial Report of the Crime/First Responder**
**(Preliminary Investigator)** ......................................................... **13**

   A. Answering the 9–1–1/Emergency Call
      (Call-Taker/Dispatcher) .................................................... 13

   B. Investigating the Scene (Preliminary Investigating Officer) .... 14

   C. Obtaining Information From the Witness(es) ........................... 15

**Section II: Mug Books and Composites** ............................................. **17**

   A. Preparing Mug Books ............................................................ 17

   B. Developing and Using Composite Images ............................... 18

   C. Instructing the Witness .......................................................... 19

   D. Documenting the Procedure .................................................. 20

**Section III: Procedures for Interviewing the Witness by the**
**Followup Investigator** ................................................................ **21**

   A. Preinterview Preparations and Decisions ................................ 21

   B. Initial (Preinterview) Contact With the Witness ...................... 22

   C. Conducting the Interview ....................................................... 22

   D. Recording Witness Recollections ............................................ 23

   E. Assessing the Accuracy of Individual Elements of a
      Witness' Statement ............................................................ 24

   F. Maintaining Contact With the Witness ................................... 25

DEFENDANT'S EXHIBIT

**1010-11**

ix

**Section IV: Field Identification Procedure (Showup) ........................ 27**

A. Conducting Showups ............................................................... 27

B. Recording Showup Results ..................................................... 28

**Section V: Procedures for Eyewitness Identification of Suspects ..... 29**

A. Composing Lineups ................................................................ 29

*Photo Lineup* ........................................................................ 29

*Live Lineup* .......................................................................... 30

B. Instructing the Witness Prior to Viewing a Lineup ................... 31

*Photo Lineup* ........................................................................ 31

*Live Lineup* .......................................................................... 32

C. Conducting the Identification Procedure ................................. 33

*Simultaneous Photo Lineup* ................................................... 33

*Sequential Photo Lineup* ....................................................... 34

*Simultaneous Live Lineup* ..................................................... 35

*Sequential Live Lineup* .......................................................... 36

D. Recording Identification Results ............................................. 38

**Appendixes ........................................................................... 39**

**Appendix A: Further Reading ..................................................... 41**

**Appendix B: Reviewer List ........................................................ 43**

X

DEFENDANT'S EXHIBIT

**1010-12**

# Introduction

The legal system always has relied on the testimony of eyewitnesses, nowhere more than in criminal cases. Although the evidence eyewitnesses provide can be tremendously helpful in developing leads, identifying criminals, and exonerating the innocent, this evidence is not infallible. Even honest and well-meaning witnesses can make errors, such as identifying the wrong person or failing to identify the perpetrator of a crime.

To their credit, the legal system and law enforcement agencies have not overlooked this problem. Numerous courts and rulemaking bodies have, at various times, designed and instituted special procedures to guard against eyewitness mistakes. Most State and local law enforcement agencies have established their own policies, practices, and training protocols with regard to the collection and handling of eyewitness evidence, many of which are quite good.

In the past, these procedures have not integrated the growing body of psychological knowledge regarding eyewitness evidence with the practical demands of day-to-day law enforcement. In an effort to bring together the perspectives of law enforcement, lawyers, and researchers, the National Institute of Justice (NIJ) convened the Technical Working Group for Eyewitness Evidence (TWGEYEE). The purpose of the group was to recommend uniform practices for the collection and preservation of eyewitness evidence.

This *Guide* differs from earlier efforts in several fundamental ways:

**This *Guide* is supported by social science research.** During the past 20 years, research psychologists have produced a substantial body of findings regarding eyewitness evidence. These findings offer the legal system a valuable body of empirical knowledge in the area of eyewitness evidence. This *Guide* makes use of psychological findings, either by including them in the procedures themselves or by using them to point

DEFENDANT'S EXHIBIT

**1010-13** 1

the way to the design and development of further improvements in procedures and practices for possible inclusion in future amendments or revisions to this document.

**This *Guide* combines research and practical perspectives.** The growth of social science research into the eyewitness process coincided with parallel efforts of law enforcement agencies to improve their own procedures. This *Guide* benefits from the inclusion of the diverse perspectives of TWGEYEE members; the group included not only researchers but also prosecutors, defense lawyers, and working police investigators from departments of all sizes and from all regions. This *Guide* represents a combination of the best current, workable police practices and psychological research.

**This *Guide* does not flow from the fear of misconduct.** This *Guide* assumes good faith by law enforcement. It identifies procedures and practices that will produce more reliable and accurate eyewitness evidence in a greater number of cases while reducing or eliminating practices that can undermine eyewitness reliability and accuracy.

**This *Guide* promotes accuracy in eyewitness evidence.** This *Guide* describes practices and procedures that, if consistently applied, will tend to increase the accuracy and reliability of eyewitness evidence, even though they cannot guarantee the accuracy (or inaccuracy) of a particular witness' testimony in a particular case. Adherence to these procedures can decrease the number of wrongful identifications and should help to ensure that reliable eyewitness evidence is given the weight it deserves in legal proceedings.

**This *Guide* is not a legal mandate; it promotes sound professional practices.** The *Guide* is not intended to state legal criteria for the admissibility of evidence. Rather, it sets out rigorous criteria for handling eyewitness evidence that are as demanding as those governing the handling of physical trace evidence. This *Guide* encourages the highest levels of professionalism.

Finally, it should be noted that, while this *Guide* outlines basic procedures that can be used to obtain the most reliable and accurate informa-

2

DEFENDANT'S EXHIBIT

**1010-14**

tion from eyewitnesses, it is not meant as a substitute for a thorough investigation by law enforcement personnel. Eyewitness evidence is often viewed as a critical piece of the investigative puzzle, the utility of which can be further enhanced by the pursuit of other corroborative evidence. Sometimes, even after a thorough investigation, an eyewitness identification is the sole piece of evidence. It is in those cases in particular where careful use of this *Guide* may be most important.

## Purpose and Scope of the Project

After reviewing the National Institute of Justice Research Report, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial*, Attorney General Janet Reno directed NIJ to address the pitfalls in those investigations that may have contributed to wrongful convictions. The most compelling evidence in the majority of those 28 cases was the eyewitness testimony presented at trial.

NIJ initiated this study in May 1998 with the primary purpose of recommending best practices and procedures for the criminal justice community to employ in investigations involving eyewitnesses. Using its "Template for Technical Working Groups," NIJ established the Technical Working Group for Eyewitness Evidence to identify, define, and assemble a set of investigative tasks that should be performed in every investigation involving eyewitness evidence to best ensure the accuracy and reliability of this evidence. The initial members of this group were the Planning Panel, a multidisciplinary group of nine professionals brought together to identify the needs of the criminal justice system in the area of eyewitness evidence, define goals and objectives for TWGEYEE, and develop the initial strategy for achieving TWGEYEE's mission.

The Planning Panel agreed that eyewitness evidence, in general, can be improved and made more reliable through the application of currently accepted scientific principles and practices. It was acknowledged that research has shown that a witness' memory of an event can be fragile

DEFENDANT'S EXHIBIT

**1010-15** 3

and that the amount and accuracy of information obtained from a witness depends in part on the method of questioning. Based on these precepts, the following goals and objectives for the study were identified:

◆ Increase the amount of information elicited from witnesses through improved interview techniques.

◆ Heighten the validity/accuracy of eyewitness evidence as police, prosecutors, and other criminal justice professionals work with witnesses to identify suspects.

◆ Improve the criminal justice system's ability to evaluate the strength and accuracy of eyewitness evidence.

Although the development of a guide for eyewitness evidence can be instructive in addressing issues surrounding this evidence, the Planning Panel recognized that local logistical and legal conditions may dictate the use of alternative procedures. Further, eyewitness identification procedures that do not employ the practices recommended in this *Guide* will not necessarily invalidate or detract from the evidence in a particular case.

## Project Design

**Technical Working Group process.** The National Institute of Justice has developed a template for technical working groups that has been successfully used in previous studies of this nature. The process begins with a request from the criminal justice community, generally through the Attorney General; NIJ researches the issue of concern and assembles a planning panel of content-area experts. This panel, together with NIJ, determines whether a Technical Working Group is needed to explore the issue further.

Once the decision is made to form a Technical Working Group, the planning panel determines the group's size and composition and drafts an agenda. NIJ supports the planning panel by requesting member nominations from its multidisciplinary membership resource pool throughout the

4

DEFENDANT'S EXHIBIT

**1010-16**

national criminal justice community based on regional distribution and individual expertise and availability.

Once members are identified, meetings are conducted by designated planning panel members. NIJ maintains a purely facilitative function.

The Planning Panel for Eyewitness Evidence met for the first time in May 1998 in Washington, D.C. After two planning meetings (the second in Oak Brook, Illinois), the Technical Working Group for Eyewitness Evidence was formed and convened for the first time in October 1998 in Chicago. The 34 TWGEYEE members (including the 9 Planning Panel members) represent the law enforcement, prosecution, defense, and research communities from across the United States and Canada.

DEFENDANT'S EXHIBIT

**1010-17**

5



The regional distribution of the Technical Working Group members is:

| Region | Number of Participants | Percentage of Total |
|--------|----------------------|---------------------|
| Northeast | 14 | 41 |
| Southeast | 9 | 26 |
| Rocky Mountain | 5 | 15 |
| West | 4 | 12 |
| Canada | 2 | 6 |

The disciplinary distribution of the Technical Working Group members is:

| Discipline | Number of Participants (Full TWG/ Planning Panel) | Percentage of Total (Full TWG/ Planning Panel |
|------------|---------------------------------------------------|-----------------------------------------------|
| Law Enforcement | 17/3 | 50/33.3 |
| Prosecutors | 6/2 | 18/22.2 |
| Defense Lawyers | 4/1 | 12/11.1 |
| Researchers | 7/3 | 20/33.3 |

6

DEFENDANT'S EXHIBIT

**1010-18**

**Development of the *Guide*.** During the course of three full meetings—the second in Washington, D.C., in January 1999 and the third in San Francisco in May 1999—and four Planning Panel meetings during a 1-year period, the Technical Working Group for Eyewitness Evidence members identified specific investigative tasks they felt represented the best practices currently available to investigators. These tasks were organized based on the categories of investigation defined by the Planning Panel, and these categories were modified during the process where necessary. Once specific tasks were identified, they were incorporated into the following format:

◆ A statement of *principle* citing what is accomplished by performing the procedure.

◆ A statement of *policy* to the investigator regarding performance of the procedure.

◆ The *procedure* for performing the list of tasks.

◆ A *summary* statement explaining the justification for and importance of performing the procedure.

**National reviewer network.** After the Technical Working Group completed the initial draft of the *Guide* in March 1999, it was distributed to a broad audience throughout the criminal justice community for review. Comments from these organizations and individuals then were considered by TWGEYEE at its May 1999 meeting to finalize and approve the *Guide* for publication.

The 95 organizations and individuals whose comments were solicited during the national review of the *Guide* represented all levels of law enforcement from local officers to State superintendents to Federal agencies, regional and national organizations, individual attorneys and judges, and social science researchers from around the United States and Canada. The disciplinary distribution of these reviewers was as follows: 43 law enforcement and corrections agencies and organizations; 20 prosecutors, defense lawyers, and judges (individuals and organizations); 19 national law enforcement and legislative policy organizations; and

DEFENDANT'S EXHIBIT

**1010-19**

7

13 individual social science and legal researchers (a complete list of reviewers can be found in appendix B).

## Training Criteria

NIJ is planning a second phase of this study to produce training criteria for each of the procedures included in this document. This research is expected to be completed and disseminated by the summer of 2000. TWGEYEE members and other training practitioners from around the Nation will define and verify minimum levels of performance for each procedure. The training criteria will be published and widely distributed to provide organizations and individuals with the materials needed to establish and maintain the knowledge and skills for performance of the procedures.

## Validation of the Guide

Although the investigative tasks identified in this *Guide* represent the consensus of the TWGEYEE members on procedures for collection and preservation of eyewitness evidence, no attempt was made to conduct validation studies to state the significance or degree of improvement in eyewitness evidence these practices should be expected to yield. NIJ plans to develop a national validation strategy for the field testing and validation of each procedure. It should be noted that the existing *Guide* is subject to future modification or revision based on the outcome of these validation procedures.

## Future Considerations

Advances in social science and technology will, over time, affect procedures used to gather and preserve eyewitness evidence. The following examples illustrate areas of potential change.

8

DEFENDANT'S EXHIBIT

**1010-20**

Scientific research indicates that identification procedures such as lineups and photo arrays produce more reliable evidence when the individual lineup members or photographs are shown to the witness sequentially—one at a time—rather than simultaneously. Although some police agencies currently use sequential methods of presentation, there is not a consensus on any particular method or methods of sequential presentation that can be recommended as a *preferred* procedure; although sequential procedures are included in the *Guide*, it does not indicate a preference for sequential procedures.

Similarly, investigators' unintentional cues (e.g., body language, tone of voice) may negatively impact the reliability of eyewitness evidence. Psychology researchers have noted that such influences could be avoided if "blind" identification procedures were employed (i.e., procedures conducted by investigators who do not know the identity of the actual suspect). However, blind procedures, which are used in science to prevent inadvertent contamination of research results, may be impractical for some jurisdictions to implement. Blind procedures are not included in the *Guide* but are identified as a direction for future exploration and field testing. In the interim, an enhanced awareness on the part of investigators of the subtle impact they may have on witnesses will result in more professional identification procedures.

Technological advances such as computer-based imaging systems and the Internet will enable law enforcement to share images among departments and can facilitate the use of improved procedures. This *Guide* is not meant to inhibit the development and field testing of new technologies and procedures. On the contrary, it anticipates those developments and can provide a framework for innovation.

DEFENDANT'S EXHIBIT

**1010-21**

9

# Eyewitness Evidence: A Guide for Law Enforcement

| Section I | Initial Report of the Crime/First Responder (Preliminary Investigator) |

| Section II | Mug Books and Composites |

| Section III | Procedures for Interviewing the Witness by the Followup Investigator |

| Section IV | Field Identification Procedure (Showup) |

| Section V | Procedures for Eyewitness Identification of Suspects |

DEFENDANT'S EXHIBIT

**1010-22** 11

> **This handbook is intended as a guide to recommended practices for the collection and preservation of eyewitness evidence.**
>
> **Jurisdictional, logistical, or legal conditions may preclude the use of particular procedures contained herein.**

12

DEFENDANT'S EXHIBIT

**1010-23**

## Section I. Initial Report of the Crime/First Responder (Preliminary Investigator)

### A.       Answering the 9–1–1/Emergency Call (Call-Taker/Dispatcher)



**Principle:**   As the initial point of contact for the witness, the 9–1–1/emergency call-taker or dispatcher must obtain and disseminate, in a nonsuggestive manner, complete and accurate information from the caller. This information can include the description/identity of the perpetrator of a crime. The actions of the call-taker/dispatcher can affect the safety of those involved as well as the entire investigation.

**Policy:**   The call-taker/dispatcher shall answer each call in a manner conducive to obtaining and disseminating accurate information regarding the crime and the description/identity of the perpetrator.

**Procedure:**   During a 9–1–1/emergency call—after obtaining preliminary information and dispatching police—the call-taker/dispatcher should:

1.  Assure the caller the police are on the way.

2.  Ask open-ended questions (e.g., "What can you tell me about the car?"); augment with closed-ended questions (e.g., "What color was the car?").

3.  Avoid asking suggestive or leading questions (e.g., "Was the car red?").

4.  Ask if anything else should be known about the incident.

5.  Transmit information to responding officer(s).

6.  Update officer(s) as more information comes in.

**DEFENDANT'S EXHIBIT**

**1010-24**

13

A. Answering the 9–1–1/Emergency Call (Call-Taker/Dispatcher)

**Summary:**  The information obtained from the witness is critical to the safety of those involved and may be important to the investigation. The manner in which facts are elicited from a caller can influence the accuracy of the information obtained.

# B. Investigating the Scene (Preliminary Investigating Officer)

**Principle:**  Preservation and documentation of the scene, including information from witnesses and physical evidence, are necessary for a thorough preliminary investigation. The methods used by the preliminary investigating officer have a direct impact on the amount and accuracy of the information obtained throughout the investigation.

**Policy:**  The preliminary investigating officer shall obtain, preserve, and use the maximum amount of accurate information from the scene.

**Procedure:**  After securing the scene and attending to any victims and injured persons, the preliminary investigating officer should:

1. Identify the perpetrator(s).

   a. Determine the location of the perpetrator(s).

   b. Detain or arrest the perpetrator(s) if still present at the scene.

2. Determine/classify what crime or incident has occurred.

3. Broadcast an updated description of the incident, perpetrator(s), and/or vehicle(s).

4. Verify the identity of the witness(es).

14

DEFENDANT'S EXHIBIT

**1010-25**

5.  Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses.

6.  Canvass the area for other witnesses.

**Summary:**    The preliminary investigation at the scene forms a sound basis for the accurate collection of information and evidence during the followup investigation.

# C.    Obtaining Information From the Witness(es)

**Principle:**    The manner in which the preliminary investigating officer obtains information from a witness has a direct impact on the amount and accuracy of that information.

**Policy:**    The preliminary investigating officer shall obtain and accurately document and preserve information from the witness(es).

**Procedure:**    When interviewing a witness, the preliminary investigating officer should:

1.  Establish rapport with the witness.

2.  Inquire about the witness' condition.

3.  Use open-ended questions (e.g., "What can you tell me about the car?"); augment with closed-ended questions (e.g., "What color was the car?"). Avoid leading questions (e.g., "Was the car red?").

4.  Clarify the information received with the witness.

5.  Document information obtained from the witness, including the witness' identity, in a written report.

6.  Encourage the witness to contact investigators with any further information.

DEFENDANT'S EXHIBIT

**1010-26**

15

### C. Obtaining Information From the Witness(es)

7.  Encourage the witness to avoid contact with the media or exposure to media accounts concerning the incident.

8.  Instruct the witness to avoid discussing details of the incident with other potential witnesses.

**Summary:**    Information obtained from the witness can corroborate other evidence (e.g., physical evidence, accounts provided by other witnesses) in the investigation. Therefore, it is important that this information be accurately documented in writing.

16

DEFENDANT'S EXHIBIT

**1010-27**

## Section II. Mug Books and Composites

## A.        Preparing Mug Books

**Note:**        *"Mug books" (i.e., collections of photos of previously arrested persons) may be used in cases in which a suspect has not yet been determined and other reliable sources have been exhausted. This technique may provide investigative leads, but results should be evaluated with caution.*



**Principle:**        Nonsuggestive composition of a mug book may enable the witness to provide a lead in a case in which no suspect has been determined and other reliable sources have been exhausted.

**Policy:**        The investigator/mug book preparer shall compose the mug book in such a manner that individual photos are not suggestive.

**Procedure:**        In selecting photos to be preserved in a mug book, the preparer should:

1. Group photos by format (e.g., color or black and white; Polaroid, 35mm, or digital; video) to ensure that no photo unduly stands out.

2. Select photos of individuals that are uniform with regard to general physical characteristics (e.g., race, age, sex).

3. Consider grouping photos by specific crime (e.g., sexual assault, gang activity).

4. Ensure that positive identifying information exists for all individuals portrayed.

5. Ensure that photos are reasonably contemporary.

6. Ensure that only one photo of each individual is in the mug book.

DEFENDANT'S EXHIBIT
**1010-28**

17

A.  Preparing Mug Books

**Summary:**    Mug books must be objectively compiled to yield
investigative leads that will be admissible in court.

# B.    Developing and Using Composite Images

*Note:*    *Composite images can be beneficial investigative tools;
however, they should not be used as stand-alone
evidence and may not rise to the level of probable cause.*

**Principle:**    Composites provide a depiction that may be used to
develop investigative leads.

**Policy:**    The person preparing the composite shall select and
employ the composite technique in such a manner that
the witness' description is reasonably depicted.

**Procedure:**    The person preparing the composite should:

1.  Assess the ability of the witness to provide a description of the
perpetrator.

2.  Select the procedure to be used from those available (e.g.,
identikit-type, artist, or computer-generated images).

3.  Unless part of the procedure, avoid showing the witness any
photos immediately prior to development of the composite.

4.  Select an environment for conducting the procedure that mini-
mizes distractions.

5.  Conduct the procedure with each witness separately.

6.  Determine with the witness whether the composite is a reasonable
representation of the perpetrator.

18

DEFENDANT'S EXHIBIT

**1010-29**

**Summary:**     The use of composite images can yield investigative leads in cases in which no suspect has been determined. Use of these procedures can facilitate obtaining from the witness a description that will enable the development of a reasonable likeness of the perpetrator.

## C.        Instructing the Witness

**Principle:**     Instructions to the witness prior to conducting the procedure can facilitate the witness' recollection of the perpetrator.

**Policy:**     The investigator/person conducting the procedure shall provide instructions to the witness prior to conducting the procedure.

**Procedure:**

*Mug Book:*     The investigator/person conducting the procedure should:

1. Instruct each witness without other persons present.

2. Describe the mug book to the witness only as a "collection of photographs."

3. Instruct the witness that the person who committed the crime may or may not be present in the mug book.

4. Consider suggesting to the witness to think back to the event and his/her frame of mind at the time.

5. Instruct the witness to select a photograph if he/she can and to state how he/she knows the person if he/she can.

6. Assure the witness that regardless of whether he/she makes an identification, the police will continue to investigate the case.

7. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

DEFENDANT'S EXHIBIT

**1010-30**

19

### C.  Instructing the Witness

***Composite:***      The investigator/person conducting the procedure should:

1.  Instruct each witness without other persons present.

2.  Explain the type of composite technique to be used.

3.  Explain to the witness how the composite will be used in the investigation.

4.  Instruct the witness to think back to the event and his/her frame of mind at the time.

**Summary:**      Providing instructions to the witness can improve his/her comfort level and can result in information that may assist the investigation.

# D.           Documenting the Procedure

**Principle:**      Documentation of the procedure provides an accurate record of the results obtained from the witness.

**Policy:**      The person conducting the procedure shall preserve the outcome of the procedure by accurately documenting the type of procedure(s) employed and the results.

**Procedure:**      The person conducting the procedure should:

1.  Document the procedure employed (e.g., identikit-type, mug book, artist, or computer-generated image) in writing.

2.  Document the results of the procedure in writing, including the witness' own words regarding how certain he/she is of any identification.

3.  Document items used and preserve composites generated.

**Summary:**      Documentation of the procedure and its outcome improves the strength and credibility of the results obtained from the witness and can be an important factor in the investigation and any subsequent court proceedings.

20

DEFENDANT'S EXHIBIT

**1010-31**

## Section III. Procedures for Interviewing the Witness by the Followup Investigator

## A.      Preinterview Preparations and Decisions

**Principle:**    Preparing for an interview maximizes the effectiveness of witness participation and interviewer efficiency.

**Policy:**    The investigator shall review all available witness and case information and arrange an efficient and effective interview.

**Procedure:**    Prior to conducting the interview, the investigator should:

III

1. Review available information.

2. Plan to conduct the interview as soon as the witness is physically and emotionally capable.

3. Select an environment that minimizes distractions while maintaining the comfort level of the witness.

4. Ensure resources are available (e.g., notepad, tape recorder, camcorder, interview room).

5. Separate the witnesses.

6. Determine the nature of the witness' prior law enforcement contact.

**Summary:**    Performing the above preinterview preparations will enable the investigator to elicit a greater amount of accurate information during the interview, which may be critical to the investigation.

DEFENDANT'S EXHIBIT

**1010-32**

21

## B.  Initial (Preinterview) Contact With the Witness

**Principle:**  A comfortable witness provides more information.

**Policy:**  Investigators shall conduct themselves in a manner conducive to eliciting the most information from the witness.

**Procedure:**  On meeting with the witness but prior to beginning the interview, the investigator should:

1. Develop rapport with the witness.

2. Inquire about the nature of the witness' prior law enforcement contact related to the incident.

3. Volunteer no specific information about the suspect or case.

**Summary:**  Establishing a cooperative relationship with the witness likely will result in an interview that yields a greater amount of accurate information.

## C.  Conducting the Interview

**Principle:**  Interview techniques can facilitate witness memory and encourage communication both during and following the interview.

**Policy:**  The investigator shall conduct a complete, efficient, and effective interview of the witness and encourage postinterview communication.

**Procedure:**  During the interview, the investigator should:

1. Encourage the witness to volunteer information without prompting.

2. Encourage the witness to report all details, even if they seem trivial.

22

DEFENDANT'S EXHIBIT

**1010-33**

3. Ask open-ended questions (e.g., "What can you tell me about the car?"); augment with closed-ended, specific questions (e.g., "What color was the car?").

4. Avoid leading questions (e.g., "Was the car red?").

5. Caution the witness not to guess.

6. Ask the witness to mentally recreate the circumstances of the event (e.g., "Think about your feelings at the time").

7. Encourage nonverbal communication (e.g., drawings, gestures, objects).

8. Avoid interrupting the witness.

9. Encourage the witness to contact investigators when additional information is recalled.

10. Instruct the witness to avoid discussing details of the incident with other potential witnesses.

11. Encourage the witness to avoid contact with the media or exposure to media accounts concerning the incident.

12. Thank the witness for his/her cooperation.

**Summary:**   Information elicited from the witness during the interview may provide investigative leads and other essential facts. The above interview procedures will enable the witness to provide the most accurate, complete description of the event and encourage the witness to report later recollections. Witnesses commonly recall additional information after the interview that may be critical to the investigation.

# D.        Recording Witness Recollections

**Principle:**   The record of the witness' statements accurately and completely reflects all information obtained and preserves the integrity of this evidence.

DEFENDANT'S EXHIBIT

**1010-34**   23

D.  Recording Witness Recollections

**Policy:**      The investigator shall provide complete and accurate documentation of all information obtained from the witness.

**Procedure:**      During or as soon as reasonably possible after the interview, the investigator should:

1.  Document the witness' statements (e.g., audio or video recording, stenographer's documentation, witness' written statement, written summary using witness' own words).

2.  Review written documentation; ask the witness if there is anything he/she wishes to change, add, or emphasize.

**Summary:**      Complete and accurate documentation of the witness' statement is essential to the integrity and success of the investigation and any subsequent court proceedings.

# E.      Assessing the Accuracy of Individual Elements of a Witness' Statement

**Principle:**      Point-by-point consideration of a statement may enable judgment on which components of the statement are most accurate. This is necessary because each piece of information recalled by the witness may be remembered independently of other elements.

**Policy:**      The investigator shall review the individual elements of the witness' statement to determine the accuracy of each point.

**Procedure:**      After conducting the interview, the investigator should:

1.  Consider each individual component of the witness' statement separately.

24

DEFENDANT'S EXHIBIT

**1010-35**

2.  Review each element of the witness' statement in the context of the entire statement. Look for inconsistencies within the statement.

3.  Review each element of the statement in the context of evidence known to the investigator from other sources (e.g., other witnesses' statements, physical evidence).

**Summary:**  Point-by-point consideration of the accuracy of each element of a witness' statement can assist in focusing the investigation. This technique avoids the common misconception that the accuracy of an individual element of a witness' description predicts the accuracy of another element.

# F.        Maintaining Contact With the Witness

**Principle:**  The witness may remember and provide additional information after the interview has concluded.

**Policy:**  The investigator shall maintain open communication to allow the witness to provide additional information.

**Procedure:**  During postinterview, followup contact with the witness, the investigator should:

1.  Reestablish rapport with the witness.

2.  Ask the witness if he/she has recalled any additional information.

3.  Follow interviewing and documentation procedures in subsections C, "Conducting the Interview," and D, "Recording Witness Recollections."

4.  Provide no information from other sources.

**Summary:**  Reestablishing contact and rapport with the witness often leads to recovery of additional information. Maintaining open communication channels with the witness throughout the investigation is critical.

DEFENDANT'S EXHIBIT

**1010-36**

25

## Section IV. Field Identification Procedure (Showup)

### A.    Conducting Showups

**Principle:**    When circumstances require the prompt display of a single suspect to a witness, the inherent suggestiveness of the encounter can be minimized through the use of procedural safeguards.

**Policy:**    The investigator shall employ procedures that avoid prejudicing the witness.

**Procedure:**    When conducting a showup, the investigator should:

1. Determine and document, prior to the showup, a description of the perpetrator.

2. Consider transporting the witness to the location of the detained suspect to limit the legal impact of the suspect's detention.



3. When multiple witnesses are involved:

   a. Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses.

   b. If a positive identification is obtained from one witness, consider using other identification procedures (e.g., lineup, photo array) for remaining witnesses.

4. Caution the witness that the person he/she is looking at may or may not be the perpetrator.

5. Obtain and document a statement of certainty for both identifications and nonidentifications.

**Summary:**    The use of a showup can provide investigative information at an early stage, but the inherent suggestiveness of a showup requires careful use of procedural safeguards.

DEFENDANT'S EXHIBIT

**1010-37**    27

## B.            Recording Showup Results

**Principle:**     The record of the outcome of the field identification
procedure accurately and completely reflects the identifi-
cation results obtained from the witness.

**Policy:**     When conducting a showup, the investigator shall
preserve the outcome of the procedure by documenting
any identification or nonidentification results obtained
from the witness.

**Procedure:**     When conducting a showup, the investigator should:

1. Document the time and location of the procedure.

2. Record both identification and nonidentification results in writing,
including the witness' own words regarding how certain he/she is.

**Summary:**     Preparing a complete and accurate record of the outcome
of the showup improves the strength and credibility of
the identification or nonidentification results obtained
from the witness and can be a critical document in the
investigation and any subsequent court proceedings.

28

DEFENDANT'S EXHIBIT

**1010-38**

# Section V. Procedures for Eyewitness Identification of Suspects

## A.        Composing Lineups

**Principle:**   Fair composition of a lineup enables the witness to provide a more accurate identification or nonidentification.

**Policy:**   The investigator shall compose the lineup in such a manner that the suspect does not unduly stand out.

**Procedure:**

***Photo Lineup:***  In composing a photo lineup, the investigator should:

1.  Include only one suspect in each identification procedure.

2.  Select fillers who generally fit the witness' description of the perpetrator. When there is a limited/inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.

3.  If multiple photos of the suspect are reasonably available to the investigator, select a photo that resembles the suspect description or appearance at the time of the incident.

4.  Include a *minimum* of five fillers (nonsuspects) per identification procedure.

5.  Consider that complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers.

6.  Create a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos)

**V**

DEFENDANT'S EXHIBIT

**1010-39**  29

### A. Composing Lineups

used to describe the perpetrator by artificially adding or conceal-ing that feature.

7. Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly in the lineup.

8. When showing a new suspect, avoid reusing fillers in lineups shown to the same witness.

9. Ensure that no writings or information concerning previous arrest(s) will be visible to the witness.

10. View the spread, once completed, to ensure that the suspect does not unduly stand out.

11. Preserve the presentation order of the photo lineup. In addition, the photos themselves should be preserved in their original condition.

*Live Lineup:*    In composing a live lineup, the investigator should:

1. Include only one suspect in each identification procedure.

2. Select fillers who generally fit the witness' description of the perpetrator. When there is a limited/inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the sus-pect, fillers should resemble the suspect in significant features.

3. Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly unless, where local practice allows, the suspect or the suspect's attorney requests a particular position.

4. Include a *minimum* of four fillers (nonsuspects) per identification procedure.

5. When showing a new suspect, avoid reusing fillers in lineups shown to the same witness.

30

DEFENDANT'S EXHIBIT

**1010-40**

6. Consider that complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers.

7. Create a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature.

**Summary:** The above procedures will result in a photo or live lineup in which the suspect does not unduly stand out. An identification obtained through a lineup composed in this manner may have stronger evidentiary value than one obtained without these procedures.

## B.    Instructing the Witness Prior to Viewing a Lineup

**Principle:** Instructions given to the witness prior to viewing a lineup can facilitate an identification or nonidentification based on his/her own memory.

**Policy:** Prior to presenting a lineup, the investigator shall provide instructions to the witness to ensure the witness understands that the purpose of the identification procedure is to exculpate the innocent as well as to identify the actual perpetrator.

**Procedure:**

*Photo Lineup:* Prior to presenting a photo lineup, the investigator should:

1. Instruct the witness that he/she will be asked to view a set of photographs.

DEFENDANT'S EXHIBIT

**1010-41**

31

### B. Instructing the Witness Prior to Viewing a Lineup

2. Instruct the witness that it is just as important to clear innocent persons from suspicion as to identify guilty parties.

3. Instruct the witness that individuals depicted in lineup photos may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.

4. Instruct the witness that the person who committed the crime may or may not be in the set of photographs being presented.

5. Assure the witness that regardless of whether an identification is made, the police will continue to investigate the incident.

6. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

***Live Lineup:***    Prior to presenting a live lineup, the investigator should:

1. Instruct the witness that he/she will be asked to view a group of individuals.

2. Instruct the witness that it is just as important to clear innocent persons from suspicion as to identify guilty parties.

3. Instruct the witness that individuals present in the lineup may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.

4. Instruct the witness that the person who committed the crime may or may not be present in the group of individuals.

5. Assure the witness that regardless of whether an identification is made, the police will continue to investigate the incident.

6. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

32

> **DEFENDANT'S EXHIBIT**
> **1010-42**

**Summary:**    Instructions provided to the witness prior to presentation of a lineup will likely improve the accuracy and reliability of any identification obtained from the witness and can facilitate the elimination of innocent parties from the investigation.

## C.    Conducting the Identification Procedure

**Principle:**    The identification procedure should be conducted in a manner that promotes the reliability, fairness, and objectivity of the witness' identification.

**Policy:**    The investigator shall conduct the lineup in a manner conducive to obtaining accurate identification or nonidentification decisions.

**Procedure:**

***Simultaneous***
***Photo Lineup:***    When presenting a simultaneous photo lineup, the investigator should:

1. Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2. Confirm that the witness understands the nature of the lineup procedure.

3. Avoid saying anything to the witness that may influence the witness' selection.

4. If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

5. Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

DEFENDANT'S EXHIBIT

**1010-43**  33

### C. Conducting the Identification Procedure

6. Document in writing the photo lineup procedures, including:

   a. Identification information and sources of all photos used.

   b. Names of all persons present at the photo lineup.

   c. Date and time of the identification procedure.

7. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

**Sequential**
**Photo Lineup:** When presenting a sequential photo lineup, the investigator should:

1. Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2. Provide the following *additional* viewing instructions to the witness:

   a. Individual photographs will be viewed *one at a time*.

   b. The photos are in random order.

   c. Take as much time as needed in making a decision about each photo before moving to the next one.

   d. All photos will be shown, even if an identification is made; **or** the procedure will be stopped at the point of an identification (consistent with jurisdictional/departmental procedures).

3. Confirm that the witness understands the nature of the sequential procedure.

4. Present each photo to the witness separately, in a previously determined order, removing those previously shown.

5. Avoid saying anything to the witness that may influence the witness' selection.

34

DEFENDANT'S EXHIBIT
**1010-44**

6.  If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

7.  Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

8.  Document in writing the photo lineup procedures, including:

    a.  Identification information and sources of all photos used.

    b.  Names of all persons present at the photo lineup.

    c.  Date and time of the identification procedure.

9.  Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

**Simultaneous**
**Live Lineup:**     When presenting a simultaneous live lineup, the investigator/lineup administrator should:

1.  Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2.  Instruct all those present at the lineup not to suggest in any way the position or identity of the suspect in the lineup.

3.  Ensure that any identification actions (e.g., speaking, moving) are performed by all members of the lineup.

4.  Avoid saying anything to the witness that may influence the witness' selection.

5.  If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

DEFENDANT'S EXHIBIT

**1010-45**   35

### C.  Conducting the Identification Procedure

6.  Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

7.  Document the lineup in writing, including:

   a.   Identification information of lineup participants.

   b.   Names of all persons present at the lineup.

   c.   Date and time the identification procedure was conducted.

8.  Document the lineup by photo or video. This documentation should be of a quality that represents the lineup clearly and fairly.

9.  Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

**Sequential**
**Live Lineup:**    When presenting a sequential live lineup, the lineup administrator/investigator should:

1.  Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2.  Provide the following *additional* viewing instructions to the witness:

   a.   Individuals will be viewed *one at a time*.

   b.   The individuals will be presented in random order.

   c.   Take as much time as needed in making a decision about each individual before moving to the next one.

   d.   If the person who committed the crime is present, identify him/her.

36

DEFENDANT'S EXHIBIT

**1010-46**

e.  All individuals will be presented, even if an identification is made; *or* the procedure will be stopped at the point of an identification (consistent with jurisdictional/departmental procedures).

3.  Begin with all lineup participants out of the view of the witness.

4.  Instruct all those present at the lineup not to suggest in any way the position or identity of the suspect in the lineup.

5.  Present each individual to the witness separately, in a previously determined order, removing those previously shown.

6.  Ensure that any identification actions (e.g., speaking, moving) are performed by all members of the lineup.

7.  Avoid saying anything to the witness that may influence the witness' selection.

8.  If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

9.  Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

10. Document the lineup procedures and content in writing, including:

    a.  Identification information of lineup participants.

    b.  Names of all persons present at the lineup.

    c.  Date and time the identification procedure was conducted.

11. Document the lineup by photo or video. This documentation should be of a quality that represents the lineup clearly and fairly. Photo documentation can be of either the group or each individual.

12. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

DEFENDANT'S EXHIBIT

**1010-47**

37

C.  Conducting the Identification Procedure

**Summary:**   The manner in which an identification procedure is conducted can affect the reliability, fairness, and objectivity of the identification. Use of the above procedures can minimize the effect of external influences on a witness' memory.

# D.        Recording Identification Results

**Principle:**   The record of the outcome of the identification procedure accurately and completely reflects the identification results obtained from the witness.

**Policy:**   When conducting an identification procedure, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness.

**Procedure:**   When conducting an identification procedure, the investigator should:

1. Record both identification and nonidentification results in writing, including the witness' own words regarding how sure he/she is.

2. Ensure results are signed and dated by the witness.

3. Ensure that no materials indicating previous identification results are visible to the witness.

4. Ensure that the witness does not write on or mark any materials that will be used in other identification procedures.

**Summary:**   Preparing a complete and accurate record of the outcome of the identification procedure improves the strength and credibility of the identification or nonidentification results obtained from the witness. This record can be a critical document in the investigation and any subsequent court proceedings.

38

DEFENDANT'S EXHIBIT

**1010-48**

# Appendixes

| Appendix A | Further Reading |
| --- | --- |

| Appendix B | Reviewer List |
| --- | --- |

**DEFENDANT'S EXHIBIT**

**1010-49**

39

# Appendix A. Further Reading

Connors, E., T. Lundregan, N. Miller, and T. McEwen. *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial*. Washington, DC: U.S. Department of Justice, National Institute of Justice, 1996, NCJ 161258.

Cutler, B.L., and S.D. Penrod. *Mistaken Identification: The Eyewitness, Psychology, and the Law*. New York: Cambridge University Press, 1995.

Fisher, R.P., and R.E. Geiselman. *Memory Enhancing Techniques for Investigative Interviewing*. Springfield, IL: Charles Thomas, 1992.

Fisher, R.P., and M.L. McCauley. "Information Retrieval: Interviewing Witnesses." In *Psychology and Policing*, ed. N. Brewer and C. Wilson. Hillsdale, NJ: Erlbaum, 1995: 81–99.

Fisher, R.P., R.E. Geiselman, and D.S. Raymond. "Critical Analysis of Police Interview Techniques." *Journal of Police Science and Administration* 15 (1987): 177–185.

Geiselman, R.E., and R.P. Fisher. "Ten Years of Cognitive Interviewing." In *Intersections in Basic and Applied Memory Research*, ed. D. Payne and F. Conrad. Mahwah, NJ: Erlbaum, 1997: 291–310.

Lindsay, R.C.L., and G.L. Wells. "Improving Eyewitness Identification From Lineups: Simultaneous Versus Sequential Lineup Presentations." *Journal of Applied Psychology* 70 (1985): 556–564.

Loftus, E.F., and J. Doyle. *Eyewitness Testimony: Civil and Criminal*, 3d ed. Charlottesville, VA: Lexis Law Publishing, 1997.

Wells, G.L., M.R. Leippe, and T.M. Ostrom. "Guidelines for Empirically Assessing the Fairness of a Lineup." *Law and Human Behavior* 3 (1979): 285–293.

DEFENDANT'S EXHIBIT

**1010-50**

41

Wells, G.L., S.M. Rydell, and E.P. Seelau. "On the Selection of Distractors for Eyewitness Lineups." *Journal of Applied Psychology* 78 (1993): 835–844.

Wells, G.L., E.P. Seelau, S.M. Rydell, and C.A.E. Luus. "Recommendations for Properly Conducted Lineup Identification Tasks." In *Adult Eyewitness Testimony: Current Trends and Developments*, ed. D.F. Ross, J.D. Read, and M.P. Toglia. New York: Cambridge University Press, 1994: 223–244.

Wells, G.L., M. Small, S.D. Penrod, R.S. Malpass, S.M. Fulero, and C.A.E. Brimacombe. "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads." *Law and Human Behavior* 22 (1998): 603.

42

DEFENDANT'S EXHIBIT

**1010-51**

# Appendix B. Reviewer List

During the review process, drafts of this document were sent to the following agencies and organizations for comment. Although the Technical Working Group considered all comments and issues raised by these organizations, this *Guide* reflects only the positions of its authors. Mention of the reviewers is not intended to imply their endorsement.

The Academy Group, Inc.

American Bar Association

American Correctional Association

American Jail Association

American Society of Law
Enforcement Trainers

American Prosecutors Research Institute

Association of Federal Defense Attorneys

Bureau of Alcohol, Tobacco and Firearms

Campaign for Effective Crime Policy

Commission on Accreditation for Law
Enforcement Agencies, Inc.

Conference of State Court Administrators

Cleveland State College Basic
Police Academy

Council of State Governments

Criminal Justice Institute

Drug Enforcement Administration

Executive Office for United States Attorneys

Fairfax County (Virginia) Police
Association

Federal Bureau of Investigation

Federal Law Enforcement Training Center,
Department of the Treasury

Home Office, Policing and Reducing
Crime Unit (UK)

International Association of Chiefs
of Police

International Association for Identification

International City/County Managers
Association

International Homicide Investigators
Association

Law Enforcement Training Institute,
University of Missouri - Columbia

Madison County (New York)
Sheriff's Department

Metro Nashville Police Academy

National Association of Attorneys General

National Association of Black Women
Attorneys

National Association of Counties

National Association of Criminal Defense
Lawyers

National Association of Drug Court
Professionals

National Association of Police
Organizations

National Association of Sentencing
Commissions

DEFENDANT'S EXHIBIT

**1010-52**

43

National Association of State Alcohol and
Drug Abuse Directors

National Association of Women Judges

National Black Police Association

National Center for State Courts

National Conference of State Legislators

National Council on Crime and
Delinquency

National Crime Prevention Council

National Criminal Justice Association

National District Attorneys Association

National Governors Association

National Institute of Standards
and Technology, Office of Law
Enforcement Standards

National Law Enforcement and
Corrections Technology Centers

National Law Enforcement Council

National League of Cities

National Legal Aid & Defender
Association

National Organization of Black Law
Enforcement Executives

National Organization for Victim
Assistance

National Sheriffs' Association

National Victim Center

New York State Police

Oneida County (New York)
Sheriff's Office

Oneida Indian Nation Police

Peace Officers Standards & Training

Police Executive Research Forum

Police Foundation

Royal Canadian Mounted Police

Tennessee Law Enforcement
Training Academy

United States Conference of Mayors

United States Secret Service

Utah State Crime Scene Academy

44

DEFENDANT'S EXHIBIT

**1010-53**

For more information on the National Institute of Justice,
please contact:

**National Criminal Justice Reference Service**
Box 6000
Rockville, MD 20849–6000
800–851–3420
e-mail: askncjrs@ncjrs.org

To access the World Wide Web site, go to
http://www.ncjrs.org

If you have any questions, call or e-mail NCJRS.

DEFENDANT'S EXHIBIT

**1010-54**

# About the National Institute of Justice

The National Institute of Justice (NIJ), a component of the Office of Justice Programs, is the research agency of the U.S. Department of Justice. Created by the Omnibus Crime Control and Safe Streets Act of 1968, as amended, NIJ is authorized to support research, evaluation, and demonstration programs, development of technology, and both national and international information dissemination. Specific mandates of the Act direct NIJ to:

◆  Sponsor special projects, and research and development programs, that will improve and strengthen the criminal justice system and reduce or prevent crime.

◆  Conduct national demonstration projects that employ innovative or promising approaches for improving criminal justice.

◆  Develop new technologies to fight crime and improve criminal justice.

◆  Evaluate the effectiveness of criminal justice programs and identify programs that promise to be successful if continued or repeated.

◆  Recommend actions that can be taken by Federal, State, and local governments as well as by private organizations to improve criminal justice.

◆  Carry out research on criminal behavior.

◆  Develop new methods of crime prevention and reduction of crime and delinquency.

In recent years, NIJ has greatly expanded its initiatives, the result of the Violent Crime Control and Law Enforcement Act of 1994 (the Crime Act), partnerships with other Federal agencies and private foundations, advances in technology, and a new international focus. Some examples of these new initiatives:

◆  New research and evaluation is exploring key issues in community policing, violence against women, sentencing reforms, and specialized courts such as drug courts.

◆  Dual-use technologies are being developed to support national defense and local law enforcement needs.

◆  Four regional National Law Enforcement and Corrections Technology Centers and a Border Research and Technology Center have joined the National Center in Rockville, Maryland.

◆  The causes, treatment, and prevention of violence against women and violence within the family are being investigated in cooperation with several agencies of the U.S. Department of Health and Human Services.

◆  NIJ's links with the international community are being strengthened through membership in the United Nations network of criminological institutes; participation in developing the U.N. Criminal Justice Information Network; initiation of UNOJUST (U.N. Online Justice Clearinghouse), which electronically links the institutes to the U.N. network; and establishment of an NIJ International Center.

◆  The NIJ-administered criminal justice information clearinghouse, the world's largest, has improved its online capability.

◆  The Institute's Drug Use Forecasting (DUF) program has been expanded and enhanced. Renamed ADAM (Arrestee Drug Abuse Monitoring), the program will increase the number of drug-testing sites, and its role as a "platform" for studying drug-related crime will grow.

◆  NIJ's new Crime Mapping Research Center will provide training in computer mapping technology, collect and archive geocoded crime data, and develop analytic software.

◆  The Institute's program of intramural research has been expanded and enhanced.

The Institute Director, who is appointed by the President and confirmed by the Senate, establishes the Institute's objectives, guided by the priorities of the Office of Justice Programs, the Department of Justice, and the needs of the criminal justice field. The Institute actively solicits the views of criminal justice professionals and researchers in the continuing search for answers that inform public policymaking in crime and justice.

For information on the National Institute of Justice, please contact:

**National Criminal Justice Reference Service**
Box 6000
Rockville, MD 20849–6000
800–851–3420
e-mail: askncjrs@ncjrs.org

You can view or obtain an electronic version of this document from the NCJRS Justice Information Center World Wide Web site. To access this site, go to http://www.ncjrs.org

If you have questions, call or e-mail NCJRS.

DEFENDANT'S EXHIBIT

**1010-55**