FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 14, 2020

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

JAMES DEAN CLOUD (01), and
DONOVAN QUINN CARTER
CLOUD (02),

Defendants.

No.   1:19-cr-02032-SMJ-1
         1:19-cr-02032-SMJ-2

**ORDER DENYING
DEFENDANTS' EVIDENTIARY
MOTIONS**

Juries—not judges—traditionally evaluate the reliability of evidence. *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012). Three key eyewitnesses might be called to testify at trial: J.V., E.Z., and L.L. Defendant James Dean Cloud[1] moves to suppress or exclude their identifications of him. He argues the photo lineups administered to J.V. and E.Z. violate due process; he also moves to exclude all their identifications under Federal Rule of Evidence 403. Defendant Donovan Quinn Carter Cloud joins James's motion to exclude L.L.'s identification of him, claiming that L.L.'s testimony would be unfairly prejudicial. The Clouds ask the Court to

---

[1] For clarity and brevity, the Court will refer to James and Donovan by their first names when discussing each defendant individually; it will refer to them by their last name when discussing them collectively. The Court intends no disrespect.

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 1

deprive the jury of its duty to assess the credibility of this relevant, probative evidence. It will not. The Court thus denies their motions.

## BACKGROUND[2]

**A.    The Murders**

One sunny June afternoon in White Swan, Washington, Dennis Overacker picked up friends L.L., E.Z., and E.Z.'s 6-month-old son, A.Z. ECF No. 195, Ex. A. They headed over to another friend's house, John Cagle's, for purportedly different reasons, including possibly to buy methamphetamine. *Compare* ECF No. 195, Ex. A *with* ECF No. 210-19. When they arrived, an unknown man hailed them at the front cattle gate blocking the driveway. ECF No. 195, Ex. A; ECF No. 213. He conveyed that Cagle was not seeing visitors. ECF No. 195, Ex. A. Something seemed amiss. *Id*. So, they left, stymied yet undeterred. *Id*. The group headed to Thomas Hernandez's house and solicited him for help. *Id*. Hernandez knew Cagle well, and he too thought something seemed off. *Id*. He agreed to help them, and they opted to return to Cagle's. *Id*. When they arrived this time, they encountered two men—one in a red shirt, the other in blue. *Id*. Both men brandished firearms— one a shotgun, the other a rifle. *Id*.

---

[2] Because some facts do not relate to all the issues or motions, and to avoid duplication throughout this Order, the Court limits its initial statement of facts to provide necessary context and background. It incorporates any additional relevant decisional facts throughout its analysis of the issues they concern.

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 2

Overacker turned the truck around, so the front faced away from Cagle's. *Id*. Hernandez got out to speak with the two men; Overacker, L.L., and E.Z. remained in the truck. *Id*. Overacker was in the driver's seat, L.L. was in the front passenger seat, and E.Z. was in the backseat with her infant. *Id*. Hernandez spoke with the red-shirted man for several minutes, as E.Z. watched from the backseat. *Id*. She saw another man and woman on the property. *Id*. At that point, the red-shirted man asked Hernandez for a cigarette. *Id*. Hernandez ambled back to the truck to get a cigarette from Overacker. *Id*. As Overacker grabbed a cigarette from the center console, gunfire erupted, striking Hernandez, Overacker, L.L., and E.Z. *Id*. Hernandez fell to the ground. *Id*. The truck began to roll forward down the driveway. *Id*. E.Z. nudged Overacker aside, and L.L. got in the driver's seat and drove away. *Id*. As they escaped, E.Z. called 911. *Id*. Overacker died while they fled. *Id*.

The police later discovered four people dead from gunshot wounds on Cagle's property, including Hernandez, Cagle, Catherine Eneas, and Michelle Starnes.

**B.    The Carjacking**

The four alleged assailants—James, Donovan, Morris Jackson, and Natasha Jackson[3]—needed the means to escape the area, so they stole Cagle's truck. ECF No. 1-1. The truck broke down about 10 miles away. *Id*. At that point, Morris and

---

[3] The Court will use Morris and Natasha's first names as well.

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 3

Natasha allegedly parted ways with James and Donovan. *Id.*

Law enforcement received another 911 call. ECF No. 1-1; Evidentiary Hr'g Tr. ("Tr.") (Sept. 29, 2020). The caller advised that two males approached their home while brandishing firearms. *Id.* Responding officers spoke with the caller, N.V., her husband, J.V., and their two children, S.V. and M.V. ECF No. 185-5. One of the men had seized S.V., holding a gun to his head. ECF No. 1-1. The men demanded the keys to their vehicles. *Id.* J.V. retrieved the keys from inside and gave them to the men. *Id.* The men got in J.V.'s truck and tried to take S.V. against his will.  Id.  As they fled, however, S.V. jumped out of the truck bed when they were pulling away. *Id.*

**C.    The Identifications**

**1.    J.V.'s Identification**

The next day, Federal Bureau of Investigation ("FBI") Special Agent Ronald T. Ribail ("S.A. Ribail") and Yakima County Sheriff's Office ("YCSO") Detective Dan Cypher returned to J.V.'s house and administered four lineups to all the family members. Tr. (Sept. 29, 2020); ECF No. 185-5. When J.V. viewed the lineup containing Donovan, he "teared up," stating he "looks like the man that held the pistol to his son's head." Tr. (Sept. 29, 2020); ECF No. 155-3. He noted Morris had similar eyes to the one with the shotgun. *Id.* Still, he identified only Donovan. *Id.* The law enforcement officers did not warn J.V. against any media contact. *See* Tr.

(Sept. 29, 2020).

Later that afternoon, the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation") published a public safety announcement advising that law enforcement had arrested "[a]ll suspects" wanted in connection with the murder investigation. ECF No. 155-1. Less than two hours later, the Yakama Nation published updated information for immediate release, advising:

> Due to misidentification, one suspect remains at large in the five murders that were committed on the Yakama Reservation on Saturday, June 8, 2019. James Cloud (07/08/1983), who is pictured below, is still being sought by law enforcement agencies. James is considered armed and extremely dangerous, if you see this subject do not approach him, call 911. If you know his whereabouts, please call 911 immediately.

ECF No. 210-7. The public safety announcement contained a photo of James in an orange jumpsuit. *Id*. J.V. saw James on the announcement, which had been uploaded to the Yakama Nation Facebook page. ECF Nos. 210-6, 210-7. J.V. also saw a different Facebook photo of Donovan on the Yakima Scan Facebook page. ECF Nos. 210-4, 210-6.

S.A. Ribail and Detective Cypher happened to be back searching for evidence near J.V.'s residence when J.V. flagged them down. Tr. (Sept. 29, 2020). J.V. told them that he saw the Yakama Nation Facebook post, and he was now 100 percent certain James was the other man he could not at first identify. *Id*. He claimed that the photo better depicted the other man who stole his truck. *Id*.

## 2.    E.Z.'s Identification

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 5

E.Z. provided statements to emergency personnel immediately following the Medicine Valley incident. Two days later, YCSO detectives interviewed E.Z. again and conducted four photo lineups. ECF No. 195, Ex. A. The YCSO detectives recorded her interview. *See generally id*. E.Z. identified James as "the guy that was wearing the red shirt, the one who shot Dennis." *Id*. at 13:48:06–13:48:08. E.Z. identified Morris as the suspect in the blue shirt. *Id*. at 13:49:30–13:50:30. No one looked familiar to E.Z. in the third array containing Donovan. *Id*. at 13:51:02–13:51:43. E.Z. was thirty-percent sure about one woman in the fourth array containing Natasha but declined to make an identification because of her uncertainty. *Id*. at 13:52:42–13:53:46.

### 3.    L.L.'s Identification

The day after the murders, S.A. Ribail also interviewed L.L. and conducted a photo lineup. ECF No. 210-17. He did not record the interview or lineup. *Id*. S.A. Ribail read photo lineup instructions to L.L. and provided him a copy to read. *Id*. L.L. signed the instructions. *Id*. L.L. reviewed four arrays, each containing six photographs. *Id*. L.L. identified no one in the first two arrays. *Id*. In the third, L.L. stated that Morris's photo possibly looked like the guy wearing the blue shirt. *Id*. L.L. then said, "that is the person that shot me and had the shotgun," identifying Morris as the shooter with the shotgun. *Id*. L.L. stated another person in the lineup looked sort of like the other shooter but did not identify him. *Id*. He identified no

one in the fourth and final array provided. *Id*. During the interview, L.L. advised that he has health issues and sometimes has short term memory loss. *Id*.

At another FBI interview with S.A. Ribail about six months later, L.L. associated the Clouds with the murders. According to S.A. Ribail's report, L.L. "referred to the man wearing the red shirt as James Cloud, after seeing Cloud, and hearing the name, on the news." ECF No. 196 at 4.

Chris Reyes and Cole Rojan, investigators with Federal Public Defender's office, also interviewed L.L. on August 7, 2020. Tr. (Sept. 30, 2020). L.L. purportedly confirmed that he believes James was the red-shirted man and Donovan was the blue-shirted man. *Id*.

**D.    Procedural History**

Law enforcement arrested James two days after the Medicine Valley incident. ECF No. 23. The Court is unsure about when the police arrested Donovan.[4] ECF

---

[4] The United States asserts "Donovan Cloud was apprehended on June 9, 2019 at approximately 2:00 p.m. in Oregon, the day after the murders. When he was arrested, he was accompanied by two women. One of those women had an outstanding warrant out in Washington unrelated to the Medicine Valley investigation. She was arrested on the outstanding warrant. News of the arrest was communicated through various agencies." ECF No. 155 at 9. Yet the United States did not provide any citation to the docket/record or provide an exhibit to support this factual assertion. The arrest warrant contradicts this factual statement; it states the arrest warrant was received on June 9, 2019 and modified on June 11, 2019, and that Donovan was arrested on July 3, 2019. *See* ECF Nos. 40, 40-1. Donovan did not make his initial appearance before this Court until July 3, 2019. ECF No. 42. The Court does not possess all the discovery exchanged between the parties. The Court notes that the parties' briefs discuss many facts unsupported by exhibits or

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 7

No. 40. The Clouds were arraigned on a superseding grand jury indictment. ECF Nos. 59, 77 & 78. And they were later arraigned once again on a second superseding indictment. ECF Nos. 132, 140 & 142. Both pleaded not guilty at each arraignment. *Id.* The grand jury charges pending against James are first-degree murder, kidnapping, carjacking, brandishing a firearm to further a violent crime, discharge of a firearm during a violent crime, and assault with a dangerous weapon. ECF Nos. 132, 134. The charges pending against Donovan are kidnapping, carjacking, and brandishing a firearm to further a violent crime. ECF Nos. 132, 135.

James moves to suppress J.V. and E.Z.'s identifications of him under the Due Process clause or, in the alternative, exclude both identifications under Federal Rule of Evidence 403. ECF Nos. 147, 186. He also moves to exclude L.L.'s identification of him under Rule 403. ECF No. 185. Donovan joins James's motion to exclude L.L.'s identification of him, claiming L.L.'s testimony would be unfairly prejudicial. ECF Nos. 189, 197. The parties have fully briefed and argued these evidentiary motions, and the Court finds this matter ripe for disposition.

## DISCUSSION

**A.    Due Process Challenge**

James challenges J.V. and E.Z.'s identifications of him on the ground that

---

citations to the record. Because the Court has no way to review the unsupported factual assertions in the parties' briefs, it can only base its decision on facts supported in the record before it.

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 8

admitting this evidence at trial would violate due process. ECF Nos. 147, 186.

"[T]he jury, not the judge, traditionally determines the reliability of evidence." *Perry*, 565 U.S. at 245. The Due Process Clause does not require a district court to examine the "reliability of an eyewitness identification" unless evidence shows that law enforcement "arranged" to "procure[]" the identification "under unnecessarily suggestive circumstances." *Id*. at 248. To trigger a "due process check for reliability," a defendant must first show "improper police conduct."[5] *Id*. at 241. Without such a showing, trial courts need not "screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id*. at 245. But even if a defendant shows improper police conduct tainted an identification, that evidence is "not automatically excluded." *Id*. at 232.

Instead, courts pivot to a two-step due process inquiry. First, courts must analyze whether the police used "an identification procedure that is *both* suggestive and unnecessary." *Id*. at 238–39 (emphasis added). "[W]hen the police use such a procedure, … suppression of the resulting identification is not the inevitable consequence." *Id*. at 239. Courts must next analyze, "on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id*. at 239 (quoting *Neil v. Biggers*, 409 U.S. 188, 197 (1972)).

---

[5] *See also id*. (Sotomayor, J., dissenting) at 250 ("Absent 'improper police arrangement,' 'improper police conduct,' or 'rigging,' the majority holds, our two-step inquiry does not even 'com[e] into play.'").

To do so, courts study the "'totality of the circumstances,'" *id*. at 239 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977)), including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Brathwaite*, 432 U.S. at 114. Courts then weigh these factors against "corrupting effect of the suggestive identification itself." *Id*.

The Supreme Court has "held that pretrial identification procedures violated the Due Process Clause only once." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (per curiam) (referencing *Foster v. California*, 394 U.S. 440 (1969)). In *Foster*, a late-night manager was the only witness to a robbery. 394 U.S. at 441. After police arrested Foster, they asked the witness to come down to the station to view a lineup. *Id*. The lineup included three men. *Id*. Foster was about six inches taller than the other two men; he also was the only one who wore a leather jacket like the one the robber reportedly wore. *Id*. After seeing the lineup, the witness could not positively identify Foster. *Id*. He thought it might be him but was unsure. *Id*. The witness asked to speak to Foster, and prosecutors arranged a "one-to-one confrontation" where the witness talked with Foster across a table. *Id*. Still, the witness could not positively identify him. *Id*. A little over a week later, the police arranged a second lineup, now with five men. *Id*. Yet Foster was the only man in

the second lineup who had also appeared in the first. *Id.* 441–42 This time, the witness "was 'convinced' [Foster] was the man." *Id.* at 442.

Reviewing under the "totality of circumstances" standard, the Supreme Court determined, "this case presents a compelling example of unfair lineup procedures." *Id.* "The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [Foster] whether or not he was in fact 'the man.'" *Id.* at 443. "In effect, the police repeatedly said to the witness, 'This is the man.'" *Id.* "This procedure so undermined the reliability of the eyewitness identification as to violate due process." *Id.*

Since *Foster*, the law has changed. *See generally Perry*, 565 U.S. 228. Courts only reach the "totality of circumstances" inquiry if a defendant establishes the first two steps outlined above. *See id.* It is not enough to show the "identification procedure employed may have in some respects fallen short of the ideal." *Simmons v. United States*, 390 U.S. 377, 385–86 (1968). A defendant must first show "improper police misconduct." *Perry*, 565 U.S. at 241. Supreme Court "decisions . . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array." *Id.* at 232–33. The Supreme Court has "not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Id.* at 232.

> When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id*. at 233. *Compare Crawford v. Washington*, 541 U.S. 36, 61 (2004) (discussing the Sixth Amendment aims to ensure the reliability of evidence but does so through its procedural guarantees) *with Perry*, 565 U.S. at 239 (discussing the Due Process clause likewise aims to ensure the reliability of eyewitness identifications, but does so by barring only "unnecessarily suggestive circumstances *arranged* by law enforcement." (emphasis added)).

### 1.    James's Motion to Suppress J.V.'s Identification

To leadoff, James moves to suppress J.V.'s identification. ECF No. 147. He argues law enforcement engaged in improper conduct by violating several policies, procedures, and best practices. *Id*. at 19–28. The Court disagrees.

James contends S.A. Ribail and Detective Cypher violated FBI and YCSO policies by failing to audio or video record the lineups administered at J.V.'s home. ECF No. 147 at 22. Recording, he explains, enables "later review in court" and "allows fact finders to directly evaluate a witness's verbal and nonverbal reactions and any aspects of the array procedure that would help to contextualize or explain the witness' selection." *Id*. (citing U.S. Dep't of Justice, Eyewitness Evidence: A

Guide for Law Enforcement 10 (October 1999) available at https://www.ncjrs.gov/pdffiles1/nij/178240.pdf ("DOJ Report")). James emphasizes that FBI and YCSO policies encourage the use of audio or video recording to document the lineup procedure. *Id.* at 23. And law enforcement flouted these policies, especially given that it videotaped at least five other witness interviews—including the interviews of James and Donovan. *Id.*

The United States concedes that the officers failed to record the lineup procedures. Yet it tries to minimize that failure by noting that the officers had no audio-or-video equipment when they conducted the lineup. In any event, the United States claims, failing to record the lineup "did not in any way create an unnecessarily suggestive circumstance" that tainted the procedure or J.V.'s later identification of James. ECF No. 155 at 23.

James argues that law enforcement also failed to document the lineup procedure and results thoroughly, reiterating the importance of proper documentation for later review. *Id.* at 24 (citing Third Circuit Task Force, 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 Temp. L. Rev. 1, 72 (2019) ("Third Circuit Task Force Report")). James notes Detective Cypher made no written record of the lineups. Though S.A. Ribail authored a report, he still omitted (1) the time elapsed for both identifications and nonidentifications, (2) the sequence of the photos, (3)

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 13

the names of each person present during the lineups, and (4) "any other facts or circumstances that would help contextualize or explain the witness's selection." *Id.* at 24–25. He stresses FBI policy suggests documenting these encounters. *Id.*

James next highlights that law enforcement failed to conduct a "blind" lineup, "where the lineup administrator doesn't know who the suspect is." ECF No. 147 at 25. James expounds that blind lineups prevent the administrator from subconsciously—or, worse, intentionally—exerting influence on the witness to select the person whom law enforcement suspects committed the crime. *Id.* (citing Third Circuit Task Force Report, 92 Temp. L. Rev. at 13). Detective Cypher and S.A. Ribail knew that the Clouds were the prime suspects in the murder and carjacking investigations. James contends the officers violated FBI and YCSO policies that require or suggest conducting a blind lineup. *Id.* (quoting DOJ Report at 8).

In a "blind" lineup, the Government counters, neither the law enforcement official administering the identification procedure, nor the witness, know the suspect's identity. ECF No. 155 at 23. A "blinded" lineup, by contrast, involves a law enforcement official familiar with the suspect's identity, but who shields from his view the image shown to the witness to mitigate any suggestive influence. *Id*. S.A. Ribail testified he used a "blinded" approach because no agents in the area could conduct a "blind" lineup. Tr. (Sept. 29, 2020).

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 14

Finally, James underscores law enforcement violated several policies by failing to warn J.V. against media contact, a warning intended to help prevent witnesses from identifying someone from a lineup simply because they recognize the person, rather than remembering them from the crime scene. ECF No. 147 at 26 (citing Third Circuit Task Force Report, 92 Temp. L. Rev. at 60).[6]

The United States responds that while FBI policy instructs law enforcement to caution witnesses against contact with the media, it cannot, and should not, compel a witness to "ignore or block out public safety messages from law enforcement or their government." ECF No. 155 at 24. Although the United States concedes that law enforcement failed to warn J.V. to avoid media contact, such a warning would not have included the public safety announcement from which J.V. later identified James. *Id.* at 24–25.

Even accepting that law enforcement breached applicable policies, procedures, and best practices, James's argument operates under the false premise that *any* policy violation constitutes improper conduct in the due process context. True, under some fact patterns, policy violations accompanied by evidence that law enforcement intended to arrange, rig, organize, design, or otherwise manipulate the photo lineup, would likely constitute improper police conduct. *See generally Perry*,

---

[6] *But see* ECF No. 210-13 ("Unless directed by the court, a witness must never be ordered not to talk to potential witnesses, the media, or any other persons.").

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 15

565 U.S. 228. But he has not made such a showing here. J.V. did not identify James during the photo lineup. He only later identified him after seeing the public safety announcement with James's photo attached. James has produced no evidence that law enforcement played any part in creating that public safety announcement. By all accounts, the Yakama Nation did so independently. More importantly, though, law enforcement did not send J.V. the public safety announcement; he happened upon it on Facebook.

At any rate, DOJ policy on eyewitness identification procedures undermines James's arguments. ECF No. 210-10 at n.1 (Memorandum from Sally Q. Yates, U.S. Dep't of Justice, to Heads of Department Law Enforcement Components et al., Eyewitness Identification: Procedures for Conducting Photo Arrays (Jan. 6, 2017) (on file with U.S. Dep't of Justice)). DOJ stresses that its policy is "not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nothing in these procedures implies that an identification not done in accordance with them is unreliable or inadmissible in court." *Id*.

A review of *Perry*'s facts also helps clarify the high bar the Supreme Court has created for a pretrial motion like James's to prevail. There, a woman in an apartment complex called 911 after seeing a man breaking into cars in a nearby parking lot. *Perry*, 565 U.S. at 233. When officers arrived, they encountered a man

who matched the description that the eyewitness provided. *Id.* They detained the man and directed him to stand with another officer next to their patrol car in the parking lot. *Id.* Officers then went inside to interview the eyewitness. *Id.* The police asked her to describe the suspect, but she simply "pointed to her kitchen window and said the person . . . was standing in the parking lot, next to the police officer." *Id.* at 234. The police arrested the suspect. *Id.* "About a month later," the eyewitness could not identify him in a photo array. *Id.*

At trial, the defendant moved to exclude the witness's identification as unconstitutionally suggestive—he was the sole civilian, standing at the alleged crime scene, next to a police officer. *Id.* at 235. The trial court denied his motion, and eventually, the New Hampshire Supreme Court affirmed: "[o]nly where the police employ suggestive identification techniques . . . does the Due Process Clause require a trial court to assess the reliability of identification evidence before permitting a jury to consider it." *Id.* at 236. The United States Supreme Court affirmed, noting its past decisions on the constitutional limits of eyewitness identifications "linked the due process check, not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Id.* at 242.

*Perry* does not support James's many arguments that law enforcement policy violations—even policies meant to bolster the reliability of eyewitness

identifications—warrant suppression. Instead, *Perry* requires some affirmative police misconduct resulting in an unnecessarily suggestive identification "arranged" by law enforcement. *See id.* at 248. Indeed, the dissent highlighted—and lamented— that the Court's opinion "connote[s] a degree of intentional orchestration or manipulation" by law enforcement necessary to trigger a reliability analysis. *Id.* (Sotomayor, J., dissenting) at 255.

Ninth Circuit decisions relying on *Perry* support this interpretation. In *Schroeder v. Premo*, 714 F. App'x 666, 669 (9th Cir. 2019), the Ninth Circuit upheld the dismissal of a state prisoner's habeas petition, arguing the state court improperly admitted eyewitness identification evidence. Applying *Perry*, the court held that the petitioner's due process rights were not violated when the witness "read a newspaper article that included a photograph of [the defendant] and saw a brief news clip about [the defendant's] case prior to identifying him in the photo lineup" because under *Perry*, "only police-created impermissibly suggestive circumstances implicate due process concerns." *Id.* Because law enforcement "had nothing to do with [the witness] seeing the article or viewing the television clip," the court need not conduct a reliability analysis. *Id.*; *see also Boyer v. Chappell*, 793 F.3d 1092, 1100 (9th Cir. 2015) (affirming dismissal of state habeas petition when a witness failed to identify the defendant in two live lineups and a photo array, yet identified defendant in a fourth photo array, because petitioner showed no "unreliability stems from

unnecessarily suggestive circumstances arranged by law enforcement"); *Benjamin v. Gipson*, 640 F. App'x 656, 659 (9th Cir. 2016) (rejecting ineffective assistance of counsel claim where defense counsel did not seek to suppress "exceedingly unreliable" eyewitness identification because "courts suppress eyewitness identifications only when they are the product of improperly suggestive conduct by the police.").

James contends that the public safety announcement "called out" J.V.'s failure to identify James Cloud as the reason he remained at large—focusing on the phrase "due to misidentification." *See* ECF No. 147 at 5 ("The poster stated 'due to misidentification,' [read: the family's inability to select him].") (brackets in original).

Still, the United States clarifies that the phrase "due to misidentification" referred to the earlier public safety announcement error, which informed the public that the police had arrested all the murder suspects. The Yakama Nation mistakenly believed—"due to misidentification"—that law enforcement had arrested the Clouds the day after the murders. *See* ECF No. 155 at 9. The United States argues the Yakama Nation had a duty to issue the correction to protect public safety because one of the murder suspects was still at-large. The Court finds this rationale for the public safety announcement far more persuasive.

Even assuming the public safety announcement had a suggestive influence on

J.V.'s later identification of James, James fails to link J.V.'s identification to any improper police conduct. He also fails to distinguish it from the eyewitness identification in *Perry*. Like *Perry*, law enforcement here exposed the eyewitness to (as James puts it) a *de facto* showup. Just like J.V. saw the public safety announcement, the witness in *Perry* saw the lone civilian standing at the alleged crime scene next to a police officer. *Perry* held suppression was inappropriate—not because the identification was free of suggestive taint, but because law enforcement had not *arranged* that taint. *See Perry*, 565 U.S. at 248. Because James has presented no evidence showing law enforcement arranged for J.V.'s exposure to the public safety announcement, *Perry* holds the jury must decide what weight to give his identification. *See id.*  Ruling otherwise would ignore and undermine the direction that *Perry* has given.

James has not established the improper police conduct necessary to trigger a reliability analysis of J.V.'s identification. *See id*. The Court thus denies his motion to suppress J.V.'s identification.

**2.    James's Motion to Suppress E.Z.'s Identification**

Next up, James moves to suppress E.Z.'s identification, arguing administration of unblinded, nonsequential lineup constitutes improper police conduct because it violates several law enforcement policies, procedures, and best practices. ECF No. 186 at 29–31; ECF No. 202 at 26–27. The Court disagrees for

many of the same reasons articulated above.

James highlights that the YCSO detectives reviewed both the photos and sequence before giving it to E.Z. ECF No. 186 at 29. And the United States concedes that "flipping through the photos made this lineup no longer 'blind.' That is a violation of best practices and department policy." ECF No. 192 at 22. Cloud next stresses that the police failed to administer a sequential lineup, but instead gave all the photos to E.Z. to sort through simultaneously. ECF No. 186 at 29. Again, the United States concedes as much: "Similarly, providing all of the photos in the lineup to E.Z. at the same time was inconsistent with best practices and YCSO policy." ECF No. 192 at 23.

The United States argues because Cloud "has alleged no police misconduct, but instead, violations of best practices that did not influence E.Z.'s identification, the Court's inquiry is complete." ECF No. 192 at 18. In the United States' view, administering an unblinded lineup does not equate to improper police conduct. *Id*. It maintains Detective McIlrath had just compiled four lineups and printed them all out before bringing them to the interview room. *Id*. at 22. Each photo array contained not only pictures but also a sheet including the names of each person pictured. *Id*. Both detectives supposedly gave a brief flip-through the photo arrays because they wanted to ensure they had the right lineup, including only correct fillers and no identifying information. *Id*. The United States insists overlooking

1   policies, procedures, and best practices when administering a photo lineup is not

2   tantamount to improper police conduct in this case. *See id*. And the "[l]ack of a

3   double blind or single blind procedure does not establish misconduct leading to

4   suggestion without an actual, substantive suggestion by police." *Id*. at 23. As for

5   showing the lineup all at once, rather than sequentially, the United States claims it

6   was not unduly suggestive but provides no rationale. *See id*.

7       In reply, Cloud advocates that violating recognized policy, procedures, or

8   best practices equals improper police conduct. ECF No. 202 at 26. The plain

9   language meaning of the word "improper," he says, is "not in accord with fact, truth,

10  *or right procedure*." *Id*. (emphasis in original) (citation omitted). The detectives

11  here failed to follow the *right procedure*, which, in his view, amounts to improper

12  police conduct. *Id*. He underscores, "the United States wants the Court to accept

13  that police can violate department policies and best practices," as long as the

14  violation is unintentional. ECF No. 202 at 26. He then resorts to *Perry*'s dissent,

15  arguing the "Supreme Court's 'precedents make no distinction between intentional

16  and unintentional suggestion. To the contrary, they explicitly state that suggestion

17  can be created intentionally or unintentionally in many subtle ways.'" ECF No. 202

18  at 27 (quoting *Perry* 565 U.S. at 251 (Sotomayor, J., dissenting) (internal quotations

19  and brackets omitted)).

20      But Justice Sotomayor's dissent helps James little. She keenly recognized

that the *Perry* majority rejected this view:

> The majority does not simply hold that an eyewitness identification must be the product of police action to trigger our ordinary two-step inquiry. Rather, the majority maintains that the suggestive circumstances giving rise to the identification must be police-arranged, police rigg[ed], police-designed, or police-organized. Those terms connote a degree of intentional orchestration or manipulation. . . . The majority categorically exempts all eyewitness identifications derived from suggestive circumstances that were not police manipulated—however suggestive, and however unreliable—from our due process check. The majority thus appears to graft a *mens rea* requirement onto our existing rule.

*Perry*, 565 U.S. at 255 (Sotomayor, J., dissenting) (internal quotation marks and citations omitted). If concerned by Justice Sotomayor's characterization of its holding, the *Perry* majority made no effort to correct her.

      *Perry* also distinguishes the dissent's view of *United States v. Wade*, 388 U.S. 218 (1967), to clarify that "the risk of police rigging was the very danger" *Wade* sought to prevent and to provide some added examples of improper police conduct. *See Perry*, 565 U.S. at 242. In *Wade*, "the Court pointed to police-designed lineups where 'all in the lineup but the suspect were known to the identifying witness, the other participants in [the] lineup were grossly dissimilar in appearance to the suspect, . . . only the suspect was required to wear distinctive clothing which the culprit allegedly wore, . . . the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, . . . the suspect is pointed out before or during a lineup, . . . [and] the participants

1    in the lineup are asked to try on an article of clothing which fits only the suspect.'"

2    *Id.* (quoting *Wade,* 388 U.S. at 233).

3         Although the police administered an unblinded, nonsequential photo lineup

4    here, James has provided no evidence that the detectives intentionally arranged,

5    manipulated, or rigged the lineup so that E.Z. would identify him. Detective

6    McIlrath quickly glanced at the lineup photos to confirm that he had the right array.

7    Detective Williams then confirmed E.Z. had not done a photo lineup before. He

8    advised: "The important thing to remember is that the person may or may not be in

9    this lineup. Don't feel obligated to choose anyone in particular. We're not going to

10   manipulate it in any way. If you know, great. If you don't, don't." ECF No. 195,

11   Ex. A at 13:45:08–13:45:28. He then read the lineup instructions verbatim:

> You are about to be shown a group of photographs. Before you view these photographs, please read the following carefully: Because an officer is showing you a group of photographs, this should not influence your judgment in any way. The person who committed the crime may or may not be in this group of photographs. It is just as important to eliminate innocent persons as it is to identify those persons responsible. You are in no way obligated to identify anyone. Study each photograph carefully before making any comments. Consider that the photographs could be old or new, and that hairstyles change and that persons can alter their appearance by growing or shaving facial hair.

18   *Id*. at 13:45:29–13:46:12. He gave E.Z. the instructions to read and sign. *Id.*

19        At that point, Detective Williams handed her the photo array. *Id.* 13:47:31.

20   Seconds later, E.Z. spontaneously identified James: "This guy, I think I recognized

[sic] him. I don't know if he was the one wearing the red shirt."[7] *Id*. at 13:44:42–13:47:47. After looking through the remaining photos and not recognizing anyone else, E.Z returned to James's image and said: "Yeah. This is the guy that was wearing the red shirt, the one who shot Dennis." *Id*. at 13:48:06–13:48:08. Detective McIlrath handed a pen to E.Z. and said, "Okay, do you want to write that on there and sign your name? Just write 'guy who shot Dennis' or whatever if that's what you think." *Id*. at 13:48:13–13:48:19. E.Z. wrote, "guy who shot Dennis" on James's photo and signed it. *Id*.; ECF No. 210-20.

Though James disputes this, the Court finds all the photos in the array generally fit the suspect's description. E.Z. knew no people in the lineup. The lineup did not present James in a red or blue shirt or other distinctive clothing. The officers did not either explicitly or implicitly finger the suspect before or during the photo lineup. Roughly 37 seconds elapsed between the time she received the photo array, reviewed all six photos, and the time she positively identified James as the red-shirted man who shot Overacker. She appeared confident in her identification.

The Court concludes that law enforcement did not engage in improper

---

[7] The parties dispute what E.Z. said here. *Compare* ECF No. 186 at 16 (James's version) ("this guy, I think I recognized him. I don't think he was wearing the red shirt.") *with* ECF No. 192 at 12 (United States' version) ("This guy I think I recognized him. I don't know if he was the one wearing the redshirt."). The Court has reviewed the video and finds that the version of E.Z.'s statement provided in the body of this Order most accurately reflects what she said. At trial, the jury will make its own determination of it believes she said.

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 25

conduct because the Court finds no evidence that the YCSO detectives intended to

arrange, rig, organize, design, or otherwise manipulate the photo lineup so that E.Z.

would identify James. *See generally Perry*, 565 U.S. 228. Because James has not

shown improper police conduct, this Court need not inquire further. *See id*. The

Court thus denies James's motion to suppress E.Z.'s identification.

**B.    FRE 403 Challenge**

James finally moves to exclude J.V., E.Z., and L.L.'s identifications of him

under Federal Rule of Evidence 403. ECF Nos. 147 at 42–43, 185 & 186 at 50.

Donovan joins James's motion to exclude L.L.'s identification of him, claiming it

would be unfairly prejudicial. ECF Nos. 189, 197.

Rule 403 is "an extraordinary remedy to be used sparingly because it permits

the trial court to exclude otherwise relevant evidence." *United States v. Patterson*,

819 F.2d 1495, 1505 (9th Cir. 1987) (quoting *United States v. Meester*, 762 F.2d

867, 875 (11th Cir. 1985)). Even so, courts "may exclude relevant evidence if its

probative value is substantially outweighed by a danger of . . . unfair prejudice."

Fed. R. Evid. 403.

Rule 403's Advisory Committee Notes explain: "'Unfair prejudice' within

its context means an undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one." *United States v. Hankey*, 203

F.3d 1160, 1172 (9th Cir. 2000) (citing advisory committee notes). The Supreme

Court has advised that the term "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States,* 519 U.S. 172, 180 (1997). The Ninth Circuit has also defined its nuances:

> Unfair prejudice results from an aspect of the evidence other than its tendency to make the existence of a material fact more or less probable, e.g., that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.

*United States v. Bailleaux*, 685 F.2d 1105, 1111 (9th Cir. 1982). Other circuits offer similar definitions. *E.g.*, *United States v. Soto*, 799 F.3d 68, 90 (1st Cir. 2015) (internal quotation marks omitted) ("Unfair prejudice, however, is reserved for evidence that invites the jury to render a verdict on an improper emotional basis or for evidence that is shocking or heinous and likely to inflame the jury."); *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982) ("Put another way, courts should be sensitive to any unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.") (citation omitted)).

### 1. The danger of unfair prejudice does not substantially outweigh the probative value of J.V.'s identification

James contends J.V.'s identification of him is of "marginal" probative value because he failed to identify him during the first photo lineup. ECF No. 147 at 45. But this argument ignores the probative value of J.V.'s later identification with 100

percent certainty. *See* Tr. (Sept. 29, 2020). J.V. viewed him for several minutes during the carjacking. Just because he initially failed to pick James out of a photo array does not negate the probative value of J.V.'s later identification. J.V.'s testimony will not lure the jury into declaring guilt on any basis other than the specific events he witnessed. *See Old Chief*, 519 U.S. at 180. Nor will his testimony persuade by illegitimate means, *see Birney*, 686 F.2d at 106, or provoke an improper emotional response. *See Bailleaux*, 685 F.2d at 1111. Despite the risk of unfair prejudice, on balance, that prejudice does not substantially outweigh the probative value of J.V.'s identification.

### 2. The danger of unfair prejudice does not substantially outweigh the probative value of E.Z.'s identification

E.Z.'s identification is highly probative. She picked Cloud out of the photo lineup, quickly stating, "This is the guy who was wearing the red shirt, the one who shot Dennis." ECF No. 195, Ex. A at 13:48:06–13:48:08. This evidence is damning to be sure, but, on balance, the danger of unfair prejudice does not substantially outweigh the identification's probative value. E.Z.'s identification is not shocking or heinous or likely to inflame the jury—she saw the red-shirted man shoot Dennis from the backseat of the truck; she recognized him immediately when she saw his picture. *See Soto*, 799 F.3d at 90. Her identification will not lure the jury into declaring guilt on any basis other than the specific events she witnessed that day at John Cagle's. *See Old Chief*, 519 U.S. at 180. Nor will her testimony persuade by

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 28

1  illegitimate means, *see Birney*, 686 F.2d at 106, nor will it provoke an improper

2  emotional response. *See Bailleaux*, 685 F.2d at 1111.

3      **3.    The danger of unfair prejudice does not substantially outweigh the**
                        **probative value of L.L.'s identification**

4          L.L.'s later identification is probative. Though he could not initially pick

5  James or Donovan out of a lineup, he gave a description that generally fit both

6  defendants. As an eyewitness victim, L.L. has a firsthand account of what happened

7  at Cagle's that day. Though the Clouds argue that the media implanted a false

8  memory in L.L.'s mind, there is no evidence establishing why L.L. later identified

9  James and Donovan. The Court will not speculate on how he came to identify the

10  Clouds. The only evidence we have right now are inconsistent police reports, hardly

11  enough to deprive the jury of L.L.'s testimony. At the hearing, Donovan argued that

12  the Court should not allow just anyone to come into court and testify about the

13  identity of the defendants without laying some foundation. *See* Tr. (Sept. 30, 2020).

14  The Court agrees, but L.L. is not just anyone—he is an eyewitness victim. If the

15  Clouds wish to discredit his testimony, they may do so at trial.

16          On balance, the danger of unfair prejudice does not substantially outweigh

17  the probative value of L.L.'s testimony. His testimony will not be shocking or

18  heinous or likely to inflame the jury—he saw the people who shot him and his

19  friends. *See Soto*, 799 F.3d at 90. Nor will his testimony lure the jury into declaring

20  guilt on any basis other than the specific events he witnessed. *See Old Chief*, 519

ORDER DENYING DEFENDANTS' EVIDENTIARY MOTIONS – 29

U.S. at 180. Even if his testimony is inconsistent, it will not persuade by illegitimate means, *see Birney*, 686 F.2d at 106, nor will it provoke an improper emotional response. *See Bailleaux*, 685 F.2d at 1111. If called as a witness, the jury will assess his credibility.

In sum, the Court declines to exclude J.V., E.Z., and L.L.'s identifications under Rule 403.

## CONCLUSION

J.V., E.Z., and L.L.'s identifications must go to the jury for "testing in the crucible of cross-examination." *See Crawford*, 541 U.S. at 61. Indeed, any inconsistencies in their testimony will serve as ample fodder for "vigorous cross-examination." *Perry*, 565 U.S. at 233. But "the jury, not the judge," must determine the reliability of their identifications. *See id.* at 245. The Court will not rob the jury of its role in weighing the worth of relevant, probative evidence.

//

//

//

//

//

//

//

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendant James Dean Cloud's (01) Motion to Suppress J.V.'s Tainted ID, **ECF No. 147**, is **DENIED**.

2.    Defendant James Dean Cloud's (01) Motion in Limine Re: L.L.'s False Memory, **ECF No. 185**, is **DENIED**.

    *A.*    Defendant Donovan Quinn Carter Cloud's (02) Motion in Limine Re: L.L.'s False Memory is **DENIED**. *See* ECF Nos. 189, 197 (granting Donovan's (02) motion to join).

3.    Defendant James Dean Cloud's (01) Motion to Exclude E.Z.'s Unreliable ID, **ECF No. 186**, is **DENIED**.

    **IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

    **DATED** this 14th day of October 2020.

SALVADOR MENDOZA, JR.
United States District Judge