William D. Hyslop
United States Attorney
Eastern District of Washington
Thomas J. Hanlon
Assistant United States Attorney
Richard C. Burson
Assistant United States Attorney
402 E. Yakima Avenue, Suite 210
Yakima, Washington 98901
(509) 454-4425

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES DEAN CLOUD and<br>DONOVAN QUINN CARTER CLOUD,<br><br>Defendants. | 1:19-CR-02032-SMJ<br><br>NOTICE OF INTENT TO USE EXPERT TESTIMONY |

The Plaintiff, United States of America, by and through William D. Hyslop, United States Attorney for the Eastern District of Washington, and Thomas J. Hanlon and Richard C. Burson, Assistant United States Attorneys for the Eastern District of Washington, hereby respectfully submits the following Notice of Intent to Use Expert Testimony:

Notice of Intent to Use
Expert Testimony

1

FINGERPRINTS

The United States expects to call Krystal N. Watts ("Watts") as an expert witness.[1] Watts will testify as to her qualifications and background. Watts will testify as to her training and experience as a latent print examiner. Watts will describe/define terms such as "latent prints", "friction ridge skin", "friction ridge impressions", and "known prints." Watts will testify as to the ACE (Analysis, Comparison, and Evaluation) framework for decision-making. Watts will testify that a latent print was observed on Lab Item #8-rear view mirror. Watts determined that the print was suitable for comparison. The latent print was identified by Watts to the #1 finger (right thumb) recorded on the known cards bearing the name Donovan Cloud.

FIREARM/TOOLMARKS

The United States expects to call Michael Van Arsdale ("Arsdale") of the Federal Bureau of Investigation Firearms/Toolmarks Unit.[2] Arsdale will testify as to his qualifications and background. Arsdale will testify as to his training and experience in the Firearms/Toolmarks Unit. Arsdale will describe/define terms such as "physical and visual examinations," "bullet examinations," "source exclusion," "source identification," and "comparison. Arsdale will testify as to how firearms are test fired. Arsdale will testify that he received a Ruger rifle, Model 10/22. Arsdale will testify that a magazine (Item 57) fit in and functioned in the Ruger rifle. Arsdale will testify that bullets were fired from the Ruger rifle and examined. Arsdale examined several bullets (Items 109-119) that were provided to him. Arsdale

---

[1] As to Watts, a summary and Curriculum Vitae have been attached and marked as Exhibit 1. The summary and Curriculum Vitae were previously provided to defense counsel on September 19, 2019 via e-mail. A report prepared by Watts has been attached and marked as Exhibit 2.

[2] As to Van Arsdale, a summary has been attached and marked as Exhibit 3. Curriculum Vitae has been attached and marked as Exhibit 4. Van Arsdale's report has been attached and marked as Exhibit 5.

Notice of Intent to Use
Expert Testimony

2

conducted a comparison and determined that the bullets (Items 109-119) had been fired from the Ruger rifle. Arsdale examined additional items (Items 20-1 and 21-1) and determined they were .22 caliber deformed bullet fragments. After his examination, Arsdale determined that Item 21-1 was fired from a barrel rifled with six grooves, right twist. Arsdale determined that Item 20-1 was fired from a barrel with six grooves, but a directionality of the twist could not be determined. Upon the completion of his examination, Arsdale was unable to determine if Items 20-1, 21-1, and Item 23 were fired from the Ruger rifle or from barrel(s) of the same firearm.

Arsdale also received Items 42-33, and after examination, determined they were all 12 gauge shotgun shells and that they had been fired in the same shotgun. Arsdale received Items 27 and 28, and conducted an examination. Arsdale concluded that Items 27 and 28 are 12 gauge shotshell wads.

CAUSE OF DEATH

The United States expects to call Sigmund M. Menchel ("Menchel"), M.D.[3] Menchel will testify as to his qualifications and background. Menchel will testify as to his training and experience. Menchel has previously been qualified as an expert witness in both state and federal courts.

Menchel will testify that victim C.E. suffered a gunshot wound to her head. Menchel will testify that a bullet entered from behind her ear. Menchel will testify that victim M.S. suffered a gunshot wound to her head. Menchel will testify that the bullet entered behind her ear. Menchel will testify that victims J.C., T.H. and D.O. suffered multiple gunshot wounds. Menchel will testify that he completed a thorough examination of each victim and ruled the cause of death as homicide. Menchel will testify that all victims suffered significant bleeding which indicated that their hearts were still beating at the time they were shot.

---

[3] As to Dr. Menchel, a summary has been attached and marked as Exhibit 6. Curriculum Vitae has been attached and marked as Exhibit 7.

Notice of Intent to Use
Expert Testimony

3

DNA EXPERT

The United States expects to call Charity N. Davis ("Davis") as an expert witness.[4] Davis will testify as to her qualifications and background. Davis will testify as to her training and experience as a forensic examiner in the FBI Laboratory's DNA Casework Unit. Davis will define and describe Deoxyribonucleic acid ("DNA.") Davis will testify as to where DNA is found and how DNA varies from person to person. Davis will explain how a DNA profile is developed from DNA extracted from physical items. Davis will explain how DNA profiles are compared to each other to determine the likelihood that the profiled DNA came from the same person.

Davis will testify that she extracted DNA from the physical items identified in Exhibit 8 and compared such DNA profiles to DNA samples taken from certain individuals, including the Defendants. Davis will testify that her comparisons resulted in findings that supported her conclusion that DNA extracted from physical evidence in this case was likely to be contributed by certain individuals in this case, as defined by a ratio likelihood.

Among the results that Davis will testify about, detailed on Exhibits 8 and 9, Davis will testify that DNA was located on the interior driver side door pull of a truck identified as belonging to J.V., and that the DNA results obtained are two times more likely if J.V. and Defendant James Cloud had contributed such DNA than if J.V. and an unidentified person had contributed such DNA. Davis will testify that DNA originating from two individuals was located on a cigarette butt located on top of a pool table at the crime scene in this case. Davis will testify that the DNA results obtained from the cigarette butt are 240 quintillion times more likely if Defendant Donovan Cloud and an unknown individual contributed the DNA than if two

---

[4] As to Davis, a summary and Curriculum Vitae have been attached and marked as Exhibit 8. The summary and Curriculum Vitae were previously provided to defense counsel. Reports prepared by Davis have been attached and marked as Exhibit 9.

Notice of Intent to Use
Expert Testimony

4

unknown individuals had contributed the DNA, and 2.3 octillion times more likely if victim John Cagle and an unknown individual had contributed the DNA than if two unknown individuals had contributed the DNA. Davis will testify that DNA originating from one individual was located on a second cigarette butt located on top of a pool table at the crime scene in this case. Davis will testify that the DNA results obtained from the second cigarette butt are 20 septillion times more likely if Defendant James Cloud had contributed the DNA than if an unknown individual had contributed the DNA.

## INTERSTATE NEXUS – CHEVROLET SILVERADO

The government anticipates calling Jeff Harris ("Mr. Harris") as a witness.[5] The government believes that his testimony fits within the parameters of Fed. R. Evid. 701. However, out of an abundance of caution, the government has included him here. Mr. Harris has worked at Harvest Chevrolet for more than 27 years. Mr. Harris has received General Motors training and has been the Parts Manager since 2010. Due to his training and experience, Mr. Harris is aware that Chevrolet assembly plants do not exist and have never existed in the State of Washington. Furthermore, due to his training and experience, Mr. Harris is familiar with the significance of a vehicle's Vehicular Identification Number ("VIN.") Mr. Harris would testify that in regards to a VIN number, the first digit "2" documents that a vehicle was manufactured in Canada. Mr. Harris would testify that the VIN is the fingerprint of a vehicle. Mr. Harris would testify that he reviewed the vehicle information detail report for the vehicle in question. Mr. Harris would testify that parts for the vehicle in question originated in numerous locations including Michigan, Indiana, Germany, Mexico, and Singapore. Mr. Harris would testify that the vehicle in question was assembled in

---

[5] In September 2019, the government provided a letter via e-mail to counsel summarizing the testimony of Mr. Harris.

Notice of Intent to Use
Expert Testimony

5

Canada. Lastly, Mr. Harris would testify as to how new Chevrolet vehicles are transported into the State of Washington.

Respectfully submitted this 19th day of October, 2020.

        William D. Hyslop
        United States Attorney

        s/ Thomas J. Hanlon
        THOMAS J. HANLON
        Assistant U.S. Attorney

I hereby certify that on October 19, 2020, I electronically filed the foregoing with the clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Lorinda Youngcourt; John B. McEntire, IV., Jeremy B. Sporn; Richard A. Smith; Mark A. Larranaga.

        s/ Thomas J. Hanlon
        Thomas J. Hanlon
        Assistant United States Attorney
        United States Attorney's Office
        402 E. Yakima Ave., Suite 210
        Yakima, WA 98901
        (509) 454-4425