Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Thomas J. Hanlon
Assistant United States Attorney
Richard Burson
Assistant United States Attorney
402 E. Yakima Avenue, Suite 210
Yakima, Washington 98901
(509) 454-4425

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>     vs.<br><br>JAMES DEAN CLOUD,<br><br>                Defendant. | 1:19-CR-02032-SMJ-1<br><br>United States Briefing<br>RE: Toolmark Evidence |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, Thomas J. Hanlon, Assistant United States Attorney for the Eastern District of Washington, and Richard C. Burson, Assistant United States Attorney for the Eastern District of Washington, hereby submits briefing pursuant to this Court's order (ECF No. 421).

United States Briefing
RE:  Toolmark Evidence            1

## I. FIREARM IDENTIFICATION/ TOOLMARK EVIDENCE IS ADMISSIBLE AND WOULD BE HELPFUL TO A JURY

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In its role as gatekeeper, the court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc., v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). To be qualified, the expert must have sufficient "knowledge, skill, experience, training, or education" to offer the opinion. Fed. R. Evid. 702.

Therefore, a district court must determine if the proposed testimony would assist the trier of fact and if the witness is qualified to render the opinion. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010). Under *Daubert*, a district court must "ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

### A. Firearm Identification/Toolmark Evidence Will Assist the Jury

To be admitted, expert testimony must help the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. "Evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action." Fed. R. Evid. 401. The evidence must logically advance a material aspect of the party's case. *Cooper v. Brown*, 510 F. 3d 870, 942 (9th Cir. 2007) (citing *Daubert II*, 43 F.3d at 1315). Regarding firearm/toolmark identification, it is widely accepted that expert testimony can help the jury. *See, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (contrasting the usefulness of testimony of a polygraph expert, essentially testifying with an opinion about a witness's truthfulness, to a jury with "other expert witnesses who testify about factual matters outside jurors' knowledge, such as the analysis of fingerprints, *ballistics*, of DNA found at a crime scene . . ." (emphasis added).

### B. It is Undisputed That Forensic Examiner Van Arsdale is an Expert

Pursuant to Rule 702, a witness may provide opinion testimony if first qualified as an expert "by knowledge, skill, experience, training or education." Fed. R. Evid. 702.

### 1. Mr. Van Arsdale's Qualification

Mr. Van Arsdale is qualified to testify as an expert in firearm and toolmark identification. Mr. Van Arsdale employs the theory of toolmark identification adopted by the AFTE, the leading international organization for firearms and toolmark examiners. Mr. Van Arsdale is currently a Forensic Examiner in the Federal Bureau of Investigation ("FBI") Firearms/Toolmarks Unit. *See ECF No. 220-4*. Mr. Van Arsdale has worked in the FBI laboratory for more than twenty years. *Id*. Mr. Van Arsdale was qualified as a firearms/toolmarks examiner after completing an extensive training program. *Transcript*[1] at 48. The FBI training program was three (3) years in length. *Id*. at 50. During that time period, Mr. Van Arsdale studied firearms/ammunition development, history, and manufacturing (including tours of manufacturers to understand the manufacturing process). *Id.* at 48-49. Mr. Van Arsdale studied tool development and manufacturing. *Id.* at 49. Mr. Van Arsdale completed microscopic examinations in the realm of firearms and toolmarks. *Id.* These examinations provided Mr. Van Arsdale with comparison microscope experience and allowed him to develop a threshold for identification. *Id.* Lastly, at the conclusion of his training, Mr. Van Arsdale successfully completed a written test

---

[1] Two transcripts were prepared in the instant case. The first transcript contains pages 1-233. The second transcript contains pages 234-396. Both transcripts were filed on October 21, 2021.

United States Briefing
RE: Toolmark Evidence           4

and a series of physical examination/competency tests. *Id.* All of Mr. Van Arsdale's work was subject to peer review and administrative review. *Id*. at 50. Finally, Mr. Van Arsdale regularly attends training conferences, participates in ongoing proficiency testing, and has three publications. As such, Mr. Van Arsdale is qualified by knowledge, skill, experience, training, and education to provide his expert testimony regarding firearms and toolmark identification.

### 2. Defendant's Expert Testimony Regarding Mr. Van Arsdale's Qualifications

Mr. William A. Tobin ("Mr. Tobin") testified at the *Daubert* hearing. Mr. Tobin prepared a slideshow presentation. *Defense Exhibit* 1005. Mr. Tobin testified as to the term "technician." *Defense Exhibit* 1005, Slide 3. Mr. Tobin's slide show defined "technician" as a person with minimal understanding of theory but working mastery of technique. *Id*. Mr. Tobin testified that, in his view, "technicians" are "bench experts." *Transcript* at 332. Mr. Tobin agreed that such technicians are individuals who have "knowledge, skill, experience, and training." *Id*. Mr. Tobin agreed that such a technician is "an expert in that technique." *Id*.

Mr. Tobin simply does not believe in the science/technique of firearm/toolmark examinations. This is despite the fact (discussed further below) that Mr. Tobin employed the same science/technique (pattern matching) to track down a tool that was

the source of a pattern embedded on nails used in a bomb.  Nonetheless, it appears Mr. Tobin would concede that Mr. Van Arsdale is expert in the technique.

## II.   Firearm/Toolmark Evidence Satisfies Requirements of Daubert

*Daubert* identified several factors that often play a role in a Rule 702 inquiry, but cautioned "[m]any factors will bear on the inquiry, and we do not presume to set out a definite checklist or test." *Daubert*, 509 U.S. at 593.  The Daubert factors are: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.  *Id.* at. 593-94.  These factors are not exhaustive and they "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).  Although *Daubert* was limited to scientific evidence, the Supreme Court later clarified that the gatekeeping function of courts described in *Daubert* applies not just to scientific testimony, but to all expert testimony.  *Id.* at 141.  The court should ensure the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.  *Id.* at 152.  In exercising its gatekeeping

function, a court must keep in mind the Supreme Court's admonition that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert,* 509 U.S. at 596.

### III.  Firearm Identification Satisfies the Requirements of *Daubert*

The Ninth Circuit and other courts have held that the field of firearm and toolmark identification is a proper subject of expert testimony under both Fed. R. Evid. 702 and *Daubert*. *See, e.g.*, *United States v. Johnson*, 875 F.3d 1265, 1281 (9th Cir. 2017) (affirming district court's denial of defendant's *Daubert* motion to exclude ballistics testimony); *United States v. Brown*, 973 F.3d 667, 704 (7th Cir. 2020)(district court did not abuse its discretion in determining that toolmark evidence was admissible); *United States v. Gil*, 680 Fed. Appx. 11, 13-14 (2nd Cir. 2017)(affirming court's admitting expert ballistics testimony under *Daubert*); *United States v. Otero*, 557 Fed. Appx. 146, 169 (3rd Cir. 2014)(same); *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004)("[T]he matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades."); *United States v. Harris*, 502 F. Supp. 3d 28 (D.D.C. 2020); *Ricks v. Pauch*, 2020 WL 1491750 at *10 ("Indeed, the Court is not aware that any federal court that found firearm and toolmark identification to be unreliable under *Daubert* and *Kumho Tire*."); *United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1117 (D. Nev. 2019)("no

United States Briefing
RE:  Toolmark Evidence            7

federal court (at least to the Court's knowledge) has found the AFTE method to be unreliable under *Daubert*.")

The first Daubert factor asks whether the particular theory can be and has been tested. The Association of Firearms and Toolmark Examiners ("AFTE") is a professional organization specifically for firearms and toolmark examiners. *Transcript* at 56. As noted in the initial briefing, courts across the country have concluded that AFTE theory is regularly tested both on an individual level, by peer review and verification, and on a larger level with numerous studies.

When an examiner utilizes a comparison microscope, the standard is the AFTE Theory of Identification. *Id.* at 76. An examiner is looking at a pattern (random imperfections) produced by the firearm/manufacturer. The examiner is looking at the pattern for a level of agreement that is based upon the examiners training and experience. *Id.* at 76. The Theory defines "sufficient agreement" as looking at the quantity and quality of the individual characteristics within a pattern, that the likelihood of another tool making those marks from manufacturing or from use and abuse would be considered so remote that it's a practical impossibility. *Id.* at 79. Mr. Van Arsdale testified that this is a subjective valuation founded on scientific principles and supported by validation and empirical studies. *Id.* at 79.

Mr. Tobin testified as to his view of the critical underlying premises used in firearms and toolmarks identification. *Id.* at 217-218. The first premise is that if an

United States Briefing
RE: Toolmark Evidence            8

examiner is going to opine on a specific source attribution, the implication is that there is no other item on earth that could produce the same characteristic. *Id.* at 218.  Mr. Tobin testified that uniqueness and/or discernible uniqueness have never been proven scientifically. *Id.* at 240; 241.  Second, Mr. Tobin raised the question of whether a human can observe discern uniqueness based on the instrumentation and skills available today. *Id.*  The third underlying premise deals with persistence, that is can a bullet fired in a firearm today be matched to a firearm discovered at a later point in time. *Id.* at 218-219.  Mr. Tobin testified at length regarding the lack of scientific support for such premises. Surprisingly, after testifying as to these supposedly unscientific premises, Mr. Tobin testified that when he was employed by the FBI, he was able to do what he testified cannot be done, that is identity a pattern on an object and trace it to the manufacturing source – the tool that created the pattern. *Id.* at 326-327.   Mr. Tobin testified that he worked a case where a bomb killed a federal judge and his wife. *Id.* at 326.  Mr. Tobin inspected nails the bomber had used in the bomb. *Id.*  Mr. Tobin was tasked with inspecting the manufacturing patterns on the nails and tracing such to the manufacturer. *Id.* at 326-327.  Mr. Tobin traveled to Taiwan and found the tool that created the patterns on the nails. *Id.* at 327.

 Mr. Tobin also testified that firearm/toolmark identification is flawed because "subjectivity allows for excessive bias. . ." *Id.* at 267.  Mr. Tobin explained that "you

United States Briefing
RE:  Toolmark Evidence            9

cannot scientifically validate a subjective opinion." *Id.* at 269.  However, Mr. Tobin later acknowledged that all forensic science has some level of subjectivity.  *Id.* at 356.

Mr. Tobin explained that the only way to validate such subjective opinion is by conducting black box studies. *Id.* at 269.  The PCAST authors also stated that additional black box studies were needed to establish foundational validity.  In response to PCAST, three black box studies (Kaiser, FBI/Ames, Smith) were executed.  The Kaiser and Smith studies confirmed an error rate of less than one percent.  *See Gov't Exhibit #6, Slide 38; Transcript at 97.*

As such, the first Daubert factor - whether the particular theory can be and has been tested - weighs in favor of admissibility.

The second *Daubert* factor asks if the theory has been subjected to peer review and publication.  First, every identification in the FBI laboratory also is verified as a quality control measure.  *Transcript* at 86.  Second, the FBI laboratory has instituted a blind verification process, which involves a full examination by a second examiner and a supervisor.  *Id.* at 86-87.  Third, the AFTE Journal, "is dedicated to the sharing of information, techniques, and procedures," and the papers published within "are reviewed for scientific validity, logical reasoning, and sound methodology." *Romero-Labato*, 379 F.3d Supp. 3d at 1119.  Fourth, several other courts have commented on the AFTE Journal and have found that it meets the *Daubert* peer review element. See *Johnson*, 2019 WL 1130258 at *16 (AFTE toolmark methodology has been subject to

peer review and publication and this *Daubert* factor weights in favor of admission); *Ashburn*, 88 F. Supp. 3d at 245-46 (finding that the AFTE method has been subjected to peer review through the AFTE Journal); *Otero*, 849 F. Supp. 2d at 433 (D.N.J. 2012)(describing the AFTE Journal's peer review process and finding that the methodology has been subjected to peer review); *United States v. Taylor*, 663 F. Supp. 2d 1170, 1176 (D.N.M. 2009)(finding that the AFTE method has been subjected to peer review through the AFTE Journal and two articles submitted by the government in a peer-reviewed journal about the methodology); *United States v. Monteiro*, 407 F. Supp. 2d 351, 366-67 (D. Mass. 2006)(describing the AFTE Journal's peer review process and finding that it meets the *Daubert* peer review element.)   Furthermore, while the PCAST Report was sharply critical of the lack of "black box" studies supporting the "foundational validity" of firearms identification expert witness testimony, it never questioned the publication and peer review of firearms identification studies in the AFTE Journal.  Lastly, firearm/toolmark examiners work has been peer reviewed though validation studies, empirical studies, and publication. *Transcript* at 100.

   The second *Daubert* factor - whether the theory has been subjected to peer review and publication - weights in favor of admissibility.

   The third *Daubert* factors asks about the known potential rate of error.  When looking at error rates, the question is "whether, in respect to a particular technique,

United States Briefing
RE:  Toolmark Evidence            11

there is a high known or potential rate of error." *Kumho Tire*, 526 U.S. at 137. The Supreme Court was justifiably concerned about a "high" rate of error, however, it did not establish what constituted a "high" rate of error. The PCAST report notes a false positive rate lower than 5% is the benchmark for reliability.[2]

First, FBI firearm/toolmark technicians are required to complete a competency test which is an accreditation requirement. *Transcript* at 98. Second, FBI firearm/toolmark examiners are subjected to proficiency testing. *Id.* The FBI outsources proficiency testing to eliminate in-house bias. The FBI utilizes Collaborative Testing Services ("CTS") for proficiency tests. *Id.* A study was completed which reviewed error rates from 1978 to 1991. The study concluded that during that time period, false positives were about 1%. *Id.* at 98. A second study looked reviewed error rates from between 1992 to 2007. The study concluded that found false positives for firearms to be 1.5%. *Id.* It should be noted that non-certified examiners also take the test. *Id.* at 99. Presumably, the error rate would have been less than 1% if only certified firearm/toolmark examiners completed the examinations.

Mr. Tobin testified that such proficiency tests are "very easily defeated." *Id.* at 380. Mr. Tobin believes this to be the case because such tests are closed set and an

---

[2] "To be considered reliable, the FPR (false positive rate) should certainly be less than 5 percent and it may be appropriate that it be considerably lower, depending on the intended application." (ECF No. 325-4, at 152).

United States Briefing
RE:  Toolmark Evidence          12

unnamed laboratory director "in some state" made some sort of flippant remark regarding such tests. *Id.* at 379. However, despite Mr. Tobin's reservations, the PCAST authors specifically recommended proficiency testing.

Lastly, Mr. Van Arsdale testified concerning a number of recent validation studies. *Id.* at 94-97. The validation studies confirmed that qualified examiners have rarely made a false positive decision when comparing two toolmarks, and the theory of identification has yet to be disproven. *Id.* at 99-100.

Mr. Tobin testified that the validation studies are "seriously flawed." *Id.* at 242. Mr. Tobin explained that the studies were flawed because they were "closed set sample space." *Id.* Mr. Tobin explained that such are not like casework because "one can use differences to eliminate." *Id.* at 243. However, Mr. Tobin is not and has never been a certified firearm/toolmarks examiner. *Id.* at 211. If a firearm/toolmarks examiner received multiple cartridge cases, such examiner would likely compare the cartridge cases. In casework (like the instant case), the examiner is not to receive a single cartridge case, but rather multiple cartridge cases for comparison. Mr. Tobin's understanding of actual "casework" is flawed.

Mr. Tobin also testified that the validation studies are flawed because they are not blinded. *Id.* at 244. However, the authors of the PCAST report found the AMES study (which was not blinded) to be "appropriately designed to test foundational validity and estimate reliability." *PCAST* at 111. Lastly, it should be pointed out that

United States Briefing
RE: Toolmark Evidence            13

the quality assurance protocols implemented in actual casework at the FBI are not present in validation studies. Such quality assurance protocols negate error.

Mr. Tobin and the defense suggest that the validation studies are essentially invalid because of inconclusive responses. However, inconclusive responses are not error. Mr. Tobin acknowledged that published academics have concluded that framing inconclusive results as error is simply wrong. *Transcript* at 359. An inconclusive decision exists when an examiner does not see a level of agreement within the pattern to reach the conclusion of identification. *Id.* at 80. The examiner simply does not have enough information. In any event, all of the validation studies consistently established that when an examiner was able to view a pattern, image the pattern, understand the level of agreement, and apply the AFTE theory, they were able to make the proper conclusion nearly 99 percent of the time. *Id.* at 151.

The Fourth *Daubert* factor – rate of error - weights in favor of admissibility.

The fifth *Daubert* factor asks if the technique has achieved general acceptance in the relevant scientific or expert community. First, multiple courts evaluating the issue have found the AFTE has general acceptance within the relevant community. *See, e.g.*, *Romero-Lobato*, 379 F. Supp. 3d at 1122 (collecting cases); *Johnson*, 2019 WL 1130258, at *19, *McCluskey*, 2013 WL 12335325, at *8. Second, techniques do not have to have universal acceptance before they are allowed to be presented before a court. Lastly, firearm identification is accepted by practitioners, academia, and the

United States Briefing
RE:  Toolmark Evidence          14

industry.  In regards to practitioners, firearms identification is accepted by AFTE, American Academy of Forensic Sciences, the International Association for Identification, and the European Network of Forensic Science Institutes.  *Transcript* at 89.  In regards to academia, more than 50 institutions have a degree in forensic science which include some aspect of firearms and toolmarks.  *Id.* at 89.  Lastly, there is an industry built around firearms and toolmarks and accrediting bodies.  *Id.* at 90.

Thus, the final *Daubert* factor - general acceptance in the relevant scientific or expert community - weighs in favor of admission.

## IV.    CONCLUSION

Consistent with FRE 702, Mr. Van Arsdale is qualified by knowledge, skill, experience, training, and education and should be permitted to testify as to his opinion.  His expert knowledge will help the trier of fact to understand the evidence.  His testimony is based on sufficient facts and is the produce of reliable methods.  Furthermore, Mr. Van Arsdale has reliability applied the principles and methods to the facts of the instant case.

DATED: October 29, 2021

                                                Vanessa R. Waldref
                                              United States Attorney

                                              *s/ Thomas J. Hanlon*
                                              Thomas J. Hanlon
                                              Assistant United States Attorney

                                    *s/ Richard Burson*____
                                    Richard Burson
                                    Assistant United States Attorney

I hereby certify that on October 29, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Lorinda Youngcourt, Esq.; John B. McEntire, IV, Esq.; Jeremy B. Sporn, Esq.

                                    *s/ Thomas J. Hanlon*____
                                    Thomas J. Hanlon
                                    Assistant United States Attorney