1  Jeremy B. Sporn
2  Federal Defenders of Eastern Washington and Idaho
   306 East Chestnut Avenue
3  Yakima, Washington 98901
   (509) 248-8920
4
   Attorneys for the Defendant
5

6              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
7              The Honorable SALVADOR J. MENDOZA, JR.

8  United States of America,              Case No. 19-cr-2032-SAB

9              Plaintiff,                 **Post-Hearing Brief in Support of Mr.
                                          Cloud's Motion to Exclude or Limit
10      v.                                <u>Firearms Identification Evidence</u>**

11 James D. Cloud,

12              Defendant.

13       That testimony as to a forensic practice has been previously accepted in courtrooms

14 in no way makes it reliable, and does not make it admissible now.  We have seen this before

15 with respect to other disciplines, some of which were largely accepted and deemed

16 admissible for years, if not decades.  But things change.  Science sharpens.  The relevant

17 community awakens.  Testing reveals serious flaws and shortcomings.  Lawyers and judges

18 become more astute, more comfortable with new, technical areas, and more learned.  And

19 less intimated by a user community that hides behind its purported expertise.  The paradigm

20 shifts.  What was previously admissible, even for long periods of time, now gets consigned

21 to the shelf, at least for purposes of in-court use.  It has happened to numerous other

22

23 forensic disciplines, and it is happening now with respect to firearms identification.  It is no

24 James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
   Identification Evidence

                                          1

exaggeration to say that there is a growing chorus among federal and state courts, with more and more extensive limitations on firearms identification testimony, discussed in detail in Mr. Cloud's opening brief, and outlined on page 21 therein. We ask this Court to join them.

The defendant, James Cloud, respectfully submits this memorandum in further support of his motion [ECF Document No. 325] to exclude and/or, in the alternative, to limit firearms/toolmark identification evidence. For the reasons advanced in the prior submissions and adduced at the evidentiary hearing in October 2021, the government has not carried its burden of demonstrating the reliability of the type of firearms individualized source attribution testimony it seeks to introduce through the testimony of Michael Van Arsdale. The evidence at the hearing simply underscored its *lack* of foundational validity, and highlighted the lack of sufficient testing. If anything, studies to date, culminating with the recent Ames-FBI study released one year ago, provide reason to doubt rather than confirm the reliability of firearms identification testimony. Accordingly, pursuant to the Court's post-*Daubert* gatekeeping function to keep out such evidence, it should grant the motion in its entirety, or in large part.

## II. Testimony at the Hearing

At bottom, and whatever else was shown at the hearing, it demonstrated that firearms identification, as practiced through the AFTE theory of identification, remains a highly subjective, extra-scientific practice that relies almost exclusively on an examiner's training and experience. Tr. at 121-22, 147, 261-66. In addition, it relies on vague, ambiguous terminology and circular, tautological reasoning. *Id.* at 268. Mr. Van Arsdale struggled in

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

1   articulating the "sufficient agreement" standard in anything close to objective, reproducible

2   terms. Tr. at 122-29. This is because there effectively is no standard, and the definition is

3   circular. Sufficient agreement exists when the examiner feels that the questioned markings

4   pass beyond known disagreement. ECF Document No. 325, at 16 n. 10. In other words,

5   markings can be said to agree when they do not disagree, or when the examiner feels there is

6   not enough evidence of disagreement. Tr. at 267-68. Def. Ex. 1005, at 36, 40.

7         From a scientific standard, as this is what firearms identification purports to be, this is

8   terribly deficient and leaves the practice with no reliable and reproducible standards. When

9   we pass beyond observable, somewhat obvious and objective class characteristics, we leave

10  those yardsticks behind entirely and the practice is 100% subjective in nature. Exhibit D

11  [attached to ECF Document No. 325, hereinafter "Exhibit D"], at 17, 20, 53. This is why

12  Mr. Tobin and others call such claims *ipse dixit* in nature; it is simply assumed or presumed

13  and remains entirely unproven scientifically. Tr. at 262; Exhibit D, at 21, 48; *see also General*

14  *Elec. Co. v. Joiner*, 536 U.S. 136, 146 (1997). Even if most forensic disciplines contain *some*

15  level of subjectivity, firearms identification relies on an impermissible amount of subjectivity,

16  which almost subsumes the practice. Tr. at 356-58, 377-78. This distinguishes it from other

17  disciplines (DNA, for example) that do not pose the same issues with respect to reliability or

18  foundational validity, and admissibility in Court. Tr. at 356-58, 377-78. And whatever place

19  that training and experience has in the reliability of an expert's opinion, it cannot substitute

20  for objective protocols, from a scientific basis. Tr. at 296-97. The PCAST Report

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
Identification Evidence

3

underscored a firearms examiner's over-reliance on training and experience, as well as the inherent shortcomings in such subjective practices.  Def. Ex. 1006, at 60-61.

From a more technical standpoint, Mr. Tobin testified as how the key premises on which firearms identification relies – uniqueness, discernible uniqueness, and repeatability – are simply assumptions or presumptions, and unproven.  Tr. at 217-19, 222-24 239-42; Def. Ex. 1005, at 25-26, 31-34.  Mr. Van Arsdale agreed that individualization or uniqueness has never been proven, cannot be tested, that no study has validated individualization, and that establishing individualization or uniqueness cannot be done by study.  Tr. at 132-37.  Van Arsdale was similarly unable to articulate any scientific principles that govern the concept of individualization.  Tr. at 136-37.  Further, that uniqueness that it has never been *disproven* [Govt. Ex. 6, at 42] or falsified is irrelevant and of no moment from a scientific or logical (*argumentum ad ignorantiam*) basis.  Tr. at 375-76.  Even if firearms identification has not been "disproven" by skeptics (an odd metric given that in courts, its proponents are the ones who have the burden of demonstrating its reliability), that does not indicate suggest any validity to the practice.  Tr. at 375-76.  Part of the problem from a reliability standpoint is precisely that the AFTE theory of identification *cannot* be falsified as a hypothesis.  Tr. at 251-56, 375-76.

Further, as to discernible uniqueness, and whether or not markings are random and individualized, the more critical question is whether examiners are capable of observing characteristics and discerning what is random and what is subclass, and the answer is no. Def. Ex. 1006, at 64.  This practice remains without foundational validity, and there is no method to reliably discern sub class characteristics from more random, individual ones.  *Id*.;

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

Tr. at 227, 319-20.  AFTE theory is further flawed because it relies on what Mr. Tobin calls an "irrational dichotomy" - that markings of the same tools are persistent and stable over time (in other words, not changing as the firearm is discharged over potentially long periods of time), but that they are changing at the production or manufacturing level with each individual new tool produced so as to permit identification of unique or individual markings. Tr. at 270-71, Def. Ex 1005, at 35.

DOJ attempts to paper over these problems by limiting what examiners can say in documents like the ULTRs, with prohibitions on using terminology like individualization and uniqueness.  Tr. at 132-36, 187-90, 298-300.  It thus eschews language and source conclusions "to the exclusion of all others" or "to a reasonable degree of ballistic certainty." Tr. at 189-90.  But an identification or source attribution like Mr. Van Arsdale's is effectively the same thing as a finding of individualization or uniqueness.  The ULTRs are thus little more than a band-aid for a more festering problem.  They are designed to provide a patina of reliability by removing some of the most problematic, objectionable language.  However, this assumes the validity of what it permits for inclusion.  Trimming fat does not mean that what remains is muscle.  And, partially because examiners and other DOJ personnel lack expertise in fields like statistics, science and probability, they are unable to see that opining an identification or source attribution is essentially the same in substance as what they are not permitted to say.

Both witnesses at the hearing agreed on the need to understand manufacturing processes and the metallurgical principles behind them.  Tr. at 114-15, 143-45, 149-52.  An

examiner needs to understand the origin of the markings as an aspect of his/her

identification, and how to distinguish individual from subclass characteristics.  Tr. at 144,

152.  Mr. Van Arsdale admitted that markings on bullets or casings may be quite similar

when fired from different firearms, and how this reflects the need to recognize subclass

characteristics imparted during manufacturing. Tr. at 138-39.  And that sometimes, there is

disagreement in markings from even the same firearm.  Tr. at 139-40.  Mr. Tobin's

testimony [Tr. at 226; Def. Ex. 1005, at 22] too indicates that markings on ammunition

components fired from different firearms can appear virtually identical or indistinguishable.

Yet familiarity with the relevant manufacturing processes was hardly established during Van

Arsdale's testimony.  He did not and could not look at the entire production lot or other

samples from it.  Tr. at 153-54.  Subclass characteristics can persist across multiple

production lots. Tr. at 155.  He did not appear to know about a geographic component, as

to whether firearms or tools from the same production lot are concentrated in any given

area. Tr. at 154.  Because of the real and evident risk in confusing subclass for individual

characteristics, it is critical for a firearms examiner to understand, be familiar with and aware

of manufacturing processes of the tools involved.  Tr. at 227.  More than that, it also

requires knowledge of the production lot, which Mr. Tobin defined as "all of the

components that were fabricated or manufactured by a particular tool or die."  Tr. at 229.

This is because subclass characteristics are likely transferred to most, if not all components

that are part of the same production lot.  Tr. at 230.  Absent this type of rigor, it is difficult

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
Identification Evidence

to have any confidence in the reliability of his purported identification.  Tr. at 226-30; *see also* Def. Ex. D, sub-parts D &G.

For these and many other reasons, firearms identification, to the level of a source attribution, is not generally accepted in the relevant scientific community, include the NAS and PCAST.  Tr. at 321; Def. Ex. 1005, 1006, 1007.  That it is generally accepted in the *user* or practitioner community by other AFTE adherents[1] [Govt Ex. 6, at 31], is, again, of no moment in the *Daubert* analysis, for largely the same reasons advanced in Mr. Cloud's earlier briefing.

Mr. Tobin also outlined a number of problems in AFTE's peer review process, both historically, and currently, to include that it relies on a selected, insular community, is not truly blinded, is not or has not been made available more broadly to the general scientific community, and is reviewed seemingly only by others who subscribe to the AFTE theory of identification.  Tr. at 302-07.  Particularly when contrasted with true or legitimate refereeing in the scientific community for academic or scientific articles, the peer review practice here is highly limited and does not promote or confer reliability in any sense.  Tr. at 309.

_____

[1] Moreover, that it achieves foundational validity or reliability because it is a subject of university course offerings is simply false.  Govt. Ex. 1006, at 31; Tr. at 261-262.  Likewise, lab accreditation [Govt. Ex. 6, at 32], which has to do more with administrative or logistical protocols like chain of custody, does not validate the theory either.  Tr. at 347.

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

### III. <u>Validation Testing Confirms a Lack of Reliability</u>

The lack of standards, and the degree of subjectivity and reliance on training and experience sharpens the need for validation studies to test the relevant propositions. And here too, firearms identification falls well short of the mark. On the whole, the relevant studies are "grossly unacceptable scientific empirical research." Tr. at 365. Mr. Tobin testified that "there is not a single study that -- that purports to validate the practice that is, in fact, valid. It does not do what practitioners present to courts or claim to courts that it does. So, in other words, there's not a single "validation" study out there that is meaningful for judicial application." Tr. at 241. Mr. Tobin outlined some of the myriad flaws for "validation" studies – too numerous to include within the limited confines of this brief. Tr. at 242-45, 252-53, 277-788, 290; Def. Ex. 1005, at 65; *see also* id. at 43, 50-54, 60-64, 69, 73. The PCAST Report similarly summarized many of the flaws in testing, including a study from Mr. Van Arsdale himself. Tr. at 295, Def. Ex. 1005, at 63. Moreover, even Mr. Van Arsdale appeared to either agree with defense counsel about many of these flaws among the five studies the government hand-picked for presentation at the hearing. Tr. at 166-86. Alternatively, Mr. Van Arsdale was unaware of the underlying information or defect, but did not appear to suggest that such flaws did not exist or were not problematic. *Id.*

At the most fundamental level, the validation studies are critically flawed because what they purport to measure does not replicate casework, in large part because they rely on deductive reasoning, as opposed to the inductive regime in actual casework. Tr .at 164, 273-75; Def. Ex. 1005, at 54. Because of this and other shortcomings, the studies contain very

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

little (if any) external validity, that is, generalization from the specific conclusions of the studies themselves to the practice of firearms identification at large.  Tr. at 277-78; Def. Ex. 1005, at 64.  When asked as to studies that replicate casework according to a scientifically valid or acceptable methodology, Mr. Van Arsdale testified that he has "not seen a study yet that has been designed to do this."  Tr. at 393-94.  Most studies are not black-box in design, which renders them significantly flawed as it relates to a subjective practice like firearms identification.  Tr. at 282-84; Def. Ex. 1006, at 5, 9, 11-12, 46.  Moreover, nothing about using consecutive manufactured firearms in studies[2] can account for the myriad flaws in the validation studies, or, more fundamentally for the unproven premises underlying AFTE's theory of identification.  Tr. at 295-96.

The government conflates the timing of post-PCAST studies as a sufficient indicator of a reliable testing design, when the reality is that the more recent studies can be just as flawed as the pre-PCAST ones, whether or not the administrators attempted to address them or not.  Tr. at 362, 378.  Attempting to address PCAST's criticism does not correlate to success in that endeavor.  *Id.*  And perhaps more important, especially for the more Ames-FBI study, the results were hardly reflective of a reliable practice, either in terms of accuracy (including false positives and inconclusives), repeatability or reproducibility.  Tr. at 247-48,

---

[2] This would even assume that firearms with sequential serial numbers were in fact consecutively manufactured, a premise that Mr. Tobin largely debunks in the first instance.  Tr. at 353, 374.

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

9

259, 284-88; Def. Ex. 1005, at 73; Def. Ex. D, at 55-58.  Indeed, that would be a significant

understatement – the results suggest a highly unreliable practice.

Each study in Slide 36 of Govt. Ex. 6 is highly flawed, with little to no external

validity beyond the study itself (if it has any internal validity to begin with).  Even the study

that PCAST criticized the least, the 2014 Ames/Baldwin study [Exhibit E to ECF

Document No. 325], remains highly flawed.  For one, it involved newly purchased firearms

rather than those that had been in circulation for some time, and there was no indication

they were consecutively manufactured.  It involved only one brand, and cartridge casings

only, and all firings were performed close in time to one another.  The study was not

blinded, involved volunteer participants, has not been published or peer reviewed, and the

participants were not monitored as to collaborative efforts or the extent or consistency to

which the participants applied AFTE guidelines.  Even its "black box" status is in dispute, as

is the ability of the examiner in the study to use dissimilarities to make eliminations (similar

to the closed-set deductions that PCAST criticized).  Even so, nearly a quarter of

participants (66 of 284) dropped out, and the number of inconclusives measured about a

third of responses, and the error rate appeared far higher than other studies, including the

ones discussed during the government's examination of Mr. Van Arsdale.  When *this* is

supposed to be gold standard, the practice is seriously flawed from a reliability standpoint.

The actual error rate for firearms identification is unknown, as Mr. Van Arsdale

acknowledged.  With regard to error rates in testing, the validation studies simply beg the

question of what is being tested and how?  And how much does it resemble what examiners

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
Identification Evidence

purport to do in the real world for actual casework?  Especially for studies that produce a purported error rate of zero or approaching zero, these are suspect given that the error rate in casework is assuredly higher.  If the error rate is zero, there would be no need to institute the verification or review procedures[3] the FBI has, however imperfect they are.  Further, how they arrive at the purported error rate is often anything but clear, and seems more the product of misrepresenting errors and how they are calculated than with the validity of the practice itself.  This is most apparent in the 2020 Smith study in the government's presentation.

With regard to the treatment of "inconclusives," Mr. Cloud continues to believe that those like Mr. Tobin, and Professors Dror and Scurich [Exhibit I, at 336-37 attached to ECF Document No. 325], have the better of the argument that they should not be excluded from the error rate.  Where ground truth is known, the administrators know whether a response is correct or incorrect, and the consensus in the scientific community is that inconclusive responses should count towards an error rate.  Tr. at 288, 311.  Further, when an examiner knows that he is being tested, i.e. because the study is not properly blinded, there is evidence that the rates of inconclusives rise significantly.  Tr. at 278, 281, Exhibit I, at 336.

---

[3] On the subject of the FBI's verification or review procedures, the reviewer is also applying the same flawed AFTE theory of identification. Tr. at 158-59.  In addition, they are more likely to be looking at identifications because they are far less obvious than eliminations, and they do not review all exclusions. Tr. at 159-60.  Mr. Van Arsdale testified that "[t]he verification process utilized in most verifications is not necessarily blind."  Tr. at 160.  In many instances, the (initial) examiner is anything but removed from the verification or review process.

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

Of course, deciding which questions to answer or to provide a conclusive answer for will increase the purported success rate for the conclusions or answers provided. Discarding the hardest calls increases the ease with which a test subject provides an identification or exclusion. Thus, the claims of 99% correctness in validation studies should be assessed in the context in which such answers were provided, where examiners chose when to provide one, or chose to provide answers to the questions for which they were most confident.

Mr. Van Arsdale's analogy [Tr. at 196-97] is flawed, because the very premise for both testing and casework is that examiners should be able to do what they purport to do, not be stymied. Even when the testing is designed to be more difficult, it is not designed for the purpose of preventing an identification or exclusion. At a fundamental level, when a match is not identified as a match, or when an elimination is not identified as an elimination, those responses are objectively wrong. And the whole point of the studies is that the ground truth is known; simply ignoring an inconclusive response is thus incongruent with what the test administrators are trying to measure. Inconclusive responses are acceptable in casework to avoid speculation, but not in studies where the ground truth is known, and responses are either right or wrong.

### IV. Lack of Testimony and Evidence that AFTE Methodology was Reliably Applied in this Case Requires Excluding Mr. Van Arsdale's Testimony

Even if the Court were to find that the AFTE's theory of identification is the product of reliable methods, the government has not shown, by any standards, that it was reliably applied *in this case*. This requirement is no mere formality; it is a foundational condition

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

precedent expressly baked into Rule 702.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745

(3d Cir. 1994) ("[A]ny step that renders the analysis unreliable [] renders the expert's

testimony inadmissible.  This is true whether the step completely changes a reliable

methodology or merely misapplies that methodology.").  The Court cannot find that it has

satisfied here upon the government's scant showing, expressly, by inference, implicitly, or

otherwise.

This foundational prong of Rule 702 becomes even more critical in the realm of

testimony that, like firearms/toolmark identification, relies in such large part on subjective

analysis, without recognized standards and so dependent on individual training and

experience.  *See* Fed. R. Evid. 702, *adv. comm. notes* ("If the witness is relying solely or

primarily on experience, then the witness must explain how that experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts.  The trial court's gatekeeping function requires

more than simply "taking the expert's word for it.") (citing *Daubert II*, 43 F.3d at 1319).  This

is what the Supreme Court in *Joiner* also warned against, noting that courts should reject

expert testimony where "there is simply too great an analytical gap between the data and the

opinion proffered."  536 U.S. at 146.  Where only *ipse dixit* statements make that connection

or permit a conclusion that the methods were reliably applied in this case, the testimony

should be inadmissible at trial.

The government's direct examination of Mr. Van Arsdale, across their many slides,

did not contain any questions or answers about what Mr. Van Arsdale did in this case, that

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
Identification Evidence

1   is, whether the methods and principles a firearms examiner generally employs, were reliably

2   applied in this case to reach the conclusions Mr. Van Arsdale appears to draw in

3   Government Exhibit 8.  It was almost as if Mr. Van Arsdale was brought in to speak about

4   AFTE methodology generally, without having played any role in this case.  Nor did the

5   government save such testimony for its rebuttal; there, Mr. Van Arsdale and the prosecutor

6   focused on Mr. Tobin's slides and testimony, without any reference to what Mr. Van Arsdale

7   did in this case.  Tr. at 382-90.

8        Accordingly, the government cannot demonstrate the foundational requirements to

9   admit Mr. Van Arsdale's purported conclusions, because it only tried to show half of what it

10  would have needed to demonstrate.  To put it more bluntly, without knowing what the

11  expert did in this case, and the conclusions he reached (let alone whether they were reliably

12  applied), the testimony is simply not relevant under Rule 401.

13

14       **Conclusion**

15        For the foregoing reasons, and those in prior briefing and expressed at the hearing,

16  the Court should grant the motion and exclude Mr. Van Arsdale's testimony at trial.  If not,

17  it should limit his testimony to Mr. Tobin's formulation that the "only scientifically and

18  forensically defensible position" for a firearms examiner to opine about, is that in his/her

19  opinion, "a specific firearm could not be eliminated as the firing platform."  Tr. at 301.  But

20  it should exclude it altogether rather than limit it, because that is the only way to truly

21  protect Mr. Cloud from unfair prejudice given the diminished, minimal probative value as to

22

23  an expressed  inability to eliminate a particular firearm from being the one that fired

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
24  Identification Evidence

cartridges in question. *Cf. Tibbs*, 2019 D.C. Super. LEXIS 9, at *80-81 ("Any statements by the expert involving more certainty regarding the relationship between a casing and a firearm would stray into territory not presently supported by reliable principles and methodology."). Jurors would be apt to confuse and make unwarranted inferences from testimony that cartridge casings appeared "consistent" with those known to be fired from the Ruger Rifle at issue, or even that the Ruger could not be eliminated as having fired the rounds in question.

The danger is too high that jurors would conclude through the back door what the government would not be permitted to introduce through the front, leading to the same unacceptable, unreliable result. *See* Garrett, Scurich & Crozier, *Mock Jurors' Evaluation of Firearms Examiner* Testimony, 44 Law & Human Behavior 412, 422 (2020) (suggesting "that many judicial and prosecution-driven interventions to limit conclusion language for firearms testimony are not likely to be effective" because laypeople place great weight on firearms testimony"). In other words, efforts to limit the conclusions expressed by firearms examiners still appear just as likely to lead to guilty verdicts, but with the exception of inability to eliminate language similar to that used in *Tibbs* and Mr. Tobin's formulation above. *See id.* And as Mr. Tobin testified, jurors are more apt to defer to matters they believe are scientific than, for example, to similarly accept evidence or testimony that is non-scientific. Tr. at 301. Because firearms identification has not been shown to be a reliable practice, and absent evidence that it was reliably applied here, the government has not met its burden. Under the reliability criteria in *Daubert* and elsewhere, and under Fed. R. Evid. 702, the motion should be granted.

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms Identification Evidence

Dated:    October 29, 2021

Respectfully Submitted,

S/Jeremy B. Sporn
Jeremy B. Sporn, NY 4779310
Attorneys for James D. Cloud
Federal Defenders of
Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920
Email:  Jeremy_Sporn@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2021, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF System which will send notification of such

filing to the following: THOMAS J. HANLON, RICHARD C. BURSON, Assistant

United States Attorneys.

S/Jeremy B. Sporn
Jeremy B. Sporn, NY 4779310
Attorneys for James D. Cloud
Federal Defenders of
Eastern Washington and Idaho
306 East Chestnut Avenue
Yakima, Washington 98901
(509) 248-8920
Email:  Jeremy_Sporn@fd.org

James Cloud's Post-Hearing Brief in Support of Motion to Exclude or Limit Firearms
Identification Evidence