FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 08, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

JAMES DEAN CLOUD (01), and
DONOVAN QUINN CARTER
CLOUD (02),

Defendants.

No.    1:19-cr-02032-SMJ-1
        1:19-cr-02032-SMJ-2

**ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT**

Before the Court is Defendant James Cloud's Motion to Dismiss Third Superseding Indictment, ECF No. 352. Defendant Donovan Cloud filed a motion for joinder in James Cloud's request, which the Court granted. ECF No. 363. After discovery of jury selection records, Defendants now seek to dismiss the third superseding indictment, asserting violations of the Jury Selection and Service Act of 1968 and the Sixth Amendments' Fair Cross Section Requirement due to the underrepresentation of Latinos and Native Americans in the jury panel. On November 23, 2021, the Court heard oral argument from the parties and orally denied the motion. This Order memorializes and supplements the Court's oral ruling.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 1

# BACKGROUND

Defendants James Dean Cloud and Donovan Quinn Carter Cloud are charged by superseding indictment with crimes related to the June 8, 2019 quintuple homicide, carjacking, and kidnapping on the Yakima Indian Reservation. While Defendants' motion challenges only the third superseding indictment, the Court briefly discusses the first three indictments for context and background.

## A.    The Indictments

On June 11, 2019, a grand jury sitting in Yakima, Washington returned a three-count indictment against Defendants. ECF No. 17. Approximately one month later, a grand jury sitting in Yakima returned the first superseding indictment, charging six counts. ECF No. 59. On February 11, 2020, a grand jury sitting in Yakima returned the second superseding indictment, charging eight counts. ECF No. 132.

On June 23, 2020, Defendant James Cloud[1] filed a motion seeking access to certain information concerning the selection of the grand juries that returned the above-mentioned indictments. ECF No. 179. The Court granted in part and denied in part the motion, ordering that Defendants could have access to certain grand jury selection records and materials, subject to certain restrictions. ECF No. 184 at 15–

---

[1] Defendant Donovan Cloud filed a motion for joinder in Defendant James Cloud's request, ECF No. 180, which the Court granted, ECF No. 184 at 15.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 2

20.

Several months later, on November 17, 2020, a grand jury sitting in Spokane,[2] Washington returned a nineteen-count third superseding indictment—the indictment Defendants challenge in this instant motion. ECF No. 242. Having reviewed the United States District Court for the Eastern District of Washington's Plan for the Random Selection of Grand and Petit Jurors ("Jury Plan"), Defendants now challenge the Clerk's Offices' compliance with the Jury Plan when it selected the grand jury that returned the third superseding indictment in this matter.

## B.    Eastern District of Washington Jury Selection Process

Years ago, the Eastern District of Washington developed the Jury Plan, which dictates how the Clerk's Office brings in both grand and petit jurors for service. The Jury Plan is periodically updated and submitted for the Ninth Circuit's approval; the most recent version took effect on January 1, 2017. Plan for the Random Selection of Grand and Petit Jurors, U.S. DIST. COURT EAST DIST. OF WASH., https://www.waed.uscourts.gov/sites/default/files/jury/JuryPlan.pdf (effective Jan. 1, 2017) (last visited Dec. 7, 2021) (hereinafter "Jury Plan"). The latest version has been approved by the Ninth Circuit. *Id.* Defendants allege that the Clerk's Office deviated from the Jury Plan in several respects, including how it prorated the

---

[2] Although this is a Yakima-based case, Defendants were indicted on the third superseding indictment by a grand jury sitting in Spokane. Due to the COVID-19 pandemic, no other grand juries were seated in November 2020.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 3

Division A master wheel and how it summonsed jurors for service. The Court discusses the Jury Plan as it relates to each allegation below.

### i.    The Divisional Master Wheels

The Jury Plan divides the district into two divisions: Division A and Division B, which are separated by county. Jury Plan § 1.08. Division A, relevant to this case, encompasses fourteen counties: Adams, Asotin, Chelan, Columbia, Douglas, Ferry, Garfield, Grant, Lincoln, Okanogan, Pend Oreille, Spokane, Stevens, and Whitman. *Id.* Every two years, the Clerk's Office assembles two lists of potential jurors, referred to as "divisional master wheels." *Id.* §§ 1.08–1.09. A separate divisional master wheel is maintained for each of the two divisions. *Id.* § 1.09. The divisional master wheels are populated from two source lists: 1) general election voter registration lists; and 2) records of holders of drivers' licenses and identification cards. *Id.* § 2.01. The two source lists are merged to create the "combined source lists," with duplicate records purged. *Id.* §§ 2.02–2.03. ⫶

Each divisional master wheel contains roughly 55,000 names. *Id.* § 2.02. These 55,000 names are selected randomly from the combined source lists. *Id.* § 2.03. But not every name on the combined source lists has an equal chance of making it onto the divisional master wheel. Rather, the Jury Plan requires the 55,000 names selected for each divisional master wheel be a product of a proration methodology, which ensures "that each county within the division is substantially

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 4

proportionately represented in the master jury wheels." *Id.* This helps ensure the divisional master wheels resemble the distribution of individuals in each division and prevents heavily populated counties from dominating the wheel. To prorate the divisional master wheels, the Clerk's Office uses registered voters in each county. *Id.*

### ii.    Bringing jurors in for service

When the Clerk's Office brings jurors in for service, the Jury Plan mandates that it follow a two-step process. First, the Clerk's Office mails jury qualification questionnaire notices to prospective jurors randomly selected (by use of a nationally approved jury management system program) from the relevant divisional master wheel. *Id.* § 3.02(a). The notice directs the prospective juror to complete an online jury qualification questionnaire within ten days. *Id.* If the prospective juror fails to respond, the Clerk's Office follows up by sending a paper copy of the questionnaire. *Id.* Then, for all qualification notices or questionnaire forms returned as "undeliverable," or those to which no response has been received after a follow-up mailing, the Clerk's Office must issue a new notice to a person "within the same zip code area to which the undeliverable or non-responding qualification notices/forms had been sent." *Id.* § 302(b). This is referred to as "supplemental draw." *Id.* From there, the Clerk's Office reviews the returned questionnaires and removes the respondents who are ineligible to serve—for example, non-citizens and

individuals who cannot speak English. *Id.* § 3.04. After removing ineligible persons, the Clerk's Office is left with "a separate qualified jury wheel." *Id.* § 3.05.

Then, at the second step, the Clerk's Office draws at random from the qualified jury wheel and issues summonses for petit and grand jury service to those persons whose names are drawn. *Id.* §§ 4.01–4.02. To populate a grand jury, the Clerk's Office typically sends out 150 summonses. ECF No. 392 at 6.

### iii.    Deviations from the Jury Plan and Defendants' allegations

In selecting the grand jury that returned the third superseding indictment against Defendants, the Clerk's Office deviated from the Jury Plan in two respects. First, in building the Division A master wheel, the Clerk's Office determined proportional representation—i.e., prorated the master wheel—by using only the number of *active* registered voters and excluding inactive voters. This, Defendants contend, resulted in the exclusion of 60,395 voters in Division A, which contributed to the underrepresentation of Latinos and Native Americans on the grand jury.[3] ECF No. 352 at 4. The Government concedes that the Clerk's Office prorated by using active voters only, noting that it used the list of voters provided by Enterprise

---

[3] Defendants also contend that the Clerk's Office should have prorated the Division A master wheel by using the full source lists—i.e., the number of registered voters and those identified from DMV records. Section 2.03 of the Jury Plan, however, only requires the Clerk's Office to use the number of registered voters. Because the text is clear, the Court need not address the Defendants' argument that excluding the number of persons identified from DMV records violates the Jury Plan's "intent." ECF No. 390 at 9.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 6

Services (a third-party management system).[4] ECF No. 392 at 4. Nonetheless, the Court finds that using only active voters to prorate the divisional master wheel violates Section 2.03 of the Jury Plan, which requires the Clerk's Office to use the number of *registered* voters—not just the number of *active* registered voters.

Second, the Clerk's Office failed to maintain a qualified jury wheel, as required by Section 3.05 of the Jury Plan. Put differently, the Clerk's Office conflated the two-step process described above when it summonsed the grand jurors for service. The Clerk's Office should have sent the qualification notices and removed ineligible persons to create the qualified jury wheel, after which the Clerk's Office should have sent summonses to persons from this qualified wheel. Instead, the Clerk's Office sent the juror qualification questionnaires and the summonses to 170 individuals on Division A's *master wheel* at the same time, effectively eliminating the existence of a qualified jury wheel. This deviation prevented the Clerk's Office from performing a supplemental draw for those persons that did not respond to the first mailing. Without a supplemental draw, the Clerk's Office, contrary to the Jury Plan, did not replace non-responders with other eligible persons from the same zip code. This, Defendants contend, contributed to the systematic underrepresentation of Native Americans on the grand jury, because

---

[4] According to the Government, Enterprise Services obtained the list of active voters from the Washington Secretary of State.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 7

many of the unanswered summonses came from zip codes with higher Native American populations.[5] ECF No. 352 at 4.

Of the 170 prospective grand jurors summonsed in this case, 50 responded that they were available. These 50 ultimately comprised the grand jury panel. There were two Latinos on the panel and no Native Americans. ECF No. 352-1 at 3. Ultimately, 27 grand jurors were empaneled on July 23, 2019. Of the 27 grand jurors, there were no Latinos or Native Americans. ECF No. 352-1 at 2. The empaneled grand jury returned the third superseding indictment against Defendants on November 17, 2020. Defendants now ask this Court to dismiss the third superseding indictment without prejudice, arguing that the jury selection process in this matter violated the fair cross-section requirement of the Sixth Amendment and the Jury Selection and Service Act of 1968 ("JSSA").

## LEGAL STANDARD

The Sixth Amendment and the JSSA afford criminal defendants the right to be indicted and tried by impartial juries selected at random from a fair cross-section of the community. 28 U.S.C. § 1861 *et seq*.; *Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (juries must be made from "a body truly representative of the community," and therefore "drawn from a fair cross section of the community"). To give meaning to this protection, each district

---

[5] Out of the 170 summonses sent out, only 15 persons did not respond.

court is required to formulate its own written plan for jury selection to ensure that

the jury selection process complies with the JSSA. 28 U.S.C. § 1863.

But defendants do not have a constitutional right to a representative

*empaneled* jury. *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946) ("This does not

mean, of course, that every jury must contain representatives of all the economic,

social, religious, racial, political and geographical groups of the community;

frequently such complete representation would be impossible."). Rather, jurors

must be *selected* from a fair cross-section of the community and "without

systematic and intentional exclusion" of any of any group. *Id.*

In order to establish a prima facie violation of the "fair cross-section

requirement," a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group
> in the community; (2) that the representation of this group in
> venires from which juries are selected is not fair and reasonable
> in relation to the number of such persons in the community; and
> (3) that this underrepresentation is due to systematic exclusion
> of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Courts colloquially refer to this three-

part showing as the *Duren* test.[6]

---

[6] The test is the same for constitutional and statutory challenges. *See, e.g.*, *United States v. Sanchez-Lopez*, 879 F.2d 541, 546 (9th Cir. 1989) ("The test for a constitutionally selected jury is the same whether challenged under the Sixth Amendment of the Constitution or under the Jury Selection and Service Act.").

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 9

A prima facie demonstration of the fair cross-section requirement is not the end of the inquiry into whether a constitutional violation occurred. Once the defendant makes this showing, the burden shifts to the government to demonstrate "a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68.

## DISCUSSION

## A.    Defendants have satisfied the first *Duren* prong

Defendants have unquestionably satisfied the first requirement of the *Duren* prima facie case. Here, Defendants allege that the grand jury selection process resulted in the underrepresentation of Latinos and Native Americans. Both Latinos and Native Americans undoubtedly comprise distinctive groups in the community. *See, e.g.*, *Hernandez-Estrada*, 749 F.3d 1154, 1159 (9th Cir. 2014) ("[Latinos] are distinctive groups in the community."); *United States v. Yazzie*, 660 F.2d 422, 426 (10th Cir. 1981) ("There is no question that [Native Americans] constitute a distinctive group in the community.").

## B.    Defendants have not satisfied the second *Duren* prong

The second *Duren* prong proves problematic for Defendants' prima facie case. Under this prong, Defendants must demonstrate that Latinos and Native Americans were underrepresented in the jury-selection process. *Duren*, 439 U.S. at

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 10

364. This showing "requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996).

The parties apparently agree on the relevant community and jury pool to analyze. Here, the relevant "community" to analyze is the Division A community—i.e., the fourteen counties comprising Division A. *See United States v. Bahna*, 68 F.3d 19, 24 (2d Cir. 1995) ("Where a jury venire is drawn from a properly designated division, we look to that division to see whether there has been any unlawful or unconstitutional treatment of minorities."). Meanwhile, the relevant jury pool to analyze is Division A's master wheel and resulting panel, as Defendant takes issue with how the Clerk's Office built the master wheel and summonsed individuals from the wheel for service.

As an initial matter, the Court first addresses the relevant population data. The parties disagree on the correct census data to establish the Latino and Native American population in the Division A community. Defendants' expert—Jeffrey Martin—submitted a statistical analysis of the grand jury selection process in this matter, utilizing population figures from the 2019 American Community Survey 5 Year Average, which was published in 2020. *See generally* ECF No. 352-1 (finding that Latinos and Native Americans represent, respectively, 7.55 percent and 1.92

percent of the Division A population.). The Government disputes these figures, noting that the master jury wheel was last filled in April of 2019. As such, the Government contends that the Clerk's Office cannot validate results against unpublished and unknown population data. The Court agrees and finds that the correct population data to utilize in assessing statistical underrepresentation is the population data listed in the November 2019 AO-12, which reflects population figures from the 2015 American Community Survey 5 Year Average. *See* ECF No. 445-1.

While the Court understands these figures are outdated, it cannot expect the Clerk's Office to establish a fair cross section by using data not available to it.[7] Therefore, for purposes of this motion, Latinos represent 6.6 percent of the Division A population, and Native Americans represent 2 percent. ECF No. 445-1 at 2. Having established the relevant population data, the Court now addresses the statistical methods used to assess the alleged underrepresentation.

### 1.    Statistical Methods

Courts have employed several statistical methods to determine whether a defendant can make the requisite showing of inadequate representation in the jury

---

[7]  Although the Court has no control over the production and distribution of the census data used in AO-12 reports, the Court agrees that districts across the country, particularly those that are rapidly diversifying, would benefit greatly from more frequent updates to the available population statistics.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 12

pool under the second *Duren* prong. *See United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999) ("[C]ourts and commentators have [long] discussed the various forms of statistical analysis that may be used" to show underrepresentation.). Here, the parties disagree on the proper statistical method to utilize. The Government argues that the Court should use the "absolute disparity test." ECF No. 392 at 10. Defendants cite reliability concerns with the absolute disparity test and argue that the Court should instead use the "standard deviation theory." ECF No. 352 at 26–28. The Court addresses each theory in turn.

### i.    *Absolute disparity test*

The upside of the absolute disparity theory is that it is easy to administer; the downsides are many. Until 2014, the Ninth Circuit employed the absolute disparity test "exclusively." *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014). This test examines "the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool." *Id.*   For example, if a distinctive group comprises 10 percent of the population, but only 7 percent of the relevant jury pool, the absolute disparity is 3 percent. *See United States v. Barlow*, 732 F. Supp. 2d 1, 31 (E.D.N.Y. 2010), *aff'd*, 479 F. App'x 372 (2d Cir. 2012). Under this test, courts generally "decline[] to find underrepresentation of a distinctive group where the absolute disparity is 7.7% or lower." *Hernandez-Estrada*, 749 F.3d 1154, 1161 (9th Cir.

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 13

2014). Thus, this test becomes substantially less useful when the distinctive group at issue is a relatively small percentage of the population. *Id.* (criticizing the test because "if a minority group makes up less than 7.7% of the population in the jurisdiction in question, that group could *never* be underrepresented in the jury pool, even if none of its members wound up on the qualified jury wheel.") (emphasis in original).

This concern, as well as concerns about distortion based on population size, led the Ninth Circuit to "abandon the absolute disparity approach." *Id.* at 1164. Although the Ninth Circuit did not explicitly preclude the approach, its criticism strongly suggests that lower courts should not employ it. And this case illustrates why. Neither Latinos nor Native Americans comprise more than 7.7 percent of the Division A population, which makes the absolute disparity test effectively useless in this case. Accordingly, the Court declines to employ this approach to measure the complained of underrepresentation.

### ii.    *Standard deviation theory*

Recognizing the problems in the absolute disparity test, "[s]ome courts have used an analysis of standard deviation, which is the 'measure of the predicted fluctuations from the expected value.'" *Hernandez-Estrada*, 749 F.3d at 1163 (quoting *Castaneda v. Partida*, 430 U.S. 482 n.17 (1977)). This approach is "firmly grounded in statistical theory, and generally applicable to both large and small

population groups." *Id.* "Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system." *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996).

But the standard deviation theory is not without criticism. *See Hernandez-Estrada*, 749 F.3d at 1163 ("[S]ome courts have questioned whether a pure standard deviation analysis is appropriate given that the characteristics of the general population differ from a pool of qualified jurors."); *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996) (criticizing the standard deviation theory as "illogical"). For these reasons, "no court in the country has accepted [the standard deviation theory] alone as determinative in Sixth Amendment challenges to jury selection systems." *Rioux*, 97 F.3d at 655.

Here, the Court considers the standard deviation theory a helpful tool but declines to accept it as dispositive. Under this measure, Defendants have shown statistical underrepresentation. By Mr. Martin's calculations, the underrepresentation of Latinos in the jury panel is over three standard deviations from what is expected, and the underrepresentation of Native Americans is over two standard deviations from what is expected. ECF No. 352-1 at 8. The Court finds that the disparities shown by the standard deviations are likely caused at least in part by Mr. Martin's use of the more recent, then-unpublished population data. In

other words, given the population trends in the Division over time, the statistical underrepresentation of Latinos posited by Mr. Martin is at least somewhat overstated. Nonetheless, the Court accepts these calculations for purposes of ruling on this motion and finds that they show statistical underrepresentation.

### 2.    Legal Significance

Although Defendants have shown statistical underrepresentation of Latinos and Native Americans in the jury panel, the Court agrees with the Government that the underrepresentation is legally insignificant. It is well settled in the Ninth Circuit that showing statistical underrepresentation alone is not enough to satisfy the second *Duren* prong. *Hernandez-Estrada*, 749 F.3d at 1165 ("[T]he challenging party must establish not only *statistical* significance, but also *legal* significance." (emphasis in original)). Rather, "[t]he results of any statistical method must be examined in the context of the likely, actual, real life impact" on the jury panel. *Id.*; *see also United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir. 1977) ("[W]e look to people not percentages.). "If a statistical analysis shows underrepresentation, but the underrepresentation does not substantially affect the representation of the group in the actual jury pool, then the underrepresentation does not have legal significance in the fair cross-section context." *Hernandez-Estrada*, 749 F.3d at 1165.

In *Kleifgen*, the Ninth Circuit declined to find substantial underrepresentation where the absolute numerical effect in a panel of 100 jurors was 2.9 fewer African

Americans and 4.4. fewer males than expected. *Kleifgen*, 557 F.2d at 1297. Here, the absolute numerical effect of the underrepresentation is weaker. The 50-person panel in this case included two Latinos and no Native Americans. Per the relevant AO-12, and as previously discussed, Latinos and Native Americans make up 6.6. percent and 2 percent of the Division A population respectively. If the 50-person panel maintained these percentages, such that there was a perfect distribution, there would have been 3.3 Latinos and 1 Native American on the panel. The real-life impact of the underrepresentation is therefore 1.3 fewer Latinos and 1 fewer Native American on the jury panel. A grand jury of 27 drawn from this array would underrepresent both Latinos and Native Americans by less than one juror.

As in *Kleifgen*, this is not substantial—i.e., legally significant— underrepresentation. Defendants in effect ask this Court to find unfair underrepresentation in every jury panel in the Eastern District of Washington that slightly differs—even by a single person—from the projected jury panel composition. But "[n]either the Constitution nor the [JSSA], however, requires the grand jury to duplicate precisely the statistical complexion of the community." *Id.* at 1296. To hold otherwise would stretch the meaning of a "fair cross-section" beyond its breaking point and demand a perfection not otherwise contemplated or required.

## CONCLUSION

The Court takes seriously any allegation that the Jury Plan was not followed to the letter; but here, the described deviations did not result in legally significant underrepresentation. Accordingly, Defendants cannot satisfy the second *Duren* prong, and the Court therefore denies Defendants' requested relief.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendant James Cloud's Motion to Dismiss Third Superseding Indictment, **ECF No. 352**, is **DENIED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel, the U.S. Probation Office, and the U.S. Marshals Service.

**DATED** this 8th day of December 2021.

_____
SALVADOR MENDOZA, JR.
United States District Judge

ORDER DENYING MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT – 18