FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 09, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JAMES DEAN CLOUD (01), <br><br> Defendant. | No. 1:19-cr-02032-SMJ-1 <br><br> **ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION** |

"When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law." *United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013). On the eve of the expected testimony of the Government's key witness in this quintuple murder trial, the Government learned that she may be willing to fabricate her testimony in exchange for the FBI resolving her boyfriend's pending drug and weapon charges, among other potential benefits sought. It was only by sheer chance that this information was then passed to the defense not by the Government, but by the witness' counsel. The next morning, defense counsel, not the Government, revealed

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 1

1  this still undisclosed information to the Court.[1] Troubled to learn of this
2  information, the Court asked the Government for an explanation. After the
3  Government initially proffered a beleaguered and sanitized version of events, the
4  Court excused the jury for several hours and began calling witnesses to the stand to
5  resolve this issue. Information eventually trickled out. These proceedings resulted
6  in the Court finding that the Government violated its *Brady v. Maryland* obligations
7  and excluding the witness after she admitted her willingness to provide false
8  testimony in exchange for negotiated benefits.

## BACKGROUND

Defendant is on trial for fourteen criminal offenses—including five counts of murder—and is facing significant penalties. Esmeralda Z. is an eyewitness to several of the Medicine Valley shootings and was designated as a material witness in this matter. Her testimony's significance was heightened when the Court limited the testimony of the only other surviving eyewitness. Due to her status as a material witness, Roger Peven was appointed to represent her in the proceedings. She was set to testify on March 1, 2022 and was expected to identify Defendant as one of the perpetrators. But on March 1, 2022, at approximately 8:15 A.M., just fifteen minutes before jury proceedings were set to commence, defense counsel notified

---

[1] Defense counsel informed the Court that, prior to the start of the hearing, defense counsel asked the Government whether it had anything to discuss with the Court outside the presence of the jury. The Government responded that it did not.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 2

the Court of a concerning issue. John McEntire, defense counsel for James Cloud, proffered to the Court that he received a phone call from Mr. Peven at approximately 10 P.M. the night before. During that phone call, Mr. Peven informed Mr. McEntire that Esmeralda's significant other, James S., sent a text message to FBI Agent Troy Ribail indicating that Esmeralda would shape her testimony if Agent Ribail could make James' pending Kittitas County weapon and drug charges go away.[2] Mr. Peven also expressed concern that the Government had met with his client without his knowledge or agreement earlier that evening.

The Court later received a copy of the text message, which states, in relevant part:

> Hi it's James what can we do about my stuff in Kittitas county. I've been more than willing to help you guys out and still am cause she wants to go in there and pleex the 5th and say she don't remember anything and is even thinking about taking off. I need my kitittas stuff to go away you guys need her testimony sayi g which one shot who…I need my charges gone so I can get to work and move on in my life. She will testify to whatever you need her to if you can make that happen.

ECF No. 737 at 7 (typographical errors in original). Agent Ribail responded: "[m]eeting a witness, will call you later." *Id.* It appears Agent Ribail and James exchanged phone numbers weeks prior following Agent Ribail's visit to James'

---

[2] Before Mr. McEntire and Mr. Peven discussed this matter, Mr. McEntire confirmed that Esmeralda had waived her attorney-client privilege with respect to this communication.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 3

residence in search of Esmeralda. The Government characterized the exchange as James inserting himself into issues surrounding Esmeralda's anticipated testimony in this matter. The Court also received a copy of a text message sent by Esmeralda to Agent Ribail on February 22, 2022, in which she stated: "Idk if ur trying to lose a big case case but we need to talk." ECF No. 737 at 2.

The Court then heard from the Government on this issue. Assistant United States Attorney Rick Burson stated that the Government did not immediately disclose the text message because it had doubts that Esmeralda was going to arrive at the Courthouse to testify:

> I've never come across a situation like this, so I was speaking with a senior litigation counsel - - or, sorry - - Deputy United States Attorney last night, co-counsel, the agents, trying to figure out what to do with this information…[a]nd so our intent was to see if she shows up this morning at 9:00 a.m., even though she's not going to be called until this afternoon at the earliest…It was at that point, once confirmation was that she was not at her hotel or the court, that we were going to approach the Court, ask for a bench warrant or a material witness warrant. I think folks in the office are drafting one right now. And we were going to include for the Court the statements made by the boyfriend as evidence that, okay, it really does appear as though she's not going to show.

ECF No. 700 at 11. This suggests to the Court that the Government's primary concern was securing Esmeralda's testimony, not its constitutional obligations.

With significant questions left unanswered, the Court called Agent Ribail to the stand outside the presence of the jury. Agent Ribail testified that he had been communicating with James several weeks prior in an effort to locate Esmeralda.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 4

Agent Ribail indicated that he received the messages at issue from James at approximately 5:30 P.M. the night before Esmeralda's expected testimony and communicated the information to AUSA Burson at approximately 6:30 P.M. the same day. Shortly after, Agent Ribail called Esmeralda to "put an end to this," and told her "that we can't have this, that I'm not going to be threatened; we're not going to have a discussion about trading something for her testimony and that [James] needed to not text me any further." ECF No. 700 at 70. Esmeralda apparently had the phone call on speaker with James present, as James began yelling at Agent Ribail, terminating the call.

The Court then heard testimony from Esmeralda, also outside the presence of the jury. She was accompanied at the witness stand by her attorney. Mr. McEntire asked Esmeralda whether she was aware that James sent the text message and whether it was done with her approval. Esmeralda responded "yes" to both questions but clarified that she had not read the text before it was sent.[3] *Id.* at 98–103. Although difficult to track Esmeralda's testimony, the Court understands that she had discussions with Agent Ribail about possibly relocating for safety reasons after providing testimony in this matter. According to Esmeralda, James could not travel out of state with pending charges, so she understood that Agent Ribail or the

---

[3] The Government submits it was not previously aware that Esmeralda approved of, or otherwise authorized, the text message.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 5

1 Government may help resolve his charges so he could relocate with her. Esmeralda
2 indicated that "they promised us that," although it is unclear whether she was
3 referring to relocation or resolving James' charges, or both. She testified that she
4 asked the FBI to put these promises in writing, but "they said they couldn't because
5 it was too late." *Id.* at 102. She also testified that "the FBI agent just said to make a
6 list of everything that it – that we would need done," and admitted that these were
7 promises she wanted in order to testify. *Id.* at 105. This wish list—including
8 assistance with housing expenses and relocation costs—was communicated to
9 Agent Ribail over the phone.

10 Pushing the noon hour, the Court called lunch recess. Once the proceedings
11 reconvened, the Court called Esmeralda back to the stand outside the presence of
12 the jury. Esmeralda testified that after James sent the text message, Agent Ribail
13 "called [her] and told me not to do anything over text anymore."[4] *Id.* at 113. She
14 also indicated that the first time she spoke to Agent Ribail, he promised to provide
15 her with funds for a down payment or rent on a home or apartment, presumably so
16 that she could relocate after her testimony. Agent Ribail confirmed that he had such
17 discussions with Esmeralda. This assortment of desired benefits was never
18 communicated to defense counsel.

---

[4] Agent Ribail maintains that this communication was stated out of context, testifying that he simply told Esmeralda that James could not text him anymore.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 6

The Court then asked Esmeralda if she was willing to testify to whatever the Government wanted if either Agent Ribail or the Government could make James' charges go away. Esmeralda responded: "Yeah. Um, I - - I had a choice to say something or not. And if they were willing to keep me safe, then I was willing to, you know - - to, you know, agree to whatever happened that day." *Id.* at 117. To clarify, the Court asked whether Esmeralda was willing to change her testimony based upon whether she received these benefits. Esmeralda answered: "yes." *Id.* at 122.

Based on Esmeralda's admission that she was willing fabricate her testimony, the Court excluded her as a witness. The Court also made a specific finding that the Government violated its *Brady* obligations for failing to disclose the text message to defense counsel and indicated that an order regarding sanctions would be forthcoming.

## LEGAL STANDARD

Under *Brady v. Maryland* and its progeny, prosecutors have an affirmative obligation to disclose material exculpatory evidence, whether for substantive or for impeachment purposes.[5] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United*

---

[5] To that end, there is a standing order in this case requiring the Government to produce all exculpatory evidence to the Defendant pursuant to *Brady* and its progeny "in a timely manner." ECF No. 263 at 3. This Order put the Government on notice that the Court may impose sanctions for failing to do so. *Id.*

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 7

*States*, 405 U.S. 150, 153 (1972). "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 154 (internal quotations omitted); *see also Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) ("Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses.").

A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, (2) the evidence must have been suppressed by the [Government], and (3) the suppression must have been prejudicial. *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015). Evidence is "favorable to the accused" when it calls the Government's case into doubt, whether through substantive or impeachment evidence. *Id.* The Government suppresses evidence when the evidence is known to it and it fails to disclose the evidence to the defendant. *Id.* This duty to disclose is affirmative—i.e., the Government need not wait on a "request by the accused." *Id.* Evidence is prejudicial "if it undermines confidence in the outcome of the trial." *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002).

Given the significant interests at stake when the Government charges a defendant with a criminal offense, courts "expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery." *United*

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 8

*States v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993). This uncontroversial requirement mandates that the government "turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility." *Id.* (emphasis in original).

## DISCUSSION

**A.    *Brady* Violation**

Despite the Government's continuing and meritless protests, the Court has little reservation in concluding that the Government's conduct constitutes a *Brady* violation. As the parties are acutely aware, Esmeralda's testimony was expected to be crucial to the Government's case. James' text message indicating that she was willing to provide fabricated testimony and the benefits she negotiated with Agent Ribail call her credibility into significant question, and on the eve of her expected testimony, Defendant was immediately entitled to this impeachment evidence from the Government—not from a fortuitous disclosure by Esmeralda's counsel.

**1.    Evidence that Esmeralda negotiated benefits and was potentially willing to fabricate her testimony is favorable evidence.**

The undisclosed evidence patently undermines Esmeralda's reliability as a witness. On this point, the Court first addresses the Government's justifications for withholding the text message and negotiated benefits from the defense. Put bluntly, the Government's proffered justifications for withholding the evidence do not sit well with the Court.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 9

To date, the Government disputes that its conduct violated *Brady,* clinging to a labored argument that strains logical considerations *See* ECF No. 743 at 2. The Government marshals the notion that it did not disclose the text message because it was unaware that Esmeralda had prior knowledge or otherwise acquiesced to the content of the message. However, the Court cannot reconcile the Government's stated confusion with the testimony of Agent Ribail, who specifically told Esmeralda that he was not going to be trading benefits for her testimony. This suggests to the Court that Agent Ribail knew Esmeralda's agenda, and by extension, so did the Government. Citing doubts that Esmeralda would arrive at the courthouse as scheduled, the Government conveniently proffers that it was waiting to disclose the evidence until it either knew that Esmeralda would in fact testify, or until it had to apply for a warrant to secure her presence.

But the Government's *Brady* obligations are not limited to evidence the Government is *certain* has impeachment value. Rather, "whether evidence is favorable is a question of substance, not degree, and evidence that has any…impeachment value is, by definition, favorable." *Comstock*, 786 F.3d at 708. To trigger disclosure obligations, evidence need only "tend to call the government's case into doubt." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013).

The Court will not belabor an obvious point, but suffice it say that evidence of a material witness' boyfriend attempting to bargain with a federal agent in

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 10

exchange for her favorable testimony tends to call the witness's credibility into doubt, even if the Government, as claimed, has not determined with certainty that the witness is on board with the plan. Similarly, evidence that a witness negotiated financial benefits for her testimony does the same. Had Esmeralda testified and identified the Defendant as a shooter, evidence that her testimony was at a minimum motivated, but also potentially false, would have been of value to the defense's line of cross-examination and the jury's assessment of her credibility. More importantly, this central witness' identification could have been "determinative of guilt or innocence." *Giglio*, 405 U.S. at 154. The Court therefore finds that the Government's conduct meets the first prong of a *Brady* violation.

**2.     The Government's suppression of the impeachment evidence prejudiced the defense.**

First, the evidence was plainly suppressed. Suppression occurs when favorable evidence is known to the prosecution but withheld from the defense "either willfully or inadvertently." *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007). Here, it is undisputed that the Government did not itself disclose the evidence despite ample opportunity and a known alternative to seek *ex parte* direction from the Court. *United States v. Cadet*, 727 F.2d 1453, 1467–68 (9th Cir. 1984) ("If the prosecution is uncertain about the materiality of information within its possession, it may submit the information to the trial court for an *in camera* inspection and evaluation."). Instead, this evidence only came to light

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 11

through a third party's serendipitous disclosure to defense counsel. The Court recognizes the rapid nature of trial, particularly a trial of this magnitude, but it reminds the Government that an obligation to timely disclose evidence bearing on a witness' credibility becomes urgent on the eve of the witness' anticipated testimony—particularly when the witness is crucial to the Government's case.

Finally, the Government's suppression prejudiced the Defendant. Prejudice ensues when there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985). Fortunately, the evidence came to light before Esmeralda testified before the jury. The Government suggests that it intended to disclose the evidence once it was confident that Esmeralda would testify. This statement is reminiscent to a child whose hand is caught in the cookie jar. The Court finds this stated intention unlikely, as the Government had been granted a material witness warrant authorizing Esmeralda's arrest. The Government knew that Esmeralda had been arrested on the warrant and was subject to GPS monitoring pending her testimony. This suggests to the Court that the Government knew Esmeralda would eventually be hailed into Court to testify, even if authorities had to chase her down again. Given her status as a material witness, the Government should have immediately informed the Court of these issues, even if uncertain that

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 12

she would arrive to testify as scheduled. Instead, the Government was surreptitiously silent.

Nonetheless, even accepting the Government's position, the Government almost certainly knows that a last-minute disclosure would prejudice the defense by hindering its investigation of the evidence. And it is not lost on the Court that such a belated disclosure would have caused defense counsel and the Court to scramble to figure out an appropriate course of action, as additional witnesses and documents may have been needed.

The court is cautious to not dwell on hypotheticals, but a brief discussion of the avoided prejudice is warranted here. If not for Mr. Peven's disclosure, the jury likely would have heard tainted testimony, and defense counsel would have had to cross-examine Esmeralda ignorant of the motivations for her testimony. Compounding this problem is the fact that Esmeralda was undeniably the Government's key witness and expected to provide damming testimony that could expose the Defendant to significant sentencing penalties if convicted. The Court thus has little trouble concluding that Esmeralda's testimony would have undermine[d] confidence in the outcome of the trial." *Kohring*, 637 F.3d at 902 (9th Cir. 2011).

Still, defense counsel suffered tangible prejudice in the form of the time and expenses it incurred in addressing Esmeralda's reliability concerns. Pursuant to the

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 13

Court's direction, defense counsel submitted an accounting of the resources spent on this avoidable matter. By withholding crucial impeachment evidence, the Government caused the defense to spend 25.9 work hours and $630.00 in additional expenses. These resources could have, and should have, gone toward preparing the Defendant's defense; they were instead waisted on mitigating the Government's misconduct.

\* \* \*

The Government's conduct was offensive to the sound administration of justice and principles of fairness on which the American criminal justice system is founded. By withholding key evidence that it had a duty to produce, the Government jeopardized the integrity of the proceedings, which is particularly egregious conduct in light of the serious consequences Defendant faces if convicted. This assault on the principles of justice can never be tolerated nor ignored.

**B. Sanctions**

Having found that the Government violated its *Brady* obligation, as well as the Court's standing Order, ECF No. 263 at 3, the Court now turns to the appropriate remedy. Defendant asks the Court to sanction the Government by dismissing Counts 7 through 14 of the Third Superseding Indictment with prejudice. ECF No. 742. Notwithstanding the concerning nature of the Government's conduct, the Court finds that this extraordinary remedy is not warranted here.

A district court may exercise its supervisory power to implement of range of remedies for governmental misconduct, including dismissing an indictment. *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008). But "[d]ismissing an indictment is so intrusive on a prosecutor's charging authority that it is justified only when the government's conduct substantially prejudiced the defendant and the government flagrantly disregarded the limits of professional conduct." *United States v. Lopez,* 989 F.2d 1032, 1041 (9th Cir.1993). Although the Court finds the Government's inactions insulting, it cannot say this is the type of misconduct necessitating dismissal of charges, particularly because the prejudice was mitigated by the fact that the Court excluded Esmeralda as a witness and the acknowledged lies surrounding her testimony never came to pass before the jury.

Instead, the Court will exclude Esmeralda as a witness in this matter[6] and impose monetary sanctions on the Government. These remedies are the most closely tailored to the harm Defendant suffered from the Government's nondisclosure and do not excessively penalize the Government. The monetary sanctions, while significant, are appropriately limited to reimbursing defense counsel and the Court for expenses that could have been avoided had the Government carried out its constitutional duties. Having so decided, the Court directs the Government to

---

[6] Aside from excluding Esmeralda as a sanction for the Government's conduct, the Court, for obvious reasons, will not permit a witness with a documented motivation and willingness to lie to take the stand.

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 15

submit payment as detailed below. The Government should be on notice in this and all other cases that the Court will not tolerate such conduct and will further implement safeguards necessary to prevent future misconduct.

Accordingly, **IT IS HEREBY ORDERED**:

**1.** Defendant's Motion to Dismiss Counts for *Brady* Violation, **ECF No. 742**, is **DENIED**.

**2.** The Court hereby enters a specific finding that the Government violated its *Brady v. Maryland* obligations when it failed to timely disclose favorable evidence affecting the credibility of an anticipated Government witness.

**A.** As a sanction for this misconduct and for violating the Court's standing order mandating timely disclosure of *Brady* material, ECF No. 263 at 3, the Government shall **SUBMIT PAYMENT** as follows:

*i.* **By no later than April 9, 2022**, the Government shall pay directly to the Federal Defenders of Eastern Washington & Idaho the sum of **$4,844.68**.

1. This sum constitutes **(1)** 15.53 attorney hours at the CJA Panel Attorney Hourly Rate of $158.00 per hour plus 7.76 hours at the CJA Panel Attorney Capital

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 16

Hourly Rate of $202.00 per hour; **(2)** 2.6 investigator hours at $75.00 per hour; and **(3)** $630.00 in expenses. *See* ECF No. 736.

    *ii.* **By no later than April 9, 2022**, the Government shall pay directly to the Clerk's Office the sum of **$216.00**. This sum constitutes the amount paid by the Clerk of Court to the jurors while they sat idle, waiting for the Court to investigate and resolve this matter.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order as provide copies to all counsel.

**DATED** this 9th day of March 2022.

_____
SALVADOR MENDOZA, JR.
United States District Judge

ORDER REGARDING GOVERNMENT'S *BRADY* VIOLATION – 17