

John B. McEntire, IV
Lorinda M. Youngcourt
Jeremy B. Sporn
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorneys for James D. Cloud

# United States District Court
## Eastern District of Washington
### Honorable Salvador Mendoza, Jr.

| | |
|---|---|
| United States, | No. 1:19-CR-2032-SMJ-1 |
| Plaintiff, | |
| | Rule 29 Motion for Partial |
| v. | Judgment of Acquittal; Rule 33 |
| | Motion for New Trial |
| James Dean Cloud, | |
| | July 18, 2022 – 6:30 p.m. |
| Defendant. | |
| | Yakima—Without Argument |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

# Table of Contents

I.      Introduction...............................................................................................................3

II.     Background................................................................................................................8

        A.      What the Government promised.................................................................8

        B.      Michael Peterson ......................................................................................9

        C.      Janet Hoptowit .........................................................................................9

        D.      Pat Lewis ...............................................................................................10

        E.      Michelle Sconawah .................................................................................10

        F.      Julia Saluskin .........................................................................................10

        G.      Wyeth Wallace .......................................................................................10

        H.      William Boyer .........................................................................................11

        I.      Troy Ribail .............................................................................................11

        J.      Morris Jackson .......................................................................................13

        K.      David Hoffman .......................................................................................19

        L.      Natasha Jackson .....................................................................................19

        M.      Charity Davis ..........................................................................................23

        N.      Lindell L. ................................................................................................23

        O.      Jesus Arreguin ........................................................................................23

        P.      Sigmund Menchel....................................................................................24

        Q.      Jon V. .....................................................................................................24

        R.      Berdleen Cootes ......................................................................................24

        S.      Alvin Cootes ...........................................................................................24

        T.      Shannon Prince .......................................................................................25

        U.      Jeremy Wyatt ..........................................................................................25

        V.      Deanna Leslie ..........................................................................................25

III.    Discussion ...............................................................................................................26

        A.      Standard..................................................................................................26

|  |  | 1. | Rule 29 .................................................................................... | 26 |

| | | 2. | Rule 33 .................................................................................... | 30 |

| | B. | The house murders don't survive post-trial scrutiny. ........................... | 32 |

| | | 1. | Under Rule 29, the Government failed to prove premeditation for the house murders with near certitude. ........................ | 32 |

| | | 2. | Under Rule 33, the Government failed to prove premeditation for the house murders with near certitude. ........................ | 37 |

| | | 3. | Under Rule 29, the Government failed to prove James committed the house murders with near certitude. ........................ | 40 |

| | | 4. | Under Rule 33, the Government failed to prove James committed the house murders with near certitude. ........................ | 44 |

| | | 5. | Under Rule 29, the Government failed to prove James aided in the house murders with near certitude. .................... | 47 |

| | | 6. | Under Rule 33, the Government failed to prove James aided in the house murders with near certitude. .................... | 49 |

| | C. | The truck murders don't survive post-trial scrutiny. ........................... | 49 |

| | | 1. | Under Rule 29, the Government failed to prove James committed the truck murders with near certitude. ........................ | 49 |

| | | 2. | Under Rule 33, the Government failed to prove James committed the truck murders with near certitude. ........................ | 55 |

| | | 3. | Under Rule 29, the Government failed to prove James aided in the truck murders with near certitude. ........................ | 58 |

| | | 4. | Under Rule 33, the Government failed to prove James aided in the truck murders with near certitude. ........................ | 59 |

| IV. | Conclusion ............................................................................................ | | | 61 |

# I.    Introduction[1]

The Government's case against James Cloud unfolded in one courtroom, but it felt like two trials—one a picture of clarity, the other a picture of chaos.

At Jon's house, the Government laid out a clear narrative about James's role in the June 8 carjacking, kidnapping, and assault. Natasha placed James and Donovan in Jon's backyard minutes before the crimes occurred; Jon identified James as the man who pointed a shotgun at him; Nancy corroborated Jon; police recovered Donovan's prints from Jon's truck; and police located Jon's truck near where the Clouds were seen. The evidence against James was detailed, credible, and convincing.

At Dobie's house, the Government laid out a contradicting, inferential mess. Its #1 eyewitness (Morris) didn't see any murders; Natasha didn't see the house murders,[2] but exculpated James for the truck murders[3]; and Lindell not only exculpated James for the truck murders, but also agreed with Natasha that Morris was

---

[1] Throughout trial, the parties referred to several witnesses on a first-name basis. For this motion, James does the same; he also refers to select others on a first-name basis (e.g., Morris) for ease and consistency.

[2] The house murders embrace the following counts: 1) first-degree murder of Catherine (Count 10); 2) use of a gun during Catherine's murder (Count 11); 3) first-degree murder of Michelle (Count 12); and use of a gun during Michelle's murder (Count 13).

[3] The truck murders embrace the following counts: 1) first-degree murder of Dennis. (Count 7); 2) use of a gun during Dennis's murder (Count 8); 3) first-degree murder of Thomas (Count 14); and use of a gun during Thomas's murder (Count 15).

1  the blue-shirted, shotgun-toting man who nearly killed him—wholly undercutting what

2  the Government promised the jury (and the Court) the evidence would show.

3    One moment captured this mess perfectly: when the Government took time

4  during rebuttal to discredit its own eyewitnesses. Remarkable. This mess means the

5  verdict's murder convictions don't survive post-trial scrutiny. Here's why:

6    ***First***, under Rule 29, the Government failed to prove premeditation for the

7  house murders with near certitude.[4] Without a single eyewitness to say who-shot-who,

8  the Government built its case against James on an inferential chain tied to shooting

9  order—that is, Dobie got killed first during an unplanned argument, which meant

10  Michelle and Catherine got killed next during a premeditated cover-up.

11    This chain assumes Dobie got killed first—something the Government doesn't

12  know. It's guessing. Even "strong suspicion[s]" are "no substitute of guilt beyond a

13  reasonable doubt" under Rule 29, and the Government offers nothing more than

14  suspicions. *U.S. v. Jones*, 713 F.3d 336, 347 (7th Cir. 2013); *see also U.S. v. Katakis*, 800

15  _____

16  [4] During the jury instruction conference, the Government took issue with "this language about
   'near certitude,'" noting it "sounds different" than proof beyond a reasonable doubt. (ECF No.

17  666 at 9) (Transcript–Feb 22 pretrial hearing). The implication is this phrase (near certitude)
   incorrectly captured the Government's burden. Not so. The Ninth Circuit didn't divine this

18  phrase from thin air; it pulled the phrase from the Supreme Court. *See U.S. v. Velasquez*, 1 F.4th
   1132, 1137 (9th Cir. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) ("At the same time

19  by impressing upon the factfinder the need to reach a subjective state of ***near certitude*** of the guilt
   of the accused, the standard symbolizes the significance that our society attaches to the criminal
   sanction and thus to liberty itself.") (emphasis added)).

1  F.3d 1017, 1025 (9th Cir. 2015) (affirming judgment of acquittal since the

2  Government's evidence lacked a "critical link in the logical chain of inference").

3        Under Rule 33's more-relaxed standard, the Court gets to consider trial errors,

4  including the exclusion of James's evidence rebutting premeditation—namely, records

5  showing he got shot shortly before Medicine Valley, making it reasonable for him to

6  show up armed for protection, not aggression.

7        **Second**, under Rule 29, the Government failed to prove James committed the

8  house murders with near certitude. Once again, the Government built its case on an

9  inferential chain: Michelle and Catherine got killed with a rifle, and since a rifle was

10  consistently seen in James's hands, he's the shooter. This chain holds only if there was

11  one rifle at Medicine Valley, which wasn't the case; there were multiple rifles—so says

12  the Government's own witnesses.

13        Beyond the one-rifle problem, James wasn't the only one consistently seen with

14  a rifle that day; Donovan was too, including when it mattered most—right after the

15  shootings, as he ran towards Morris and Natasha all worked up and breathing hard. At

16  best, the Government's evidence creates equipoise, which falls short under Rule 29's

17  deeper audit for circumstantially-built cases. *See U.S. v. Coplan*, 703 F.3d 46, 69 (2d

18  Cir. 2012) (Noting "if the evidence viewed in the light most favorable to the

19  prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a

1    theory of innocence, then a reasonable jury must necessarily entertain a reasonable

2    doubt" under Rule 29).

3    Under Rule 33, the Court gets to consider the credibility of the Government's #1

4    witness: Morris, the man who left the stand with his credibility in shambles. When the

5    credibility of a Government witness gets that bad, courts grant new trials. *See*, *e.g.*, *U.S.*

6    *v. Capati*, 980 F. Supp. 1114, 1134 (S.D. Cal. 1997) (granting new trial because the

7    Government's theory, which was "based so heavily on the incredible testimony of one

8    witness, can in the end be no better than the discredited witness who gave it birth.").

9    ***Third***, under Rule 29, the Government failed to prove James aided in the house

10   murders with near-certitude. At best, the Government's evidence placed James near

11   the shootings, but mere presence isn't enough to convict. *See*, *e.g.*, *U.S. v. Goldtooth*,

12   754 F.3d 763, 768-69 (9th Cir. 2014) (noting "mere presence at the scene does not an

13   aider and abettor make"). Nor is evidence that James dragged Dobie's body, as that's

14   more akin to accessory-after-the-fact (§3), which the Government didn't charge.

15   Under Rule 33's more-relaxed standard, little changes.

16   ***Fourth***, under Rule 29, the Government failed to prove James committed the

17   truck murders with near certitude. Here, the Government's own witnesses tell

18   contradicting stories: the cooperating ones (Morris and David Hoffman) say James was

19   involved in the shootings, while the disinterested ones (Natasha and Lindell) say he

1   wasn't. That's equipoise, which doesn't survive Rule 29's deeper audit for

2   circumstantially-built cases. *See Coplan*, 703 F.3d at 69 (same as above).

3      Under Rule 33's more-relaxed standard, the Court gets to consider who came

4   off as more credible on the stand—Morris, or Natasha and Lindell. It also considers

5   trial errors, including when the Government was allowed to tell the jury (incorrectly)

6   that Morris saw James shoot Tommy—twice.

7      ***Fifth***, under Rule 29, the Government failed to prove James aided in the truck

8   murders with near certitude. Once again, the Government's witnesses contradict each

9   other: the cooperating one said James talked about taking out the truck (showing he had

10  murder on his mind), while the disinterested one said those words came from

11  Donovan. That's equipoise, which isn't enough under Rule 29's deeper audit in

12  circumstantially-built cases. It also shows no aiding liability, as James didn't share a

13  "state of mind extending to the entire crime," which is what the Supreme Court looks

14  for. *Rosemond v. U.S.*, 572 U.S. 65, 75-76 (2014) ("That is because, as we will describe,

15  an aiding and abetting conviction requires not just an act facilitating one or another

16  element, but also a state of mind extending to the entire crime.").

17     Under Rule 33's more-relaxed standard, the Court again weighs in on who came

18  across as more credible on the stand—Morris or Natasha.

19     Here are James's specific asks for both motions (laid out in the alternative):

    1)  enter Rule 29 acquittals for all the murders (without reaching Rule 33);

Rule 29 + Rule 33

   2) alternatively, enter Rule 29 acquittals for the house murders, then grant a new trial under Rule 33 for the truck murders;

   3) alternatively, enter Rule 29 acquittals on premeditation for the house murders, then grant a new trial under Rule 33 for the remaining house murders, as well as the truck murders.

The reasons why are set forth below.

## II.    Background

For ease, James organized the background to match how evidence came in at trial: by witness. This background doesn't capture every moment from every witness— that's unnecessary. Instead, it focuses on Medicine Valley. There will be periodic references to pre- and post-Medicine Valley events, but only insomuch as they shed light on the post-trial analysis.

### A.    What the Government promised.

It helps to begin with the Government's promises.[5] During opening, it promised the jury evidence showing James murdered five people, and he did so with a rifle:[6]

| 24 | DNA evidence. But most importantly what you're going to hear is |
|----|----|
| 25 | that on Saturday, June 8th of 2019, this man, James Dean Cloud, |

---

[5] Although this deviates from a witness-order format, these promises inform the Court's analysis under both Rule 29 and Rule 33.

[6] ECF No. 693 at 310 (Transcript–Day 3).

> murdered five unarmed individuals, and he shot all of them with
> a .22-caliber Ruger rifle.

That was its promise. But as set forth below, the Government's evidence showed something else entirely.

## B.    Michael Peterson

The Government opened with Michael Peterson; he offered little. Three days before the June 8 shootings, Michael saw James and Donovan parked outside his mother's house.[7]  They had guns, but Michael couldn't remember who had what.[8] When James saw Michael, he walked over and introduced himself, telling Michael they were waiting for help with a flat tire.[9] That's it.

## C.    Janet Hoptowit

Next was Janet Hoptowit. Janet told the jury the following: 1) she owned the property at 5151 Medicine Valley[10]; 2) she let Dobie live there rent-free[11]; and 3) the property "got a bit trashier" while he lived there.[12]

---

[7] ECF No. 693 at 344 (Transcript–Day 3).
[8] ECF No. 693 at 345, 346 (Transcript–Day 3).
[9] ECF No. 693 at 351 (Transcript–Day 3).
[10] ECF No. 693 at 354 (Transcript–Day 3).
[11] ECF No. 693 at 355-56 (Transcript–Day 3).
[12] ECF No. 693 at 363 (Transcript–Day 3).

### D.    Pat Lewis

Pat Lewis felt like a character witness—the good kind. Although Pat is James's step-father,[13] James refers to him as "Pops."[14] Pat told the jury James is an enrolled Yakima tribal member[15]; he also said James lacked a stable family growing up, so he spent more time than usual with his grandmother.[16]

### E.    Michelle Sconawah

Michelle Sconawah helped check the jurisdictional box, telling the jury James possesses sufficient blood quantum to be a Yakama tribal member.[17]

### F.    Julia Saluskin

Julia Saluskin also helped check the jurisdictional box, telling the jury James received tribal per capita checks, a benefit reserved for enrolled members.[18]

### G.    Wyeth Wallace

Wyeth Wallace finished checking the jurisdictional box, confirming Medicine Valley falls within the Yakama Nation's boundaries.[19]

---

[13] ECF No. 693 at 368 (Transcript–Day 3).
[14] ECF No. 693 at 370 (Transcript–Day 3).
[15] ECF No. 693 at 369 (Transcript–Day 3).
[16] ECF No. 693 at 371 (Transcript–Day 3).
[17] ECF No. 693 at 379 (Transcript–Day 3).
[18] ECF No. 693 at 384-85 (Transcript–Day 3).
[19] ECF No. 693 at 394 (Transcript–Day 3).

**H.    William Boyer**

Sergeant William Boyer served as a foundational witness, so it makes sense he spent some time on the stand. The Government used him to introduce crime scenes,[20] photos,[21] and physical items.[22]

But besides admitting exhibits and providing background, Sergeant Boyer offers little to this motion. He wasn't present during the shootings, he never saw the Clouds that day, and he didn't participate in any pivotal interviews.

Sergeant Boyer's testimony isn't wholly irrelevant, as he offered one fact that informs James's Rule 33 motion: he described Dobie's as a "tactical nightmare"—a location so packed with junk that there were many "places for a shooter to hide."[23]

**I.    Troy Ribail**

FBI agent Troy Ribail also served as a foundational witness. The Government used him to introduce photos (e.g., a shirtless Donovan with "Savage Till Death" tattooed across his chest),[24] as well as physical items (e.g., the .22-caliber rifle Morris ditched in the canal).[25]

---

[20] ECF No. 693 at 414 (Transcript–Day 3) (introducing Medicine Valley).

[21] ECF No. 693 at 425 (Transcript–Day 3) (introducing truck photos).

[22] ECF No. 693 at 470-71 (Transcript–Day 3) (introducing Natasha's green bag).

[23] ECF No. 693 at 433 (Transcript–Day 3). Since this is the background, James Cloud won't unpack how Sergeant Boyer's "tactical nightmare" comment informs the Rule 33 analysis; he'll save that analysis for the discussion section below.

[24] ECF No. 700 at 708 (Transcript–Day 4).

[25] ECF No. 700 at 717 (Transcript–Day 4).

1    But the most relevant information from Agent Ribail (at least for post-trial

2  motion purposes) came when James called him on direct. There, Agent Ribail told the

3  jury he did the following:

4      - **He labeled Morris a liar.** During various interviews, Agent Ribail repeatedly
         accused Morris of dishonesty and withholding information.[26]

5

6      - **He confronted Morris with inconsistent evidence.** Agent Ribail confronted
         Morris with evidence that other witnesses ID'd him as a shooter.[27]

7

8      - **He collected evidence that inculpated Morris.** Agent Ribail documented that,
         according to Lindell, Morris was the blue-shirted shooter who shot him and
         had the shotgun.[28]

9

10     - **He collected evidence that exculpated James.** Agent Ribail documented that
         Lindell excluded James as the person who shot Dennis and Thomas.[29]

11  Those are the things Agent Ribail did. He also told the jury he was surprised by several

12  things Morris said on the stand. Among them:

13     - **An unmentioned confession.** Morris mentioned James purportedly confessed
         to shooting Dobie Jack—news to Agent Ribail.[30]

14

15     - **Unmentioned time under a tarp.** Morris mentioned he spent several minutes
         during the post-shooting chaos sitting under a tarp by some wood stoves—
         news to Agent Ribail.[31]

16

17  _____

[26] ECF No. 739 at 1411 (Transcript–Day 7).
18  [27] ECF No. 739 at 1411 (Transcript–Day 7).
[28] ECF No. 739 at 1417 (Transcript–Day 7).
19  [29] ECF No. 739 at 1421-22 (Transcript–Day 7).
[30] ECF No. 739 at 1422-23 (Transcript–Day 7).
[31] ECF No. 739 at 1425 (Transcript–Day 7).

- ***An unmentioned confrontation.*** Morris mentioned Thomas confronted one of the Clouds about knowing Dobie was around[32]—news to Agent Ribail.

- ***An unmentioned friend.*** Morris mentioned Natasha was upset because she thought one of the shooting victims was "Chucky" from White Swan—news to Agent Ribail.[33]

It's revealing when the lead agent gets surprised by testimony from his #1 witness.

## J.    Morris Jackson

Morris served as the Government's #1 witness, so there's much to unpack from his testimony. The best way to view his statements is a table—the left column covering what Morris said on direct, the right column covering what changed on cross:

| Testimony on Direct | Admission on Cross |
|---|---|
| ***Drug use in morning.*** Morris woke up on June 8 and used meth.[34] | ***This was new.*** Morris admitted he never went to bed the night before and also used cocaine and alcohol. He agreed he told the jury something different the day before.[35] |
| ***Alcohol use at Medicine Valley.*** Morris took a couple of drinks of Jim Beam with Michelle.[36] | ***Admits to lying.*** Morris admitted to lying to police about his alcohol use on June 8.[37] |
| ***Weapons in car.*** James and Donovan *each* had rifles—Morris couldn't remember what they looked like, but "knew they were rifles."[38] | |

---

[32] ECF No. 739 at 1425 (Transcript–Day 7).
[33] ECF No. 739 at 1426 (Transcript–Day 7).
[34] ECF No. 700 at 761 (Transcript–Day 4).
[35] ECF No. 717 at 865-66 (Transcript–Day 5).
[36] ECF No. 700 at 770 (Transcript–Day 4).
[37] ECF No. 717 at 867 (Transcript–Day 5).
[38] ECF No. 700 at 762-63 (Transcript–Day 4).

| Testimony on Direct | Admission on Cross |
|---|---|
| **Relationship with Dobie Jack.** Morris referred to Dobie as his friend.[39] | **Admits to lying.** Morris admitted he "may have been lying" when he told police Dobie wasn't his friend.[40] |
| **Relationship with the Clouds.** Morris knew James longer than Donovan.[41] | **Admits to lying.** Morris admitted he told police the opposite—that is, he knew Donovan better than James.[42] |
| **Reason for Going to Medicine Valley.** Morris went to buy "some dope from Dobie."[43] | |
| **Who wore what.** Couldn't remember what James wore; Donovan wore "darker colors," not a white tank top.[44] | |
| **Weapons in house.** James and Donovan *each* had rifles (or *long* guns) inside Dobie's game room.[45] | **Memory gets fuzzy.** Morris didn't remember telling the FBI the opposite during a recorded interview—that is, Donovan had a rifle inside Dobie's game room, but James did not.[46]<br><br>Morris also couldn't remember telling the FBI—in a recorded interview—that he didn't know who had the .22 rifle.[47] |
| **Drug use at Medicine Valley.** Morris sat in the Blazer with Natasha and smoked meth.[48] | |
| **Morris enters the game room.** After waiting in the Blazer, Morris went to the game room and | **Getting things confused.** Morris didn't remember telling the FBI the opposite during a |

---

[39] ECF No. 700 at 763 (Transcript–Day 4).
[40] ECF No. 717 at 872-73 (Transcript–Day 4).
[41] ECF No. 700 at 759 (Transcript–Day 4).
[42] ECF No. 717 at 871 (Transcript–Day 5).
[43] ECF No. 700 at 766 (Transcript–Day 4).
[44] ECF No. 700 at 772 (Transcript–Day 4).
[45] ECF No. 700 at 772 (Transcript–Day 4).
[46] ECF No. 717 at 875 (Transcript–Day 5).
[47] ECF No. 717 at 875 (Transcript–Day 5).
[48] ECF No. 700 at 774 (Transcript–Day 4).

| Testimony on Direct | Admission on Cross |
|---|---|
| *believed* "they" (James, Donovan, and Dobie) were talking about gas, but didn't clarify who was doing the talking—or arguing.[49] James and Dobie then joked about Morris coming to check on them at Natasha's behest.[50] | recorded interview—that is, Donovan was the one joking about Morris coming to check on them at Natasha's behest. When confronted about this inconsistency, Morris admitted he gets James and Donovan confused when it comes to who did what.[51] |
| ***Morris returns to the Blazer.*** Morris left the game room, returned to the Blazer, and waited with Natasha for an unknown time period.[52] | |
| ***Morris hears something.*** While waiting in the car and listening to music loudly, Morris thought he heard a gunshot coming from the west—away from Dobie's residence.[53] | |
| ***What Morris sees next.*** Donovan ran from the property, jumped the fence, entered the Blazer, and rammed it through the gate. He was "worked up" and "breathing really hard," claiming "Dobie was gone."[54] | |
| ***The looting begins.*** Donovan directed Morris and Natasha to loot the place. He didn't see James.[55] | |
| ***James seen with one of two rifles.*** Morris eventually saw James, who carried a .22 rifle—one of two from the Blazer.[56] | |
| ***Entering Dobie Jack's bedroom.*** James purportedly told Morris to "get something" | ***This was new.*** Morris couldn't recall if he told his attorney, the FBI, or the prosecutors about |

---

[49] ECF No. 700 at 776 (Transcript–Day 4).
[50] ECF No. 700 at 776-77 (Transcript–Day 4).
[51] ECF No. 717 at 876 at 876 (Transcript–Day 5).
[52] ECF No. 700 at 778 (Transcript–Day 4).
[53] ECF No. 700 at 778 (Transcript–Day 4).
[54] ECF No. 700 at 779 (Transcript–Day 4).
[55] ECF No. 700 at 780 (Transcript–Day 4).
[56] ECF No. 700 at 780-81 (Transcript–Day 4).

| Testimony on Direct | Admission on Cross |
|---|---|
| from Dobie's bedroom. He entered the bedroom, used a cellphone as a flashlight, and then ran into Donovan, who now had a pistol as well.[57] | using a cell phone as a flashlight during seven different interviews and two dress rehearsals.[58] |
| ***Searching Dobie.*** While looking for gas, James and Morris returned to the game room. Once there, James directed Morris to search Dobie's pockets—his pockets were already pulled out.[59] | ***This was new.*** Morris was confronted with a prior recorded statement where he told police he didn't even know if Dobie was alive—he couldn't remember making that statement.[60] Morris insisted Dobie was wearing bib overalls, though photos show otherwise.[61] Morris thought someone took the time to remove these bib overalls.[62] |
| ***Alone time under the tarp.*** After exiting the game room, Morris sat under a tarp by some kitchen stoves for 5-10 minutes.[63] | ***This was new.*** Morris admitted he never told his attorney, the FBI, or the prosecutors about his alone time with the stoves during seven different interviews and two dress rehearsals.[64] |
| ***The truck arrives.*** While Morris searched the property for gas, a truck pulled up. He turned them away.[65] | |
| ***Morris sees multiple rifles.*** After the truck left, he saw Donovan carrying multiple rifles. James purportedly told Morris to shoot who came down the driveway.[66] | ***Confirms there were multiple guns.*** Morris confirmed seeing "a whole bunch of guns" being carried out of Dobie's house (5 or 6 or more).[67] |

---

[57] ECF No. 700 at 782-83 (Transcript–Day 4).
[58] ECF No. 717 at 861-62 (Transcript–Day 4).
[59] ECF No. 700 at 785-86 (Transcript–Day 4).
[60] ECF No. 717 at 852 (Transcript–Day 5).
[61] ECF No. 717 at 853-54 (Transcript–Day 5).
[62] ECF No. 717 at 857 (Transcript–Day 5).
[63] ECF No. 700 at 786 (Transcript–Day 4).
[64] ECF No. 717 at 854-55 (Transcript–Day 5).
[65] ECF No. 700 at 789 (Transcript–Day 4).
[66] ECF No. 700 at 790 (Transcript–Day 4).
[67] ECF No. 717 at 877 (Transcript–Day 5).

| Testimony on Direct | Admission on Cross |
|---|---|
| ***The truck returns.*** Roughly 20 minutes later, the returns.[68] During that time, Morris saw James with a rifle and Donovan with a pistol—Morris was going to say more about what Donovan possessed, but he wasn't able to finish answering the question.[69] | |
| ***Exchange with Thomas.*** Thomas exited the truck, walked around the property, and then said he knew Dobie was there, as he just spoke to him on the phone.[70] | ***This was new.*** Morris admitted he never told his attorney, the FBI, or the prosecutors about his exchange with Thomas during seven different interviews and two dress rehearsals.[71] |
| ***Random Confession.*** According to Morris, James told Thomas he killed Dobie.[72] | ***This was new.*** Morris admitted he never told his attorney, the FBI, or the prosecutors about James's purported confession during seven different interviews and one dress rehearsal.[73] Morris thought he brought it up during his final dress rehearsal with the Government on the Saturday before trial[74]—Agent Ribail said otherwise.[75] |
| ***Shifted on the truck shooting.*** Morris claimed James and Donovan were shooting at the truck as it drove away. When asked who had a .22-caliber rifle, Morris said Donovan had the rifle—he then corrected himself after prompting from the Government to say it was James.[76] | ***Didn't see any shootings.*** Morris admitted he didn't see anyone get shot.[77] |

---

[68] ECF No. 700 at 791 (Transcript–Day 4).
[69] ECF No. 700 at 793 (Transcript–Day 4).
[70] ECF No. 700 at 795 (Transcript–Day 4).
[71] ECF No. 717 at 845-47 (Transcript–Day 5).
[72] ECF No. 700 at 796 (Transcript–Day 4).
[73] ECF No. 717 at 843 (Transcript–Day 5).
[74] ECF No. 717 at 845 (Transcript–Day 5).
[75] ECF No. 739 at 1422-23 (Transcript–Day 7).
[76] ECF No. 717 at 821 (Transcript–Day 5).
[77] ECF No. 717 at 917 (Transcript–Day 5).

| Testimony on Direct | Admission on Cross |
|---|---|
| ***Natasha thought her friend was killed.*** Morris said Natasha was "shaken up" because she thought the man who was shot was "Chucky," a friend from White Swan.[78] | ***This was new.*** Morris couldn't recall if he told his attorney, the FBI, or the prosecutors about "Chucky" during seven different interviews and two dress rehearsals.[79] |
| ***The Jacksons and the Clouds load up.*** Morris found keys to Michelle's truck.[80] The Clouds and the Jacksons got in—Donovan drove, James was in front-passenger, and the Jacksons were in the back. James had a rifle, Donovan had a pistol, but it's unclear where the shotgun was.[81] | ***Getting things confused.*** Morris stated he was seated in the back when they left Medicine Valley, but insists there wasn't a dog in the back seat (there was).[82] |
| ***A seat switch.*** Donovan stopped the truck at Levi Culps's house, where James and Morris switched seats. According to Morris, this is how he ended up with a rifle.[83] | |
| ***Who had what gun.*** After leaving the Silverado, Morris had a rifle, James had a shotgun, and Donovan had a pistol.[84] | |
| | ***Plea benefit.*** Morris acknowledged his cooperation means the Government won't charge him with other crimes (e.g., shooting the truck with a shotgun).[85] |
| | ***Accused of lying.*** Morris admitted the FBI and other police repeatedly accused him of lying during his many interviews.[86] |

[78] ECF No. 717 at 822 (Transcript–Day 5).
[79] ECF No. 717 at 859-60 (Transcript–Day 5).
[80] ECF No. 717 at 824 (Transcript–Day 5).
[81] ECF No. 717 at 827 (Transcript–Day 5).
[82] ECF No. 717 at 882 (Transcript–Day 5).
[83] ECF No. 717 at 829 (Transcript–Day 5).
[84] ECF No. 717 at 830 (Transcript–Day 5).
[85] ECF No. 717 at 893-94 (Transcript–Day 5).
[86] ECF No. 717 at 886 (Transcript–Day 5).

Rule 29 + Rule 33
– 18 –

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

## K.    David Hoffman

David Hoffman testified about a handful of inculpatory statements James purportedly made when they were cellmates at FDC Sea-Tac. Mr. Hoffman told the jury he and James "grew up together."[87] He also told the jury James made the following statements: 1) "he was there on five bodies"[88]; 2) he shot a female in the arm[89]; and 3) he shot one victim twice.[90] We also learned the following: 1) he has no agreement with the Government "at this point in time," so Mr. Hoffman was testifying on his "own free will"[91]; 2) inmates at FDC Sea-Tac receive their discovery electronically, which is viewed on a non-private computer in the middle of the housing unit for all to see;[92] 3) it's hard to have private legal calls because the phones are located in the middle of the housing unit for all to hear[93]; and 4) he lacked any personal knowledge about what happened at Medicine Valley.[94]

## L.    Natasha Jackson

Natasha was supposed to shore-up Morris's testimony about James's role at Medicine Valley; she did anything but. She told the jury the following:

---

[87] ECF No. 717 at 926 (Transcript–Day 5).
[88] ECF No. 717 at 927-28 (Transcript–Day 5).
[89] ECF No. 717 at 928 (Transcript–Day 5).
[90] ECF No. 717 at 928 (Transcript–Day 5).
[91] ECF No. 717 at 939 (Transcript–Day 5).
[92] ECF No. 717 at 933-34 (Transcript–Day 5).
[93] ECF No. 717 at 938 (Transcript–Day 5).
[94] ECF No. 717 at 946 (Transcript–Day 5).

1   -   ***Who wore what.*** Morris wore a blue shirt and Donovan wore a white tank top.[95]

2   -   ***The Clouds brought two rifles, not one.*** Natasha knows the difference between shotguns and rifles, and the Clouds brought two rifles with them in the Blazer, not one.[96]

4   -   ***Morris wanted to go to Medicine Valley, not the Clouds.*** Donovan detoured to Medicine Valley because Morris wanted to "get what Dobie owed him."[97]

6   -   ***The Clouds entered Medicine Valley with two rifles, not one.*** After waiting inside the Blazer for Morris, the Clouds entered Dobie's property—each brought a rifle.[98]

8   -   ***She saw James drag Dobie's body.*** While retrieving items from Medicine Valley at Donovan's direction, Natasha saw James drag Dobie's body toward the game room. While doing so, he asked Natasha to help look for gas.[99]

11  -   ***Couldn't recall seeing James armed.*** When asked whether James was armed when dragging Dobie's body, she couldn't recall.[100]

12  -   ***Saw everyone head towards the truck.*** Natasha saw Donovan, James, and Morris walk towards the truck with Thomas.[101]

---

[95] ECF No. 717 at 962-63 (Transcript–Day 5).

[96] ECF No. 717 at 966 (Transcript–Day 5).

[97] ECF No. 717 at 1007 (Transcript–Day 5).

[98] ECF No. 717 at 972 (Transcript–Day 5).

[99] ECF No. 717 at 975-76 (Transcript–Day 5).

[100] ECF No. 717 at 976, 1024 (Transcript–Day 5).

[101] ECF No. 717 at 982 (Transcript–Day 5). Note: this contradicts Morris, who testified he hid behind a truck with Natasha while James and Donovan shot the truck. (ECF No. 717 at 820 – Transcript–Day 5).

1

2

- ***The Clouds were armed.*** Natasha thought James and Donovan were armed when walking towards the truck.[102]

3

- ***Morris ditched a rifle in the canal.*** Shortly before his arrest, Morris threw a rifle in the canal and told Natasha to start running.[103]

4

5

- ***Before the shootings, someone chased the Clouds in a car.*** Before the shootings, Natasha rode with James and Donovan when a car chased them.[104]

6

7

- ***The Clouds offered to buy gas.*** When the Clouds arrived to pick up the Jackson, they offered to buy gas from the Jacksons to get them to White Swan.[105]

8

9

- ***Saw Dobie mock Donovan.*** Natasha saw Dobie mock and laugh at Donovan, which made him mad.[106]

10

11

- ***Natasha wasn't loaded, but Morris was.*** Natasha said she wasn't phased by the alcohol and meth she used, as she smoked and drank daily.[107] Morris, on the other hand, was "pretty hyped up."[108]

12

13

- ***Didn't see the initial shootings.*** Natasha didn't see who shot Dobie, Michelle, or Catherine.[109]

14

- ***Donovan ran to the Blazer with a hot rifle.*** After the first shootings, Donovan ran to the Blazer with a rifle, which was "all hot." Then Donovan took the

15

16

---

17

[102] ECF No. 717 at 983 (Transcript–Day 5).

[103] ECF No. 717 at 992-93 (Transcript–Day 5).

[104] ECF No. 717 at 998 (Transcript–Day 5).

18

[105] ECF No. 717 at 1004 (Transcript–Day 5).

[106] ECF No. 717 at 1009-1010 (Transcript–Day 5).

19

[107] ECF No. 717 at 1014 (Transcript–Day 5).

[108] ECF No. 717 at 1014 (Transcript–Day 5) (removed verbal pause "you know" from quote).

[109] ECF No. 717 at 1015-16 (Transcript–Day 5).

Blazer, rammed it through Dobie's gate, and directed Morris and Natasha to start grabbing items.[110]

- ***Natasha didn't confuse Tommy for Chucky.*** When Thomas exited the truck to inspect the property, Natasha recognized him—she didn't confuse him for a friend from White Swan, as Morris claimed.[111]

- ***Natasha excluded James as a shooter.*** Natasha confirmed James didn't shoot at the truck.[112]

- ***Donovan wanted to shoot the truck, James said no.*** As the truck approached Medicine Valley, Donovan wanted to "take out the people in the black truck." James said "No fucker!" and told Donovan to calm down.[113]

- ***Morris shot the truck.*** Natasha corroborated Lindell's testimony—Morris shot the truck with a shotgun.[114]

Of all the statements Natasha made, her final words weighed heavy. When the Government asked Natasha if her exculpatory statements about James (and her inculpatory statements about Morris) were the truth or simply an effort to get off the witness stand, she doubled down: "they were true."[115]

---

[110] ECF No. 717 at 1022-23 (Transcript–Day 5).
[111] ECF No. 717 at 1029 (Transcript–Day 5). This contradicts Morris, who testified Natasha thought confused Thomas H. for "Chucky," a friend from White Swan. (ECF No. 717 at 822 – Transcript–Day 5.)
[112] ECF No. 717 at 1032 (Transcript–Day 5).
[113] ECF No. 717 at 1038-39 (Transcript–Day 5).
[114] ECF No. 717 at 1039 (Transcript–Day 5).
[115] ECF No. 717 at 1042-43 (Transcript–Day 5).

1

**M.    Charity Davis**

Charity Davis offered little to help the Government's case. She testified James's DNA was on a cigarette from Dobie's game room.[116]

**N.    Lindell L.**

Lindell was also supposed to shore-up Morris's testimony about James's role at Medicine Valley. But like Natasha, he did anything but. Lindell saw Dennis get shot by a red-shirted male that was "short and stocky."[117] The day after the shootings, he participated in a FBI-administered line-up and excluded James as the red-shirted shooter.[118] Lindell also agreed with Natasha that Morris was the blue-shirted male who "shot him and had the shotgun."[119]

**O.    Jesus Arreguin**

The Government called Jesus Arreguin to impeach its own witness. That is, Deputy Arreguin told the jury that when he interviewed Lindell at the hospital shortly after the shootings, he couldn't remember which direction the birdshot came from.[120]

---

[116] ECF No. 725 at 1089 (Transcript–Day 6).
[117] ECF No. 725 at 1105 (Transcript–Day 6).
[118] ECF No. 725 at 1114 (Transcript–Day 6).
[119] ECF No. 725 at 1114 (Transcript–Day 6).
[120] ECF No. 725 at 1125 (Transcript–Day 6).

**P.    Sigmund Menchel**

Dr. Sigmund Menchel confirmed the cause of death for each victim—that is, they were all killed with a distance shot (i.e., 18 inches or greater) from a weapon other than a shotgun.[121]

**Q.    Jon V.**

Jon offered no observations about Medicine Valley, but he did offer helpful observations about James, noting he apologized while collecting the keys to his truck.[122] He also testified Donovan held a pistol to his son's head.[123]

**R.    Berdleen Cootes**

Berdleen Cootes also offered no observations about Medicine Valley, but she did describe the Clouds—James was "awful polite," while Donovan looked "weird" with "bugged out" eyes.[124]

**S.    Alvin Cootes**

Alvin Cootes confirmed a subtle, but important observation: when he saw the Clouds, James had a pistol clip in his waistband, but no gun.[125]

---

[121] ECF No. 725 at 1211, 1214-17 (Transcript–Day 5).
[122] ECF No. 725 at 1257 (Transcript–Day 6).
[123] ECF No. 725 at 1249 (Transcript–Day 6).
[124] ECF No. 725 at 1273, 1277 (Transcript–Day 6).
[125] ECF No. 725 at 1283 (Transcript–Day 6).

### T.    Shannon Prince

Shannon Prince testified a fingerprint retrieved from the rearview mirror of Jon's truck belonged to Donovan.[126]

### U.    Jeremy Wyatt

Jeremy Wyatt undermined the idea James showed up to Medicine Valley with ill-motives. He told the jury James and Dobie were friends, and that Dobie had previously helped James with a car and money when he was "down-and-out" a few years back.[127] Jeremy also confirmed James routinely visited Medicine Valley, and was playing pool with Dobie the night before the shootings—they were "talking and laughing together" late into the night.[128]

### V.    Deanna Leslie

Deanna Leslie also undermined the idea James showed up to Medicine Valley with ill-motives. She told the jury James and Dobie were friends, and that James dropped off elk or deer meat to Dobie and Michelle the day before the shootings.[129]

With the relevant facts laid out, James turns to the law.

---

[126] ECF No. 739 at 1366-67 (Transcript–Day 7).
[127] ECF No. 764 at 1561 (Transcript–Day 8).
[128] ECF No. 764 at 1568 (Transcript–Day 8).
[129] ECF No. 764 at 1615 (Transcript–Day 8).

### III.    Discussion

**A.    Standard**

The Due Process Clause "protects a defendant in a criminal case against a conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). This "beyond-a-reasonable-doubt standard" is "***not*** irretrievably committed to jury discretion," as is sometimes the impression. *Id.* at 317 n.10 (emphasis added). No, the law requires a trial court to independently audit a trial using two procedural mechanisms—the first is Rule 29; the second is Rule 33.

**1.    Rule 29**

Under Rule 29, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Assessing whether sufficient evidence exists is a two-part query:

1)    "a reviewing court must consider the evidence presented at trial in the light most favorable to the [government]"; and

2)    a reviewing court determines "whether the evidence, so viewed, is adequate to allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."

*U.S. v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (cleaned up). During this inquiry, courts don't weigh witness credibility. *See id.* at 1169-70.

1    While this two-part query applies to all Rule 29 audits, courts perform a deeper,

2    more-searching audit when the Government builds its case on circumstantial evidence.

3    *See*, *e.g.*, *U.S. v. Jones*, 713 F.3d 336, 341 (7th Cir. 2013) ("Since this case turns on

4    whether the inferences leading to a guilty verdict based on circumstantial evidence

5    were reasonable or speculative, we must review the government's evidence in

6    detail."). "Entirely circumstantial cases are not unusual," and "a verdict may be

7    rational even if it relies solely on circumstantial evidence." *Id.* at 340. But "as the name

8    'circumstantial evidence' suggests, the strength of a particular piece of evidence turns

9    on the specific circumstances that accompany that evidence." *U.S. v. Glenn*, 312 F.3d

10   58, 70 (2d Cir. 2002); *see also Jones*, 713 F.3d at 339 (noting "the height of [Rule 29's]

11   hurdle depends directly on the strength of the government's evidence."). And "as the

12   inferential leap between the fact and the proposition to be derived grows, the probative

13   value of the evidence diminishes." *Glenn*, 312 F.3d at 70.

14   There's sound logic in performing a deeper audit in circumstantially-built cases,

15   as a line exists "between reasonable and unreasonable inferences from circumstantial

16   evidence." *Jones*, 713 F.3d at 340. While that line "is by no means a sharp one," it's

17   crossed when the Government proves its case "with conjecture camouflaged as

18   evidence." *Id.* To keep the Government from crossing that line, a trial court's deeper

19   audit must ensure "each link in the chain of inferences" is "sufficiently strong to avoid

a lapse into speculation." *Jones*, 713 F.3d at 340.

1    Of all the scenarios where the Government could lapse into speculation, one

2    stands out: convicting someone through "guilt by association" under an aiding &

3    abetting theory. *See id.* at 352 ("The prohibition on speculative inference based solely

4    on guilt by association or mere presence is ***especially relevant*** in aiding-and-abetting

5    cases....") (emphasis added). It is long-settled the Government can't survive a Rule 29

6    by simply placing the accused at a crime scene. *See id.* at 347 ("Inferences cannot be

7    motivated by or made possible by speculation focused on a defendant's presence or

8    association with criminals or their criminal activity."); *see also U.S. v. Goldtooth*, 754

9    F.3d 763, 768-69 (9th Cir. 2014) (reversing under Rule 29 in robbery case because "an

10   aiding and abetting conviction requires a state of mind extending to the entire crime,"

11   and no rational juror could conclude as much).

12   There's a clear takeaway from these cases: when the Government builds its case

13   on circumstantial evidence, it can't speculate its way to a conviction by putting James

14   in the same place as Donovan. Instead, the Government needs to provide the jury with

15   "a sufficient evidentiary predicate" to show that, "beyond a reasonable doubt," James

16   was ***involved*** in killing Catherine, Michelle, Thomas, and Dennis on June 8 in

17   Medicine Valley. *Glenn*, 312 F.3d at 70.

18   Beyond closely tracking inferential links, courts employ another protective

19   measure when auditing circumstantially-built cases under Rule 29: they watch for

evidentiary equipoise. That is, "if the evidence viewed in the light most favorable to

1    the prosecution gives equal or nearly equal circumstantial support to a theory of guilt

2    and a theory of innocence, then a reasonable jury must necessarily entertain a

3    reasonable doubt." *U.S. v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (cleaned up); *see also*

4    *U.S. v. Ayala-Garcia*, 574 F.3d 5, 11 (1st Cir. 2009) ("A judgment of acquittal based on

5    equally viable prosecution and defense theories is required only where the evidence is

6    in equipoise, or nearly so, even when viewed in the *government*'s favor.") (emphasis in

7    original). Or, put differently: a Rule 29 acquittal becomes required when the evidence

8    as to guilt and innocence is a wash.[130]

9        Rule 29's heightened protections for circumstantially-built cases guard against

10    two scenarios: 1) a jury convicting an accused even though the evidence is "insufficient

11    to establish every element of the crime"; and 2) "where mere speculation, rather than

12    reasonable inference, supports the government's case." *Goldtooth*, 754 F.3d at 768.

13        There's another nugget about Rule 29 worth noting, as it plays a potential role in

14    James's post-trial request: if a court "deems the evidence insufficient as a matter of law

15    to support a jury's guilty verdict on a greater offense," it may acquit on the greater

16    offense and "enter a judgment of conviction on the lesser included offense." *U.S. v.*

17    *Cavanaugh*, 948 F.2d 405, 409 (8th Cir. 1991) (holding that if a court grants a judgment

18

19    ───────────────

[130] Of course, the Government "need not refute every possible hypothesis supporting a defendant's innocence." *U.S. v. Friedman*, 300 F.3d 111, 123 (2d Cir. 2002). But it "must do more than introduce evidence that is at least as consistent with innocence as with guilt." *U.S. v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

1    of acquittal following a jury verdict of guilty, it may enter judgment of conviction on a

2    lesser included offense); *see also U.S. v. Ellsworth*, 647 F.2d 957, 965 (9th Cir. 1981),

3    *cert. denied*, 456 U.S. 944 (1982); *U.S. v. Wood*, 207 F.3d 1222, 1229 (10th Cir. 2000)

4    ("When ruling on a motion for judgment of acquittal, a district court should consider

5    not only whether the evidence would be sufficient to sustain a conviction of the offense

6    charged, but also whether it would be sufficient to sustain a conviction on a lesser

7    included offense."). So, if the Court found insufficient evidence on premeditation

8    (what's needed for 1st-degree murder), it could enter a judgment of conviction on the

9    lesser-included offense: 2d-degree murder.

10        With the procedure for a Rule 29 audit established, let's turn to Rule 33.

11        **2.    Rule 33**

12        Under Rule 33, a court may "grant a new trial if the interest of justice so

13    requires." Fed. R. Crim. P. 33 (a). Rule 33 operates much differently than Rule 29—

14    the court's "power to grant a motion for new trial is ***much broader*** than its power to

15    grant a motion for judgment of acquittal." *U.S. v. Alston*, 974 F.2d 1206, 1211 (9th Cir.

16    1992) (citing 3 Charles Wright, *Fed. Practice & Procedure* §553)) (emphasis added). In

17    considering a new trial, the court "need ***not*** view the evidence in the light most

18    favorable to the verdict; [and] it may weigh the evidence and in so doing evaluate for

19    itself the credibility of the witnesses." *Alston*, 974 F.2d at 1211; *see also U.S. v.*
     *Washington*, 184 F.3d 653, 658 (7th Cir. 1999) (for a Rule 33 motion, "the court may

1    reweigh the evidence, taking into account the credibility of the witnesses."). In effect,

2    the court "sits as a thirteenth juror." *U.S. v. Capati*, 980 F. Supp. 1114, 1132 (S.D. Cal.

3    1997) (citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)). Sitting in this position, if the

4    court finds the "evidence preponderates sufficiently heavily against the verdict that a

5    serious miscarriage of justice may have occurred, it may set aside the verdict" and

6    grant a new trial. *Alston*, 974 F.2d at 1211. A trial court possesses considerable

7    discretion in granting a new trial, and its "judgment call" is afforded "an appreciable

8    measure of respect" given the court's "sense of the ebb and flow of the recently

9    concluded proceedings." *U.S. v. Baptiste*, 8 F.4th 30, 41 (1st Cir. 2021).

10                                    * * *

11          With both standards set out, the next question is how best to apply them. While

12    there are many issues to cover during the Court's deeper audit under Rule 29 and

13    Rule 33, those issues fall fairly neatly into three categories:

14          1)  the Government's failure to prove premeditation with near certitude;

15          2)  the Government's failure to prove James shot anyone with near certitude;
16              and

17          3)  the Government's failure to prove James aided the murders with near
18              certitude.

19    Given these categories, a roadmap helps: begin with the house murders. Examine each

       category (i.e., premeditation, James as shooter, and James as aider)—first under

                              Rule 29 + Rule 33
                                  – 31 –

Rule 29's more-stringent standard, then under Rule 33's more-relaxed standard. Finish with the truck murders, performing the same analysis.

**B.    The house murders don't survive post-trial scrutiny.**

### 1.    Under Rule 29, the Government failed to prove premeditation for the house murders with near certitude.

To see why the Government presented insufficient evidence on premeditation, it helps to return to the Government's theory on premeditation: James killed Dobie first, but "to be frank," it didn't know why—"[h]ence, second-degree murder" for Dobie.[131] With Dobie dead, James now had an eyewitness problem, as "Michelle and Catherine [were] still on the property."[132] To address this eyewitness problem, James killed both during a premeditated cover-up—hence, first-degree murder for Michelle and Catherine. That's its theory.

This theory assumes many things, but one above all: Dobie got shot first. The Government needed to prove shooting order because, otherwise, it can't say which death should be charged as the unplanned killing (i.e., 2d-degree murder), and which deaths should be charged as the cover-up killings (i.e., 1st-degree murder). The Government assumed a heavy burden when it brought 1st-degree murder charges against James for the deaths of Michelle and Catherine, and shooting order helped make that lift possible.

---

[131] ECF No. 775 at 1665 (Transcript–Day 9).
[132] ECF No. 775 at 1665 (Transcript–Day 9).

But almost no evidence shows Dobie got shot first. Let's tick through it:

***No eyewitnesses.*** The Government presented no testimony from eyewitnesses on who got shot first. Morris didn't see any house murders,[133] and Natasha didn't know "who shot those people" either.[134]

***DNA evidence.*** The Government linked the Clouds' DNA to some cigarettes on Dobie's pool table, which means little. Jeremy saw James playing pool and smoking cigarettes with Dobie the night before the shootings,[135] and Morris saw James and Donovan standing in the game room at some point before the shootings while talking with Dobie.[136] This evidence doesn't establish shooting order.

***Toolmark evidence.*** The Government found a spent .22 casing near Dobie's body in the game room, and Dr. Menchel said a small-caliber bullet killed Dobie.[137] This also means little, as it doesn't establish shooting order.

So what did the Government rely on to claim —with near certitude—that Dobie got shot first? Two things: location and time. That is, police found Dobie's body in the game room near the Clouds' cigarettes and a .22 casing (location), which is the last moment Morris saw Dobie alive (time). By connecting the Clouds to the last place (and

---

[133] ECF No. 717 at 917 (Transcript–Day 5).
[134] ECF No. 717 at 1015-16 (Transcript–Day 5).
[135] ECF No. 764 at 1562, 1565-66 (Transcript–Day 8).
[136] ECF No. 700 at 775-76 (Transcript–Day 4).
[137] ECF No. 775 at 1665 (Transcript–Day 9).

time) Dobie was seen alive, the Government created an inferential chain to say Dobie got shot first, which it explained to the jury during closing:

> 11       And John was found in the same place that Morris
> 12  testified he saw him last or last alive, in close proximity to
> 13  that shell casing, those cigarettes where Morris saw him having
> 14  an argument with the defendants.
> 15       I submit to you that, based on the proximity of the shell
> 16  casing, him being in the last place he was seen alive with the
> 17  defendant and his brother, that this is where John was killed
> 18  and that he was killed first.  Hence, second-degree murder.

Visually, the Government's inferential chain looks like this:



### Inferential Chain for Premediation

.22 casing + cigarettes with the Clouds' DNA found near Dobie's body in game room → Dobie killed in game room → Dobie last seen alive in game room with the Clouds → Dobie killed first

But as circuit courts caution, Rule 29 audits—especially deeper audits—must ensure "each link in the chain of inferences" is "sufficiently strong to avoid a lapse into speculation." *Jones*, 713 F.3d at 340.

Here, this chain breaks in two places:

***Dobie killed in the game room.*** The Government told the jury during closing there was "[n]o evidence in the record that [Dobie] was moved or dragged," inferring

1   Dobie was killed in the same spot his body was found—the game room.[138] That's false.

2   On direct, Natasha testified she saw James "dragging Dobie's body *to* the game

3   room"[139]— testimony the Government called "candid" during closing.[140] Morris

4   corroborated Natasha, telling the jury someone tampered with Dobie's body

5   (specifically, took off his Carhartt coveralls and went through his pockets) after he

6   died.[141] So, at best, the Government's own witnesses describe Dobie getting moved to

7   the game room. There goes the first link, which is enough to damn this count for

8   Rule 29 purposes. *See U.S. v. Katakis*, 800 F.3d 1017, 1025 (9th Cir. 2015) (affirming

9   judgment of acquittal since the Government's evidence lacked a "critical link in the

10  logical chain of inference").

11       ***Dobie last seen alive with the Clouds.*** The Government told the jury during

12  closing that Morris left everyone in the game room, returned to the Blazer, and waited

13  with Natasha until, eventually, "all hell broke loose."[142] But in making this claim, the

14  Government glosses over a critical component: time. Neither Morris nor Natasha

15  testified how long they waited in the Blazer before seeing Donovan run towards them.

16  If Donovan ran towards the Blazer *immediately* after Morris left the game room, this

17  ─────────────────

18  [138] ECF No. 775 at 1665 (Transcript–Day 9).
    [139] ECF No. 717 at 975-76 (Transcript–Day 5) (emphasis added).
    [140] ECF No. 775 at 1654 (Transcript–Day 9).

19  [141] ECF No. 717 at 857 (Transcript–Day 9) ("Question: So somebody came in and took his
    Carhartts off after he was dead? Answer: Yeah.").
    [142] ECF No. 775 at 1653 (Transcript–Day 9).

might support an inference Dobie got shot first. But the Government offered no evidence about how much time elapsed, be it five minutes, fifteen minutes, or longer. We just know Morris and Natasha sat in the Blazer listening to music and doing meth until they eventually saw Donovan running towards them—"worked up,"[143] "breathing really hard,"[144] and with a hot rifle in-hand.[145] There goes the second link.

Without time as a benchmark, and with Natasha saying Dobie's body was moved *to* the game room, it's impossible for the Government to say with near certitude that Dobie got shot first. Without a shooting order, the Government can't prove who got killed during an unplanned argument (i.e., 2d-degree murder), and who got killed during a premeditated effort to remove eyewitnesses (i.e., 1st-degree murder). These proof problems break the inferential chain:



While the Government may have a "strong suspicion" Dobie got shot first, a "strong suspicion" is "no substitute of guilt beyond a reasonable doubt."—even under

---

[143] ECF No. 700 at 779 (Transcript–Day 4).
[144] ECF No. 700 at 779 (Transcript–Day 4).
[145] ECF No. 717 at 1022-23 (Transcript–Day 5).

Rule 29's deferential standard. *U.S. v. Jones*, 713 F.3d 336, 347 (7th Cir. 2013).

(affirming the trial court's Rule 29 grant, finding the circumstantial evidence amounted

to nothing more than a "strong suspicion" of criminal activity, which cannot "satisfy

the state of near certitude required" by the Supreme Court). To find otherwise would

lower the Government's burden, allowing it to prove-up counts "with conjecture

camouflaged as evidence." *Id.* at 340; *see also U.S. v. Del Toro-Barboza*, 673 F.3d 1136,

1144 (9th Cir. 2012) (noting reasonable inferences must be "supported by a chain of

logic, rather than mere speculation dressed up in the guise of evidence.") (cleaned up).

Without premeditation, the house murders need to be reduced from 1st- to 2d-

degree murder—a remedy Rule 29 allows. *See U.S. v. Wood*, 207 F.3d 1222, 1229 (10th

Cir. 2000) (noting a court may enter conviction on a lesser-included offense).[146]

### 2. Under Rule 33, the Government failed to prove premeditation for the house murders with near certitude.

The Court need not examine premeditation under Rule 33, as the Government

offered insufficient evidence under Rule 29—the inquiry's over. But if the Court

---

[146] James anticipated arguing the affiliated gun counts would need to be tossed as well, as §924(c) convictions require predicate crimes of violence—something 2d-degree murder is not. *See U.S. v. Begay*, 934 F.3d 1033 (9th Cir. 2019) (finding 2d-degree murder isn't a crime of violence). But yesterday, the Ninth Circuit walked that decision back, holding 2d-degree murder qualifies as a crime of violence because it involves "extreme recklessness," which is a higher mens rea than "ordinary recklessness." *U.S. v. Begay*, __F.4th__, 2022 WL 1417535 (9th Cir. May 5, 2022) (en banc). While James disagrees with the majority and doesn't concede this issue, he's mindful the Court is bound by this latest turn in the ever-changing categorical world.

1    proceeds, little changes. The Government still can't prove shooting order, leaving

2    "strong doubt" Michelle or Catherine were shot second and third (or vice versa) in a

3    premeditated effort to remove witnesses. *See, e.g., U.S. v. Washington*, 184 F.3d 653,

4    658-59 (7th Cir. 1999) (finding the weight of the evidence was against the verdict, and

5    the court abused its discretion in declining to grant a new trial under Rule 33). Simply,

6    the lack of evidence on premeditation weighs against the verdict.

7         Beyond the Government's conjecture on shooting order, another fact supports a

8    new trial under Rule 33: the exclusion of medical records showing James was shot a few

9    weeks before Medicine Valley. Here's why:

10        During trial, the Government introduced evidence James and Donovan showed

11   up armed to Medicine Valley, suggesting ill-motives. Indeed, during the Rule 29

12   hearing, the Court noted it looks bad when people show up armed to a house (from a

13   premeditation standpoint):[147]

14
15   > 16    THE COURT: Counsel, do you show up at houses taking two
     > 17    firearms and then putting them on and going into the house at --
     > 18    just for no reason?
16

17   Anticipating this issue, James offered a compelling response: a few weeks before

18   Medicine Valley, James was shot during a drive-by. This drive-by, coupled with

19

---

[147] ECF No. 739 at 1434 (Transcript–Day 7).

1  Natasha's testimony the Clouds were chased by another car in White Swan,[148] as well

2  as Sergeant Boyer describing Medicine Valley as a "tactical nightmare,"[149] would have

3  allowed James to argue a sensible inference: if James just got shot, it's reasonable for

4  him to drive around White Swan with a gun for protection, not aggression.

5      The Government's own witnesses corroborate this inference. A few days before

6  Medicine Valley, Michael Peterson saw the Clouds with guns while they waited by the

7  roadside for help with a flat tire.[150] Protection, not aggression.

8      But when James offered his self-authenticated medical records to pair with the

9  testimony of Natasha, Sergeant Boyer, and Mr. Peterson, the Court excluded the

10  records on relevance.[151] Relevance is a low bar, as James need only show these records

11  had "any tendency" to speak to a fact "of consequence"—here, whether he acted with

12  premeditation. Fed. R. Evid. 401 (2022). Respectfully, James believes the Court erred

13  by finding the records irrelevant, and this error harmed James in two ways:

14      ***First***, it harmed James's ability to rebut evidence on premeditation. For most lay

15  jurors, people don't randomly show up armed to another person's house. These

16  records pushed back on that point.

17

18

_____

[148] ECF No. 717 at 998 (Transcript–Day 5).
[149] ECF No. 693 at 433 (Transcript–Day 3).
[150] ECF No. 693 at 344-46 (Transcript–Day 3).
[151] ECF No. 764 at 1525 (Transcript–Day 8).

1    ***Second***, it harmed James's credibility with the jury. During opening, defense

2    counsel told the jury James was shot in the face and torso only a few weeks before

3    Medicine Valley, which is why he obtained "some means of being able to protect

4    himself out there from people who would want to do him harm" in White Swan.[152]

5    That was the defense's promise, and that promise went unfulfilled.

6        This error—alone, or in conjunction with insufficient evidence on shooting

7    order—serves as a basis for a new trial under Rule 33. *See* Moore's Federal Practice –

8    Criminal Procedure §633.02[2] (outlining the various grounds for a new trial under

9    Rule 33, including evidentiary errors); *see also U.S. v. Ramirez-Rivera*, 800 F.3d 1, 34

10    (1st Cir. 2015) (defendant entitled to new trial based on evidentiary errors during trial).

11    **3.    Under Rule 29, the Government failed to prove James committed the house murders with near certitude.**

12        To see why the Government presented insufficient evidence on James shooting

13    anyone, it again helps to return to its theory: Michelle and Catherine were killed with a

14    rifle. And since there was only one rifle at Medicine Valley, which was consistently

15    seen in James's hands, it concluded he's the shooter.[153] Visually, the Government's

16    inferential chain looks like this:

17

18

19    ---

[152] ECF No. 693 at 336 (Transcript–Day 3).

[153] ECF No. 775 at 1666 (Michelle killed with .22 retrieved from canal); 1667 (Catherine killed with a rifle); and 1666 (Morris saw James "consistently at Medicine Valley with a rifle").

## Inferential Chain for James as Shooter



This chain breaks in two places:

***There was only one rifle.*** To make its case against James, the Government needed a closed universe of guns for the shootings at Medicine Valley—one pistol, one shotgun, and one .22-caliber rifle. By closing the universe, the Government added gravitas to each moment James had a rifle. It wasn't just *a* rifle, after all; it was ***the*** rifle.

The Government doubled-down on this closed universe, telling the jury if witnesses referred to multiple rifles at Medicine Valley, those witnesses likely used "rifle" as a catch-all for guns generally, just as Southerners call "every soda a 'Coke.'"[154] It went on to claim the "only evidence that we have that other weapons were present is a shotgun."[155]

---

[154] ECF No. 775 at 1651 (Transcript–Day 9). An aside: undersigned counsel is also from the South, and Southerners don't collectively refer to all sodas as "Cokes"—especially in Texas, which is the home of Dr. Pepper (and 7-Up).

[155] ECF No. 775 at 1666 (Transcript–Day 9).

1    That's false. Natasha testified she knew the difference between shotguns and

2  rifles, and the Clouds brought **two** rifles with them in the Blazer, not one.[156] She also

3  said **both** Clouds entered Dobie's residence with rifles.[157]

4    Morris said the same, testifying he couldn't remember what James and

5  Donovan's guns looked like, but "knew they were rifles."[158] In fact, Morris saw

6  Donovan with multiple rifles right after the shooting.[159] So even viewing the evidence

7  in the light most favorable to the Government, its own witnesses describe an open

8  universe of guns at Medicine Valley.

9    Another fact damages the Government's efforts to portray a closed universe of

10  guns: what police found. It would be persuasive if the Government's witnesses

11  described three guns at Medicine Valley, and police recovered three guns during the

12  investigation. That's tidy. But of the three guns the Government talk about at trial,

13  only one was found—the rifle. Police never found the pistol Donovan possessed during

14  the carjacking; and police never found the shotgun Morris possessed during the truck

15  murders. Police also never found the other rifles (plural) Donovan was carrying when

16  loading up the Blazer to leave. There goes the first link.

17

18  _____

19  [156] ECF No. 717 at 966 (Transcript–Day 5).
[157] ECF No. 717 at 972 (Transcript–Day 5).
[158] ECF No. 700 at 762-63 (Transcript–Day 4).
[159] ECF No. 700 at 790 (Transcript–Day 4).

1    ***James was consistently seen with a rifle.*** The Government told the jury during

2    closing that James was seen "consistently in Medicine Valley with a rifle."[160] Okay,

3    but so was Donovan. Donovan was seen driving to Medicine Valley with a rifle;

4    Donovan was seen walking into Dobie's game room with a rifle; and Donovan was seen

5    carrying multiple rifles right after the shooting. In fact, Donovan was seen with a rifle

6    when it mattered most—immediately after Morris thought he heard a gunshot, running

7    towards Morris and Natasha all "worked up"[161] and "breathing really hard."[162] So

8    even viewing the evidence in the light most favorable to the Government, its own

9    witnesses place rifles in the hands of both James and Donovan—rifles Morris couldn't

10   describe. There goes the second link.

11   Beyond these broken links, the Government's evidence creates equipoise, which

12   isn't enough under Rule 29's deeper audit for circumstantially-built cases. *See U.S. v.*

13   *Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (Noting "if the evidence viewed in the light

14   most favorable to the prosecution gives equal or nearly equal circumstantial support to

15   a theory of guilt and a theory of innocence, then a reasonable jury must necessarily

16   entertain a reasonable doubt" under Rule 29).

17

18

19   ───────────────
[160] ECF No. 775 at 1666 (Transcript–Day 9).
[161] ECF No. 700 at 779 (Transcript–Day 4).
[162] ECF No. 700 at 779 (Transcript–Day 4).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

**4.      Under Rule 33, the Government failed to prove James committed the house murders with near certitude.**

Like before, the Court need not examine who-shot-who for the house murders under Rule 33, as the Government offered insufficient evidence under Rule 29. But if the Court proceeds, things get worse for the Government. It still can't show a closed universe of guns, and it still can't show James possessed ***the*** rifle when it counts, as opposed ***a*** rifle. Those problems remain.

What gets worse is, under Rule 33, the Court gets to weigh witness credibility. *See U.S. v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992) (In considering a new trial, the court "need ***not*** view the evidence in the light most favorable to the verdict; [and] it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."). And since Natasha couldn't recall if James was armed after the shootings, that means the Government's case against James rested on the shoulders of Morris— its #1 witness.

What a liar.[163] Of all the eyebrow-raising moments from Morris's time on the stand, one stands out: on direct, Morris claimed (for the first time) James confessed to shooting Dobie. It's hard to imagine Morris self-inflicting a more credibility-damaging wound. He agreed to cooperate against James; he met with police a dozen times,

---

[163] A bold statement, but when the Government's lead case agent repeatedly called Morris a liar, that's license for James to call him one as well.

1  detailing James's purported involvement in the Medicine Valley murders; and he spent

2  hours rehearsing his testimony with the Government in the days leading up to trial.

3  Despite all those meetings and dress rehearsals, Morris never told police about James's

4  purported confession—not once? Unbelievable.

5  To be fair, Morris thought he "had brought it up" during his dress rehearsal on

6  the Saturday before trial,[164] but Agent Ribail corrected the record—James's purported

7  confession was news to him.[165] This moment, above all, captures Morris's character—

8  when prison is on the line, he'll trade truth for freedom.

9  It's also hardly confidence-inspiring when the lead FBI agent repeatedly accused

10  the Government's #1 witness of lying and withholding information.[166]

11  When witness credibility gets this bad, courts grant new trials. *See, e.g.*, *U.S. v.*

12  *Capati*, 980 F. Supp. 1114 (S.D. Cal. 1997). There, the Government charged Alberto

13  Capati with Hobbs Act robbery (among other offenses), and its case rested upon the

14  testimony of Jeffrey Diaz, the Government's #1 witness. *Id.* at 1117 (referring to

15  Mr. Diaz as "the Government's key witness"). Mr. Diaz was less-than-candid on the

16  stand—a point the court noticed. In fact, the court invoked a "familiar legal maxim,

17  *falsus in uno, falsus in omnibus*," commenting that if "Diaz fabricated the most crucial

18

19  _____

[164] ECF No. 717 at 845 (Transcript–Day 5).
[165] ECF No. 739 at 1422-23 (Transcript–Day 7).
[166] ECF No. 739 at 1411 (Transcript–Day 7).

1   part of his testimony, it is difficult to imagine what aspect of Diaz's testimony can be

2   believed." *Id.* at 1133. After pouring over the transcripts, the court was left with "a

3   powerful impression that everything Diaz said was precisely what he thought the

4   Government wanted him to say, true or false." *Id.* at 1134. The court granted a new

5   trial, finding those deep credibility issues were too much to ignore. *See id.* Simply, Diaz

6   was a Government "yes" man—truth be damned.

7        Sounds familiar. When the Government asked Morris who had the rifle during

8   the truck shootings, he initially said Donovan, but changed his answer in response to a

9   follow-up question from the Government:[167]

```
 5   Q    They were shooting at the truck as it was driving away
 6        going down the driveway back towards Medicine Valley Road?
 7   A    Yes.
 8   Q    Could you tell what, if any, firearms Donovan had on him at
 9        that point in time?
10   A    Um, he had the .22 rifle.
11   Q    That's Donovan.
12   A    Oh, I'm sorry.  Um, he had the 12-gauge.
```

16   With one follow-up, the Government put Morris back in line—a "yes" man, indeed.

17        Then there was Morris's selective memory. When the Government asked

18   questions, Morris exhibited an eidetic memory, answering every question the

19

---

[167] ECF No. 717 at 821 (Transcript–Day 5).

Government asked. But when James's defense team asked questions, Morris became awfully forgetful, stating he "couldn't remember" what happened 47 times.

Morris's memory got fuzzy during some opportune moments. Like when he couldn't remember telling police—during a ***recorded*** interview—that Donovan had a rifle inside Dobie's game room, but James did not;[168] or when he couldn't remember telling police—during a ***recorded*** interview—that he didn't know who had the .22 rifle when it mattered;[169] or when he couldn't remember telling police—during a ***recorded*** interview—that he didn't know whether Dobie was alive.[170]

Morris's credibility weighs against the verdict on the house murders.

### 5.    Under Rule 29, the Government failed to prove James aided in the house murders with near certitude.

Even today, it's unclear if the Government intended to assign aiding & abetting liability to James for the house murders. It intended to do so for the truck murders, formally charging James under §2 (aiding & abetting) in the last indictment.[171] But curiously, the Government declined to take the same formal steps for the house murders. That says something.

---

[168] ECF No. 717 at 875 (Transcript–Day 5).
[169] ECF No. 717 at 875 (Transcript–Day 5).
[170] ECF No. 717 at 852 (Transcript–Day 5).

[171] ECF No. 242 at 5, 7-8 (Third Superseding Indictment).

1    Nor did the Government argue James aided the house murders during closing.

2    In fact, the Government never uttered the words "aiding" or "abetting" until it talked

3    about the carjacking. That says something too.

4    While these charging decisions and closing tactics aren't evidence, they convey

5    insight—specifically, the Government believed its evidence that James aided Donovan

6    was so soft, it was barely worth mentioning. At best, it showed two things: 1) James was

7    with Donovan before the shootings; and 2) Natasha saw James drag Dobie's body to

8    the game room. Neither fact presents sufficient evidence for a conviction. Here's why:

9    James's presence with Donovan in the game room at some point before the

10    shootings doesn't carry the day, for as courts have long held, "mere presence at the

11    scene does not an aider and abettor make." *U.S. v. Goldtooth*, 754 F.3d 763, 768-69 (9th

12    Cir. 2014) (finding insufficient evidence for verdict based on aiding & abetting

13    liability); *U.S. v. Jones*, 713 F.3d 336, 352 (7th Cir. 2013) ("Simply put, our criminal

14    justice system does not tolerate the conviction and imprisonment of people based on

15    suspicion, speculation, and association with criminals. The government must present

16    direct or circumstantial evidence of each element of each charged offense," and

17    "cannot fill the gaps with inferences of guilt by association or evidence of an

18    individual's mere presence somewhere criminal activity may have occurred.").

19    Similarly, James moving Dobie's body *after* the shootings also doesn't carry the

day, for as courts have long held, "an aiding and abetting conviction requires a state of

Rule 29 + Rule 33

– 48 –

1    mind extending to the entire crime," which necessarily includes "foreknowledge that

2    the [murders were] to occur." *Goldtooth*, 754 F.3d at 768. Moving a body *after* a murder

3    better fits an "accessory after the fact," which is a separate crime the Government

4    didn't charge. *See* 18 U.S.C. § 3 (Accessory after the fact).

> **6.    Under Rule 33, the Government failed to prove James aided in the house murders with near certitude.**

5

6    Like before, the Court need not examine whether James aided the house

7    murders under Rule 33, as the Government offered insufficient evidence under

8    Rule 29. But if the Court proceeds under Rule 33's more-relaxed standard, little

9    changes. It still can't show James acted with the intent to facilitate 1st-degree murder;

10   it can only show James was present.

**C.    The truck murders don't survive post-trial scrutiny.**

11

> **1.    Under Rule 29, the Government failed to prove James committed the truck murders with near certitude.**

12

13   During closing, the Government provided three reasons James killed Dennis and

14   Thomas:

15      1)   "the testimonies regarding the red shirt";

16      2)   "the proximity of Thomas and Dennis"; and

17      3)   "what Morris testified he saw." [172]

18   Each merits scrutiny, for the closer you look, the less you see.

19

---

[172] ECF No. 775 at 1663 (Transcript–Day 9).

### a.    The Government ignored evidence to claim James wore red.

Lindell testified the man who shot Dennis and Thomas wore red,[173] but there's no testimony James wore red. So to link James to the red-shirted male Lindell saw, the Government used a "process of elimination,"[174] assembling quite the inferential chain:



**Inferential Chain for James Wearing Red**

To keep this chain connected, the Government needed consensus on what colors Donovan and Morris wore that day. Without it, the Government can't employ deductive reasoning to say James wore red. And therein lies the rub: there isn't consensus on who wore what. While everyone agrees Morris wore blue,[175] witnesses don't agree on what Donovan wore. Natasha said Donovan wore a white tank top;[176] meanwhile, Morris remembered Donovan wearing "darker colors."[177] Morris and Natasha didn't describe colors separated by a few degrees on the spectrum; white and

---

[173] ECF No. 725 at 1106

[174] ECF No. 775 at 1664 (Transcript–Day 9) (Government during closing: "I submit to you the man in the red shirt, by process of elimination, was the defendant.").

[175] ECF Nos. 717 at 832(Morris saying he wore blue); 962 (Natasha saying Morris wore blue); 725 at 1114 (Lindell saying Morris wore blue).

[176] ECF No. 717 at 962-63 (Transcript–Day 5).

[177] ECF No. 700 at 772 (Transcript–Day 4).

1    dark are, quite literally, yin and yang—unless, of course, Donovan started out wearing

2    something darker (say, dark red) and then removed that shirt to reveal a white tank.

3        How can the Government explain this? Its two eyewitnesses disagree on the

4    color of Donovan's shirt, and his shirt color is ***the*** fact that allows the Government to

5    argue James wore red. There goes this link.

6        **b.    James's proximity to Dennis and Thomas means little.**

7        The Government insists James was near Dennis and Thomas, so this helps show

8    he's the red-shirted shooter. Not so. Natasha testified Donovan, Morris, and James

9    walked out to the truck with Thomas—so, all the suspects.[178] That helps little.

10        **c.    Natasha contradicted what Morris saw.**

11        Here's the Government's best evidence that James shot Dennis and Thomas:

12    Morris claimed he saw James shooting at the truck as it pulled away from Medicine

13    Valley.[179] But let's look closely at what Morris said: he testified Donovan had a .22 rifle

14    (sorry, 12-gauge) at that time,[180] but never said what gun James had at the time:

15

16

17

18

19    _____
[178] ECF No. 717 at 982 (Transcript–Day 4).
[179] ECF No. 717 at 821 (Transcript–Day 5).
[180] ECF No. 717 at 821 (Transcript–Day 5).

```
 5    Q      They were shooting at the truck as it was driving away
 6   going down the driveway back towards Medicine Valley Road?
 7    A      Yes.
 8    Q      Could you tell what, if any, firearms Donovan had on him at
 9   that point in time?
10    A      Um, he had the .22 rifle.
11    Q      That's Donovan.
12    A      Oh, I'm sorry.  Um, he had the 12-gauge.
13    Q      What firearm did you have on your person?
14    A      Um, at that time I still had the -- the one gun that didn't
15   shoot.
16    Q      How about Natasha?  What, if any, firearms did she have?
17    A      She didn't have one.
18    Q      What, if anything, happened after that -- the truck left?
19   The truck that was heading down the driveway that the man in the
```

In fact, Morris said who had what gun for everyone *but* James. He also admitted he
never saw either Dennis or Thomas get shot;[181] he claims to have just seen the
aftermath as Thomas lay on the ground and Lindell drove the truck down the driveway.
Given what Morris *didn't see* (anyone get shot), as well as an open universe of guns, it's
impossible to say with near certitude that James possessed the murder weapon—even
when viewing things favorably for the Government. It's guesswork, which isn't
enough. *See*, *e.g.*, *U.S. v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (noting "specious

---

[181] ECF No. 717 at 917 (Transcript–Day 5).

inferences are not indulged," as "it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty.") (emphasis in original).

Then there's Natasha, who contradicted Morris outright: James ***didn't*** shoot at the truck.[182] So one Government witness (the one with a reason to lie) says James shot at the truck, the other witness (the one inculpating her own uncle) says he didn't.

That's equipoise, which doesn't survive Rule 29's deeper inquiry for circumstantially-built cases. *See Coplan*, 703 F.3d at 69.

But in reality, the evidentiary scales aren't balanced. There's also Lindell, who participated in a FBI-administered line-up and excluded James as the red-shirted shooter.[183] He also agreed with Natasha that Morris was the blue-shirted male who "shot him and had the shotgun."[184]

With all these facts, it helps to take a step back and view them in a chart:

| Evidence showing James shot Dennis and Thomas | Evidence showing otherwise |
|---|---|
| ***Natasha on shirt colors***: Donovan wore white,[185] while Morris wore blue.[186] | ***Morris on shirt colors***: He wore blue, while Donovan wore "darker colors."[187] Couldn't remember what James was wearing.[188] |

---

[182] ECF No. 717 at 1032 (Transcript–Day).
[183] ECF No. 725 at 1114 (Transcript–Day 6).
[184] ECF No. 725 at 1114 (Transcript–Day 6).
[185] ECF No. 717 at 962-63 (Transcript–Day 5).
[186] ECF Nos. 717 at 832(Morris saying he wore blue); 962 (Natasha saying Morris wore blue); 725 at 1114 (Lindell saying Morris wore blue).
[187] ECF No. 700 at 772 (Transcript–Day 4).
[188] ECF No. 700 at 772 (Transcript–Day 4).

| Evidence showing James shot Dennis and Thomas | Evidence showing otherwise |
| --- | --- |
| ***Morris on who shot truck as it pulled away***: James.[189] | ***Morris on who shot Dennis or Thomas***: Didn't see Dennis or Thomas get shot.[190] |
| ***Morris on what gun Donovan had during truck shooting***: the .22-rifle (sorry, the 12-gauge).[191] | ***Morris on what gun James had during truck shooting***: Didn't say.[192] |
| ***David Hoffman on James's involvement***: He shot a female in the arm and one person twice. | ***Dr. Sigmund Menchel on shootings***: No female was shot in the arm with a rifle, which contradicts Mr. Hoffman's testimony. Also, Mr. Hoffman had no first-hand knowledge about shootings. |
| | ***Natasha on Morris's involvement***: Morris shot the truck with a shotgun[193] |
| | ***Natasha on James's involvement***: James didn't shoot the truck.[194] |
| | ***Lindell on who shot Dennis or Thomas***: Not James, as Lindell excluded him as the red-shirted shooter during FBI-administered line-up.[195] |
| | ***Lindell on who shot the truck (and him) with a shotgun***: Morris.[196] |

---

[189] ECF No. 717 at 821 (Transcript–Day 5).
[190] ECF No. 717 at 917 (Transcript–Day 5).
[191] ECF No. 717 at 821 (Transcript–Day 5).
[192] ECF No. 717 at 821 (Transcript–Day 5).
[193] ECF No. 717 at 1039 (Transcript–Day 5).
[194] ECF No. 717 at 1032 (Transcript–Day 5).
[195] ECF No. 725 at 1114 (Transcript–Day 6).
[196] ECF No. 725 at 1114 (Transcript–Day 6).

1    These scales are imbalanced, and not in a way that helps the Government. Faced with

2    all these facts from the Government's ***own witnesses***, we are nowhere close to near

3    certitude, which is why the Government provided insufficient evidence to sustain the

4    verdict on the truck murders.

5           **2.**       **Under Rule 33, the Government failed to prove James committed the truck murders with near certitude.**

6          Under Rule 33's more-relaxed standard, things get much worse for the

7    Government, as now the Court gets to weigh in on evidence, including who testified

8    more truthfully—Morris or Natasha. Because boiled down, that's what it comes down

9    to: Morris claims James shot the truck as it drove away; Natasha said he didn't. Two

10   different Government witnesses saying two different things.

11         To resolve this conflict under Rule 33, the Court gets to consider Morris's

12   credibility, which we covered above. But it also gets to weigh Natasha's credibility. In

13   doing so, the Court considers that when Natasha exculpated James in the truck

14   shooting, she also inculpated Morris—*her own uncle*; it considers when Natasha

15   confirmed her comments about James and Morris "were true"—her literal last words

16   under oath;[197] it considers when Lindell corroborated Natasha by also identifying

17   Morris as a shooter; it considers when Lindell corroborated Natasha by also excluding

18   James as a shooter; and it considers when Natasha testified she wasn't messed up from

19

---

[197] ECF No. 717 at 1042-43 (Transcript–Day 5).

the drugs and alcohol she used that day, but Morris was "pretty hyped up" from the alcohol, meth, and cocaine he consumed during his all-nighter.[198]

Beyond the evidentiary and credibility shortfalls above, another fact supports a new trial under Rule 33 on the truck murders: an evidentiary error. During closing, the Government told the jury Morris saw James shoot Tommy:[199]

> 19       And you'll recall that, by that time, she testified that
> 20  James was shirtless.  So the evidence shows that at this time,
> 21  Morris had a blue shirt; Donovan, a white tank top.  And who
> 22  does that leave?  It leaves the defendant.  It leaves the
> 23  defendant, who Morris Jackson testified he saw shoot Tommy.

That's false. Morris admitted on cross he didn't see anyone get shot (i.e., Thomas, Dennis, or otherwise);[200] instead, he told the jury the Clouds shot at the truck as it pulled away (i.e., *after* Dennis and Thomas were shot).[201] He also didn't say what gun James purportedly had.[202] These are subtle, but critical distinctions that leave the Government's claim unsupported in the record.

---

[198] Under Rule 33, the Court also needs to weigh Mr. Hoffman's testimony. Considering half of what Mr. Hoffman told the jury (James shot a woman in arm) is verifiably incorrect, his credibility leaves something to be desired. No, the true credibility contest is between Morris and Natasha.
[199] ECF No. 775 at 1660 (Transcript–Day 9).

[200] ECF No. 717 at 917 (Transcript–Day 5).
[201] ECF No. 717 at 821 (Transcript–Day 5).
[202] ECF No. 717 at 821 (Transcript–Day 5).

But after a timely objection for misstating testimony, the Court overruled it,

empowering the Government to double-down on this falsehood:[203]

```
22   does that leave?  It leaves the defendant.  It leaves the
23   defendant, who Morris Jackson testified he saw shoot Tommy.
24       MR. McENTIRE:  Objection.  That also misstates the
25   testimony.
```

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER

```
                    USA v. Cloud/1:19-cr-2032-SMJ-1          1661
              Jury Trial/Day 9, Volume IX/ March 8, 2022
                      Government Closing Argument
1    THE COURT:  Hold on.
2    Just one second, Counsel.
3    (Counsel conferring.)
4    THE COURT:  The Court's going to overrule that objection.
5    Go ahead.
6    MR. BURSON:  So Morris sees the defendant shoot Tommy,
7    according to Morris' testimony.
```

This error harmed James in two ways:

*First*, it allowed the Government to connect James to Thomas's death in a way

unsupported by the evidence; and

---

[203] ECF No. 775 at 1661 (Transcript–Day 9).

*Second*, by overruling James's objection, the Court effectively vouched for the Government, finding its read on the evidence to be the right one. The Court's ruling would hurt less if it instructed the jury to rely on its own memory, as it did the last time James objected to the Government misstating evidence:[204]

```
14          THE COURT:  Ladies and gentlemen, you are to disregard
15   the statement that counsel indicated, "She," Natasha, "also
16   recalls seeing Morris Jackson walk in that direction too, but
17   she does not recall if she [sic] was armed."
18          That misstates the testimony.  But, again, I'd ask you to
19   remember the testimony of the witnesses, and it is your memory
20   that controls.
21          All right.  Go ahead, Counsel.
```

But the Court didn't provide a similar cautionary instruction when overruling James's objection, which imbued the Government's double-down with extra credibility.

Given all this evidence (from the Government's own witnesses), the weight of the evidence goes against the verdict on the truck murders.

### 3. Under Rule 29, the Government failed to prove James aided in the truck murders with near certitude.

As stated above, the Government never mentioned the words "aiding" or "abetting" during closing until it started talking about the carjacking at Jon's house. Without guidance from the Government, James (and the Court) are left to guess what

---

[204] ECF No. 775 at 1659 (Transcript–Day 9).

1  facts show James aided the truck murders. At best, the Government has Morris's

2  testimony, which includes James purportedly telling Morris to shoot anyone that came

3  down the driveway.[205]  That statement *could* help the Government clear Rule 29's

4  hurdle on the truck murders…if it was uncontroverted.

5      But it wasn't. Natasha said otherwise, hearing Donovan declare they should

6  "take out the people in the black truck"; she also heard James's response: "No

7  fucker!" telling Donovan to calm down. This exchange speaks volumes, as it showed

8  the Clouds didn't share a "state of mind extending to the entire crime," which is what

9  the Supreme Court looks for. *Rosemond v. U.S.*, 572 U.S. 65, 75-76 (2014). Quite the

10  opposite: minutes before Dennis and Thomas are shot, James told Donovan to calm

11  down, which infuriated Donovan more. We're back to evidentiary equipoise (Morris

12  saying one thing, Natasha saying another), which doesn't clear Rule 29's deeper audit.

13      **4.    Under Rule 33, the Government failed to prove James aided in the
       truck murders with near certitude.**

14      Once again, things get worse for the Government under Rule 33's more-relaxed

15  standard, as the Court gets to weigh in on Morris and Natasha's testimony. Morris

16  claims James wanted to shoot the truck and worked with Donovan to do so; Natasha

17  said the Clouds fought over shooting the truck. Once again, two Government witnesses

18  saying two different things.

19

---

[205] ECF No. 700 at 790 (Transcript–Day 4).

1    We covered this conflict above, and the result remain unchanged: Natasha is

2    credible, Morris is not.

3    Beyond the evidentiary and credibility shortfalls above, another fact supports a

4    new trial under Rule 33 on the truck murders: an evidentiary error. Some context helps:

5    Since the Government formally charged James with aiding in the truck murders,

6    he needed to educate the jury about the various times on June 8 that he and Donovan

7    weren't on the same page. To that end, James called FBI Special Agent Jennifer

8    Terami to discuss an interview she had with Laura Tulee, a witness who passed away

9    between the June 8 shootings and trial. During that interview, Ms. Tulee advised Agent

10   Terami of the following: 1) she saw the Clouds on June 8, 2019, after the shootings at

11   Medicine Valley; 2) the Clouds wanted to borrow her car; and 3) when Ms. Tulee said

12   "no," Donovan became aggressive and wanted to take the car, as well as Ms. Tulee;

13   and 4) James stopped Donovan from doing so.

14   James attempted to elicit this evidence during Agent Terami's direct, but the

15   Government objected on hearsay grounds—an objection the Court sustained.[206] James

16   asked the Court to reconsider its ruling on four grounds: 1) James didn't offer these

17   statements for the truth, but rather to show what effect these statements had on James,

18   which is a "common" exception to the hearsay rule[207]; 2) James telling Donovan "no"

19

---

[206] ECF No. 739 at 1403-04 (Transcript–Day 7).
[207] ECF No. 724 at 2 (Bench Brief on Laura Tulee).

Rule 29 + Rule 33
– 60 –

isn't hearsay because it's an imperative statement[208]; 3) no double hearsay issues existed because the statements weren't offered for the truth[209]; and 4) even if this statements were hearsay, they were admissible under Rule 807's hearsay catch-all.[210] The Court declined to reconsider its ruling, which kept James's reaction to Donovan's aggression from the jury.[211] This error harmed James because it prevented him from showing the jury other examples throughout June 8 when he and Donovan weren't on the same page. It's not a pivotal moment, but it does play into the Rule 33 calculus.

Given all this evidence (from the Government's own witnesses), the weight of the evidence goes against the verdict that James aided in the truck murders.

## IV.    Conclusion

James Cloud is many things, but a killer isn't one of them.

Dated: May 6, 2022.

Federal Defenders of Eastern Washington & Idaho
Attorneys for James D. Cloud

<u>s/ John B. McEntire, IV</u>
John B. McEntire, IV, WSBA 39469
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
jay_mcentire@fd.org

---

[208] ECF No. 745 at 4 (Motion to Reconsider on Laura Tulee).
[209] ECF No. 745 at 5 (Motion to Reconsider on Laura Tulee).
[210] ECF No. 745 at 5 (Motion to Reconsider on Laura Tulee).
[211] ECF No. 764 at 1495 (Transcript–Day 8).

s/ Lorinda M. Youngcourt
Lorinda M. Youngcourt, WSBA No. 50998
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
Lorinda_Youngcourt@fd.org

s/ Jeremy B. Sporn
Jeremy B. Sporn, NYSBA No. 4779310
306 East Chestnut Avenue
Yakima, Washington 98901
t: (509) 624-7606
Jeremy_Sporn@fd.org

**Service Certificate**

I certify that on May 6, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Tom Hanlon and Rick Burson.

s/ John B. McEntire, IV
John B. McEntire, IV, WSBA No. 39469
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
jay_mcentire@fd.org

Rule 29 + Rule 33
– 62 –